UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELESTE J. MATTINA, Regional Director, Region 2, National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>　　　　　　　　　　　　　Petitioner,<br><br>　vs.<br><br>KINGSBRIDGE HEIGHTS REHABILITATION AND CARE CENTER,<br><br>　　　　　　　　　　　　　Respondent. | **DECLARATION OF JACOB PERLES**<br><br>**Civil Action No:**<br>**08-CV-6550 (DLC)**<br>**ECF CASE** |

　　　I, JACOB PERLES, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. §1746:

　　　1.　　　I am the Administrator for Respondent Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge"). I have been employed at Kingsbridge in this capacity since July, 2006. I am familiar with the facts and circumstances surrounding this action and submit this Declaration in Opposition to Petitioner's Petition for Temporary Injunction Under Section 10 (j) of the National Labor Relations Act.

　　　2.　　　The Petition cites my interaction with Union organizer Noreen Wray-Roach and suggests that we have unlawfully denied the Union access the facility. Ms. Wray-Roach's affidavit misrepresents what occurred in this regard. Kingsbridge's visitor policy, a copy of which is attached as Exhibit 1, provides that all visitors, excepting family, guardians, state/federal agencies and delivery personnel, need prior authorization to visit the facility. Ms. Wray-Roach did seek permission to use the conference room on August 7, 2007. I responded via letter dated August 7, 2007 that the date was inconvenient and that another day should be scheduled. I note that I had communicated with and allowed Ms. Wray-Roach access to the

facility prior to this date. Instead of rescheduling, Ms. Wray-Roach showed up on the 9th and proceeded to the conference room without prior authorization. This was in clear violation of policy. When I confronted her on this issue, she became verbally abusive. I did not tell her I "needed to monitor" her as she alleges. Thereafter, our attorney sent the Union a letter, a copy of which is attached as Exhibit 2, advising them that until the matter was resolved, we would not make Kingsbridge available for Union meetings. It is my understanding that this was now the second time that this particular organizer had created a disturbance as indicated in the letter attached as Exhibit 3, which I understand was sent by our attorney in 2005. As she admits in paragraph 6 her affidavit, Ms. Wray-Roach intentionally disregarded my subsequent correspondence that the conference room was unavailable, as well as Mr. Cohen's letter, and showed up unannounced and without authorization the following week. To the extent the police were called on this occasion, when she was again loud and disruptive, it was in accordance with facility policy. Ms. Wray-Roach further demonstrated her defiance by continuing to send letters, as she had in the past, with full knowledge that our response, based on Mr. Cohen's letter, would be to deny her requests for the reasons stated by Mr. Cohen, unless and until the Union addressed and resolved the underlying matter regarding her inappropriate conduct. It is obvious that Ms. Wray-Roach continued to send letter after letter for no other reason than to create a self-serving paper trail to use to file a charge. Moreover, the Union's professed need for the conference room space and their suggestion that since August 2007 they have been forced to have meetings outside, on the sidewalk is disingenuous. For the majority my employment here, the Union has rented a house across the street from the facility. It is my understanding that once the strike started in February of this year, they rented a second house. Thus, the Union has ample facilities to conduct its meetings.

3.  To the extent Nadine Boyce was disciplined as a result of this incident it was for failure to follow policy on August 9, 2007 by failing to immediately contact me or another member of the administration when Ms. Wray-Roach first arrived, especially because there was not authorization for her to be there. It was my practice to communicate with Ms. Boyce prior to any visits requiring authorization to advise whether or not the request had been granted and/or the person was scheduled to be at the facility.

4.  I have no recollection of receiving the "information requests" referenced in the Petition. It is my understanding that the Union regularly received the information requested in the August 3 letter as part of the monthly reports sent to them from the business office which accompanied the benefit fund checks. On no occasion did I willfully refuse to provide the Union with requested information.

5.  On one occasion prior to the strike notice, Noreen Wray-Roach, Isaac Nortey and about twelve others forced themselves into our lobby, stating that they refused to leave until Mrs. Seiger signed a contract. They left only after the police physically removed them.

6.  It is my understanding that the Petition seeks an Order prohibiting Kingsbridge from engaging in any video surveillance. Video surveillance is essential for the safety and security of our residents and staff. It is not being used, nor has it ever to my knowledge been used, to monitor any Union activity. I am not aware of anyone using a video camera to record from residents' rooms as alleged. Specific examples of strike misconduct, which justifies our need to videotape, as set forth in the accompanying affidavits of other staff. We reserve all rights to terminate any employee who engages in strike misconduct.

7.  Since the strike began, the Union has taken many actions which are designed to threaten and intimidate our employees but also jeopardize the care of our residents. For

example, the Union continues to try stop the cars of our staff from coming to work. They stand in front of the cabs and physically prevent them from coming down the street. They have kicked and thrown eggs at the drivers of the cars. We are required to maintain certain staffing levels pursuant to Department of Health guidelines. The Union was obviously trying to prevent us from meeting these guidelines.

8. Before the employees went out on strike, they vandalized the facility. Specifically on or about February 19, 2008, the freezer in the kitchen was vandalized and broken, superglue was put on the elevator buttons, and foreign material was stuffed in the toilets, causing them to overflow. Union members have slashed the tires on the vans that are used to take residents to their clinic appointments. These types of acts threaten the health and well being of our residents. Individuals who engaged in such conduct should not be ordered to return to work here. We have no reason to believe that if the individuals who performed the above acts were returned to work that they would be committed to serving the residents and their needs. If they were in fact committed to this, they would not be trying to compromise our residents' care from the outside by intimidating our vendors who supply food, medicine and other necessary items. They would not be shouting profanity and foul language, banging pots and pans and engaging in other behavior that disrupts our residents' days and nights.

9. We hired permanent replacement workers premised on the understanding that the strike was an economic strike, if not an unlawful strike. To have complete turnover in a 220 employee staff was confusing and stressful for the residents. Our current employees, who are committed to providing our residents with quality care, have been working here for over six months. They have developed relationships with our residents. It would not be proper for the Court to give the strikers the optional and unilateral right to attempt to return to their jobs. They

could come back for a day, displace all the current staff, and we would have no way to prevent them from doing it all over again. Moreover, in light of the behavior we have observed in the past few months, where strikers have villianized, vandalized and terrorized their supervisory staff, we no longer has faith in their ability to provide appropriate care and act as representatives of our licensed staff.

10. The Petition also seeks an injunction prohibiting Kingsbridge from entering into any contracts with individual employees. This allegation involves a situation that occurred prior to the strike wherein certain employees expressed concern about whether they wanted to go on strike at all. It was my understanding at the time that employees needed to resign from the Union in order not to be disciplined for failing to strike. We did not speak to any employees about working conditions until after they presented proof that they had resigned from the Union. After some employees resigned, they inquired as to what benefits they would receive if they continued to work for Kingsbridge. I explained what the benefits we were going to be, but the employees expressed a concern that this offer be reduced to writing. The referenced "yellow dog" contracts were intended only to confirm in writing the benefits that we intended to pay. We did not appreciate or understand at the time that a resignation from the Union did not equate to a resignation from the bargaining unit, and moreover, that the language in the document about joining a union was not permissible. Only a handful of people signed the agreements. As soon as we became aware of our mistake, we considered the statement to be to be null and void and on or about March 31, 2008 issued a memo to this effect. I now understand what a "yellow dog" contract is and why they are considered impermissible. We regret the error and will not make this mistake again.

11. Toma Beica was terminated for using foul and abusive language towards a co-worker, his supervisor and towards Ms. Sieger. To my knowledge, Mr. Beica was not a Union delegate, nor is there anything presented by Petitioner to suggest that his discipline unlawfully stemmed from participation in any protected activity.

**EXECUTED ON THE 5TH DAY OF AUGUST, 2008.**

_____
JACOB PERLES

# Kingsbridge Heights Rehabilitation Care Center

Title:   Visitors

Policy:   It is the policy of Kingsbridge Heights Rehabilitation Care Center to allow appropriate visitors into the facility. This includes but not limited to…..

1. Family members
2. Guardians
3. State/City agencies
4. Delivery Personnel

Procedure:   All other visitors will need prior authorization before allowed to enter the building.
Reception/Security will notify Administration immediately of any unauthorized visitors trying to enter the facility.
Administration will make the final decision.

If a visitor is disruptive or inappropriate while in the facility they will be asked to leave immediately.
If they refuse to do so 911 will be called.

EXHIBIT
1

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5566

August 14, 2007

Hanan B. Kolko, Esq.
Meyer, Suozzi, English & Klein, PC
1350 Broadway, Suite 501
New York, New York 10018

Re:   Kingsbridge Heights and 1199

Dear Hanan:

As you know, Kingsbridge and the Union have specific rules about how and when the Union can use Kingsbridge's facilities for employee meetings. Unfortunately, Union officials have been violating the rules.

On August 7, 2007, Noreen Wray asked that she be allowed to use Kingsbridge's conference room for a meeting on August 9, 2007. She was told that that day was inconvenient for Kingsbridge and that another date should be scheduled.

Despite being told that the 9th was not convenient for Kingsbridge, Ms. Wray showed up on the 9th and proceed to the conference room. Kingsbridge's Administrator Jacob Perles was notified and he called Ms. Wray in the conference room and reminded her that she had been explicitly told that permission had been denied for the use of the room that day. Ms. Wray proceeded to argue vehemently with Mr. Perles and was in fact abusive.

This conduct will not be tolerated by Kingsbridge. Please notify the Union that until this matter is resolved, Kingsbridge will not make its facilities available for Union meetings.

Very truly yours,

Joel E. Cohen

JEC/JDA

NYK 1116180-1.009900.0011

EXHIBIT 2

Boston Brussels Chicago Dusseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5500

May 13, 2005

## DRAFT

Irwin Bluestein, Esq.
Meyer, Suozzi, English & Klein
1350 Broadway, Suite 501
New York, New York 10018

Re:  Kingsbridge Heights

Dear Irwin:

On Thursday, May 12, 2005, 1199 organizer Noreen Wray created a commotion in the lobby of Kingsbridge Heights Rehabilitation Center. Ms. Wray had previously asked Soloman Rutenberg for permission to hold a Union meeting that day, a request Mr. Rutenberg granted- when Ms. Wray arrived at Kingbridge at 7:00A.M. on the 12th, the receptionist simply asked her if Mr. Rutenberg was aware of her visit. Instead of simply saying yes, Ms. Wray screamed at the top of her lungs at the receptionist, upsetting not only the receptionist but patients who were in the area.

Mr. Rutenberg has already notified Issac Nortey of this inappropriate behavior, but the Home asked that you as counsel remind Ms. Wray of the rules of civility that both the Union and the Home have agreed to abide by. We trust that 1199 will do its best to insure that this sort of behavior does not reoccur in the future.

Very truly yours,

Joel E. Cohen

NYK 965660 1.057806 0011

TOTAL P.02



EXHIBIT 3