Michael J.Sciotti, Esq. (MS 007)
John T. McCann, Esq. (*to be admitted pro hac vice*)
Lindsey H. Hazelton, Esq. (*to be admitted pro hac vice*)
HANCOCK & ESTABROOK, LLP
1500 AXA Tower I – 100 Madison Street 1
Syracuse, New York  13202

*Attorneys for Respondent Kingsbridge*
*Heights Rehabilitation and Care Center*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CELESTE J. MATTINA, Regional Director, Region 2,
National Labor Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

Petitioner,

vs.

KINGSBRIDGE HEIGHTS REHABILITATION
AND CARE CENTER,

Respondent.

**Civil Action No:**
**08-CV-6550 (DLC)**

**RESPONDENT'S RESPONSE TO PETITION FOR**
**TEMPORARY INJUNCTION UNDER SECTION 10(j)**
**OF THE NATIONAL LABOR RELATIONS ACT**

Respondent, Kingsbridge Heights Rehabilitation and Care Center ("Respondent"), by and through its attorneys, Hancock & Estabrook, LLP, responds to the National Labor Relations Board's Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act, as follows:

1.    **ADMITS** the allegations contained in paragraph "1" of the Petition.

2.    **ADMITS** the allegations contained in paragraph "2" of the Petition.

3.    **ADMITS** the allegations contained in paragraph "3" of the Petition only so much as they identify the charges, but **DENIES** the substantive allegations of the charges themselves.

Respondent further avers that on or about December 4, 2007 it filed a charge against the Union in Case No. 29-CB-13587 alleging that the Union violated Section 8(b)(3) of the Act by failing and refusing to bargain over fringe benefit fund contributions. A copy of the charge is attached as Exhibit A. This charge was deemed withdrawn, apparently prior to investigation, as indicated by the correspondence attached as Exhibit B. Respondent filed another charge against the Union on or about March 26, 2008 alleging that the Union violated Section 8(b)(1) and (3) of the act by unlawfully conditioning the settlement of a collective bargaining agreement on a permissive subject of bargaining and, further, engaging in an illegal strike. A copy of the charge is attached as Exhibit C. Respondent withdrew the charge without prejudice, and refiled on August 5, 2008 in accordance with the understanding reached with Petitioner, as set forth in Exhibit D.

    4.    (a)    **ADMITS** the allegations contained in paragraph "4(a)" of the Petition.

        (b)    **ADMITS** the allegations contained in paragraph "4(b)" of the Petition.

    5.    **DENIES** the allegations contained in the main portion of paragraph "5" of the Petition

        a)    **ADMITS** the allegations contained in paragraph "5(a)" of the Petition.

        b)    **ADMITS** the allegations contained in paragraph "5(b)" of the Petition.

        c)    **ADMITS** the allegations contained in paragraph "5(c)" of the Petition.

        d)    **ADMITS** the allegations contained in paragraph "5(d)" of the Petition.

        e)    **ADMITS** the allegations contained in paragraph "5(f)" of the Petition.

        f)    **ADMITS** the allegations contained in paragraph "5(f)" of the Petition that the individuals referenced held the positions indicated, except **DENIES** that Penn Guerrero held the position of Nursing Director, and, further answering, avers that Penn Guererro held the position of Director of Nursing, and **DENIES** that each individual acted as a supervisor and agent of Respondent for all purposes alleged in the Petition.

g)    **DENIES** the allegations contained in paragraph "5(g)" of the Petition.

h)    **ADMITS** the allegations contained in paragraph "5(h)" of the Petition.

i)    **ADMITS** the allegations contained in paragraph "5(i)" of the Petition, except that the allegations that Respondent was party to a collective bargaining agreement through April 30, 2005 is admitted only for purposes of this proceeding.

j)    **ADMITS** the allegations contained in paragraph "5(j)" of the Petition.

k)    **DENIES** the allegation contained in paragraph "5(k)" of the Petition and refers to Article 23 of the expired collective bargaining agreement referenced therein for its terms and effects.

l)    **ADMITS** the allegations contained in paragraph "5(l)" of the Petition.

m)    **ADMITS** the allegations contained in paragraph "5(m)" of the Petition.

n)    **DENIES** the allegations contained in paragraph "5(n)" of the Petition and refers to the settlement agreement referenced therein for its terms and effects.

o)    **DENIES** the allegations contained in paragraph "5(o)" of the Petition and avers that Respondent continued to make payments until some time in or about November 2007 when it was notified that the Union had discontinued health care benefits for its employees. See Declaration of Helen Seiger and Exhibit 11 thereto.

p)    **ADMITS** the allegations contained in paragraph "5(p)" of the Petition.

q)    **DENIES** the allegations contained in paragraph "5(q)" of the Petition and further avers that since at least August 27, 2007 Respondent has sought to bargain with the Union regarding contributions to the benefit funds but the Union has unlawfully refused to bargain over same. *See* Declaration of Helen Seiger and Exhibit 6 thereto.

r)    **DENIES** the allegations contained in paragraph "5(r)" of the Petition and avers, on information and belief, that in August 2007, the Union moved to reopen the hearing alleging that Respondent had violated the terms of the settlement agreement by failing to make

timely contributions to the Union's funds; that Administrative Law Judge Steven Fish issued an

Order to Show Cause on November 20, 2007 to which the Union, the General Counsel of the

National Labor Relations Board, and the Respondent responded; that, on December 12, 2007,

Administrative Law Judge Steven Fish granted the motions of the Union and the General

Counsel to reopen the hearing to take evidence as to whether or not Respondent had complied

with the terms of the settlement agreement, including whether or not the Union's alleged

refusal to bargain justified the Respondent's refusal to make payments to the funds specified in

the settlement agreement; and that hearings were held on the issues.  Subsequent to the filing of

the Petition, ALJ Fish issued a Recommend Order on or about July 30, 2008, a copy of which

is attached as Exhibit E.  This is not a final Board Order, with exceptions to same not due until

August 27, 2008.

      s)      **ADMITS** so much of the allegations contained in paragraph "5(s)" of the

Petition that contend that Fund and/or the Union terminated the employees benefits retroactive

to November 3, 2007, but specifically deny that such termination was due to Respondent's

conduct.  Rather, Respondent maintains that the benefits were terminated arbitrarily and in

furtherance of collateral bargaining objectives, as to its facility inasmuch as other facilities

were as delinquent, if not more delinquent in their contributions to the Funds than Respondent.

See Declaration of Helen Seiger and Exhibit 5 attached thereto.

      t)      **ADMITS** the allegations contained in paragraph "5(t)" of Petition.

      u)      **DENIES** the allegations contained in paragraph "5(u)" of the Petition,

except Admits the allegations contained in the first sentence of paragraph "5(u)" of the Petition,

and further responding, refers to the arbitration award referenced therein for its terms and

effects.

{H0972548.1}                  4

v)    **ADMITS** the allegations contained in paragraph "5(v)" of the Petition.

w)    **DENIES** the allegations contained in paragraph "5(w)" of the Petition.
Respondent further avers that to the extent Ms. Wray-Roach has not been allowed access to
Respondent's facility it is a situation of the Union's own making based on its failure to respect
the terms of the arbitration award and its failure to respond to or otherwise address the issues
raised in Respondent's August 14, 2007 correspondence to the Union.  See Declaration of
Jacob Perles and Exhibit 2 thereto.

x)    **DENIES** the allegations contained in paragraph "5(x)" of the Petition.

y)    **DENIES** the allegations contained in paragraph "5(y)" of the Petition.

z)    **DENIES KNOWLEDGE OR INFORMATION** sufficient to form a belief as to
the allegations contained in paragraph "5(z)" of the Petition.

aa)    **ADMITS** the allegations contained in paragraph "5(aa)" of the Petition.

bb)    **DENIES** the allegations contained in paragraph "5(bb)" of the Petition, to
the extent it alleges that responses to these specific letters were necessary for the Union's
performance of its duties.

cc)    **DENIES** the allegations contained in paragraph "5(cc)" of the Petition.

dd)    **DENIES** the allegations contained in paragraph "5(dd)" of the Petition.

ee)    **DENIES** the allegations contained in paragraph "5(ee)" of the Petition,
but avers that in October, 2007, after learning that it was impermissible to have been deducting
Union dues from employees' paychecks in the absence of an existing collective bargaining
agreement, took steps to remedy this error.  See Declaration of Helen Sieger.

ff)    **DENIES** the allegations contained in paragraph "5(ff)" of the Petition.

gg)    **DENIES** the allegations contained in paragraph "5(gg)" of the Petition.

hh)    **ADMITS** the allegations contained in paragraph "5(hh)" of the Petition.

ii)    **DENIES** the allegations contained in paragraph "5(ii)" of the Petition.

{H0972548.1}                                    5

jj)    **DENIES** the allegations contained in paragraph "5(jj)" of the Petition. Respondent further avers that to the extent any Union employees were videotaped, it was not unlawful surveillance prohibited by the Act but rather was justified and done with the intent, purpose and effect to insure the safety of the residents and Respondent's staff, and otherwise in furtherance of Respondent's legitimate business interests and property rights.

kk)    **ADMITS** the allegations contained in paragraph "5(kk)(i)", but **DENIES** the allegations contained in paragraph "5(kk)(ii) and (iii)" of the Petition.

ll)    **ADMITS** the allegations contained in paragraph "5(ll)" of the Petition.

mm)    **DENIES** the allegations contained in paragraph "5(mm)" of the Petition.

nn)    **ADMITS** the allegations contained in paragraph "5(nn)" that the Union requested that Respondent execute a written contract by letter dated March 6, 2008, **DENIES** the remaining substantive allegations set forth in this paragraph, and avers that the correspondence referenced in this paragraph and attached to the Petition speak for themselves.

oo)    **DENIES** the allegations contained in paragraph "5(oo)" of the Petition.

pp)    **DENIES** the allegations contained in paragraph "5(pp)" of the Petition, and avers that it has received letters from the Federal Mediation and Conciliation Service dated February 18, March 1, 6, and 26, and April 3, 2008, and refers to said letters for their content.

qq)    **DENIES** the allegations contained in paragraph "5(qq)" of the Petition, and avers that it has received letters from the New York State Employment Relations Board dated April 11, 15, and 18, 2008, and refers to said letters for their content.

rr)    **DENIES** the allegations contained in paragraph numbered "5(rr)" of the Petition.

ss)    **DENIES** the allegations contained in paragraph "5(ss)" of the Petition.

tt)    **DENIES** the allegations contained in paragraph "5(tt)" of the Petition.

uu)    **DENIES** the allegations contained in paragraph "5(uu)" of the Petition.

vv)     **DENIES** the allegations contained in paragraph "5(vv)" of the Petition.

ww)     **DENIES** the allegations contained in paragraph "5(ww)" of the Petition.

6.     **DENIES** the allegations contained in paragraph "6" of the Petition and respectfully refers all questions of law to the Court.

7.     **DENIES** the allegations contained in paragraph "7" of the Petition and respectfully refers all questions of law to the Court.

8.     With respect to the allegations in paragraph "8" of the Petition, **ADMITS** that this is the first formal application filed which seeks injunctive relief notwithstanding the fact that the alleged violations which purportedly form the basis for the requested relief date back five to twelve months, but avers that Petitioner has threatened on various prior occasions to seek such relief.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

9.     Respondent repeats and realleges the information contained in Paragraphs 1 through 8 above as if fully set forth here.

10.     The Petition, in whole or in part, fails to state a claim upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

11.     Respondent repeats and realleges the information contained in Paragraphs 1 through 10 above as if fully set forth here.

12.     The claims in the Consolidated Complaint, upon which the Petition is based, are time barred by the statute of limitations.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

13.    Respondent repeats and realleges the information contained in Paragraphs 1 through 16 above as if fully set forth here.

14.    The claims in the underlying Consolidated Complaint, upon which the Petition is based, in whole or in part, are barred by the doctrines of waiver and/or estoppel.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

15.    Respondent repeats and realleges the information contained in Paragraphs 1 through 14 above as if fully set forth here.

16.    There is no reasonable cause to support the claims in the Petition.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

17.    Respondent repeats and realleges the information contained in Paragraphs 1 through 16 above as if fully set forth here.

18.    Granting the relief sought by Petitioner would not be just and proper.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

19.    Respondent repeats and realleges the information contained in Paragraphs 1 through 18 above as if fully set forth here.

20.    The Petition is barred by laches.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

21.    Respondent repeats and realleges the information contained in Paragraphs 1 through 21 above as if fully set forth here.

22.    Striking employees in this unlawful, unprotected strike are not entitled to reinstatement or any other relief as a matter of law.

### AS AND FOR EIGHTH AFFIRMATIVE DEFENSE

23.    Respondent repeats and realleges the information contained in Paragraphs 1 through 22 above as if fully set forth here.

24.    The Petition, in whole or in part, is not ripe for adjudication and does not raise a justiciable controversy, as there is no pending request on the part of striking employees to return to work.

### AS AND FOR NINTH AFFIRMATIVE DEFENSE

25.    Respondent repeats and realleges the information contained in Paragraphs 1 through 24 above as if fully set forth here.

26.    The Court is barred from exercising its equitable power in support of an unlawful strike in support of a nonmandatory subject of bargaining, or in support of striking employees guilty of strike misconduct or displayed conduct detrimental to Respondent's legitimate business interests.

### AS AND FOR TENTH AFFIRMATIVE DEFENSE

27.    Respondent repeats and realleges the information contained in Paragraphs 1 through 26 above as if fully set forth here.

28.    It would not be just and proper for the Court to exercise its equitable powers in support of an unlawful strike, or in support of striking employees guilty of strike misconduct.

### AS AND FOR ELEVENTH AFFIRMATIVE DEFENSE

29.    Respondent repeats and realleges the information contained in Paragraphs 1 through 28 above as if fully set forth here.

30.    The employees on strike have no legal right to reinstatement to their positions of employment where they have engaged in an unlawful strike, strike misconduct or disloyal conduct.

{H0972548.1}                                          9

## AS AND FOR TWELFTH AFFIRMATIVE DEFENSE

31.     Respondent repeats and realleges the information contained in Paragraphs 1
through 30 above as if fully set forth here.

32.     The Petition is brought on behalf and seeks relief in support of an entity with
unclean hands, by virtue of the Union's failure to comply with an arbitration award, failure to
bargain in good faith, and instigation of an unlawful strike in support of a nonmandatory
subject of bargaining.

**DATED:**     August 6, 2008

                                          Yours, etc.,

                                          **HANCOCK & ESTABROOK, LLP**

                                          s/_____
                                          John T. McCann, Esq.
                                          Lindsey H. Hazelton, Esq.
                                          Michael J. Sciotti, Esq. (MS 007)
                                          *Attorneys for Respondent*
                                          Office and P.O. Address
                                          1500 AXA Tower I
                                          100 Madison Street 1
                                          Syracuse, New York     13202
                                          Telephone:     (315) 471-3151
                                          Telecopier:     (315) 471-3167

**TO:**     Jamie Rucker, Esq.
            **NATIONAL LABOR RELATIONS BOARD**
            *Attorneys for Petitioner*
            Office and P.O. Address
            26 Federal Plaza – Room 3614
            New York, New York     10278
            Telephone:     (212) 264-0300
            Telecopier:     (212) 264-2450

{H0972548.1}                                10

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5568

December 4, 2007

**BY HAND**
Alvin Blyer, Esq.
Regional Director
National Labor Relations Board
Region 29
One Metrotech Center - North
10th Floor
Brooklyn, New York 11201

Re: <u>1199 SEIU (Kingsbridge Heights Rehabilitation and Care Center) 29-CB-</u>

Dear Mr. Blyer,

We represent charging party Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge") in the above referenced matter. Enclosed please find an original and eight copies of the charge which alleges that 1199 SEIU has violated Section 8(b)(3) of the Act. The charge is being filed in Region 29 due to its relationship to Case No. 29-CA-27502.

Kingsbridge and 1199's last collective bargaining agreement expired in 2005. The parties have not negotiated for a new agreement since 2006. In August 28, 2007, after 1199 repeatedly harassed Kingsbridge over "late" payments to the 1199 benefit funds (with payments actually being made no later than scores of other 1199 represented healthcare institutions,) Kingsbridge proposed that it be given up to seven months to make payments to the funds on a go forward basis. Kingsbridge asked 1199 to bargain regarding this issue. A copy of a letter I sent on behalf of Kingsbridge to counsel for 1199 with fax receipt confirmation is enclosed. To date 1199 has not responded.

While simultaneously ignoring Kingsbridge's request to bargain, 1199 has now cut off healthcare benefits for Kingsbridge's employees due to "late payments" and has announced plans to strike Kingsbridge, ostensibly over this very issue. Such a strike would be devastating to Kingsbridge and its residents. We therefore ask the Region to seek 10(j) relief.

Very truly yours,

Joel E. Cohen

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue New York, New York 10173-1922 Telephone: 212.547.5400 Facsimile: 212.547.5444 www.mwe.com
NYK 1134622-1.057806.0011



EXHIBIT

A

FORM NLRB-508
(8-07)

FORM EXEMPT UNDER 44 U.S.C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST LABOR ORGANIZATIONS
OR ITS AGENTS**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| | / / |

INSTRUCTIONS: File an original together with four copies and a copy for each additional charged party named in item 1 with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT

| a. Name | b. Union Representative to contact |
|---|---|
| 1199 Service Employees International Union, United Health Care Workers East | Mike Rifkin |

| c. Telephone No. | d. Address (Street, city, state, and ZIP code) |
|---|---|
| 212 582 1890 Fax No. (   ) | 310 West 43rd Street, New York, New York 10036 |

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) **(3)** of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Since on or about August 28, 2007, the above named labor organization has refused to bargain with Kingsbridge Heights Rehabilitation and Care Center regarding fringe benefit fund contributions.

| 3. Name of Employer | 4. Telephone No. (718) 796-8100 |
|---|---|
| Kingsbridge Heights Rehabilitation and Care Center | Fax No. (718) 796-8182 |

| 5. Location of plant involved (street, city, state and ZIP code) | 6. Employer representative to contact |
|---|---|
| 3400-26 Cannon Place, Bronx, New York 10463 | Joel E. Cohen |

| 7. Type of establishment (factory, mine, wholesaler, etc.) | 8. Identify principal product or service | 9. Number of workers employed |
|---|---|---|
| Nursing Home | Healthcare | 300 |

10. Full name of party filing charge
Kingsbridge Heights Rehabilitation and Care Center

| 11. Address of party filing charge (street, city, state and ZIP code.) | 12. Telephone No. (718) 796-8100 |
|---|---|
| 3400-26 Cannon Place, Bronx, New York 10463 | Fax No. (718) 796-8182 |

### 13. DECLARATION

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

| By (signature of representative or person making charge) | Joel E. Cohen/Attorney (PrintType name and title or office, if any) |
|---|---|
| Address  McDermott Will & Emery LLP 340 Madison Avenue New York, New York 10173 | (Fax) (212) 547-5374   (212) 547-5566   12-1-07 (Telephone No.)              (date) |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

*************** -COMM. JOURNAL- ******************* DATE AUG-27-2007 ***** TIME 15:42 ********

| | MODE = MEMORY TRANSMISSION | | | START=AUG-27 15:41 | END=AUG-27 15:42 | |
|---|---|---|---|---|---|---|
| FILE NO.=543 | | | | | | |
| STN NO. | COMM. | ONE-TOUCH/ ABBR NO. | STATION NAME/TEL NO. | | PAGES | DURATION |
| 001 | OK | s | #069912122391311 | | 002/002 | 00:00:22 |

************************************ -                        - ***** -        212 5475030- **********

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

**FACSIMILE**

**Date:**  August 27, 2007                                   **Time Sent:**

| To: | Company: | Facsimile No: | Telephone No: |
|---|---|---|---|
| Hanan Kolko, Esq. | Meyer, Suozzi, English & Klein, P.C. | 212-239-1311 | 212-239-4999 |

| From: | Joel E. Cohen | Direct Phone: | 212.547.5566 |
|---|---|---|---|
| E-Mail: | jcohen@mwe.com | | |
| Sent By: | | Direct Phone: | |
| Client/Matter/Tkpr: | 057806-0011-2974 | Original to Follow by Mail: | No |
| | | Number of Pages, Including Cover: | 2 |

**Re:**  Kingsbridge Heights and 1199

**Message:**

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the original message to us at the below address by mail. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL AS SOON AS POSSIBLE.**

Main Facsimile: 212.547.5444          Facsimile Operator: 212.547.5400

U.S. practice conducted through McDermott Will & Emery LLP.
340 Madison Avenue          New York, New York 10017-4613          Telephone: 212.547.5400

NYK 1061569-1.057806.0011

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.
Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5586

August 27, 2007

**VIA FACSIMILE**
Hanan B. Kolko, Esq.
Meyer, Suozzi, English & Klein, P.C.
1350 Broadway, Suite 501
New York, NY 10018

   Re: Kingsbridge Heights and 1199

Dear Hanan:

   We represent Kingsbridge Heights Rehabilitation Care Center.  Kingsbridge wishes to negotiate a change in how it makes payments to the 1199 fringe benefit funds.  Kingsbridge proposes that it be given up to 7 months to make payments to the various funds without being considered in arrears.

   Please contact me with dates when the Union is available to negotiate.

       Very truly yours,

       Joel E. Cohen

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue  New York, New York 10173-1922  Telephone: 212.547.5400  Facsimile: 212.547.5444  www.mwe.com
NYK 1118343-1.057806.0011

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Reno San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5566

January 31, 2008

<u>BY FAX</u>
Alvin Blyer, Esq.
Regional Director
National Labor Relations Board
Region 29
One Metrotech Center - North
10th Floor
Brooklyn, New York 11201

Re: 1199 and Kingsbridge Heights

Dear Mr. Blyer,

As you know we represent Kingsbridge Heights Rehabilitation Care Center ("Center"). I am writing to request a meeting with you. On Monday morning January 28, 2008, moments before the hearing before ALJ Fish on whether the Center was in violation of the settlement in the prior 8(a)(5) case, Henry Powell told me that the Center's pending related 8(b)(3) charge against 1199 for refusing to bargain over when payments to the 1199 benefit funds would be considered in arrears, was being dismissed. Mr. Powell said this was due to a Regional determination that the Center had implicitly withdrawn its request to bargain (a) at a "negotiating session" between Helen Sieger, the Center's owner and 1199 Vice President Mike Rifkin; in late November 2007 held at a kosher deli in Riverdale (b) in a December 11, 2007 letter I wrote (in response to an 1199 flyer that there has been no contact between the parties since 2000 because Helen Sieger has "refused to bargain") to the effect that the "only" open issue between the parties was how arbitrations would be handled.

No one from the Region ever asked about the second "factor" and as to the first "factor", as I told the investigator only last week, in a phone conversation, the "negotiating session" was not a negotiating session but a meeting requested by Mike Rifkin so he could tell Helen Sieger that he was going to shut the Center down and put her out of business "as an example to the industry." No contract terms were discussed at this meeting. In fact, Mr. Rifkin began the meeting by saying "I am not here to negotiate".

On the morning of June 28th, I called you to discuss this matter but I have not heard back from you. I know how courteous and fair you are so I assume this was an oversight.

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue  New York, New York  10173-1922  Telephone: 212.547.5400  Facsimile: 212.547.5444  www.mwe.com
NYK 1144475-1.057806.0011



Alvin Blyer, Esq.
January 31, 2008

In advance of speaking directly with you, I ask that you consider the following:

1)    The only *substantive* issue between the parties since 2005 has been the arbitration issue. As I testified in the previous 8(a)(5) case without any contradiction, the Union – Jay Sackman in particular – told the Center that other 1199 institutions are in arrears on benefit fund contributions but that the Union does not cut off health benefits for them because of the existence of a contract. He told us that if we signed the contract the Union wanted, then the late payment of benefit fund contributions would not be a big issue for the Union. Mr. Sackman admitted that the Union was using the health benefit cut-off as a means of pressuring the Center into agreeing to the Union's terms.

2)    In August 2007 when the Union used the "late payment" issue to threaten a cut-off in health benefits again and to pursue a reopening of the 8(a)(5) case, we asked the Union in writing to bargain over when payments would be considered "late". The Union ignored this request. This is undisputed.

3)    Not only did the Center make this request to bargain in writing, it filed the 8(b)(3) charge over the Union's refusal to bargain and raised it explicitly in writing as a defense to the reopened 8(a)(5) charge, was actively pursuing this issue before the Region and made clear in writing that it would pursue it as a defense before a ALJ Fish. This conduct is completely inconsistent with a claim that the Union believed the Center was "implicitly withdrawning" its demand to bargain over the payment schedule in late November or December 2007. What is absolutely amazing to me is that at no time until I was notified of the "dismissal" on January 28th did 1199 or the Region ask if any alleged "non-raising" of the payment issue at a meeting in a deli, or my characterization of the arbitration issue being the "only" open issue between the parties in a December 11, 2007 letter (written in response to a flyer falsely saying Helen Sieger had totally refused to bargain since 2000) – in fact meant a withdrawal of the August 2007 request to bargain over a payment schedule.

4)    As I explained at the hearing on the 28th, the characterization of the arbitration dispute as the "only" issue was meant to convey that it was the only *substantive* issue, especially since Jay Sackman had always told us "late payments" are not pursued as vigorously if there is a contract. As stated above, to the degree anyone was confused by this letter, someone could have asked for clarification. I doubt seriously that anyone could have legitimately thought that the payment schedule issue was being withdrawn in light of the fact that we had not withdrawn the ULP charge or our defense to the reopened 8(a)(5).

5)    To the degree there was any "confusion", my testimony on January 28, 2007 and the attached letter from Helen Sieger to Mike Rifkin, now clears up the confusion. Is 1199 now willing to bargain over this issue?

6)    Finally, to the degree that 1199 claims that it didn't bargain over this issue because it thought that in late November and/or mid December the request to bargain had been implicitly withdrawn, why didn't it agree to bargain in August, September, October and virtually all of November of 2007? What was it's excuse then? At the very least, based on the "facts" the

Alvin Blyer, Esq.
January 31, 2008

Region was supposedly relying on to dismiss the 8(b)(3) charge, why wasn't a "merit dismissal" appropriate?

These are the issues I wish to discuss with you. Thank you in advance for your kind consideration.

Very truly yours,

Joel E. Cohen



January 30, 2008

Mike Rifkin
Executive Vice President
1199 SEIU
United Healthcare Workers East
310 West 43rd Street
New York, New York 10036

VIA FACSIMILE  212-399-9395

Dear Mr. Rifkin:

This responds to your January 25 and January 29, 2008 letters. Our proposal is to use the American Arbitration Association ("AAA") for arbitrations, not "one or more arbitrators" who also are on an AAA panel as permanent arbitrators. There is a big difference as you surely know. Your claim that all we ever wanted was to replace Mr. Scheinman is false. At an NLRB hearing on January 28, 2008 your attorney, Mr. Kolko, tried to spin your "offer" to an NLRB Judge as the Union accepting our proposal, but the NLRB Judge called him on it and made clear that the Union was not agreeing to Kingsbridge's proposal. If you want to accept our proposal say so, stop playing games. If you want to work out terms for payment of 1199 fringe benefit fund contributions as we asked you in writing in August 2007 (and which the Union ignored and instead promptly cut off health benefits) please let us know. Just in case you really were "confused" at no time did we intend to drop our proposal that we negotiate new payment terms.

Moreover, please stop telling our vendors and referral sources that we will not provide quality care during the strike. We will, and the Union and your personal continued attempts to destroy Kingsbridge and me personally will not only fail but will continue to be pursued in litigation. I note that you have told me and my attorney that you don't care if you cost all the Kingsbridge employees their jobs, as long as it helps "make me an example to the industry" of what 1199 and its individual officers will do to employers who don't do what they want.

Mike Rifkin
January 30, 2008
Page 2

     As to union dues the law is clear. After the expiration of a union contract, there is no obligation to continue the "union security clause" and employees do not have to pay union dues to keep their jobs. Both you and any employees are free to call the NLRB's information officer (212) 264-0300 or (718) 330-7723 and confirm that this is the law.

     Finally, please inform your "temporary organizer" Witold ("Victor") Nizio that if he continues to threaten our managers for doing their jobs, we will file 8(b)(1)(B) charges with the NLRB for interfering with managers and supervisors. Also inform him that we have the right to ask our employees if they plan on striking-as we have an obligation and a right to plan patient care coverage in the face of a strike threat. We have and will continue to tell employees that they have a right to strike without retaliation, and that in no case will they be fired for striking but that we as a nursing home have a right to know in advance of a strike of their intentions. Contrary to what Mr. Nizio claims, employees who tell us that they will not strike and then strike can be discharged in a health care setting for jeopardizing patients' well being. To the degree Mr. Nizio is telling employees to lie to us about their intentions he is intentionally jeopardizing those employees. Again I invite you and our employees to check with the NLRB to verify this.

Very truly yours,

Helen Sieger

FORM NLRB-508
(9-07)

FORM EXEMPT UNDER 44 U.S.C. 512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
CHARGE AGAINST LABOR ORGANIZATIONS
OR ITS AGENTS

| DO NOT WRITE IN THIS SPACE | |
| --- | --- |
| Case | Date Filed |
| 2-CB- 21511 | 13/26/08 |

INSTRUCTIONS: File an original together with four copies and a copy for each additional charged party named in Item 1 with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

| a. Name | b. Union Representative to contact |
| --- | --- |
| 1199 SEIU, Health Care Workers East | Mike Rifkin |

| c. Telephone No. ( ) Fax No. ( ) | d. Address *(Street, city, state, and ZIP code)* 310 West 43rd Street, New York, NY 10173-1922 |
| --- | --- |

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) *(list subsections)* (1) and (3) _____ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

See attachment

| 3. Name of Employer Kingsbridge Heights Rehabilitation and Care Center | | 4. Telephone No. ( ) - Fax No. ( ) - |
| --- | --- | --- |
| 5. Location of plant involved *(street, city, state and ZIP code)* 3400-3426 Cannon Place, Bronx, New York 10463 | | 6. Employer representative to contact David F. Jasinski, Esq. |
| 7. Type of establishment *(factory, mine, wholesaler, etc.)* long term health care facility | 8. Identify principal product or service | 9. Number of workers employed approximately 200 |

10. Full name of party filing charge
David F. Jasinski, Esq.

| 11. Address of party filing charge *(street, city, state and ZIP code)* Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102 | 12. Telephone No. ( ) Fax No. |
| --- | --- |

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

| By _____ *(signature of representative or person making charge)* Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102 Address | Attorney DAVID F. JASINSKI *(Print/type name and title or office, if any)* (Fax) 973 - 829 - 6061 973 - 829 - 9700        03/25/08 (Telephone No.)                (date) |
| --- | --- |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.


EXHIBIT
C

## ATTACHMENT

In or around January 2008, 1199 SEIU, Health Care Workers East (the "Union") unlawfully conditioned the settlement of a collective bargaining agreement with Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge") on a permissive subject of bargaining. Specifically, the Union insisted that Kingsbridge pay all of its alleged delinquent contributions into the Greater New York Funds (the "Funds"). (A copy of the proposed settlement agreement is annexed hereto.) By making such payments to the Funds a condition to settling the contract, the Union is unlawfully seeking to compel Kingsbridge to resolve a pending lawsuit filed by the Funds in federal district court in November 2007, and unlawfully enforce a 2006 NLRB settlement agreement. Such an act is per se bad faith bargaining by the Union.

On or about February 20, 2008, the Union engaged in an illegal strike based on Kingsbridge's refusal to settle the contract on a permissive subject of bargaining -- Kingsbridge's immediate and full payment of all alleged delinquencies into the Funds.

# 1199 – Kingsbridge Nursing Home Settlement Agreement

This dispute should be settled right away, for the benefit of workers, residents and management.

## Therefore

If Kingsbridge Heights Nursing Home agrees to number 1 and 2 below, the Union will agree to number 3 and 4 below.

## The Agreement

1. Kingsbridge Heights Nursing Home agrees to the contract terms of the 6/1/04 – 4/30/2011 contract between 1199 SEIU and Greater New York Healthcare Facilities Assoc. which covers most NYC 1199 Nursing Home members.

2. Kingsbridge Heights Nursing Home will pay, prior to February 20, 2008, all delinquencies owed to the Greater New York Funds and agrees to continue the Benefit Fund in the new contract.

3. 1199 agrees with Kingsbridge Heights Nursing Home's request to have the American Arbitration Association and therefore will accept arbitrators admitted to the National Academy of arbitrators from a panel provided by the American Arbitration Association under its labor arbitration rule.

4. 1199 agrees that if Kingsbridge Heights Nursing Home agrees to number 1 and 2 above, 1199 will withdraw the 1199 strike notice as soon as Ms. Sieger signs a full contract that includes 1 and 2 above.

_____
Mike Rifkin, Executive Vice President

Date_____

_____
Helen Sieger, Owner
Kingsbridge Heights Nursing Home



August 5, 2008

Ms. Celeste Mattinas
Regional Director
National Labor Relations Board
Region 2
26 Federal Plaza – Room 3614
New York, NY 10278-0104


VIA FACSIMILE: (212) 264-2450


   Re: 1199SEIU United Healthcare Workers East
    (Kingsbridge Heights Rehabilitation and Care Center)
    Case No. 2-CB-21511

Dear Ms. Mattinas,

  Enclosed for re-filing is the charge in the reference case.  This is being re-filed
pursuant to Ms. Slahetka's correspondence, a copy of which is also attached.



Sincerely,

Helen Siegel


cc:  Mr. Hanan Kolko
  Meyer, Suozzi, English and Klein, P.C.
  1350 Broadway – Suite 501
  New York, NY 10018-0026
  (Via regular and certified mail)





**Kingsbridge Heights Rehabilitation Care Center**



| **To:** | Ms. Celeste Mattinas (NLRB Regional Director) | **From:** | Helen Sieger |
|---|---|---|---|
| **Fax:** | (212) 264-2450 | **Pages:** | 8  (including cover sheet) |
| **Phone:** | | **Date:** | 8/5/2008 |
| **Re:** | | **CC:** | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

® **Comments:**

*The information contained in this FAX is HIGHLY CONFIDENTIAL. It is intended for the exclusive use of the addressee. If any PHI (Personal Health Information) has been faxed it must be used only to aid in providing healthcare services to the specific residents. Any other use is a violation of Federal Law (HIPAA) and will be reported a such.*

************** --IND. XMT JOURNAL-- ****************** DATE AUG-05-2008 ***** TIME 15:26 ********

DATE/TIME        = AUG-05-2008 15:24

JOURNAL No.      = 52

COMM.RESULT      = OK

PAGE(S)          = 008/008

DURATION         = 00:01'55

FILE No.         = 253

MODE             = MEMORY TRANSMISSION

DESTINATION      = 12122642450

RECEIVED ID      =

RESOLUTION       = STD

************************************* --          -- ***** --            -- **********



United States Government

NATIONAL LABOR RELATIONS BOARD

Region 2

26 Federal Plaza -- Room 3614

New York, New York 10278-0104

Tel. 212-264-0313
Fax: 232-264-2450

April 25, 2008

VIA FACSIMILE AND REGULAR MAIL

Helen Sieger
Kingsbridge Heights Rehabilitation and Care Center
3400-26 Cannon Place
Bronx, NY 10463

Re:    1199SEIU United Healthcare Workers East
       (Kingsbridge Heights Rehabilitation and Care Center)
       Case No. 2-CB-21511

Dear Ms. Sieger:

I am writing to confirm our telephone conversation yesterday. As we discussed, all evidence in support of the allegations in the charge, including your affidavit if you choose to provide one, still must be presented by Wednesday, May 7, 2008. However, if you are not able to present evidence in support of the allegations by May 7, 2008, you may withdraw the charge. You may then re-file the charge when you are able to present evidence. Please note that Section 10(b) of the National Labor Relations Act prohibits any action on an unfair labor practice charge that is filed and served more than six (6) months after the alleged unfair labor practice occurs.

If you would like to withdraw the charge, you may do so either by calling me or by sending me a short letter. If no evidence is submitted by May 7th, and you have not withdrawn the charge, I will recommend to the Regional Director that she dismiss the case for lack of cooperation.

Yesterday we did not discuss whether or not you are available for the appointment that I scheduled on April 30, 2008, at 2:00 p.m. If you are unable to make the appointment, please call me to reschedule.

Sincerely,

Nancy Slahetka
Board Attorney



May 6, 2008

Ms. Nancy Slabetka
Board Attorney
National Labor Relations Board
Region 2
26 Federal Plaza – Room 3614
New York, NY 10278-0104

VIA FACSIMILE: (212) 264-2450

Re: Case No. 2-CB-21511

Dear Ms. Slabetka,

Pursuant to your letter of April 25, 2008, I will withdraw the charge at this point and re-file at a later date.

I hope to have representation shortly. I am also hopeful that I have not prejudiced myself in any way as per your representation to me.

Sincerely,

Helen Sieger

HS/mv

3400 - 26 Cannon Place • Bronx, New York, 10463 • Tel. 718.796.8100 • Fax.718.796.8182

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* --IND. XMT JOURNAL-- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE MAY-06-2008 \*\*\*\*\* TIME 10:25 \*\*\*\*\*\*\*\*

```
DATE/TIME       = MAY-06-2008 10:18

JOURNAL No.     = 28

COMM.RESULT     = OK

PAGE(S)         = 001/001

DURATION        = 00:00'19

FILE No.        = 064

MODE            = MEMORY TRANSMISSION

DESTINATION     = 12122642450

RECEIVED ID     =

RESOLUTION      = STD
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* --        -- \*\*\*\*\* --        -- \*\*\*\*\*\*\*\*\*

FORM EXEMPT UNDER 44 U.S.C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
CHARGE AGAINST LABOR ORGANIZATIONS
OR ITS AGENTS

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 2-CB- 21511 | Date Filed 13/26/08 |

**INSTRUCTIONS:** File an original together with four copies and a copy for each additional charged party named in Item 1 with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT

a. Name

1199 SEIU, Health Care Workers East

b. Union Representative to contact

Mike Rifkin

c. Telephone No.
( ) -
Fax No.
( ) -

d. Address (Street, city, state, and ZIP code)

310 West 43rd Street, New York, NY 10173-1922

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) (1) and (3) of the National Labor Relations Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices.)

See attachment

RECEIVED
MAR 2 6 2008
SECOND REGION
NEW YORK, N.Y.
NLRB

3. Name of Employer

Kingsbridge Heights Rehabilitation and Care Center

4. Telephone No.
( ) -
Fax No.
( ) -

5. Location of plant involved (street, city, state and ZIP code)

3400-3426 Cannon Place, Bronx, New York 10463

6. Employer representative to contact

David F. Jasinksi, Esq.

7. Type of establishment (factory, mine, wholesaler, etc.)

long term health care facility

8. Identify principal product or service

9. Number of workers employed

approximately 200

10. Full name of party filing charge

David F. Jasinski, Esq.

11. Address of party filing charge (street, city, state and ZIP code.)

Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102

12. Telephone No.
( ) -
Fax No.
( ) -

## 13. DECLARATION

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

By (signature of representative or person making charge)

Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102
Address

Attorney  DAVID F. JASINSKI
(Print/type name and title or office, if any)

(Fax) 973-824-6061
973-824-9700 (Telephone No.)  03/25/08 (date)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

## ATTACHMENT

In or around January 2008, 1199 SEIU, Health Care Workers East (the "Union") unlawfully conditioned the settlement of a collective bargaining agreement with Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge") on a permissive subject of bargaining. Specifically, the Union insisted that Kingsbridge pay all of its alleged delinquent contributions into the Greater New York Funds (the "Funds"). (A copy of the proposed settlement agreement is annexed hereto.) By making such payments to the Funds a condition to settling the contract, the Union is unlawfully seeking to compel Kingsbridge to resolve a pending lawsuit filed by the Funds in federal district court in November 2007, and unlawfully enforce a 2006 NLRB settlement agreement. Such an act is per se bad faith bargaining by the Union.

On or about February 20, 2008, the Union engaged in an illegal strike based on Kingsbridge's refusal to settle the contract on a permissive subject of bargaining -- Kingsbridge's immediate and full payment of all alleged delinquencies into the Funds.

## 1199 – Kingsbridge Nursing Home Settlement Agreement

This dispute should be settled right away, for the benefit of workers, residents and management

*Therefore*

If Kingsbridge Heights Nursing Home agrees to number 1 and 2 below, the Union will agree to number 3 and 4 below

*The Agreement*

1. Kingsbridge Heights Nursing Home agrees to the contract terms of the 6/1/04 – 4/30/2011 contract between 1199 SEIU and Greater New York Healthcare Facilities Assoc. which covers most NYC 1199 Nursing Home members.

2. Kingsbridge Heights Nursing Home will pay, prior to February 20, 2008, all delinquencies owed to the Greater New York Funds and agrees to continue the Benefit Fund in the new contract

3. 1199 agrees with Kingsbridge Heights Nursing Home's request to have the American Arbitration Association and therefore will accept arbitrators admitted to the National Academy of arbitrators from a panel provided by the American Arbitration Association under its labor arbitration rule.

4. 1199 agrees that if Kingsbridge Heights Nursing Home agrees to number 1 and 2 above, 1199 will withdraw the 1199 strike notice as soon as Ms. Sieger signs a full contract that includes 1 and 2 above.



_____
Mike Rifkin, Executive Vice President

_____
Helen Sieger, Owner
Kingsbridge Heights Nursing Home

Date_____

JD(NY)–27–08
Bronx, NY

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**NEW YORK BRANCH OFFICE**

**KINGSBRIDGE HEIGHTS REHABILITATION**
**AND CARE CENTER**

      **and**

**1199 SERVICE EMPLOYEES**
**INTERNATIONAL UNION, UNITED**
**HEALTH CARE WORKERS EAST**

**Case Nos.   29-CA-27502**
**(Formerly   2-CA-37367)**

*Henry Powell, Esq.,* for the General Counsel
*Joel E. Cohen, Esq.* (McDermott, Will & Emery)
  New York, NY, and
*Paul M. Sod, Esq.,* Lawrence, NY for the
  Respondent
*Hanan Kolko, Esq.* Meyer, (Suozzi, English &
  Klein, P.C.), New York, NY for the Charging Party

DECISION

Statement of the Case

    Steven Fish,  Administrative Law Judge. Pursuant to charges filed on December 6, 2005[1] by 1199 Service Employees International Union United Health Care Workers East, herein called the Union or Local 1199 or Charging Party.  The Director for Region 29 issued a Complaint and Notice of Hearing on May 1, 2006, alleging that Kingsbridge Heights Rehabilitation Center, herein called Respondent, violated Sections 8(a)(1) and (5) of the Act by refusing to make timely or complete contributions to various Union Funds, without bargaining with the Union.  The trial opened before me on May 30, 2006, and was continued on June 8, 2006.  On that date, the parties entered into a settlement agreement, which disposed of all allegations in the complaint, except for a three month period, where Respondent contended no payments were owed.  Subsequently, Respondent and Charging Party reached a non-board settlement, with respect to payments allegedly due for this three month period.

    On June 26, 2006 I approved a request to dismiss the remaining portions of the complaint and to withdraw the charge, subject to reopening and reinstatement in the event that Respondent fails to comply with the terms of the Settlement.  I therefore closed the hearing subject to a motion to reopen in the event of non-compliance by Respondent with its agreement.

---

[1] The charge was originally filed in Region 2 under case No. 2-CA-37367.  On March 28, 2006 the General Counsel issued an Order transferring the charge to Region 29 as Case No. 29-CA-27502.

EXHIBIT
E

JD(NY)—27—08

Subsequently I received requests from Charging Party and General Counsel to reopen the trial, based on alleged non-compliance by Respondent of the Settlement Agreement. I issued an Order to Show Cause on November 20, 2007, why the request to reopen should not be granted. After receiving responses from the parties, including Respondent's objection to the
5   reopening, I granted the motion to reopen, by Order dated December 12, 2007. The reopened hearing was held on January 28, 2008 and May 1, 2008.

Briefs have been filed by all parties, and have been carefully considered. On the entire record, including my observation of the demeanor of the witnesses, and after considering the
10  briefs filed by the parties, I make the following

FINDINGS OF FACT

I. JURISDICTION AND LABOR ORGANIZATION

15
Respondent is a New York Corporation, with its principal office and place of business at 3400-26 Canon Place, Bronx, New York, herein called the Bronx facility, where it is and has been engaged in providing nursing and other services for the elderly and other individuals.

20  During the past year, Respondent derived revenues in excess of $100,000 and purchased and received at its Bronx facility, products, supplies and materials valued in excess of $5,000 directly from points located outside the State of New York.

Respondent admits, and I so find, that it is and has been an employer engaged in
25  commerce within the meaning of Section 2(6) and (7) of the Act, and a health care institution within the meaning of Section 2(14) of the Act.

It is also admitted and I so find that the Union is and has been a labor organization within the meaning of Section 2(5) of the Act.

30
II. PRIOR RELATED CASES

A. *Resort Nursing Home and Kingsbridge Heights Rehabilitation Center,* 340 NLRB 650 (2003), *enfd.* 389 F.3d 1262 (D.C. Cir. 2005).

35
This case involved two Employers, Resort Nursing Home, located in Far Rockaway, New York, and Respondent. Although *Resort* and Respondent were separate corporations, they had common ownership, and both had been members of the Greater New York Health Care Facilities Association, (the Association). The Association had negotiated collective
40  bargaining agreements on behalf of *Resort* and Respondent for many years.

In 2001, although both Respondents became dissatisfied with Association representation, they did not send a written withdrawal from the Association until January 31 and February 11, 2002. Bargaining had commenced between the Association and the Union on
45  January 9, 2002.

Respondents refused to sign the contract, eventually agreed upon by the Association, and an 8(a)(5) complaint was issued. Respondents defended their refusal to do so, on the grounds that the Association had not notified Respondents, that negotiations were to begin, and
50  that the negotiations began 10 months before the expiration date of the previous collective bargaining agreement.

2

JD(NY)—27—08

However the ALJ, affirmed by the Board, as well as by the Court of Appeals, rejected Respondent's defenses, and found that they had violated Section 8(a)(1) and (5) of the Act, and ordered the Respondents to sign the Association contract, and reimburse the Union's Benefit Funds, for payments due under the contract.

5

B. *Kingsbridge Heights Rehabilitation Care Center*, 352 NLRB #5 (January 31, 2008).

This case involved charges filed by the Union on May and September of 2006. A Complaint was subsequently issued and a trial held on February 21, 2007 before ALJ Mindy
10  Landow. Testimony was taken in that trial, and findings made thereon by the Judge, which are relevant to some of the issues in the instant case. These findings of the Judge, which also makes reference to the settlement agreement at issue here, is set forth below:

BACKGROUND TO THE INSTANT DISPUTE

15

The Union has represented Respondent's employees for a number of years. The most recent collective-bargaining agreement between the parties(the Agreement) expired on April 30, 2005, and has not been extended. As of the
20  date of the hearing, Respondent was abiding by the terms and conditions of this expired Agreement, with the sole exception of the arbitration provision.

It appears from the record that, commencing in about June 2005, Respondent failed to make timely or complete payments to various benefit funds provided for in the Agreement. On December 6, 2005, the Union filed an unfair
25  labor practice charge with the Board regarding this conduct. On January 1, 2006, the Union notified employees that due to Respondent's failure to make payments to the benefit funds, their hospital, health, prescription drug, dental, and related benefits would terminate.[2]

30  Sometime in early 2006, facility Operator Helen Sieger, together with Assistant Administrator Solomon Rutenberg, met with union representatives, including Executive Vice President Jay Sackman and Vice Presidents Neva Shillingford and Isaac Nortey,[3] to discuss these delinquencies. Sieger had asked for a delinquency report and testified that this report showed that
35  Respondent was more current in its payments to the Union's funds than other facilities. She asked why the Union was picketing Respondent but not other facilities more in arrears to the union funds.[4] According to Sieger, Sackman told her that it was because Respondent had not executed a contract with the Union, while the other facilities had done so. Sackman stated that there were
40  contractual remedies for such delinquencies; however, as Respondent was not bound by any such agreement, the Union's only recourse was to picket and strike the facility. According to Sieger's unrebutted testimony, Sackman also stated that without a signed contract, the Union would have no remedy but to continue to picket and strike the facility.

45  _____

[2] According to the letter, at the time Respondent was 4 months in arrears in making payments to the Union's benefit, pension, and education funds and 37 months behind in payments to the child care and job security funds. The total amounts owed to the funds were $854,542 with accrued interest of $59,337.
50  [3] Nortey Testified herein, Sackman and Shillingford did not.
[4] The Union's picketing activity is discussed below.

3

JD(NY)–27–08

After an investigation of the unfair labor practice charges filed by the Union, on May 1, a complaint was issued alleging that Respondent violated the Act by failing and refusing to make timely or complete payments to several contractual benefit funds.[5]  At the inception of the hearing, the parties reached a settlement of most of the issues raised by the complaint and entered into a settlement agreement which was approved by Administrative Law Judge Steven Fish on June 8.[6]  The remainder of the case was severed for hearing.  The Union and Respondent thereafter entered into a non-Board settlement of all outstanding matters, and Judge Fish entered a final Order on June 26.[7]

### THE UNION'S PLAN TO PICKET AND STRIKE THE RESPONDENT

Prior to the effectuation of the above-described settlement, in February 2006, employees took a strike vote.  Shortly thereafter, the Union's executive council approved a 2-day strike, which was scheduled to take place on May 16-19.  The employees further planned to engage in two instances of informational picketing at Respondent's facility, on March 15 and on May 15.

On February 27, Nortey sent Rutenberg a letter informing him of the Union's plan to engage in informational picketing on March 15, from 2 to 5 p.m.  The picketing took place as scheduled.  The Union secured a police permit for the event, which took place across the street from the nursing home.

The Complaint allegations litigated dealt with Respondent's reaction to the Union's informational picketing conducted on March 15, 2006, and it's threat to engage in a 3 day strike.  The ALJ found in her decision, issued on July 9, 2007, that Respondent violated Section 8(a)(1) of the Act, by a statement at a meeting of Respondent's employees on May 9, 2006, by an assistant administrator, that employees would not be able to return to work for 3 weeks if they engaged in a 3 day strike.  She also found that Respondent further violated Section 8(a)(1) of the Act by videotaping its employees picketing on March 15, 2006, without proper justification.  The Board affirmed Judge Landow's decision on January 31, 2008, in 352 NLRB #5.

### III.  THE SETTLEMENT AGREEMENT

The settlement agreement executed by the parties and approved by the undersigned, provided for payments to be made by Respondent to a number of Union Funds.  These Funds included the 1199 SEIU Greater New York Benefit Fund, Pension Fund, Education Fund, Child Care Fund, Job Security Fund and Worker Participation Fund.  I shall refer subsequently to them collectively as the Funds.

---

[5] As counsel for Respondent noted during the development of this evidence, I had previously been assigned to serve as a settlement judge in this matter.  The parties were asked if they had any objection to my continuing to hear the instant case.  No party voiced an objection.

[6] The settlement provided for, among other things, a schedule for Respondent to make payments to the union funds in order to become current as well as an undertaking that Respondent would make future payments on a timely basis and post a Notice to Employees.

[7] As a result of this settlement, the General Counsel requested that the complaint be dismissed.

JD(NY)–27–08

Paragraph 3 of the Agreement reads as follows:

> "In addition to the contributions described above, Respondent will make timely
> monthly contributions to the Benefit, Pension, Education, Job Security, Worker
> Participation and Child Care Funds, as they become due."

The Settlement Agreement does not define "timely monthly contributions".

There is no dispute that Respondent made the monetary contributions to the Funds,
agreed upon in the Settlement Agreement. However, there is a dispute, as to whether
Respondent made "timely contributions" to the Funds, subsequent to the execution of the
Agreement.

It is that issue that was litigated herein, as well as the pre settlement conduct of
Respondent, which gave rise to the instant complaint.

## IV. PRE SETTLEMENT CONDUCT

Respondent and the Union have been parties to a series of collective bargaining
agreements, the most recent of which expired on April 30, 2005. This Agreement provides for
recognition in a unit of all regular full and part-time employees, including recreation employees
listed in the classification listed in Schedule B as supplemented by customary usage and
practice.[8]

The Agreement requires Respondent to make monthly contributions to the Funds, which
are a percentage of gross payroll, and are due on the 10th day of each month following the
month the contribution was accrued.

The record reveals that payments are calculated based on the number of employees
that worked in that particular month, in accordance with a contribution report submitted by
Respondent. When no such report is submitted by Respondent, the Fund manager would
estimate the amount due, based upon the report submitted the previous month. If Respondent
or any Employer later provided the contribution and it turned out an over estimate was made,
that Employer or Respondent would receive a credit.

Starting in June of 2005, Respondent stopped making timely contributions to the Funds,
as required by the collective bargaining agreement.[9]  In that regard, the parties further stipulated
that Respondent's payment due to the Benefit Fund on June 10, 2005, covering the period from
May 1, 2005 to May 31, 2005, was not paid until August 30, 2005.

For the payment due on July 10, 2005, for the period covering June 1, 2005 to June 30,
2005, Respondent's payment was not made until October 14, 2005.  Respondent's next
payment was made on December 20, 2005, which was for the month of July 2005, and which
was due on August 10, 2005.  The payment for August of 2005, and due on September 10,
2005, was not made until January 19, 2006.

---

[8] Some of the classifications covered are certified nursing aides, dietary aides, and
housekeeping employees.

[9] Although the collective bargaining agreement had expired, the parties stipulated that
Respondent's obligation to make timely contributions to the Funds, continues notwithstanding
the fact that the contract has expired.

JD(NY)–27–08

On or about November 28, 2005, Respondent was notified by the Benefit Fund, that health coverage for its employees would be terminated effective January 31, 2006, unless all arrearages were satisfied.

5    Between November 28, 2005 and January 31, 2006, Joel Cohen Respondent's attorney had several phone conversations with Irwin Bluestein and Hanan Kolko, attorneys for the Union and the Funds, during which Cohen indicated that Respondent did not have the money to make a lump sum payment to satisfy its arrearages. Cohen asked to work out a payment schedule with the Union, so that medical coverage could continue. Bluestein and Kolko replied that the
10   Union was not interested in a payment schedule, and that Respondent must make up all the payments or benefits would be cut off.

On January 31, 2006 the Benefit Fund did cut off medical benefits for Respondent's employees. On February 22, 2006, a meeting was held at the Union's offices on West 43rd
15   Street, New York, NY. Present were Joel Cohen, Helen Sieger an administrator of Respondent, plus an administrator of Resort Nursing Home, which was as noted in the prior Board decision, related to Respondent, and which was also in arrears to the Funds. Present for the Union was Jay Sackman, who is vice president of the Union and head of its nursing home division, Bluestein, and several other Union officials. Cohen began by stating that Respondent[10] did not
20   want health benefits to be cut off, and pointed out that while Respondent was slow in making payments, this had been a pattern for many, many years and benefits had never been cut off before. Sackman replied that it is true that in the past the Benefit Fund had never cut off benefits when there had been delinquencies, but the Funds are trying to tighten up, because of the financial constraints on the Funds, and "they were making an effort to collect money in a
25   more timely fashion".

Cohen responded that "we[11] can't possibly be the only health institutions who have relationships with 1199 who were delinquent in payments to the Funds". Sackman answered that the "Union is pushing to get people not to be as delinquent as in the past".

30   Cohen asked if any other health care institutions had their benefits cut off. Sackman replied "No", and explained that the other institutions had a signed contract with the Union.[12] Cohen inquired "What does that have to do with it"? Sackman explained, "We have no enforcement mechanism to make sure that you will be bound by contract to make payments to
35   the benefit Funds. We can't take it to arbitration, because there is no agreement. We can't go, we can't bring it to Court, we need to have a signed contract". Cohen then offered to sign a interim agreement on health benefits, with an arbitration clause that would obligate Respondent to continue making benefits contributions. This would meet the Union's criteria, in that it provides the Union with an enforcement mechanism, so that employee benefits will not be cut
40   off.

Sackman responded that the Union is not willing to sign such an agreement. Cohen asked "Why not"? Sackman answered that "If the Union signs such an agreement, and health benefits continue, Respondent will not have an incentive to agree on an overall contract".
45   Cohen then stated that the Union was using the health benefits issue and the cut off of benefits as leverage in order to reach an agreement. Sackman answered that Cohen could characterize

---

[10] Cohen was also speaking on behalf of Resort Nursing Home at the time.
[11] Referring to Respondent and Resort.
50   [12] In fact Sackman gave Cohen a list of 20-25 other nursing homes that were in serious arrearages to the Funds.

6

JD(NY)–27–08

it however he wants, but the Union will not enter into an interim agreement and wants to "reach agreement on a full contract".

5    The parties then discussed the two open issues in the contract at the time. They were who the arbitrator would be in the contract, and the Respondent's position that it did not want to continue to contribute to the Child Care Fund. Various proposals went back and forth, but no agreement was reached. Cohen reiterated Respondent's prior offer to sign an interim agreement, so that health benefits are not cut off. Sackman reiterated the Union's position, that it was not willing to do that. The meeting concluded with no agreements reached on any issues.

10

Respondent made no payments to the Benefit Fund for the months of February, March and April of 2006.[13] Respondent had agreed to provide medical coverage for its employees during this period of time.

15    Respondent made a payment to the Benefit Fund on February 17, 2006, which covered the month of September 2005, which was due on October 10, 2005. On April 10, 2006, Respondent made its next payment covering the months of October and November of 2005, which were due on November 10 and December 10, 2005 respectively. On April 26, 2006, Respondent made a payment to the Benefit Fund, covering the month of December 2005, which

20    was due on January 10, 2006. On May 2, 2006, Respondent made a payment for the month of January 2006, which was due on February 10, 2006.

With respect to the Greater New York Pension Fund, Respondent made payments from August 30, 2005 through April 26, 2006, on the same dates that it made the payments to the

25    Benefit Fund, covering the same months. As of the date of the settlement, Respondent had not made the payment covering the month of January 2006, to the Pension Fund, which was due on February 10, 2006.

With respect to the Education Fund, Respondent's payments were the same time as its

30    payments to the Pension Fund. That is the payments ranged from 3-5 months late, and no payment was made, as of June of 2006, for the month of January 2006, which was due on February 10, 2006.

Respondent made no payments at all into the Child Care Fund, covering the months

35    from May 2005 through the date of the settlement, June 8, 2006.[14] Respondent also failed, as of the date of settlement agreement, to make any contributions to the Job Security Fund or the Workers Participation Fund, for the months of May 2005 through May of 2006, which were due in each case, on the 10th of the month after the month covered by such payments.

40    As noted above, on June 8, 2006, the second day of the trial, the parties entered into a settlement agreement, covering most of the allegations in the complaint. Respondent had made or agreed to make payments to the Funds to make up its delinquencies, except for payments to the Benefit Funds, for the months of February through April.[15]

45

---

[13] These payments were due on March 10, April 10 and May 10, 2006 respectively.
[14] Note that during bargaining, Respondent had taken the position that it no longer wished to be obligated to make contributions to the Child Care Fund.
50    [15] It made a payment June 2, 2006 to the Benefit Fund, covering the month of May of 2006, which was not due until June 10, 2006.

JD(NY)–27–08

As also related above, initially Respondent litigated its failure to make payments to the Benefit Funds, for the months of February through April, arguing that since the Union had improperly cut off medical benefits, and Respondent had agreed to provide health benefits to its employees during this period, Respondent had not violated the Act, by failing to make the payments for those months.

On June 2, 2006, the Benefit Funds reinstated health coverage for Respondent's employees, effective May 1, 2006.

As also noted above, on June 26, 2006 the parties entered into a non-board settlement, resolving the remaining issue of the three month period, where Respondent made no payments to the Benefit Fund.

## V. POST SETTLEMENT CONDUCT

The first payments due subsequent to the execution of the settlement agreement, was for the month of June of 2006, and which were due by July 10, 2006. Respondent made payments to all the Funds with checks dated October 9, 2006, which were received and credited by the Funds on October 27, 2006.

The next payments due for the month of July 2006, which were due by August 10, 2006 were paid by Respondent by checks dated October 31, 2006, received by the Funds on November 17, 2006, and credited to Respondent's account on November 28, 2006.[16]

For the month of August 2006, payments were due by September 10, 2006. With respect to this month's payment Respondent sent a check dated October 31, 2006 to the Benefit Fund for $1,684.48. This check was received by the Fund of November 17, 2006, and credited to Respondent's account on November 22, 2006. The amount due for that month, according to the Fund at the time was $111,3118.37.[17]

As for the Pension Fund, the Education Fund, the Child Care Fund and the Workers Participation Fund, Respondent sent checks covering August of 2006 and also due on September 10, 2006, dated November 13, 2006, received by the Funds on November 17, 2006 and credited to Respondent's accounts on November 22, 2006.

The next month for which payments were due was for the month of September, 2006, due by October 10, 2006. Respondent sent checks to all the Funds, dated November 20, 2006, which were received by the Funds on November 29, 2006, and credited to Respondent on that same date.

---

[16] Respondent also made its back payments to the Child Care Fund, Job Security Fund, and Workers Participation Fund with checks date November 27, 2006 credited by these Funds on November 28, 2006, for the period of May 2005 through May of 2006.

[17] However this amount was based on calculations under a raised rate of contributions, which the Fund believed to be owed. However General Counsel does not agree with the Union or the Fund that the extra amount is due, as a violation in this proceeding. Nonetheless, even under the old rate, this payment was far below the amount due. Respondent did make an additional payment to the Benefit Fund, with a check dated November 23, 2006 of $82,424.55, to cover the month of August 2006. This check was received by the Fund on December 27, 2006 and credited to Respondent by the Fund on December 28, 2006.

JD(NY)–27–08

Checks covering the month of October, 2006 were due by November 10, 2006. Respondent sent checks dated November 27, 2006, which were received by the Funds on December 27, 2006, and credited to Respondent's accounts on December 28, 2006.

5  Contributions for the month of November 2006, were due by December 10, 2006. Respondent sent a check to the Benefit Fund, dated December 18, 2006, received by the Fund on December 19, 2006, and credited to Respondent's account on December 20, 2006.

Respondent made no payments to the Pension Fund, Education Fund, the Child Care 10  Fund, the Job Security Fund or Workers Participation Fund for the month of November contributions, due on December 10, 2006.

Contributions for the month of December 2006, were due by January 10, 2007. Respondent made no payments for this month to any of the Funds.
15
Payments for the month of January 2007, were due by February 10, 2007. Respondent sent checks dated February 9, 2007 to the Funds. However these checks were not received by the Benefit, Pension and Education Funds until March 30, 2007, and these checks were credited to Respondent's account on that same date. The check covering the Child Care Fund 20  was received by the Funds on April 4, 2007 and credited to Respondent's accounts on that date.[18]

The checks to the Job Security Fund and for the Workers Participation Fund which were also dated February 9, 2007, were credited to Respondent's accounts on April 5, and on April 25  23, 2007 respectively. There are no date stamps on these checks. However these checks are numbered 63704 and 63705. Since check No. 63703 to the Child Care Fund was date stamped April 4, 2007, I find it likely that these two checks were received by these Funds, on dates between April 9, 2007 and April 23, 2007.

30  The next payments due were for the month of February 2007, and due by March 10, 2007. To cover these months, Respondent sent checks dated April 10, 2007, but which were not received by the Funds until May 3, 2007.[19] The Funds credited Respondent's accounts with these checks on May 4, 2007.

35  Contributions due on April 10, 2007, for the month of March 2007, were paid by checks dated April 10, 2007 and credited to Respondent's accounts on June 28, 2007. Since the date stamps on these checks are dated June 27, 2007, I again find that these checks were received by the Funds on that date. I also rely upon the numbers of Respondent's checks, in concluding that they were received in accordance with the Funds records. Thus the checks for the previous 40  month (February), received by the Funds on May 3, 2007, were also dated April 10, 2007. The check numbers on these checks were 63979 through 63484. Further, the checks for March, due April 10, 2007 although also dated April 10, 2007, had check numbers of 64340 through 64345. In view of the huge gap in numbers of the checks, I find it highly unlikely that these two batches of checks were all written on April 10, 2007, as Respondent appears to argue. Rather, 45  I conclude, as detailed above, that neither groups of checks were sent by Respondent to the Funds on April 10, 2007.

_____

[18] My findings with respect to the date of receipt of the checks is based on the date stamps appearing on the checks, which Anthony Cretella, an official of the Funds, credibly testified is 50  generally done on the date the checks are received or the next business day.
    [19] This finding again is based on the date stamps on these checks.

9

JD(NY)–27–08

April contributions were due on May 10, 2007. Respondent sent checks to the Funds dated May 10, 2007, to cover this month. However, based on the date stamps on these checks, as well as the credible testimony of Petrella, I find that the checks were not received by the Funds until July 27, 2007. They were credited to Respondent's accounts on July 30, 2007.[20]

5

Contributions for the month of May of 2007, were due on June 10, 2007. Respondent sent checks to the Funds dated June 10, 2007, but which were not received by the Funds until August 8, 2007.[21] These checks were credited to Respondent's account on August 9, 2007.

10          Respondent made no payments to any of the Funds for the next month, (June of 2007), due on July 10, 2007, and has not made any further payments to the Funds to date. Thus Respondent's last payments were made on August 8, 2007, covering the month of May 2007, and which was due on June 10, 2007.

15          Respondent argues without a shred of evidence, that the Union and the Funds engaged in a conspiracy to establish that Respondent breached the settlement, by purposely failing to date stamp the checks received from Respondent until much later than its receipt. I find this assertion preposterous, and without any evidentiary basis. I also note that Respondent produced no witnesses or any other evidence to establish that the dates on the checks were in
20     fact the dates that they were sent by Respondent to the Funds.

Furthermore, General Counsel subpoenaed financial records such as check ledgers from Respondent, which might have shown when these checks were actually sent to the Funds. I agree that it is appropriate to draw an adverse inference from Respondent's failure to produce
25     these documents, and find that these records would support my findings above, that Respondent's checks were not sent on the dates appearing thereon. *Essex Valley Visiting Nurses*, 352 NLRB #61, fn 3, ALJD, Slip at 14-15.

On August 23, 2007, Hanan Kolko, the Union's attorney sent an E-mail to the
30     undersigned, with copies to the attorneys for the other parties. In this E-mail, Kolko requested that the hearing be reopened, in view of Respondent's alleged failure to comply with the settlement agreement, that I had previously approved. The E-mail also indicated that as a result of Respondent's delinquency to the Benefit Fund, the Fund will, on August 29, 2007 send notices to Respondent, notifying it that because of the delinquencies, the employees will have
35     their benefits terminated on October 30, 2007, unless those delinquencies are resolved.

On August 27, 2007, Joel Cohen sent a letter and a FAX to Kolko. This document states that Respondent "wishes to negotiate a change in how it makes payments to the 1199 Fringe Benefits Funds. Kingsbridge proposes that it be given up to 7 months to make payments to the
40     various Funds without being considered in arrears". The letter goes on to request that Kolko contact Cohen with dates when the Union is available to negotiate.

Neither Kolko nor the Union responded to this letter, and no negotiations were conducted concerning this issue.

45

---

[20] I note that July 27, 2007 was a Friday. Thus consistent with Petrella's credited testimony, Respondent's account was credited with these checks on the next business day, after their receipt, Monday, July 30, 2007.
50     [21] Based again on the date stamps on these checks, as well as on Petrella's credited testimony.

10

JD(NY)–27–08

In early November of 2007, the Benefit Fund again cancelled health coverage for Respondent's employees, due to Respondent 's failure to remit contributions.

5     In late November of 2007, Cohen received a phone call from Union vice president Mike Rifkin. Rifkin informed Cohen that the Union intended to "Take Helen Sieger down, and close her up". Rifkin explained that the Union was working with the State Attorney General General's office to put in a Receiver and to put her out of business. Subsequently Rifkin had another conversation with Cohen, wherein he told Cohen that the Union would be calling a strike very soon and the Union was "going to shut down the nursing home".[22]

10

On November 26, 2007 I issued an Order to Show Cause why the Union's request to reopen the hearing, should not be granted. Respondent filed a response on November 27, 2007, objecting to reopening the hearing. The response asserts that "Respondent has remained relatively current in its payments to the Union funds, and it is not the role of the

15     Administrative Law Judge to act as the Union's collection agency". The response also refers to Cohen's August 27, 2007 letter to the Union that it wished to negotiate a change in the contract's requirements for making payments to the Union Funds. The response further asserts that it has been three months since the request was made, and there has been no response from the Union. The response goes on to argue that since the Union has refused to bargain

20     over a mandatory subject of bargaining, Respondent "has the right to unilaterally change the terms of the collective bargaining agreement as it relates to when Fund payments must be made. Consistent with its bargaining proposal to which the Union has not responded, Respondent has not been late in the making of any payments to the Union Funds". Therefore, Respondent argued that for the above reasons, the Union's Motion to reopen should be denied.

25     On December 6, 2007, General Counsel filed a response to the Order to Show Cause, joining in the Union's request to reopen the hearing.

On December 7, 2007, the Union responded to the Order to Show Cause, pointing out that no contributions at all have been received from Respondent since August 9, 2007, which

30     contributions covered the month of June of 2007 and which were due on July 10, 2007.

On December 12, 2007 I issued an Order granting the Motions of Charging Party and General Counsel to reopen the hearing. Sometime in December of 2007, Local 1199 sent out a flyer to its members, announcing a Family Day for December 22, 2007 at a picket line at

35     Respondent to tell Helen Sieger, the owner of Respondent that the Union needs a fair contract with decent wages and health benefits. The flyer also asserts that Sieger "has refused to negotiate with us" and that Sieger "has taken away our health benefits – leaving us without health care for our families and for ourselves just when the winter weather is arriving".

40     On December 11, 2007, Cohen wrote a letter to Irwin Bluestein. The letter reads as follows:

Dear Irwin:

Please see attached.

45

It is absolutely clear that the Union is picketing on a Saturday because it knows that Helen Sieger is an Orthodox Jew and will be restricted by her faith from protecting the Center on her Sabbath. It is repulsive for the Union to take

---

50     [22] The above findings are based upon the undenied and credited testimony of Cohen. Rifkin did not testify.

JD(NY)–27–08

advantage of Ms. Sieger's religious beliefs and we will be notifying Jewish
organizations and clergyman of all faiths about this behavior by 1199.

Secondly, two comments in the flyer are absolute brazen lies. First the
statement that there has been no contract since 2000 is a lie. There has been no
contract since April 2005. More importantly the statement that Helen Sieger has
refused to negotiate is a lie. Helen Sieger has agreed since 2005 to sign the
Greater New York Contract except that she wants American Arbitration
Association arbitrators to hear contract disputes, not the "impartial Chairman",
Martin Scheinman. That is the only issue that has kept the parties from signing a
contract. Send Ms. Sieger the Greater New York contract with the American
Arbitration Association as arbitrator and she will sign the contract today.

Moreover, Ms. Sieger has not taken away health benefits, the 1199
Benefit Fund has cut off benefits allegedly due to late payments. However,
Kingsbridge is no later in payment than most 1199 health care institutions who
have not had benefits cut off. 1199 has cut off the benefits for Kingsbridge, to
provoke its employees to strike, since it knows employees won't strike over who
the arbitrator should be.

Finally, we have evidence that 1199 is actively seeking to close
Kingsbridge "to teach Helen Sieger a lesson" even if it means that Kingsbridge
employees will lose their jobs.

Kingsbridge will not stand by and allow 1199 to close its doors to the
detriment of its employees "to teach Helen Sieger a lesson". Kingsbridge will
shortly commence legal action to protect itself and its employees from 1199's
shameful conduct.

Very truly yours,
Joel E. Cohen

On January 8, 2008 Helen Sieger sent a memo to Respondent's employees, apparently
memorializing what she had said in a meeting with its employees that day. That memo reads as
follows:

January 7, 2008

To All Employees of Kingsbridge Heights Rehabilitation Care Center:

This letter serves to confirm our conversation of today's meeting at 5:00
P.M. I agree to immediately sign the previously agreed upon contract with 1199,
adding the American Arbitrators Association as the arbitrator instead of Martin
Scheinman.

This, and only this is the reason that I have not signed the contract to
date. The union terminated your health benefits in an attempt to exert pressure
on the staff thereby forcing Kingsbridge Heights Rehabilitation Care Center to
forfeit our rights to utilize American Arbitrators Association.

Sincerely,
Helen Sieger

12

JD(NY)–27–08

Mike Rifkin responded to Sieger's January 8, 2008 letter to the Respondent's
employees, by a letter to Sieger dated January 23, 2008. It states:

January 23, 2008

5

Dear Ms. Sieger,

This is in response to your January 7, 2008 letter to the employees at
Kingsbridge Heights Rehabilitation Care Center, in which you state that you
10 "agree to immediately sign the previously agreed upon contract with 1199,
adding the American Arbitrators[sic] Association as the arbitrator instead of
Martin Scheinman".

I don't know what you mean by the "previously agreed upon contract".
15 However, I wish to make 1199's position clear, as follows:

1. 1199 is prepared to enter into an agreement with Kingsbridge Heights
for the period June 1, 2004 through April 30, 2011 on the same terms as are
contained in the June 1, 2004 through April 20, 2008 and May 1, 2007 through
20 April 30, 2011 MOA's between the Union and the Greater New York Health Care
Facilities Association, Inc.

2. 1199 is prepared to agree with you on one or more arbitrators, each of
whom is a panel member of the American Arbitration Association, to serve as
25 Impartial Chairman (Chairmen) under the agreement, in place of Mr. Scheinman.

3. Whether or not a collective bargaining agreement is entered into,
health and other benefits cannot be reinstated until Kingsbridge pays, or enters
into an arrangement satisfactory to the funds' Trustees to pay its indebtedness to
30 the Funds, which is currently in excess of $2,600,000.

4. Irrespective of whether a collective bargaining agreement is entered
into, the Union will pursue through all available means the collection of this
indebtedness to the Funds, and to recover for the employees any benefits lost by
35 virtue of the facility's delinquency.

5. As you know, 1199 has served Kingsbridge with a strike notice
effective February 20, 2008 at 6:00 am. In the event 1199 is compelled to strike,
it reserves the right to withdraw this offer.

40

I await your reply.

Very truly yours,
Mike Rifkin

45

Sieger responded to Rifkin's letter, by again sending a letter to Respondent's
employees. This letter reads as follows:

50

13

JD(NY)–27–08

January 25, 2008

To: 1199 Union Members

5

In response to the 1199 Union's letter date January 23, 2008 I would like to clarify some of the techniques Mr. Rifkin is using to further manipulate the employees of Kingsbridge Heights Rehabilitation and Care Center.

10

First, Mr. Rifkin offered to sign a contract ONLY back to June 1, 2004. This is the unions way of taking back the dues monies that is legally yours, Also the end of the year 3 banked days that I paid to you instead of the "benefit fund" as instructed by 1199 will also go back. Along with other negative implications to the facility.

15

Second, Mr. Rifkin says "1199 is prepared to agree with you on one or more arbitrators," I do not have a problem with Mr. Scheinman per se, I have a problem with 1199 denying my right to have a "RANDOMLY" chosen Arbitrator from American Arbitration Association.

20

Choosing an Arbitrator with 1199 who will rule on all cases involving the facility and 1199 is unjust and unfair. Ask yourself why is Mr. Rifkin and 1199 so adamant about having a set Arbitrator to the degree that they are playing with your jobs and your family's lives?

25

My position has not changed I will sign a contract if and while the Union agrees to the fair process of American Arbitration Association as the impartial chairman for all arbitration.

Obviously if Mr. Rifkin and 1199 decide to strike this becomes a moot point and I wish all of you the best of luck.

30

Sincerely,
Helen Sieger

35

As I have related above the reopened hearing took place on January 28, 2008 and May 1, 2008.[23]

The record also reflects, that as promised in the Union's letters, the employees of Respondent did commence a strike against Respondent on February 20, 2008, which was still continuing as the date of the end of the trial.

40

VI. ANALYSIS

A. POST SETTLEMENT CONDUCT

45

In order to find violations of the Act in this proceeding, it first must be determined if Respondent violated the terms of the settlement agreement that it entered into on June 8, 2006. If so, then I can assess whether the pre and post settlements conduct of Respondent are

50

_____

[23] In between these dates, Respondent's attorney ceased representing it, and a second attorney, initially retained to represent it, also withdrew from representation.

14

JD(NY)–27–08

violative of the Act, and order appropriate remedial relief for such actions. *Oster Specialty Products*, 315 NLRB 67, 70 (1994); *Kuna Meat Co.*, 304 NLRB 1005 (1991) *enfd.* 966 F.2d 428 (8th Cir 1992); *R. T. Jones Lumber Co.*, 303 NLRB 841, 843 (1991); *City Cab of Orlando;* 273 NLRB 1344, 1348 (1985).

5

    In that regard, it is well settled that terms and conditions of employment included in a collective bargaining agreement, such as contributions to union funds, survive contract expiration, and cannot be altered without bargaining to impasse, the Union's loss of majority or a waiver. *Concourse Nursing Home*, 328 NLRB 692, 702 (1999); *MBC Headwear, Inc.*, 315

10    NLRB 424 fn.3 (1994); *Kuna Meat, supra* at 1012; *Hen House Market No. 3*, 175 NLRB 596, 602 (1969). Further, the obligation to make payments due to the Union's Funds, includes the requirement that such payments be made on a timely and current basis. *Fallon-Williams, Inc.*, 336 NLRB 602, 604-605, 611 (2001) (Violation where Employer failed to stay "current" in payments to the Union's Funds); *R. F. Jones, supra* at 843 (Failure to timely remit dues

15    deducted from employees' salaries to the Union, violative of Section 8(a) (5) of the Act).

    The settlement agreement executed by Respondent requires that "in addition to the payments described above,[24] Respondent will make timely monthly contributions to the Benefit, Education, Job Security, Worker Participation and Child Care Funds, as they become due".

20

    The first issue to be decided is the definition of "timely" contributions, and what is meant by payments "as they become due". Respondent argues in this regard that since the settlement agreement does not define these terms, that General Counsel has not proven that the Agreement has been breached, and that Respondent has "remained relatively current", in its

25    payments to the Union's Funds. I do not agree.

    While in some circumstances, there can be legitimate issues as what constitutes "timely" payments, there is no such issue here. What constitutes "timely" payments is defined in the collective bargaining agreement, as the 10th of the month after the month for which the

30    contribution was accrued. Since as I have related above, the terms of the collective agreement survives the expiration of the contract, these provisions in the contract that define timely payments for each Fund are still in effect. I so find.

    Turning to the facts here, the record establishes that from the first month after the

35    settlement was executed, Respondent has failed to make timely payments to the Funds. Thus the first payment due, post settlement, for the month of June 2006, was due on July 10, 2006, and was not made until October, 27. For the next month's contributions, for the month of July, and due on August 10, 2006, Respondent's payments were not received until mid November of 2006, over three months late. Respondent continued to make untimely payments thereafter,

40    ranging from 9 days late, (Benefit Fund monthly payments for the month of November 2006, due on December 10, 2006), to 2½ months late. (Month of March 2007, due on April 10, 2007, not received until June 27, 2007). Further, Respondent made no contributions at all to the Pension, Education, Child Care, Job Security, or Workers Participation Funds, for the month of November 2006, due on December 10, 2006. It also failed to make any payments to any of the

45    Funds for the month of December 2006, due on January 10, 2007.

    Respondent resumed making payments, albeit on an untimely basis, covering the months of January 2007 through May of 2007. Respondent's last payment was made on

50    [24] It is undisputed that Respondent made the back payments to the Funds as specified in the settlement.

15

JD(NY)–27–08

August 9, 2007, for the month of May 2007, due on June 10, 2007, (nearly two months late) and has not made any payments thereafter. Thus starting with the payment due on July 10, 2007 covering the month of June 2007, Respondent has failed to make contributions to any of the Funds.

5

There can be little doubt based on the above facts, that Respondent has failed to make "timely" contributions to the Funds, "as they became due", as required in the settlement agreement. I so find. However, Respondent has raised several defense to its conduct, which it argues, justifies its failure to make timely payments to the Funds.

10

Its primary defense, is based upon Cohen's letter to Kolko, of August 27, 2007, in which Respondent requested that the Union bargain with it over a proposal that Respondent be "given up to 7 months to make payments to the various Funds without being considered in arrears". Neither Kolko nor the Union responded to this request to bargain. Respondent argues that the

15 Union's refusal to negotiate over Respondent's request to change the payment schedule for the Funds, entitled Respondent to implement a payment schedule different than required under the expired contract or the settlement agreement. *M & M Building and Electrical Contractors*, 262 NLRB 1472 (1982); *AAA Motor Lines Inc.*, 215 NLRB 793 (1974).

20 However, I conclude that Respondent's defense is without merit, for a number of reasons, and that *M & M Building, supra*, and *AAA Motor Lines*, are clearly distinguishable and inapposite. *M & M Building, supra*, and *AAA Motor Lines, supra*, are exceptions to the general rule, that unilateral changes in an expired contract are not permitted, until the parties reach agreement or bargain in good faith to impasse. *Tampa Sheet Metal Comp.*, 288 NLRB 322, 326

25 (1988). Thus, where the Employer has diligently sought bargaining, and the Union has avoided or delayed bargaining, the Employer may unilaterally implement the proposals without first bargaining to impasse. *Tampa Sheet Metal, supra; M & M Contractors, supra; AAA Motor Lines, supra.*

30 Since this line of cases is an exception to the Board's normal "impasse" finding, before permitting unilateral changes, the Employer must comply with the other requirements of post impasse implementation, in order to lawfully implement its proposal. That is the Employer's changes must be consistent with the Employer's previous proposal to the Union, *Tampa Sheet Metal, supra, Stone Boat Yard*, 264 NLRB 981, 982 (1983), enfd 715 F.2d 441 (9th Cir. 1983),

35 cert. denied 466 U.S. 937 (1984), and the Employer may not implement its proposals in the context of serious unremedied unfair labor practices *EIS Brake-Parts Div. of Standard Motor Products*, 331 NLRB 1466, 1492 (2000); *Noel Corp.*, 315 NLRB 905, 911 (1994).

In applying the above precedent to the instant facts, it is clear that Respondent's
40 defense fails and its reliance on *AAA Motor Lines, supra* and *M & M Contractors* is misplaced. Here Respondent requested that the Union bargain with it over its proposals in a letter of August 27, 2007. This request was made over a year *after* Respondent began to violate the terms of the settlement agreement, and consequently violated Section 8(a)(1) and (5) of the Act. Thus timely payments to the Funds were due by July 10, 2006, and were not made by Respondent

45 until October 27, 2006, some three and a half months late. As I have detailed above, Respondent continually failed to meet its obligations to make timely contributions to the Funds, since that time, and in some months, made no payments at all to any of the Funds.[25]

_____

50 [25] Contributions due by January 2, 2007, for the month of December 2006. While the Respondent made payments to the Benefit Fund for the month of November 2006, which were due by December 10, 2006, it made no payments to any of the other Funds for this month.

Therefore, Respondent cannot rely on the Union's failure to respond to its August 27, 2007 request to bargain, to justify its unilateral implementation, since the request was made in the context of its unfair practices, which had been committed by Respondent continuously for over a year. *Standard Motor Products, supra; Noel Corp., supra.* It is noteworthy that
5    Respondent proposed a seven month period to calculate late payments, but Respondent had been making untimely payments for over a year, including making no payments at all for payments due in December 2006, and January 2007, over seven months from the date that Respondent made its proposal.

10    Accordingly, I conclude that for this reason alone, Respondent's defense has no merit, and it cannot rely on *M & M Contractors, supra; AAA Motor Lines, supra.*[26]

Furthermore, in order to fall within the exception to the requirement of "impasse", before implementation, the Employer's changes must be consistent with the Employer's previous
15    proposal to the Union. *Tampa Sheet Metal, supra; Stone Boat Yard, supra.* Here I conclude that Respondent has failed to demonstrate that the proposal that it implemented, was consistent with the proposal outlined in its August 27, 2007 request to bargain. Indeed, the record is silent as to precisely when if ever Respondent implemented its proposal for a 7 month grace period before payments are considered in arrears. There is no evidence that Respondent ever
20    implemented such a proposal. It never notified the Union precisely when it intended to or whether it had in fact implemented its proposal.[27]

In fact the evidence discloses that Respondent never made <u>any</u> payments to any of the Funds, subsequent to its August 27, 2007 request to bargain.[28] Therefore, Respondent rather
25    than implementing its proposal of extending the period of measuring arrears from one month to seven months, decided to implement a policy of making no payments at all to the Funds, which was a proposal not consistent with or contemplated by Respondent's August 27 letter. Accordingly, I find that this is another reason to reject Respondent's defense and its reliance of *AAA Motor Lines* and *M & M Contractors.* See *Tampa Sheet Metal, supra* and *Stone Boat*
30    *Yard, supra,* distinguishing *AAA Motor Lines* and *M & M Contractors* on this basis.

Finally, I reject Respondent's defense in this regard for still another reason. In *AAA Motor Lines, supra,* the Board emphasized that the Employer therein had "diligently and earnestly sought bargaining sessions with the Union, to discuss it proposals". In *M & M*
35    *Contractors* the Board emphasized that the Employer must demonstrate its "diligent and earnest efforts to engage in bargaining". In both cases, the Employers had made numerous requests to the Union to bargain over their contemplated proposals, and had been ignored or rebuffed by the Unions involved.

40    I agree with General Counsel and Charging Party, that Respondent has fallen far short of establishing that it made "diligent and earnest" efforts to engage in bargaining over its August 27, 2007 proposal. In fact, Respondent did not follow up on its request, and made no further request of the Union to discuss its proposal. I also agree with General Counsel, that the

---

45    [26] I note in that both *M & M Contractors;* and *AAA Motor Lines,* there was no evidence that either Employer had engaged in any unfair labor practices, prior to their implementation of their proposals.
[27] cf. *AAA Motor Lines* and *M & M Contractors* where both Employer's provided specific notice to the Union, of when it intended to implement their proposals.
50    [28] The last payment made by Respondent to the Funds was made on August 8, 2007, which covered the month of May 2007, and which was due on June 10, 2007.

purpose of Respondent's request, rather than a good faith request to bargain, was solely to forestall the reopening of the hearing. The evidence discloses that the request was made two days after the Union had made its August 27, 2007 request to reopen the trial, based on Respondent's failure to comply with the settlement agreement. Further, in Respondent's
5    response to the Order to Show Cause, that I issued, it specifically referred to its August 27, 2007, request, as a defense to its conduct, and as a basis for its position that the hearing should not be reopened.

      No evidence was presented that Respondent's proposal was ever brought up during the
10    bargaining between the parties, which was being conducted contemporaneously with this letter. Moreover, in letters sent between the parties, and memos distributed by Respondent to its employees, in December 2007 and January of 2008, it is clear that as of that time, the only unresolved issue between the parties, concerning the signing of a new contract, was the identity of the arbitrator, in connection with the contract's arbitration clause. It is apparent that since the
15    expiring contract contained clauses defining timeliness for arrearages to the Funds, that Respondent had abandoned its proposal to extend that time to seven months.[29]

      I conclude therefore that Respondent did not diligently or earnestly pursue bargaining over its proposal with the Union, and that it had abandoned such proposal by December of
20    2007.

      Therefore, based on the above analysis and authorities, I reject Respondent's defense based on the Union's failure to respond to its August 27th 2007 request to bargain over its proposal.
25

      Respondent also raises additional defenses, which also relate to the Respondent's pre-settlement conduct. Essentially, Respondent argues that the Union has been acting in bad faith in its dealings with Respondent, by seeking to drive it out of business, and by treating it differently from how the Union treats other Employer's who contribute to its Funds. In this
30    regard, Respondent relies on the pre settlement discussions between Cohen and the Union's attorneys, wherein the attorneys refused to work out a payment schedule with Respondent for overdue payments, and insisted on full payment of all arrearages, or the health benefits for Respondent's employees would be cut off. Further Respondent relies on a meeting held on February 27, 2006 at the Union's offices to discuss Respondent's arrearages, and the Union's
35    decision to cut off health benefits for Respondent's employees. At that meeting, Cohen observed that Respondent did not want health benefits to be cut off for its employees, and pointed out that Respondent had been slow in making payments for years, and benefits had never been cut off before. Sackman conceded that in the past, the Fund had not cut off benefits before, even where there were delinquencies, but due to financial constraints on the Funds, the
40    Funds were trying to tighten up and were making an effort to collect money in a more timely fashion.

      Cohen complained that Respondent was not the only health care institution with delinquencies, and asked why it was being singled out by having benefits cut off. Sackman
45    responded that the Union did not have a signed contract with Respondent, and therefore had no enforcement mechanism to make sure that Respondent is bound by contract to make payments, since it had no arbitration clause in place. Cohen offered to sign an interim agreement on health benefits with an arbitration clause that would obligate Respondent to

---

50    [29] There is no indication in any of the letters or memos that the issue of when payments are to be deemed late, was still in issue.

18

JD(NY)–27–08

continue making benefits contributions. This would, in Cohen's view meet the Union's criteria, in that it provides the Union with an enforcement mechanism, so that employee benefits will not be cut off.

5          Sackman responded that the Union is not willing to sign such an agreement, because the Respondent will not have an incentive to agree on an overall contract. Cohen observed that the Union was using the health benefits issue as leverage, in order to reach agreement on a contract. Sackman answered that Cohen could characterize the Union's position however he wants, but the Union will not enter into an interim agreement, and wants to "reach agreement on
10        a full contract".

          Respondent also relies on phone conversations between Cohen and Rifkin in late November of 2007, after the Benefit Fund again cancelled health coverage for Respondent's employees due to Respondent's failure to remit contributions. Rifkin told Cohen that the Union
15        intended to "take Helen Sieger down and close her up". Rifkin explained that the Union was working with the State Attorney General's office to put in a Receiver and to put her out of business. In a subsequent phone conversation, Rifkin told Cohen that the Union would be calling a strike very soon and the Union was "going to shut down the nursing home".

20        Based upon these statements, Respondent argues that the Union has acted in bad faith, by treating Respondent disparately and unfairly, and that the Union's intended "to create a larger rift which it could and did utilize to have the charging party cut off benefits and provoke a strike which it hoped would make an example of Kingsbridge by destroying the employer altogether". Therefore this conduct by the Union, justified Respondent in failing to make timely
25        payments to the Funds.

          I conclude that neither the comments made by the Union's representatives, nor the Union's conduct of cutting off benefits for Respondent's employees or refusing to agree to an interim agreement on health benefits, provides any defense to Respondent's conduct in making
30        untimely payments to the Funds. With respect to the alleged disparate treatment of Respondent, by the Union's cutting off benefits for its employees, while allowing other Employer's to build up delinquencies, I find the Union's position to be neither unlawful nor unreasonable. A Union is not obligated to treat every Employer in the same manner, with respect to negotiations, positions taken, or when and if to cut off benefits. Here Respondent
35        was and is dealing with an Employer that has committed two prior unfair labor practices, including the failure to sign a contract that had been agreed to by the Association, from which Respondent had not timely withdrawn. Further the Union had been forced to go to arbitration to enforce Respondent's obligation to make payments under the 2002-2005 Agreement.[30]

40        This in view of Respondent's past conduct, I find that it was reasonable and clearly lawful, for the Union to insist that Respondent make all prior payments in order to forestall cutting off benefits, and for the Union to insist on Respondent signing a contract, rather than an interim agreement, as suggested by Cohen. I find nothing improper or illegal in the Union using the "leverage" of cutting off benefits, to persuade Respondent to sign a full contract. This
45        position is certainly within the realm of the Union's right to make reasonable judgments as to what it believes is in the best interest of its membership. In *Fallon Williams Inc.*, 336 NLRB 603 (2001), Employers fell behind in payments to Union Funds. The Union in an attempt to enforce

---

[30] The record is unclear as to precisely when these payments (which totaled $500,000) were
50        actually made by Respondent. But it is stipulated that the Respondent did make the payment of $500,000 to the Funds.

19

JD(NY)—27—08

the Employers' to make such payments, exercised its contractual right to remove employees from the companies, while they remained delinquent in payments. The Employers argued that since the Union had removed employees, it made it impossible for the Employers to comply with the contract, and to make further payments to the Funds, The Employers further asserted that
5    when they began to operate on a non-union basis, not applying the contract, it was out of necessity, not out of any desire to avoid dealing with the Union. The Employers therefore argued that they should not be held liable for failing to honor the terms of the contract.

The Board rejected these contentions of the Employers therein, which are similar to the
10   arguments raised by Respondent here. The Board observed in language equally applicable to Respondent. "Although here the Respondents argue that their inability to pay was caused by the Union's actions, the fact is that *GBS'* financial woes were not caused by the Union but by *Fallon Williams'* failure to make the contractually required payments to the Funds", *Id. at 603.*

15   The Board further commented that while the Union may have contributed to the difficulties of Respondents by asserting its rights to withhold employees, that action does not provide a defense to Respondent's conduct. The Board further observed that the Respondents failed to comply with the plain terms of the contract and having provoked a response by the Union, that was perhaps harsh, cannot argue that this "harsh" reaction by the Union, permits
20   Respondents to walk away from the contract.

These observations of the Board in *Fallon Williams, supra,* are applicable to Respondent's conduct here. Respondent, similar to the Employers conduct in *Fallon Williams,* failed to comply with its obligations to make timely payments to the Union's Funds. Thus the
25   Union in an attempt to force Respondent to comply with its contractual obligations, took action that may be considered "harsh", similar to the conduct of the Union in *Fallon Williams,* that is the Union decided to cut off health benefits for Respondent's employees, until its delinquencies to the Benefit Funds are made up. Although it could also be argued that the Union's reaction was "harsh", in that it may have treated Respondent differently than other Employers, this does not
30   provide a defense to Respondent, since it was Respondent's prior failure to make payments, that provoked the Union's "harsh" response. *Fallon Williams, supra.* Moreover, as I have observed above, the Union made a reasonable and lawful decision to treat Respondent differently than other Employers, in view of Respondent's extensive history of violating the law and its contractual obligations, as well as the fact that Respondent had not signed a new
35   contract with the Union.

Respondent's reliance on Rifkin's comments to Cohen in late November of 2007, is also misplaced. While I do not condone some of Rifkin's remarks, I do not believe that they provide any defense to Respondent's conduct. Notably, these statements were made in late November
40   of 2007, well over a year after Respondent began its post settlement conduct of failing to make timely contributions to the Funds, and over three months after Respondent made its last payment to any of the Funds. Thus at that time it appears that Respondent had decided not to make any further payments to the Funds, which it has not done to date. Moreover, a close examination of Rifkin's statements, based on their timing and context, reveals at least some
45   basis for his position. Respondent, as I have detailed above, clearly has been, as of November of 2007, an Employer who had flagrantly violated its legal obligations. Respondent had violated Section 8(a)(1) and (5) of the Act by failing to sign a contract, (See Re*sort, supra*) to which it was bound, by virtue of its Association membership. The Union was also forced to go to arbitration to enforce Respondent's obligations to make payments to the Funds, under that
50

JD(NY)–27–08

contract.[31]

Further, the Union in an attempt to protest Respondent's failure to make Fund
contributions, engaged in informational picketing on March 15, 2006 at Respondent's premises.
5   Respondent engaged in videotaping of this picketing, which was found to be violative of Section
8(a)(1) of the Act. (See Kingsbridge, supra)[32]. Additionally, the Union gave notice of a three
day strike, scheduled to begin on May 15, 2006, in order to protest Respondent's unfair labor
practices; which "among other things, have resulted in the loss of the aforesaid employees'
health care benefits". This notice resulted in statements made by Respondent to its employees,
10   that the Board found to be violative of Section 8(a)(1) of the Act, by threatening to delay their
reinstatement, in the event of a strike: Kingsbridge, Slip op. at fn. 1, ALJD Slip at 12.[33]

Additionally, Respondent entered into a settlement agreement on June 8, 2006, covering
the prior payments due to the Funds. While Respondent did make the payments to the Funds
15   agreed upon in the settlement, it continued its prior unlawful practice of making untimely
contributions thereafter, despite specifically agreeing to make such timely contributions in the
future. Indeed, as I have found above, Respondent immediately violated its undertakings in the
agreement, has not made a single timely payment, since the settlement was executed, and as
of late November of 2007, (when Rifkin made his comments), had not make any payments at
20   all, for over three months.

Therefore, Rifkin as of November of 2007, clearly had substantial justification for
questioning the good faith of Respondent in general, and of Sieger, in particular, who he
appeared to blame, at least in part for Respondent's past conduct. Thus, in view of Rifkin's
25   obvious justifiable frustration with Respondent and Sieger, it is somewhat understandable, that
he would consider attempting to take "Sieger down", and work with the Attorney General to put
in a Receiver and put her out of business. I note that this threat, does not constitute a threat to
shut down the business entirely, but merely to replace Sieger and or Respondent with a
Receiver to operate the nursing home. I make no finding as to whether this action by the Union
30   is possible, warranted, or even lawful. But I do find, that Rifkin had at least some justification for
making this comment. Most importantly, I conclude that the statement of Rifkin, even if
considered improper or inappropriate, cannot provide a defense to Respondent's conduct,
Respondent had violated its obligations to make timely contributions to the Funds for several
years, including for a year and a half after executing the settlement agreement. Rifkin's
35   statement cannot possibly be a defense to this prior conduct, nor can it justify Respondent's
continued decision to make no payments at all to any of the Funds thereafter.[34]

In that regard, there is no evidence in the record that Respondent's decision to cease
making payments to the Funds, or indeed to make late payments, was motivated in any way by
40

---

[31] Interestingly, Respondent also argues, that since it made the payments based on this
award, the Union should have taken this into consideration in its decision to cut off benefits. I
cannot agree. These payments were made based on Respondent's past delinquencies and
cannot excuse the failure to make timely payments in 2006 and 2007. It is well settled that the
45   Board rejects defenses, based on an Employer's inability to pay. Fallon Williams, supra; Nick
Rabilotto, Inc., 292 NLRB 1279 (1989).
[32] The ALJ's decision issued in July of 2007.
[33] The contemplated strike was cancelled, because Respondent, sometime prior to May 15,
2006 had agreed to make payments to the Funds.
50   [34] I emphasize again, that Respondent had not made any payments to the Funds since
August 9, 2007.

JD(NY)–27–08

Rifkin's comments.[35] I therefore conclude that Rifkin's comments described above do not justify Respondent's failure to comply with its obligations to make timely payments to the Funds.

5      Similarly, Rifkin's statements to Cohen, in a subsequent conversation, that the Union would be calling a strike very soon, and the Union was "going to shut down the nursing home", do not provide a valid defense to Respondent's conduct.

       As I have detailed above, the Union had ample justification for being frustrated by Respondent's repeated failures to meet its obligations to make timely Fund payments, as well 10     as its violations of the Act. There is certainly nothing unlawful, nor unreasonable, in the Union threatening a strike, to force Respondent to comply with its obligations, including its failure to live up to its undertakings under the settlement agreement that it executed in June of 2006. While Rifkin's further threat to "shut down the nursing home", could be considered impolitic, I find it to be little more than hyperbole, since any time the Union calls a strike, it hopes to affect 15     the Employer's business, in hopes of forcing the Employer to succumb to the Union's objectives. Therefore, a strike always has the objective of "shutting down" the Employer, until it complies with the Union's demands; here the Respondent complying with its obligations under the expired contract and the settlement agreement to make timely payments to the Funds. Finally, as was the case with Rifkin's prior comments, the record discloses no evidence that 20     Respondent's decision to cease to make any payments to the Funds, was in any way motivated by or connected to Rifkin's "threats" made to Cohen about shutting down the home.

       Accordingly, having rejected all of Respondent's defenses, and having previously found that Respondent has failed to make timely payments to the Funds since June of 2006, including 25     failing to make any payments since August of 2007, I conclude that by such conduct Respondent has violated the terms of the settlement agreement that it executed on June 8, 2006, and that it has violated Section 8(a)(1) and (5) of the Act.

## B. PRE-SETTLEMEMNT CONDUCT

30

       Having found that Respondent violated the terms of the settlement agreement, it then becomes appropriate to consider its pre-settlement conduct, as reflected in the complaint. In that connection, there can be little dispute, and indeed Respondent in effect so concedes, in executing a stipulation of facts, that it consistently failed to make timely payments to the Funds, 35     starting in June of 2005. I so find.

       Respondent offers no defense to this conduct, other than the contentions, previously rejected in my discussion of Respondent's post settlement conduct, that the Union treated Respondent unfairly and disparately, by cutting off health benefits for employees on January 31, 40     2006. I rejected that defense as a justification for Respondent's post settlement failure to make timely contributions to the Funds, and for the same reasons, I reject these arguments as a defense to its pre-settlement failures to make timely payments to the Funds.

       Accordingly, I conclude that Respondent by failing to make timely contributions to the 45     Funds, from June of 2005 through May of 2006, has violated Section 8(a)(1) and (5) of the Act.

50     _____

       [35] Sieger did not testify in this proceeding.

22

JD(NY)–27–08

CONCLUSIONS OF LAW

     1.  The Respondent is an employer engaged in commerce within the meaning of Section 2(6) and (7) of the Act.

5

     2.  The Union is a labor organization within the meaning of Section 2(5) of the Act.

     3.  The Respondent has violated the terms of the settlement agreement that it executed on June 8, 2006.

10

     4.  Respondent, by failing to make timely contributions to the Union's Funds, since June of 2005, including failing to make any contributions to the Funds for various months, including no payments to any of the Funds, since August of 2007, has violated Section 8(a)(1) and (5) of the Act.

15

     5.  The aforesaid unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

THE REMEDY

20

     Having found that Respondent has engaged in certain unfair labor practices, I shall recommend that it cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

25     In addition to recommending that Respondent make timely contributions to the Union Funds, I shall also recommend that it be ordered to remit all payments that it owes to the Funds, with interest as provided in *Merryweather Optical Co.,* 240 NLRB 12113 (1979), and to make employees whole for any expenses they may have incurred as a result of Respondent's failure to make such payments, as set forth in *Kraft Plumbing and Heating,* 252 NLRB 891 (1980),
30     *enfd. Mem,* 661 F2d. 940 (9th Cir.1981). All make whole payments to employees shall be made with interest as provided in *New Horizons for the Retarded,* 283 NLRB 1173 (1987).

     In this connection, I note that for some of the months, for which Respondent made no payments into the Funds, at least some of Respondent's employees were on strike.[36] It is well
35     established that strikers, whether economic or unfair labor practice strikers, are not entitled to compensation for the period they are on strike, and benefits paid to the Union Funds, are considered part of compensation. Thus, Respondent was not required to make contributions to any of the Funds, for the time that such employees were on strike. *Titan Tire Co.,* 333 NLRB 1156, 1165 (2001); *Towne Chevrolet,* 230 NLRB 479 (19770; *Trading Port, Inc.,* 219 NLRB 298,
40     299, fn.2 (1975); *Illinois Bell Telephone Co.,* 179 NLRB 681 (1969) *enfd.* 446 F.2d 815 (5th Cir.1971); *General Electric Co.,* 80 NLRB 510, 511-512 (1948).

     Here the record is silent as to how many of Respondent's employees were striking, and for how long, or whether or not any of the employees were on a leave of absence during the
45     strike.[37]  I shall therefore leave to the compliance stage of this proceeding to determine these issues, in accordance with the above precedent.  I shall also recommend that since this is the

---

[36] The record reflects that a strike commenced on February 20, 2008, and was continuing at the time the trial closed on May 1, 2008.

50     [37] If so, such employees would be entitled to contributions on their behalf, as well as a make whole remedy, since they were not on strike. *Titian Tire, supra.*

23

JD(NY)–27–08

third time that Respondent has been found to have violated the Act, it has demonstrated a proclivity to violate the Act, and that a broad order is appropriate. *Planned Building Services,* 347 NLRB #64 Slip op at 1, ALJD Slip op. at 51 (2006); *U.S. Service Industries,* 324 NLRB 834, 838 (1997); *Hickmont Foods,* 242 NLRB 1357 (1979).

5

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended[38]

ORDER

10    The Respondent, Kingsbridge Heights Rehabilitation Care Center, Bronx, New York, its officers, agents, successors and assigns, shall

1. Cease and desist from

15    (a) Failing and refusing to make timely contributions to the Greater New York Benefit Fund, the Greater New York Pension Fund, Greater New York Education Fund, the Greater New York Job Security Fund, The Greater New York Child Care Fund, and the Greater New York Workers Participation Fund, (herein collectively called the Funds), without notifying and bargaining with the 1199 Service Employees International Union, United Health Care Workers

20    East (the Union).

(b) In any other manner, interfering with, restraining or coercing employees in the rights guaranteed them by Section 7 of the Act.

25    2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Pay into the Union's Funds on behalf of its unit employees, those contributions that it failed to make, as set forth in the remedy section of this decision.

30    (b) Make whole any employees for any losses suffered by reason of its unlawful failure to make payments to the Union's Funds, as set forth above, in the manner set forth in the Remedy section of this decision.

(c) Preserve and, within 14 days of a request, or such additional time as the Regional
35    Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

40

(d) Within 14 days after service by the Region, post at its facility in Bronx, New York, copies of the attached notice marked "Appendix"[39]. Copies of the notice, on forms provided by

---

[38] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and
45    Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[39] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted
50    Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

JD(NY)–27–08

the Regional Director for Region 29, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered,
5     defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since May of 2005.
10

      (e)  Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

15    Dated, Washington, D.C.   July 30, 2008

                                        STEVEN FISH
20                                      Administrative Law Judge

25

30

35

40

45

50

                                    25

JD(NY)–27–08

APPENDIX

NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union.
Choose representatives to bargain on your behalf with your employer.
Act together with other employees for your benefit and protection.
Choose not to engage in any of these protected activities.

WE WILL NOT Fail and refuse to make timely contributions to the Greater New York Benefit Fund, the Greater New York Pension Fund, Greater New York Education Fund, the Greater New York Job Security Fund, The Greater New York Child Care Fund, and the Greater New York Workers Participation Fund, (herein collectively called the Funds), without notifying and bargaining with the 1199 Service Employees International Union, United Health Care Workers East (the Union).

WE WILL NOT in any other manner, interfere with, restrain or coerce employees in the rights guaranteed them by Section 7 of the Act.

WE WILL pay those contributions into the Union's Funds of our unit employees that we failed to make on the unit employees behalf.

WE WILL make whole with interest the unit employees for any losses suffered by reason of our failure to make timely payments to the Union's Funds.

KINGSBRIDGE HEIGHTS REHABILITATION
AND CARE CENTER
(Employer)

Dated _____ By _____

(Representative)        (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below. You may also obtain information from the Board's website: www.nlrb.gov.

One MetroTech Center (North), Jay Street and Myrtle Avenue, 10th Floor

Brooklyn, New York  11201-4201

Hours: 9 a.m. to 5:30 p.m.

718-330-7713.

THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, 718-330-2862.