UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELESTE J. MATTINA, Regional Director, Region 2, National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>                                             Petitioner,<br><br>          vs.·<br><br>KINGSBRIDGE HEIGHTS REHABILITATION AND CARE CENTER,<br><br>                                             Respondent. | **DECLARATION OF HELEN SIEGER**<br><br>**Civil Action No:**<br>**08-CV-6550 (DLC)**<br>**ECF CASE** |

I, HELEN SIEGER, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. §1746:

1.      I am the Owner and Facility Operator for Respondent Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge"). I am familiar with the facts and circumstances surrounding this action and submit this Declaration in Opposition to the Petition for Temporary Injunction Under Section 10 (j) of the National Labor Relations Act.

2.      Kingsbridge is a 400 bed nursing home located at 3400-26 Cannon Place, Bronx, New York. Some of our employees have been represented by United Health Care Workers East, 1199 SEIU ("Union") at least since the time I came to the facility in 1995. The most recent collective bargaining agreement with the Union expired in April 2005. We have negotiated in good faith with the Union regarding the terms and conditions for a successor agreement. As of October 2006, we had come to agreement on all terms with one exception: The Union refused to agree to Kingsbridge's proposal to utilize the services of the American Arbitration Association and have an arbitrator randomly assigned for each arbitration. Rather, the Union wanted a single person to be designated as the arbitrator on all cases. Kingsbridge was unwilling to agree to this

and maintained that the more equitable approach was for arbitrators to be randomly selected on a case by case basis. I personally, and my legal counsel at the time, Joel Cohen of the firm McDermott, Will & Emery, wrote the Union and/or its counsel numerous letters conveying this. Copies of said correspondence are attached as Exhibit 4. See also Petitioner's Exhibits XX and ZZ.

3.     During this same time, the high cost of 1199 fund contributions combined with lower reimbursement rates and large recoupments of monies created a strain for Kingsbridge and, to my understanding, in the industry as a whole. We (and upon information and belief, many other facilities) got behind in some of our benefit fund contributions. Instead of agreeing to work out a payment plan with us, as Kingsbridge had requested many times, the Union filed NLRB charges on the issue, and more significantly threatened to, and ultimately did, terminate the employees' medical benefits. It is undisputed that the Union has admitted through their agent and representative Jay Sackman, that even though other 1199 facilities have been delinquent in their benefit fund contributions, the Union has not cut off those employees' health care benefits, because they had a contract. Attached as Exhibit 5 is a copy of the Greater Funds Delinquency Report dated February 2, 2004 that Mr. Sackman gave me several years ago. While this document contains various entries for "first step termination" letters being sent, there is no indication that any other facility actually had their benefits terminated. Upon information and belief, this disparity in treatment continues and Union and the Funds continue to single out Kingsbridge in the manner in which it seeks to address delinquent payments.

4.     The issue of our delinquent payments first went to hearing before the NLRB in May and June of 2006. In the midst of the hearing, the Union and Kingsbridge reached a settlement agreement. I note that at no time during the prior proceedings, which involved nearly

identical issues regarding our contributions to the benefit fund and the employees' benefits, did the NLRB seek injunctive relief.

5.      In or about August 2007, the Union claimed that we had violated the terms of the settlement agreement and sought to reopen the original hearing. Also, at or about this same time, and continuing to date, the Union started utilizing our existing obligation to make benefit fund contributions as leverage in attempting to obtain a collective bargaining agreement on the Union's terms. It is my understanding that such tactics are not lawfully permitted under the NLRA.

6.      Further evidence of the Union's ill will towards Kingsbridge was conveyed to me during a meeting I had with the Union's Executive Vice President, Mike Rifkin, in or about November 2007 at a kosher deli in Riverdale. Mr. Rifkin began the meeting by telling me he was "not here to negotiate." He told me it was his plan to shut Kingsbridge down, and put me out of business "as an example to the industry."

7.      In August 2007 we had asked the Union to negotiate a change as to how we would make payments to the benefit funds in the future. When the Union refused to negotiate, my attorney, Mr. Cohen, filed a charge with NLRB on or about December 4, 2007. A copy of his correspondence to the NLRB, the referenced charge and supporting documents are attached as Exhibit 6. We were initially told that the Regional Director had dismissed the charge. Later, the NLRB claimed that Kingsbridge had "withdrawn" the charge. Attached as Exhibit 7 is a copy of Mr. Cohen's January 31, 2008 correspondence to the Regional Director in response to the apparent "withdrawal." I note that to date, I have never seen any documentation indicating that Kingsbridge in fact withdrew the charge. In any event, the NLRB refused to further process it.

8.      Attorney David Jasinksi filed a charge on behalf of Kingsbridge against the Union on or about March 26, 2008, a copy of which is attached as Exhibit 8. I subsequently agreed to withdraw the charge based on the representation of the NLRB that it was without prejudice to my right to re-file it, which I did on August 5, 2008, as indicated by the attached Exhibit 9.

9.      The strike propaganda being distributed by the Union, including that which is attached as Exhibit 10 is filled with blatant lies. First, these documents claim that there has not been a contract since 2000. This is false and the Union knows it. It is undisputed that the contract expired in April 2005. Second, Kingsbridge did not refuse to negotiate. We remained ready and willing to enter into an agreement so long as the arbitration procedure was fair and acceptable. It is the Union who refused to negotiate and who would only sign a contract if we made up the delinquent payments to the Fund .

10.     Union propaganda also claims that Kingsbridge "cut off" the medical benefits. Nothing can be further from the truth. Kingsbridge continued to remit payments to the funds up to and including our last payment on November 10, 2007, as indicated by the documentation attached as Exhibit 11. It was subsequent to this payment that we learned that the employees' health benefits had been discontinued.

11.     I also have offered many other options to provide health insurance coverage on an interim basis so that employees would not be without coverage.    In March 2008, we submitted a proposal whereby Kingsbridge would procure its own medical benefits in order to avoid the Union's arbitrary discontinuance of benefits. See Petition Exh. AAA, Jasinski letter of March 14, 2008 and my correspondence of May  6, 2008 attached as Exhibit 12.

12.     As a facility serving the needs of the frail and elderly, we are committed to making sure our residents feel safe and protected in their vulnerable state of health. Our only entrance is located on Cannon Place, a very narrow street in a residential area, which provides limited space for individuals to enter and exit the building. The front sidewalk is also very narrow and is only about four or five feet wide.

13.     We have, for many years, maintained and used permanent exterior and interior surveillance cameras to monitor the premises as a basic security measure. State and federal health care regulatory agencies may also seek video surveillance for compliance purposes from time to time. Petitioner alleges that we have unlawfully utilized video surveillance and suggests that this conduct was done in intentional defiance of an NLRB Order. I note that we have openly videotaped for security purposes for at least a decade without protest from the Union. Moreover, to my knowledge, the NLRB will often ask employers to submit videos of union activity when questioning the lawfulness of certain picketing activity. The necessary and legitimate reasons for our video surveillance are detailed more fully below and in the accompanying affidavits. It should be noted, however, that the dates of alleged unlawful surveillance in the Petition, with one exception, all pre-date the NLRB decision adopting the ALJ decision on January 31, 2008, which was not enforced by the Second Circuit until very recently (July 11, 2008). As set forth in the brief that was submitted on our behalf to the NLRB by our prior legal counsel excepting to the ALJ's recommended findings, a copy of which is attached as Exhibit 13, we, at all times, maintained a legitimate and justifiable reason for engaging in surveillance based on the prior acts of this Union. That the NLRB ultimately ruled against us in this regard is not a reasonable basis upon which to conclude that our continued use of video surveillance pending the determination should be viewed as willful disregard for the law.

14.     The history of violent and unpredictable conduct by this Union against our facility, as well as our understanding of its conduct during other strikes, requires us, as a health care facility charged with care of the elderly, to be vigilant in insuring the safety of our residents. On a prior occasion this Union came to Kingsbridge unlawfully, in the middle of the night, with cameramen and reporters from The New York Daily News. Our residents were traumatized and many required therapy and counseling because they thought they were being robbed or would be killed. For some, therapy continues to this day. In 2006, certain Union members made violent threats to intimidate non-striking employees and were terminated for this offense. On another occasion, Union delegates stormed the office of the Administrator and threw things off his desk. Moreover, since the picketing and strike began, there have been numerous instances which have threatened my own safety, as well as the safety my staff and residents. For example, on multiple instances while attempting to come to or leave work, I have had my car surrounded and bombarded with flying objects. Strikers also kicked and punched my car. In particular, I recall that on or about June 16, 2008, Sivasakhy Ramalingam kicked and dented the car I was in. On this occasion, the windshield was also cracked. Also on this occasion, I recall that Lily Miller along with several others laid down the ground in front of the car in an effort to prevent it from moving. On or about May 23, 2008 while trying to enter the facility I was punched in the left lower back by Union Vice President Isaac Nortey. Strikers have thrown rocks at windows. Since the strike began I have had to replace the cameras multiple times because they have been destroyed by the Union. On an occasion in or about December 2007, while going to my car to leave, I encountered a striker defecating in the parking lot. Signs and posters, copies of which are attached as Exhibit 14, threaten me and my physical safety. They held a funeral process with

effigy. Knives have been pulled. I saw one employee who had a clump of hair ripped from her head.

15.    Contrary to the allegations in the Petition, we have never sought to record Union meetings or other non-violent conduct. I have never directed anyone to film this type of Union activity. Upon information and belief, since some time in 2006, the Union has rented a house across the street from Kingsbridge. It my understanding that since the strike began in February of this year they have since rented a second house as well. Thus, the Union has space to utilize for conducting private meetings with its members if it is actually concerned that any such meeting might be recorded on our cameras.

16.    It is ironic that the Union is objecting to surveillance and recording of events especially in light of their own actions. As indicated by the flyer attached as Exhibit 15, the Union has been photographing our current staff and then seeking to identify them by name for purposes of intimidating them. Some employees were followed to their homes and threatened. Our employees have the same right to refrain from Union activity as the striking employees have to engage in it.

17.    It is my understanding that because this is an economic strike we are entitled to and did hire permanent replacement workers. It is my further understanding that we are not obligated to return to work anyone who has engaged in strike misconduct. Since it is unlikely that any employee will ever acknowledge that he or she engaged in such conduct, a recording is likely to be the only means we have available to preserve our evidence in this regard. A court order prohibiting us from utilizing our video surveillance would permit the Union to follow through with their threats and continue in their unlawful actions without fear that they will be held accountable for their actions.

18.    I note also that many of the Union's claims regarding surveillance are without any basis in fact. For example, Petitioner alleges that Mr. Szereszeski surveilled union members on October 18, 2007. In fact, Mr. Szereszeski was not even employed by Kingsbridge as of that date. In any case, it would not appear that our use of surveillance has in any way deterred employees from participating in the strike or picketing. No affidavit submitted in support of the Petition claims this. I have repeatedly conveyed to employees their right to participate in any lawful strike activity without fear of reprisal, as evidenced by my memoranda attached as Exhibit 16.

19.    Petitioner also seeks an injunction prohibiting Kingsbridge from entering into any "yellow dog" contracts with individual employees. This allegation involves a situation that occurred subsequent to a strike notification wherein certain employees expressed concern about whether they wanted to go on strike at all. It was my understanding that employees needed to resign from the Union in order in order not to be disciplined for failing to strike. We did not speak to any employees about working conditions until after they presented proof that they had resigned from the Union. The referenced "yellow dog" contracts were intended only to confirm in writing the benefits that we intended to pay these people. The referenced "yellow dog" contracts were intended only to confirm in writing the benefits that we intended to pay. We did not appreciate or understand at the time that a resignation from the Union did not equate to a resignation from the bargaining unit, and moreover, that the language in the document about joining a union was not permissible. Only a handful of people signed the agreements. As soon as we became aware of our mistake, we considered the statement to be to be null and void and on or about March 31, 2008 issued a memo to this effect, a copy of which is attached as Exhibit 17.

I now understand what a "yellow dog" contract is and why they are considered impermissible. We regret the error and will not make this mistake again.

20.     The Union has also sought to jeopardize the care we provide to residents by attempting to intimidating our vendors from doing business with us. We received calls from hospital discharge planners stating that they had received the flyer attached as Exhibit 18 and they would no longer send us referrals. Letters and flyers, like the ones attached as Exhibit 19, were sent to our vendors. Our linen supply company was threatened with a strike and refused to deliver. The only way for us to get clean linens for the residents was to rent a truck and drivers three times per week to go to pick up the linens. Our bakery was similarly threatened and in order to insure fresh baked goods, we had to send our staff out to meet the bakery truck. Our food vendor refused to deliver after being threatened by the Union. While these may be acceptable Union tactics when dealing with manufacturing operations, this is a health care facility, not an assembly line. Interfering with necessary supplies has a direct correlation to patient care. To intentionally deprive residents of food or fresh linens is abusive.

21.     Sometime in the Fall of 2007, I communicated with my attorney on a variety of subjects, including union dues contributions after contract expiration. Following those communications, I ceased deducting union dues and sought to refund this money to employees. I intended these payments not as gift, but a refund of the dues deductions.

22.     Petitioner alleges that Kingsbridge unlawfully refused to bargain in good faith by refusing to meet with the FMCS. We had been at impasse for over a year on a single straightforward issue of the arbitration service to be utilized under the contract. We were given no reason to believe that the Union had changed its position and was willing to negotiate a resolution of this contract issue independent of the fund delinquency controversy. That being

said, I was out sick with fever prior to the strike and physically unable to participate in mediation at that time. I also advised the mediators that I was without counsel at times. I have continued my dialogue with the mediators to date.

EXECUTED ON THE 6TH DAY OF AUGUST, 2008.

_____

HELEN SIEGER



October 31, 2006

To All Employees of Kingsbridge Heights,

This letter serves to advise that we have conceded on all issues with regard to the Union contract except for the Arbitrator.  It is our position that we are entitled to choose from the American Arbitrators Association (AAA) for any arbitrator.

This is the only outstanding issue with regard to signing the contract with 1199.

Kindly demand from the Union their position in writing.  Also how they can attempt to force Kingsbridge to accept their choice, Mr. Scheinman.

Sincerely,

Ms. Helen Sieger
Executive Director



EXHIBIT
4

3400 - 26 Cannon Place • Bronx, New York, 10463 • Tel. 718.796.8100 • Fax.718.796.8182

Boston  Brussels  Chicago  Düsseldorf  London  Los Angeles  Miami  Munich
New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5566

December 11, 2007

**BY HAND**
Irwin Bluestein, Esq.
Meyer, Suozzi, English & Klein
1350 Broadway, Suite 501
New York, New York  10018

      Re:    Kingsbridge

Dear Irwin:

      Please see attached.

It is absolutely clear that the Union is picketing on a Saturday because it knows that Helen Sieger is an Orthodox Jew and will be restricted by her faith from protecting the Center on her Sabbath. It is repulsive for the Union to take advantage of Ms. Sieger's religious beliefs and we will be notifying Jewish organizations and clergyman of all faiths about this behavior by 1199.

Secondly, two comments in the flyer are absolute brazen lies. First the statement that there has been no contract since 2000 is a lie. There has been no contract since April 200<u>5</u>. More importantly the statement that Helen Sieger has refused to negotiate is a lie. Helen Sieger has agreed since 2005 to sign the Greater New York contract except that she wants American Arbitration Association arbitrators to hear contract disputes, not the "Impartial Chairman", Martin Scheinman. That is the only issue that has kept the parties from signing a contract. <u>Send Ms. Sieger the Greater New York contract with the American Arbitration Association as arbitrator and she will sign the contract today.</u>

Moreover, Ms. Sieger has not taken away health benefits, the 1199 Benefit Fund has cut off benefits allegedly due to late payments. However, Kingsbridge is no later in payment than most 1199 health care institutions who have not had benefits cut off. 1199 has cut off the benefits for Kingsbridge, to provoke its employees to strike, since it knows employees won't strike over who the arbitrator should be.

Irwin Bluestein, Esq.
December 11, 2007
Page 2

Finally, we have evidence that 1199 is actively seeking to close Kingsbridge "to teach Helen Sieger a lesson" even if it means that Kingsbridge employees will lose their jobs.

Kingsbridge will not stand by and allow 1199 to close its doors to the detriment of its employees "to teach Helen Sieger a lesson". Kingsbridge will shortly commence legal action to protect itself and its employees from 1199's shameful conduct.

Very truly yours,


Joel E. Cohen



cc:    Helen Sieger

"Greater" Funds Delinquency Report

December 2003

02/14/02


EXHIBIT 5

| ID# | Institution | | 10/03 1 Month | 11/03 2 Months | 10/03 3 Months | 07/03-09/03 4-6 Mos. | 01/03-06/03 7-12 Mos. | 2002 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41837 | Belle Harbor Manor | B P E C | | | 906 | | | | 900 | Delinquency letter sent. |
| 3810 | Brooklyn-Queens | B P E C | | | | | 3,632 | | 3,632 | Delinquency letter sent. |
| 8648 | Cabs Nursing Home Company | B | 24,000 | | | 26,536 | 17,081 | 10,300 | 34,300 | Delinquency letter sent. |
| | | P | 9,200 | 150 | 176 | 143 | | 4,150 | 55,969 | Period of Suleiman "Abeyance" aw...d. |
| | | E | 731 | | | | | 220 | 5,771 | |
| | | C | 800 | | | | | 795 | 1,271 | |
| | | | | | | | | | 795 | |
| 8558 | Carlton | B | 41,800 | 41,100 | | 41,907 | 24,496 | | 83,900 | Delinquency letter sent. |
| | | P | 13,700 | 13,900 | 1,338 | 1,026 | | | 97,603 | Period of Suleiman "Abeyance" award. |
| | | E | 1,200 | 1,200 | 268 | 265 | | | 4,764 | |
| | | C | 1,200 | 1,100 | | | | | 3,773 | |
| | | J | 600 | 600 | | | | | 1,200 | |
| 8645 | Cobble Hill | B | 52,700 | 128,300 | | 162,002 | 121,200 | | 283,300 | Delinquency letter sent. |
| | | P | 52,700 | 53,202 | | | | | 318,104 | Replaced Healthcare Services effective 03/11/202. |
| | | E | 4,500 | 3,271 | 867 | | | | 7,771 | |
| | | C | 4,450 | 4,455 | | | | | 8,942 | |
| | | J | 2,350 | 1,708 | | | | | 4,058 | |
| 5726 | Confidence Management-Birdbecker | B | 3,040 | | | | | | 3,040 | Delinquency letter sent. |
| | | P | 100 | 59 | 47 | 130 | | | 1,300 | |
| | | E | 100 | 18 | 25 | 23 | | 46 | 457 | |
| | | C | 100 | | | | | | 166 | |
| | | J | | | | | | | 103 | |
| 2611 | Clove Lakes | B | 207,200 | 63,634 | 77,349 | | 74,180 | | 207,200 | Delinquency letter sent. |
| | | P | 68,300 | | | | | | 281,022 | Period of Suleiman "Abeyance" award. |
| | | E | 5,423 | | | | | | 5,423 | |
| | | C | 5,160 | | | | | | 5,500 | |
| | | J | 2,900 | | | | | | 2,900 | |
| 41820 | Clark Nursing and Rehabilitation Center | B | 2,450 | 3,850 | 2,950 | 9,960 | 348 | 732 | 19,190 | Delinquency letter sent. |
| | | P | 77 | 488 | | | | | 1,643 | |
| 41729 | Cranford Health and Extended Care | B | 37,500 | 36,600 | 32,150 | | | 1,245 | 106,250 | Delinquency letter sent. |
| | | P | 1,200 | 1,200 | 1,300 | | | 25 | 4,945 | |
| 41575 | Dalridge Care Center | | | 208 | | | | 1,325 | 1,533 | Delinquency letter sent. |

"Greater" Funds Delinquency Report                                    December 2003                                    02/17/2004

| ID# | Institution | | 12/03 1 Month | 11/03 2 Months | 10/03 3 Months | 07/03-09/03 4-6 Mos. | 01/03-06/03 7-12 Mos. | 12/02 > 1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 8233 | Dr. William Robertson | B | 11,485 | 511 | 603 | | | | 220 | Delinquency letter sent. Education and OCP delinquencies exist from payment at wrong rates, (at wrong gross wage totals.) |
| | | P E C J | | | | | | | 8,651 / 8,638 / 858 / 552 | Period of Salomon "abeyance" award. |
| 8618 | Florence Nightingale | P E C J | 145,100 | 142,600 / 2,665 / 1,729 | | 141,101 | 72,079 | 24,110 | 312,310 / 215,445 / 1,729 | Delinquency letter sent. Period of Salomon "abeyance" award. |
| 8280 | Flushing Manor | B P E C J | 25,831 | 313 | 435 | 52,493 / 511 | 39,428 | 2,890 / 688 | 131,642 / 683 / 1,054 | Delinquency letter sent. Period of Salomon "abeyance" award. |
| 9383 | Forest Hills Nursing Home | B P E C J | 800 | 751 | 10,468 / 896 | 26,747 / 1,979 | 13,760 / 1,251 | 1,440 / 496 | 1,440 / 50,975 / 496 / 5,677 | Delinquency letter sent. Shortages exist from payment on adjusted gross wages. Period of Salomon "abeyance" award. |
| 8373 | Forest View | B P E C J | 17,055 | 14,884 / 241 | 17,064 / 292 | 45,171 / 231 | | 260 | 260 / 93,574 / 764 | Delinquency letter sent. Period of Salomon "abeyance" award. |
| 41619 | Gracedel Nursing Home | B P E C J | 13,892 | | | 31,629 | 30,162 | | 100,683 | Delinquency letter sent. |
| 3710 | Healthcare Services-Florence Nightingal | B P E C J | 6,944 | | 4,770 | 15,825 | 8,228 | | 33,767 | Delinquency letter sent. |
| 8583 | Hollis Park Manor | B P E C J | 5,585 | | | 19,137 | 14,811 | | 40,183 | Delinquency letter sent. Period of Salomon "abeyance" award. |
| 8626 | Horizon | B P E C J | 28,560 / 19,311 / 1,653 / 1,653 / 827 | 47,570 / 15,712 / 1,343 / 1,345 / 673 | 19,011 / 714 / 325 | 20,612 / 1,297 / 259 | | 5,173 / 714 / 1,070 | 106,930 / 89,819 / 5,009 / 4,952 / 1,900 | Delinquency letter sent. Period of Salomon "abeyance" award. |
| 3646 | Marcus Garvey | B P E C J | 86,200 / 35,200 / 2,400 / 2,400 / 1,200 | 101,850 / 33,374 / 2,571 / 2,571 / 1,456 | 444 | 432 | | | 182,050 / 61,574 / 5,271 / 6,147 / 2,656 | Delinquency letter sent. |

"Greater" Funds Delinquency Report

December 2003

02/17/2004

| ID# | Institution | | 1/1/03 $ Month | 11/03 2 Months | 10/03 3 Months | 07/01-09/03 4-6 Mos. | 01/01-06/03 7-12 Mos. | 12/02 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 5390 | Meadow Park Nursing Home | B | 30,400 | | | 19,150 | 17,650 | 13,176 | 56,610 | Delinquency letter sent. |
| | | P | 10,200 | | | 21,193 | 6,786 | 1,979 | 53,133 | Period of Sedation "abeyance" award. |
| | | E | 900 | 965 | | 2,553 | 1,313 | 213 | 6,591 | |
| | | C | 900 | 855 | | | | 136 | 855 | |
| | | J | 450 | | | | | 455 | | |
| 5500 | Medco Enterprises-Brainbridge | B | 36,500 | | | 53,078 | 56,491 | | 55,500 | Delinquency letter sent. |
| | | P | 18,500 | | | | | | 108,069 | Period of Sedation "abeyance" award. |
| | | E | 559 | | | | | | 559 | |
| | | C | 596 | | | | | | 596 | |
| | | J | 298 | | | | | | 298 | |
| 6531 | Medco Enterprises-Easthaven | B | 700 | | | | | | 700 | Delinquency letter sent. |
| | | P | 11,700 | | | 33,112 | 11,412 | | 58,224 | Period of Sedation "abeyance" award. |
| | | E | 231 | | | | | | 231 | |
| | | C | 1,000 | | | | | | 1,821 | |
| | | J | 300 | | | | | | 1,013 | |
| 8501 | Medco Enterprises-Mohuk Parkway | B | 30,580 | | | 31,329 | 20,397 | | 30,580 | Delinquency letter sent. |
| | | P | 10,160 | | | | | | 61,626 | Period of Sedation "abeyance" award. |
| | | E | 737 | | 1,001 | | | | 1,758 | |
| | | C | 490 | | 1,004 | | | | 1,004 | |
| | | J | | | 502 | | | | 502 | |
| 8559 | Medco Enterprises-Wayne | B | 46,690 | | | 14,227 | 9,463 | | 46,690 | Delinquency letter sent. |
| | | P | 4,709 | | | | | | 28,394 | Period of Sedation "abeyance" award. |
| | | E | 1,522 | | | | | | 1,522 | |
| | | C | 1,600 | | | | | | 1,600 | |
| | | J | 803 | | | | | | 803 | |
| 4751 | Mill House | B | 8,800 | 5,080 | | 4,100 | | 4,200 | 19,180 | Delinquency letter sent. |
| 8389 | Morris Park | B | 18,497 | 14,166 | 17,937 | 43,923 | 14,212 | | 64,832 | Delinquency letter sent. Period of Sedation "abeyance" award. |
| | | E | 596 | | | | | | 596 | |
| 9303 | New Glen Oaks | B | 14,000 | 14,210 | 5,246 | 13,134 | 293 | 346 | 28,210 | Delinquency letter sent. |
| | | P | 4,600 | 4,655 | | | | 266 | 27,381 | Period of Sedation "abeyance" award. |
| | | E | 400 | 599 | | | | 266 | 1,065 | |
| | | C | 600 | 399 | | | | 903 | 2,057 | |
| 8320 | Northern Manhattan | B | | 2,011 | | 27,612 | 30,142 | 2,920 | 3,900 | Delinquency letter sent. |
| | | | | | | | | | 46,518 | Period of Sedation "abeyance" award. |
| | | | | | | | | | 2,011 | |
| 8315 | Parkview | | 1,500 | 1,279 | 1,592 | 3,445 | 1,607 | | 74,065 | Delinquency letter sent. |
| | | | | 1,305 | | | | | 1,275 | |
| | | | | | | | | | 9,449 | |

"Greater" Funds Delinquency Report

December 2003

03/17/2004

| ID# | Institution | | 10/02 1 Month | 11/02 2 Months | 10/02 3 Months | 07/02-09/02 4-6 Mos. | 01/02-06/02 7-12 Mos. | 1/2/01> >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41007 | Putnam Nursing and Rehabilitation | B<br>P<br>E<br>C<br>J | 20,160 | | | 20,640 | 14,918 | | 20,160<br>34,638<br>672<br>670<br>355 | Delinquency letter sent.<br>Period of Solcitment "abeyance" award. |
| 8021 | Queens Nassau (DUC) | B<br>P<br>E<br>C<br>J | 1,240<br>11,900<br>1,200<br>1,300 | 1,129<br>1,129 | 1,330<br>1,350 | 22,542<br>3,669<br>3,107 | 16,655<br>6,913<br>1,355 | 9,103 | 1,240<br>31,097<br>23,008<br>8,622 | Delinquency letter sent.<br>Period of Solcitment "abeyance" award. |
| 5628 | Queens Nassau (DEN) | B<br>P<br>E<br>C<br>J | 1,270<br>3,600<br>327<br>300 | 259 | 346 | 7,330<br>801 | 4,350<br>463 | | 1,270<br>15,080<br>327<br>2,169 | Delinquency letter sent.<br>Period of Solcitment "abeyance" award. |
| 41739 | Riverdale Manor Home | B<br>P<br>E<br>C<br>J | 4,600 | 4,300 | 4,800 | | | | 14,200 | Delinquency letter sent. |
| 9759 | Shalon | B<br>P<br>E<br>C<br>J | 704 | 1,524 | | 230 | 220 | 14,030<br>1,211 | 14,469<br>2,713<br>704 | Delinquency letter sent. |
| 8751 | Shalom (DEN) | B<br>P<br>E<br>C<br>J | 685 | 930 | 734 | 26,184<br>2,300 | 17,991<br>1,348 | 15,720 | 15,720<br>44,855<br>6,218 | Delinquency letter sent. |
| 8722 | Sheepshead Nursing and Rehabilitation | B<br>P<br>E<br>C<br>J | 356 | | | | | | 356 | Delinquency letter sent. |
| 8722 | Sheepshead Nursing and Rehabilitation | B<br>P<br>E<br>C<br>J | 13,133 | 401<br>619<br>1,825<br>813 | 763<br>2,008<br>1,004 | 30,025<br>1,924<br>4,353<br>2,527 | 19,530<br>3,357<br>7,566<br>4,691 | 5,015<br>5,022<br>2,423 | 62,889<br>11,890<br>20,514<br>11,464 | Delinquency letter sent.<br>Period of Solcitment "abeyance" award. |
| 41045 | Sky View Haven Nursing Home | B<br>P<br>E<br>C<br>J | | 1,475 | | 57,155 | 14,610<br>18,493 | | 14,610<br>93,648<br>1,475 | Delinquency letter sent.<br>Period of Solcitment "abeyance" award. |
| 4655 | Staten Island Care Center | B<br>P<br>E<br>C<br>J | 48,940<br>16,993 | 61,620<br>21,402 | 293 | 56,662<br>309 | 33,487<br>2,200<br>1,448 | 4,331<br>2,143 | 110,560<br>128,547<br>10,601<br>5,272 | Delinquency letter sent.<br>Period of Solcitment "abeyance" award. |
| 8815 | Terrace | B<br>P<br>E<br>C<br>J | 70,500<br>22,050<br>1,277<br>1,977<br>300 | 1,370<br>1,515 | 1,876 | 55,830<br>4,184 | 36,793<br>2,734 | | 70,500<br>116,718<br>3,347<br>12,154<br>300 | Delinquency letters sent.<br>Period of Solcitment "abeyance" award. |

"Greater" Funds Delinquency Report December 2003 02/17/2004

| ID# | Institution | | 12/03<br>1 Month | 11/03<br>2 Months | 10/03<br>3 Months | 07/03-09/03<br>4-6 Mos. | 01/03-06/03<br>7-12 Mos. | 12/02><br>>1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41616 | Townhouse Extended Care Center | B | 65,100 | | | | | | 65,100 | Delinquency letter sent. |
| | | P | 31,700 | 32,094 | 31,643 | 111,253 | 125,013 | | 331,703 | Period of Scheinman "abeyance" award. |
| | | E | 2,748 | | | | | | 2,748 | |
| | | C | 2,700 | | | | | | 2,700 | |
| | | J | | | | | | | | |
| 41054 | Wanaque Convalescent Center | B | | | | | | | | Delinquency letter sent. |
| | | P | | | | | | | | |
| | | E | | | 507 | | | | 507 | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41883 | Wellington Hall Care Center | B | 18,500 | 17,970 | | | | | 36,470 | Delinquency letter sent. |
| | | P | | | | | | | | |
| | | E | | | | | | | | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41850 | Willow Creek Rehabilitation & Care C | B | 17,300 | | | | 4,100 | 6,820 | 28,220 | Delinquency letter sent. |
| | | P | | | | | | | | |
| | | E | | | | | | | | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41795 | Woodcliff Lake Manor | B | | | | | 1,000 | | 1,000 | Delinquency letter sent. |
| | | P | | | | | | | | |
| | | E | | | | | | 1,594 | 1,594 | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| | Delinquency Notification Sent 72.22% | B | 206,520 | 509,040 | 40,780 | [illegible] | [illegible] | 97,800 | [illegible] | |
| | | P | 458,011 | [illegible] | 184,008 | [illegible] | [illegible] | [illegible] | [illegible] | |
| | | E | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | |
| | | C | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | |
| | | J | 13,813 | 6,167 | 1,506 | [illegible] | [illegible] | [illegible] | [illegible] | |

Arbitration Demanded

| ID# | Institution | | 12/03<br>1 Month | 11/03<br>2 Months | 10/03<br>3 Months | 07/03-09/03<br>4-6 Mos. | 01/03-06/03<br>7-12 Mos. | 12/02><br>>1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41787 | Arnold Walter Nursing Home | B | 5,780 | 7,760 | 4,380 | 12,310 | | | 30,230 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | | | | |
| | | E | | | | | | | | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41939 | Atlantic Coast Rehabilitation Center | B | 11,700 | 10,090 | | | | | 21,790 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | | | | |
| | | E | 400 | 315 | 469 | 896 | 1,971 | 1,774 | 5,825 | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41760 | Barnegat Nursing Home | B | 2,720 | | | | | | 2,720 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | | | | |
| | | E | 300 | 320 | | | | | 620 | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41606 | Beach Terrace Center | B | 40,500 | | | 490 | | 8,940 | 49,930 | Delinquency letter sent and arbitration demanded. |
| | | P | 13,300 | | | 38,781 | 23,934 | | 76,015 | Period of Scheinman "abeyance" award. |
| | | E | 1,100 | 1,058 | 1,262 | | | 10,128 | 13,548 | |
| | | C | 1,100 | 212 | 252 | 228 | | | 1,792 | |
| | | J | 600 | | | | | 1,909 | 2,509 | |

# "Greater" Funds Delinquency Report

December 2003

| ID# | Institution | | 12/03 1 Month | 11/03 2 Months | 10/03 3 Months | 07/03-09/03 4-6 Mos. | 04/03-06/03 7-12 Mos. | 1/03 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41607 | Bendel Nursing Home (EC) | B | 18,600 | | | | | | 19,000 | Delinquency letter sent and arbitration demanded. |
| | | E | 6,000 | | | | | | 31,230 | Period of Schirgman "abeyance" award. |
| | | P | 6,000 | | | | | | 956 | |
| | | C | 500 | | | | | | 827 | |
| | | J | 311 | | | | | | 311 | |
| 8601 | Babysecker Home | B | | | | 110 | 460 | 18,274 | 19,000 | Delinquency letter sent and arbitration demanded. |
| | | P | | 496 | | 15,969 | 12,461 | | 1,532 | Period of Schirgman "abeyance" award. |
| | | C | | 99 | | 108 | | 370 | 370 | |
| | | J | | | | | | | | |
| 41018 | Carillon House | B | 18,580 | 19,540 | 23,540 | 113,490 | 117,220 | 70,370 | 252,450 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | 69,604 | | | 139,774 | Shortages due to paying W/F at 12% instead of 16%. |
| | | C | | | | | | | 16,559 | Period of Schirgman "abeyance" award. |
| | | J | | | | | | | | |
| 41974 | Cedar Lodge Nursing Home | B | 17,400 | 3,970 | 4,960 | 13,318 | 8,830 | | 48,470 | Delinquency letter sent and arbitration demanded. |
| | | P | 5,877 | | | | | | 5,877 | Shortages due to paying W/F at 12% instead of 16%. |
| | | E | 500 | 495 | 620 | 1,660 | | | 956 | |
| | | C | 500 | 500 | | | | | 4,853 | |
| | | J | 300 | | | | | | 300 | |
| 41714 | Cedar Oaks Care Center | B | 43,500 | 24,700 | 29,260 | 45,050 | | 2,290 | 148,510 | Delinquency letter sent and arbitration demanded. |
| | | P | 1,364 | 908 | | | | | 2,172 | Shortages through 03/03 due to paying W/F at 12% instead of 16%. |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 8725 | Confidence Management-Cobble Hill | B | 6,800 | 2,397 | 2,069 | 6,608 | 2,182 | | 6,800 | Delinquency letter sent and arbitration demanded. |
| | | E | 2,200 | | 67 | 312 | | | 15,256 | |
| | | C | 200 | 205 | 35 | 16 | | | 783 | |
| | | J | 202 | 41 | | | | | 316 | |
| | | | 101 | | | | | | 101 | |
| 8309 | Crown Nursing Home | B | 61,700 | 55,820 | 21,930 | 16,710 | 12,753 | 16,374 | 155,920 | Delinquency letter sent and arbitration demanded. |
| | | P | 11,900 | 3,933 | 5,172 | 36,404 | | | 86,900 | Period of Schirgman "abeyance" award. |
| | | E | 1,900 | 342 | | 1,272 | | | 7,172 | |
| | | C | 1,900 | | | 906 | | | 3,044 | |
| | | J | 866 | | | | | | 866 | |
| 41796 | Daleview Nursing Home | B | 10,888 | 8,810 | 10,606 | 85,550 | 20,980 | 42,773 | 156,783 | Delinquency letter sent and arbitration demanded. |
| | | P | 500 | 1,101 | 1,215 | 41,013 | 2,617 | 1,001 | 83,785 | Shortages due to paying W/F at 12% instead of 16%. |
| | | E | 500 | 1,101 | | 1,396 | | | 3,491 | Period of Schirgman "abeyance" award. |
| | | C | | | | 3,311 | | | 9,654 | |
| | | J | | | | 698 | | | 698 | |
| 41869 | Emerson Health Care Center | B | 12,560 | 12,250 | 11,700 | | 3,010 | | 40,410 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | | | | |
| | | C | 437 | | | | | | 437 | |
| | | J | | | | | | | | |
| 8976 | Fairview | B | 48,780 | 11,699 | 13,400 | 1,209 | | 1,907 | 48,780 | Delinquency letter sent and arbitration demanded. |
| | | P | 15,986 | 1,695 | 1,309 | | | | 41,085 | |
| | | C | 1,369 | | | | | | 2,974 | |
| | | J | 1,369 | | | | | | 5,410 | |

'Greater' Funds Delinquency Report

December 2003

02/17/2004

| ID# | Institution | | 2003 1 Month | 11/03 2 Months | 10/03 3 Months | 07/01-09/03 4-6 Mos. | 01/03-06/03 7-12 Mos. | 12/02> >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 8979 | Freedom Lodge | B | 47,650 | 48,650 | | 109,120 | | 83,550 | 294,370 | Delinquency letter sent and arbitration demanded. |
| | | P | 15,412 | | | 53,015 | | 20,359 | 88,766 | Shortage from error in gross wage calculation. |
| | | Z | 1,319 | | | | | 1,318 | 4,037 | Period of Sabotman "abeyance" award. |
| | | C | 1,319 | | | | | 1,616 | 2,353 | |
| | | J | 660 | | | | | 292 | 952 | |
| 41819 | Healthcare Services-Burnt Tavern | B | 81 | 62 | 63 | 200 | 339 | 283 | 1,028 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | | | | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41062 | JFK Harvey's-Edison Estates | B | | 1,037 | | 4,150 | | 1,570 | 5,520 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | | 3,497 | 4,514 | |
| | | M | | | | | | | | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41747 | Liberty House Nursing Home | B | 27,500 | 5,860 | 8,460 | 18,310 | | 7,980 | 68,910 | Delinquency letter sent and arbitration demanded. |
| | | P | 900 | 733 | 155 | | | | 1,768 | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41749 | Leisure Chateau | B | 7,580 | 10,340 | 560 | 6,870 | | | 25,450 | Delinquency letter sent and arbitration demanded. |
| | | P | 240 | 422 | 420 | 415 | 151 | | 1,648 | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41013 | King Manor Care Center | B | 7,500 | 5,690 | 1,980 | 5,410 | | 1,590 | 21,770 | Delinquency letter sent and arbitration demanded. |
| | | P | 67 | 133 | 247 | | | 176 | 623 | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 9606 | Little Neck | B | 39,100 | 35,560 | 210 | 220 | 5,140 | | 40,230 | Delinquency letter sent and arbitration demanded. |
| | | P | 12,500 | 997 | 2,786 | 28,566 | 22,374 | | 67,126 | Period of Sabotman "abeyance" award. |
| | | C | 1,100 | | | 1,039 | | | 3,125 | |
| | | J | 1,100 | | | | | | 1,100 | |
| 41017 | Long Beach Dolphin | B | 1,100 | | | | | | 1,100 | Delinquency letter sent and arbitration demanded. |
| | | E | | | | | | | | |
| | | C | | | | | | | | |
| | | J | | | | | | | | |
| 41615 | Nassau Extended Care Center | B | 76,100 | 10,842 | 46,081 | 95,484 | 142,867 | | 74,350 | Period of Sabotman "abeyance" award. |
| | | P | 36,600 | | | | 150 | | 151,274 | |
| | | E | 2,641 | | | | | | 2,641 | |
| | | C | 3,125 | | | | | 1,574 | 3,125 | |
| | | J | | | | | | | 1,974 | |
| 1667 | New York Congregational Church | B | 62,700 | 53,020 | 14,120 | 38,720 | 74,690 | 36,740 | 285,010 | Delinquency letter sent and arbitration demanded. |
| | | P | 22,400 | 20,751 | 5,051 | 14,207 | 25,710 | 13,118 | 102,157 | Shortage arose from payment on adjusted gross wages. |
| | | E | 1,900 | 1,777 | 432 | 3,674 | 2,287 | 3,161 | 14,231 | Claim existed provided wages higher than standard. |
| | | C | 1,820 | 881 | | | | 669 | 4,327 | Issued by AVHH wage clearance. Shortage based on |
| | | J | 1,000 | | | | | | 1,888 | payment at AVHH minima. |

"Greater" Funds Delinquency Report

December 2003

02/17/2004

| ID# | Institution | | Current 1 Month | 2 Months | 3 Months | 24 Mos. 2000 | 7-12 Mos. 2003 | > Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41504 | Newark Extended Care Facility | B P E C J | 61,800 | 13,570 | 18,300 | 44,240 | | | 138,310 | Delinquency letter sent and arbitration demanded. |
| 41505 | Nyack Manor Nursing Home | B H E C J | 14,350 1,600 1,660 300 | 10,700 2,212 1,337 1,337 669 | 10,350 2,163 1,357 1,357 678 | 39,270 56,547 4,841 4,283 2,421 | 20,510 61,567 8,720 6,976 4,760 | 34,852 12,692 4,706 2,270 | 97,910 157,441 30,547 20,264 11,198 | Delinquency letter sent and arbitration demanded. Shortage due to paying WIP at 12% instead of 16%. Period of Scholtmann "abeyance" award. |
| 3309 | Oxford | B P E C J | 45,400 14,900 1,300 1,300 300 | 43,600 14,104 1,208 1,208 654 | 52,400 1,489 1,489 738 | 47,743 1,107 215 | 15,454 | | 140,880 92,206 5,104 4,212 1,562 | Delinquency letter sent and arbitration demanded. Period of Scholtmann "abeyance" award. |
| 41050 | Park Avenue Extended Care Center | B P E C J | 46,810 23,100 1,515 1,515 | 22,334 | 23,007 | 80,797 | 144,035 | 66,397 | 46,810 350,140 1,555 1,956 | Delinquency letter sent and arbitration demanded. Period of Scholtmann "abeyance" award. |
| 41510 | Park Terrace Nursing Home | B E C J | 47,200 15,400 1,300 1,100 | 45,900 15,000 1,300 627 | 57,350 | 45,108 1,277 | 28,999 | 3,430 | 145,590 107,827 3,877 3,977 | Delinquency letter sent and arbitration demanded. |
| 8750 | Port Chester | B P E C J | 27,820 9,113 780 780 399 | 27,100 8,377 780 760 380 | 31,660 11,025 944 944 472 | 45,680 29,625 1,893 2,143 1,244 | 50,960 8,901 2,454 3,577 2,455 | 26,060 513 2,561 1,212 | 210,680 67,481 8,705 11,111 6,173 | Delinquency letter sent and arbitration demanded. Shortage take from payments on adjusted gross wages. Period of Scholtmann "abeyance" award. |
| 3317 | Regal Care Center | B P C J | 65,360 21,574 1,830 1,850 | | | 62,060 255 | 34,033 | 2,699 5,274 2,061 | 65,260 120,168 7,064 2,061 | Delinquency letter sent and arbitration demanded. Period of Scholtmann "abeyance" award. |
| 41611 | Regency Extended Care Center | B P C J | 82,850 19,500 1,500 1,900 900 | 16,518 1,691 | 23,254 | 54,549 | 15,273 | 14,818 2,376 | 62,850 145,972 5,914 1,900 900 | Delinquency letter sent and arbitration demanded. Period of Scholtmann "abeyance" award. |
| 41525 | Regency Park Nursing Center | B P C J | 12,250 | 13,340 | 9,350 | 26,390 326 | 6,270 | | 67,330 326 | Delinquency letter sent and arbitration demanded. |
| 41612 | Rego Park Nursing Home | B P C J | 45,000 16,100 | 330 14,765 1,264 255 | 360 16,434 316 | 600 326 | 2,070 12,644 | 24,230 18,740 3,284 1,039 | 76,590 80,683 4,548 1,915 | Delinquency letter sent and arbitration demanded. Period of Scholtmann "abeyance" award. |

"Greater" Funds Delinquency Report

December 2003

03/17/2004

| ID# | Institution | | 12/03 1 Month | 11/03 2 Months | 10/03 3 Months | 07/03-09/2003 4-6 Mos. | 01/03-06/03 7-12 Pos. | 12/02 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 8326 | River Manor | B | 76,610 | | | 83,075 | 50,550 | 9,979 | 76,600 | Delinquency letter sent and arbitration demanded. |
| | | P | 22,769 | | | | | | 166,151 | Shortages due to paying WIF at 12% instead of 16% |
| | | E | 3,135 | | | | | | 2,135 | |
| | | C | 2,144 | | | | | | 5,316 | Period of Schulman "Abeyance" Award |
| 41762 | Riverhead Nursing Home | B | 16,600 | 14,540 | 11,700 | 100,330 | 24,270 | 55,065 | 157,440 | Delinquency letter sent and arbitration demanded. |
| | | P | | | 16,504 | 33,496 | | | 194,065 | Shortages due to paying WIF at 12% instead of 16%. |
| | | E | 1,600 | 1,818 | 1,462 | 4,355 | 3,014 | | 12,105 | Period of Schulman "Abeyance" award. |
| | | C | 810 | | | | | | 810 | |
| 41033 | Rockville Nursing Center, Inc. | B | | 16,090 | 13,470 | 41,510 | 19,076 | 49,220 | 101,140 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | 60,650 | | | 100,520 | Shortages due to paying WIF at 12% instead of 16%. |
| | | E | 1,800 | 2,011 | 1,684 | 4,355 | 3,014 | | 2,011 | Period of Schulman "Abeyance" award. |
| | | C | | 2,011 | | 4,138 | 3,683 | | 14,566 | |
| 41041 | Saint James Healthcare Center | B | 71,800 | 16,850 | 20,820 | 54,210 | 15,860 | 77,805 | 200,340 | Delinquency letter sent and arbitration demanded. |
| | | P | 26,200 | 24,604 | | | | | 128,699 | Shortages due to paying WIF at 12% instead of 16%. |
| | | E | 2,200 | 2,106 | | | | | 4,306 | Period of Schulman "Abeyance" award. |
| | | C | 769 | | | | | | 763 | |
| 41066 | Saint James Plaza | B | 14,190 | 16,170 | 13,140 | 125,588 | 32,470 | 47,100 | 215,550 | Delinquency letter sent and arbitration demanded. |
| | | P | | 2,021 | 18,720 | 42,481 | 4,058 | | 106,151 | Shortages due to paying WIF at 12% instead of 19%. |
| | | E | 1,808 | 2,021 | 1,653 | 3,637 | | | 7,301 | Period of Schulman "Abeyance" award. |
| | | C | 900 | | 1,643 | 5,648 | | | 14,970 | |
| | | J | | | | | | | 900 | |
| 41048 | San Simeon by the Sound | B | 46,470 | 9,470 | 10,670 | 26,690 | 7,270 | | 100,570 | Delinquency letter sent and arbitration demanded. |
| | | P | 4,621 | 1,160 | | | | | 5,781 | Shortages due to paying WIF at 12% instead of 16%. |
| | | E | 1,419 | | | | | | 1,419 | |
| | | C | 709 | 580 | | | | | 1,283 | |
| 8324 | Sands Point (BKC) | B | | | | 8,881 | 1,013 | 6,430 | 6,430 | Delinquency letter sent and arbitration demanded. |
| | | P | 1,179 | 1,384 | 282 | 170 | | 10,080 | 19,574 | Period of Schulman "Abeyance" award. |
| | | E | | 116 | | | | 1,561 | 3,924 | |
| | | C | | | | | | 2,282 | 2,310 | |
| 8315 | Sands Point (LPN) | B | | 202 | 290 | 3,241 | 1,045 | 530 | 530 | Delinquency letter sent and arbitration demanded. |
| | | P | | 202 | | | | 2,653 | 6,586 | Printed of Schulman "Abeyance" award. |
| | | E | | 202 | | | | 1,385 | 2,653 | |
| | | C | | | | | | 459 | 1,385 | |
| | | J | | | | | | | 461 | |
| 41007 | Sea Harbor Manor | B | 792,300 | 74,610 | 653,210 | 127,810 | 38,000 | 80,672 | 414,853 | Delinquency letter sent and arbitration demanded. |
| | | P | 28,900 | 27,231 | 35,447 | 86,253 | | | 256,055 | Shortages due to paying WIF at 12% instead of 16%. |
| | | E | 2,500 | 2,331 | 2,564 | 7,591 | 5,155 | | 20,241 | Period of Schulman "Abeyance" award. |
| | | C | 2,500 | 2,331 | 2,564 | 1,834 | | | 9,729 | |
| | | J | 1,200 | 1,166 | 1,432 | 3,695 | 7,050 | 3,940 | 18,483 | |
| 41010 | LICP Bayview Nursing Home | B | | 1,781 | 19,700 | 48,550 | 41,050 | 51,759 | 123,540 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | 70,809 | | | 134,568 | Shortages due to paying WIF at 12% instead of 16% |
| | | E | | | | | 157 | | 1,935 | Period of Schulman "Abeyance" award. |
| | | C | | | | | 414 | | 414 | |
| | | J | | | | | | 207 | 207 | |

"Greater" Funds Delinquency Report

December 2003

003172004

| ID# | Installation | | 12/03 1 Month | 11/03 2 Months | 10/03 3 Months | 9/03 3 Months | 07/01-9/03 4-6 Mos. | 01/01-6/03 7-12 Mos. | 12/02 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Aging Schedule | | | | |
| 8349 | University | B | 4,500 | | | | | | | 4,500 | Delinquency letter sent and arbitration demanded. |
| | | P | 1,500 | | | | | | 3,582 | 3,582 | Shortages arise from payments on adjusted gross wages |
| | | E | 172 | | | | | | 112 | 112 | |
| | | C | 100 | | | | | | 168 | 268 | |
| | | J | | | | | | | | | |
| 8351 | Yonkers | B | 34,200 | 12,100 | | | 35,385 | 42,124 | | 66,300 | Delinquency letter sent and arbitration demanded. |
| | | P | 11,200 | 10,513 | | | | | | 79,422 | Period of Sabotment "abeyance" award. |
| | | E | 1,000 | 510 | | | | | | 1,910 | |
| | | C | 1,000 | 908 | | | | | | 1,908 | |
| | | J | | | | | | | | | |
| 8357 | Woodcrest | B | 49,600 | | | | 41,684 | 32,561 | 113 | 41,570 | Delinquency letter sent and arbitration demanded. |
| | | P | 14,500 | | | | | | | 82,353 | Period of Sabotment "abeyance" award. |
| | | E | 1,300 | | | | | | | 2,477 | |
| | | C | 1,190 | 1,046 | 1,328 | | 2,855 | 26,571 | 271 2,380 | 9,189 | |
| | | J | | | | | | 970 | | | |
| 8392 | Cliffside | B | 20,200 | 1,491 | 366 | | 59,925 | 356.10 | 224 | 116,559 | Delinquency letter sent and arbitration demanded. |
| | | P | | 294 | | | 297 | | | 1,491 | Period of Sabotment "abeyance" award. |
| | | E | | | | | | | | 557 | |
| | | C | | | | | | | | | |
| 8934 | Fort Tryon | B | 59,600 | 56,700 | 1,310 | | 38,496 | 39,461 | 72,190 | 183,570 | Delinquency letter sent and arbitration demanded. |
| | | P | 17,600 | 18,600 | 322 | | 849 | 382 | 4,666 | 114,479 | Hearing of arbitration scheduled for 10 February 2004. |
| | | E | 1,600 | 1,600 | 1,516 | | 4,134 | 2,703 | 2,513 | 10,493 | Period of Sabotment "abeyance" award. |
| | | C | 1,500 | 1,505 | 759 | | | 606 | | 13,366 | |
| | | J | 820 | 808 | | | | | | 2,564 | |
| 8516 | Franklin Rehabilitation and Nursing Cen | B | 87,200 | 101,830 | | | | | | 217,110 | Delinquency letter sent and arbitration demanded. |
| | | P | 28,600 | 33,335 | | | 86,631 | 52,976 | 28,980 | 201,559 | Shortages arise from payment on adjusted gross weight |
| | | E | 2,400 | 1,855 | 2,779 | | | | | 9,952 | Period of Sabotment "abeyance" award. |
| | | C | 2,400 | 2,855 | 2,779 | | 6,274 | 1,405 | 1,523 | 15,711 | Hearing of arbitration scheduled for 5 February 2004. |
| | | J | 1,500 | 748 | | | | | | 1,248 | |
| 15001 | Huntington Hills Center for Health & Re | B | 20,850 | 20,070 | 30,390 | | 101,640 | 55,850 | 73,070 | 341,833 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | 18,955 | 75,715 | 14,116 | 179,505 | Shortages item rate increase to 10% effective 10/1/02, Contract states rate to be determined by arbitrator. |
| | | E | | 2,509 | 1,703 | | | | | 2,509 | Period of Sabotment "abeyance" award. |
| | | C | | | | | | | | 1,703 | Hearing of arbitration scheduled for 25 February 2004. |
| | | J | | | | | | | | | |
| 8902 | New Vanderbilt | B | 77,700 | 72,870 | 23,401 | | 46,435 | 71,396 | 3,112 | 150,570 | Delinquency letter sent and arbitration demanded. |
| | | P | 25,400 | | 1,703 | | | | | 171,522 | Period of Sabotment "abeyance" award. |
| | | E | 2,300 | 1,996 | | | 5,557 | | | 4,195 | Hearing of arbitration scheduled for 5 February 2004. |
| | | C | 2,200 | 2,047 | 2,432 | | | | | 13,328 | |
| | | J | | | | | | | | | |

"Greater" Funds Delinquency Report

December 2003

02/17/2004

| EIN | Institutions | | 12/00 | 11/01 2 Months | 11/01 3 Months | 11/01 | 01/02-12/02 | 01/02-12/02 7-12 Mos. | 01/02-12/03 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41509 | Oceanside Care Center | B | 215,700 | 24,300 | 82,350 | 27,310 | 10,730 | 15,215 | 1,235 | 90,040 | Delinquency letter sent and arbitration demanded. |
| | | P | 8,400 | 8,000 | | | 22,528 | 579 | 819 | 55,376 | Period of Solheman "abeyance" award. |
| | | H | 700 | 700 | 2,310 | 822 | 1,999 | 1,466 | 2,032 | 5,619 | Hearing of arbitration scheduled for 23 February 2004. |
| | | C | 730 | 600 | 2,310 | 822 | 1,674 | | 954 | 7,234 | |
| | | J | 300 | 100 | 100 | 411 | 964 | 916 | | 2,815 | |
| 41209 | Promenade | B | 57,500 | | 82,350 | 27,310 | 6,700 | | 1,235 | 84,200 | Delinquency letter sent and arbitration demanded. |
| | | P | 16,800 | | | | 59,215 | 31,691 | | 109,206 | Period of Solheman "abeyance" award. |
| | | H | 1,600 | 306 | 1,550 | 1,826 | 296 | | | 4,956 | Hearing of arbitration scheduled for 23 February 2004. |
| | | C | 1,600 | 306 | 165 | 165 | 296 | | | 2,597 | |
| | | J | 1,600 | 306 | 306 | 355 | | | | 2,597 | |
| 6328 | | B | 57,500 | | | | 6,700 | | | 84,200 | Delinquency letter sent and arbitration demanded. |
| | | P | 16,800 | | | | 59,215 | 31,691 | | 109,206 | Period of Solheman "abeyance" award. |
| | | H | 1,600 | 306 | 1,550 | 1,826 | 296 | | | 4,956 | Hearing of arbitration scheduled for 23 February 2004. |
| | | C | 1,600 | 306 | 165 | 165 | 296 | | | 2,587 | |
| | | J | 1,600 | 306 | 306 | 355 | | | | 2,597 | |
| 6324 | Riverdale | B | 29,590 | | 9,852 | 13,155 | 24,244 | 10,883 | 5,550 | 33,140 | Delinquency letter sent and arbitration demanded. |
| | | P | 5,695 | 844 | | | | | 1,582 | 69,783 | Period of Solheman "abeyance" award. |
| | | H | 870 | | | | 296 | | | 2,597 | Hearing of arbitration scheduled for 23 February 2004. |
| | | C | 1,038 | | | | 296 | | | 1,674 | Hearing of arbitration scheduled for 23 February 2004. |
| | | J | | | | | | | | 1,038 | |
| 6331 | Silver Lake Specialized Care Center | B | 57,550 | 15,168 | | 18,466 | 50,656 | 35,605 | 22,410 | 81,360 | Delinquency letter sent and arbitration demanded. |
| | | P | 18,582 | | | | | | 2 | 182,040 | Period of Solheman "abeyance" award. |
| | | H | 1,625 | 1,299 | | 1,381 | 3,225 | 2,397 | 21 | 1,647 | Hearing of arbitration scheduled for 23 February 2004. |
| | | C | 813 | | | | | | | 10,627 | |
| | | J | | | | | | | | 813 | |
| 41051 | Tarrytown Hall Care Center | B | 22,400 | 2,140 | 2,720 | | 6,730 | 31,970 | 1,370 | 59,599 | Delinquency letter sent as arbitration demanded. |
| | | P | 7,300 | 6,845 | 325 | | 11,038 | | | 25,558 | Period of Solheman "abeyance" award. |
| | | H | 600 | 703 | | | | | | 1,203 | Hearing of arbitration scheduled for 5 February 2004. |
| | | C | 452 | | | | | | | 452 | |
| 41618 | Woodmere Nursing & Rehabilitation Ce | B | 95,300 | 99,500 | 55,020 | 53,550 | 200,990 | | | 527,460 | Delinquency letter sent and arbitration demanded. |
| | | P | 32,200 | 32,600 | 718 | 93,704 | 432 | | | 154,564 | Hearing of arbitration scheduled for 3 February 2004. |
| | | H | 2,800 | 2,800 | | | 276 | | | 6,318 | Union requesting audit for this employer. |
| | | C | 2,790 | 2,600 | | | | | | 4,732 | Period requesting audit for this employer. |
| | | J | 1,400 | 1,400 | | | | | | 3,076 | Period of Solheman "abeyance" award. |
| 8933 | Kingsbridge | B | 98,740 | 82,350 | | 86,780 | 51,721 | 159,001 | | 157,459 | Hearing 10/14/03. Award to be issued. |
| | | P | 33,342 | 26,956 | 2,887 | 7,430 | 4,934 | 3,869 | | 25,219 | Favorable NLRB ruling. Instinctive expecting. Employer |
| | | C | 2,769 | 2,310 | 2,887 | 6,241 | 11,267 | 6,929 | | 32,543 | claim not bound by new Greater NY agreement. |
| | | | 2,769 | 2,310 | | | 4,885 | 5,372 | | 8,257 | |
| 3564 | Laconia | B | 55,900 | 7,030 | | 51,399 | | 36,549 | 217 | 62,980 | Delinquency letter sent and arbitration demanded. |
| | | P | 17,550 | | | 1,559 | | | 4,494 | 103,548 | Hearing held 10/14/03. Award to be issued for |
| | | H | 1,214 | | | | 1,313 | 770 | 2,197 | 3,090 | all full Pension through 6/03. |
| | | C | 1,400 | | | | | | | 7,277 | Period of arbitrator "abeyance" award. |
| | | | 850 | | | | | | | 3,767 | |
| 3311 | Park Nursing Home | B | 52,000 | 49,680 | 66,410 | 46,190 | 51,721 | 159,001 | | 228,080 | Delinquency letter sent and arbitration demanded. |
| | | P | 17,000 | 18,207 | 19,787 | 1,515 | 4,934 | 3,869 | | 68,109 | Hearing held Sept 16, 2003. Award to be issued for CCF and JSF |
| | | H | 1,500 | 1,383 | 1,694 | 1,274 | 4,681 | | 4,459 | 5,356 | through June 2003. |
| | | C | 1,500 | 1,385 | 1,694 | 3,715 | | | | 19,417 | Period of Solheman "abeyance" award. |
| | | J | 700 | 694 | 827 | 2,160 | 4,756 | | 2,145 | 10,722 | Period of arbitration "abeyance" award. |

Greater Funds Delinquency Report

December 2003

02/17/2004

| ID# | Institution | | 1 Month | 2 Months | 3 Months | 07/01-09/30 4-6 Mos. | 7-12 Mos. | 01/01-06/03 | >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3722 | Resort | B | 36,300 | 37,530 | | 54,187 | 57,832 | | | 95,530 | Hearing 10/14/03. No jurisdiction referred by employer. |
| | | P | 18,600 | 12,224 | 1,865 | 4,599 | 4,402 | 714 | 3,634 | 128,463 | Award to be issued. |
| | | C | 1,600 | 1,483 | 1,865 | 4,033 | 7,397 | 2,707 | 4,130 | 14,049 | Favorable NLRB ruling. Institution appealing. Employer |
| | | J | 1,600 | 1,483 | | | 3,122 | 1,847 | | 21,192 | claims not bound by new Greater NY agreement. |
| | | | | | | | | | | 5,453 | |
| 41631 | Rockville Residence Manor | B | 37,670 | 20,120 | | 19,390 | | | | 19,390 | Delinquency letter sent and arbitration held 7/28/03 and 12/16/03. |
| | | P | | 8,751 | 38,690 | | 208,750 | | | 3,434 | Shortages due to paying W/F at 12% instead of 16%. |
| | | C | | 339 | 296 | 1,253 | 44,130 | 9,147 | | 1,844 | Period of Schelzman "abeyance" award. |
| | | J | | 391 | | | | | | 3,960 | |
| | | | | | | | | | | 1,847 | |
| 8355 | Willoughby Nursing Home | B | | | | 102,330 | | | | 198,500 | Delinquency letter sent and arbitration demanded. |
| | | P | | | | | | | | 53,177 | Shortages arise from institution implementing staff help. |
| | | C | | | | | | | | 539 | Hearings held 11/19/03 and 11/24/03. Award issued 12/1/03 through |
| | | J | | | | | | | | 391 | Dec. 2003. Directed back to be done through Dec 2003 prior to |
| | | | | | | | | | | | determining liability for that period. |
| 8356 | Windsor Park | B | 15,600 | | 799 | 550 | | | | 16,510 | Delinquency letter sent and arbitration demanded. |
| | | P | 5,000 | 356 | 259 | 15,611 | | | | 15,019 | Hearing held Sep 16, 2003. Pension part of industry wide problem. |
| | | J | 400 | | 477 | 318 | | | | 1,571 | Period of Schelzman "abeyance" award. |
| 8409 | Brookhaven Estate | B | 42,770 | | 24,790 | 51,574 | | 67,620 | 90,390 | Delinquency letter sent and arbitration demanded. |
| | | P | 20,700 | | 4,750 | | | 48,037 | 120,711 | Award issued 01/26/04 through 12/31/03. To be paid within |
| | | C | 448 | 511 | | | | | 448 | 30 days, unless payout agreement is reached. |
| | | J | 1,782 | | 1,193 | | | | 1,786 | Period of Schelzman "abeyance" award. |
| 8385 | Surma Park Center | B | 57,300 | 33,890 | | 7,170 | | 41,770 | 169,700 | Delinquency letter sent and arbitration demanded. |
| | | P | 18,793 | 948 | 19,010 | | | | 77,234 | Award issued 01/26/04 through 12/31/03. To be paid within |
| | | F | 1,659 | 948 | 1,530 | 201 | | 42 | 4,464 | 30 days, unless payout agreement is reached. |
| | | C | 1,609 | 948 | 2,048 | | | 2,551 | 5,149 | Period of Schelzman "abeyance" award. |
| 41617 | Wedgewood Health Care Center | B | 54,239 | 16,620 | 16,760 | 164,900 | | 42,550 | 298,650 | Delinquency letter sent and arbitration demanded. |
| | | P | | 13,216 | 45,660 | 18,435 | | 3,241 | 72,533 | Hearing held 11/19/03 and 11/24/03. Award issued 12/01/03 through |
| | | C | | | | 201 | | | 201 | Oct.2003. To pay J/3 11/24/03, 2/24/03 and 3/24/03. |
| | | J | | | | | | | | Period of Schelzman "abeyance" award. |
| 8394 | White Plains | B | 43,800 | 45,700 | | 30,849 | | 310 | 89,810 | Delinquency letter sent and arbitration demanded. |
| | | P | 14,502 | 15,000 | 44,284 | | | | 104,485 | Hearing held 12/09/03. Award issued 12/03/03 through 11/03/03. |
| | | F | 1,203 | 1,300 | | | | | 2,500 | Period of Schelzman "abeyance" award. |
| | | C | 600 | 600 | | | | | 2,400 | |
| | | J | | | | | | | | 1,100 | |

Greater Faints Delinquency Report

December 2003

03/17/2004

| Id# | Institution | | 1/2/03 1 Month | 1/1/03 2 Months | 1/0/03 3 Months | 10/0/03 4-6 Mos. | 07/01/2003 7-12 Mos. | 01/00-06/03 >1 Year | >2/03 >2 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Confirmation of Judgments in Progress | | | | |
| 8750 | American Geriatric Care | S | 35,078 | | 22,120 | 22,560 | 92,810 | 8,640 | | 166,700 | Award to be issued through February 2004. Confirmation of |
| | | B | 72,007 | | 4,461 | 4,538 | 17,545 | 540 | | 42,549 | Judgment in process; 12-month payout for Benefit |
| | | E | 922 | | 631 | 650 | 2,484 | 2,032 | | 6,796 | Fund, 24-month payment for Pension and Education. |
| | | C | | | | | | | | | Period of Settlement "elegance" award. |
| 8615 | Kings Harbor Care Center | B | | 193,930 | 245,620 | 643,660 | 794,260 | 21,462 | | 1,875,370 | Delinquency letter sent and arbitration demanded. |
| | | P | | 62,908 | 79,302 | 208,770 | 293,905 | | | 666,347 | Hearing held 11/18/03. Award issued. |
| | | E | | 5,386 | 6,790 | 17,545 | | | | 12,176 | COH in progress through November 2003. |
| | | C | | 5,386 | 5,723 | | | | | 11,115 | Period of Settlement "elegance" award. |
| | | D | | 2,653 | 2,865 | | | | | 5,558 | Period of Settlement "elegance" award. |
| 8559 | Clinton Park | B | 44,030 | | | 69,370 | 137,550 | 157,550 | 2,230 | 203,860 | Delinquency letter sent and arbitration demanded. |
| | | P | 14,429 | 11,455 | | 44,877 | 44,877 | | | 70,711 | COH in process, awaiting signature. Making payments |
| | | E | 1,216 | 973 | | 52,664 | 3,414 | | | 5,629 | Period of Settlement "elegance" award. |
| | | C | 618 | 979 | | 4,509 | 3,746 | | | 8,180 | |
| | | J | | 693 | | 1,693 | 2,268 | | | 4,011 | Period of Settlement "elegance" award. |
| 8529 | Lawrence | D | 52,600 | 49,070 | 61,000 | 158,750 | 239,800 | 23,660 | | 804,970 | Delinquency letter sent and arbitration demanded. |
| | | P | 17,200 | 16,675 | 19,941 | 51,998 | 90,073 | 34,015 | | 229,410 | Hearing held 11/18/03. Award issued. |
| | | C | | 1,376 | 1,711 | | | 457 | | 5,344 | COH in progress through 12/31/03. |
| | | | | | | | | | | | Period of Settlement "elegance" award. |
| 8595 | Lily Pond | B | 7,600 | 6,890 | 8,440 | 25,660 | 4,080 | 5,790 | | 57,840 | Delinquency letter sent and arbitration demanded. |
| | | P | 2,500 | 2,157 | 2,764 | 6,199 | 5,900 | | | 21,620 | Arbitration held 12/16/01. Award issued. |
| | | E | 200 | 159 | 277 | 643 | | | | 1,275 | COH in progress through 11/30/01. |
| | | C | 200 | 193 | 237 | 568 | | | | 1,178 | Period of Settlement "elegance" award. |
| 8597 | Long Island | B | 55,100 | 51,750 | 69,370 | 136,790 | 290,100 | 4,665 | | 386,110 | Delinquency letter sent and arbitration demanded. |
| | | P | 17,400 | 16,950 | 52,664 | 52,664 | 73,842 | 7,242 | | 187,204 | Hearing held 11/18/01. Award issued. |
| | | E | 1,500 | 1,451 | 1,699 | 4,509 | 7,926 | | | 19,421 | COH in progress through 12/31/03. |
| | | C | 1,500 | 1,451 | 1,693 | 3,872 | 5,155 | | | 13,711 | Period of Settlement "elegance" award. |
| | | | | | | | 1,573 | | | 1,573 | Period of Settlement "elegance" award. |
| 8371 | New Bridgeview | B | 59,200 | 36,548 | 46,690 | 114,020 | 11,940 | 164,640 | | 405,360 | Arbitration held 08/12/03. Award issued 08/19/03 through 06/30/03. |
| | | P | | | | 31,551 | 18,355 | 27,997 | | 80,287 | Shortages aside from payments on adjusted gross wages |
| | | E | 1,100 | 1,025 | 1,309 | 3,198 | | 11,180 | | 7,413 | Shortages aside from payments on adjusted gross wages |
| | | C | 1,100 | 1,025 | 1,309 | 2,752 | | 56 | | 6,742 | Hearing held 27 January 2004. Award to be issued thru 12/03. |
| | | J | 600 | 515 | 665 | 1,599 | | 35 | | 3,401 | Hearing held 27 January 2004. Award to be issued thru 12/03. |
| 41033 | New Mayfair Company, Inc. | B | 55,500 | 53,368 | 41,460 | 108,390 | 265,450 | | | 244,860 | Arbitration held 08/13/03. Award issued 08/19/03 through 06/30/03. |
| | | P | | | | 39,126 | 24,474 | | | 64,000 | Seeking 24-month payout with COL. |
| | | E | 1,100 | 1,043 | 1,216 | 3,184 | 135 | | | 6,948 | Hearing held 27 January 2004. Award to be issued thru 12/03. |
| | | C | 1,099 | 1,043 | 1,286 | 3,194 | | | | 6,812 | |
| | | J | 501 | 521 | 643 | 1,632 | | | | 3,457 | |
| 8572 | New Midway | B | 41,200 | 34,450 | 48,920 | 125,460 | 36,400 | 56,660 | | 346,430 | Arbitration held 08/12/03. Award issued 08/19/03 through 06/30/03. |
| | | P | | 280 | 3,150 | 41,085 | 26,413 | 21,095 | | 89,314 | Shortages aside from payments on adjusted gross wages. |
| | | E | 1,300 | 1,678 | 1,355 | 3,533 | | 2,249 | | 9,400 | Seeking payout and COL. |
| | | C | 409 | | 677 | 1,759 | | | | 409 | Hearing held 27 January 2004. Award to be issued thru 12/03. |
| | | J | 509 | 539 | | | | 534 | | 4,108 | |
| 41557 | Ocean Franconette Nursing Center | B | 23,800 | 24,609 | 32,940 | 66,860 | 176,660 | 1,820 | | 316,920 | Delinquency letter sent and arbitration demanded. |
| | | E | 12,400 | 11,700 | 14,762 | 12,615 | 6,395 | 18,602 | | 56,672 | COH in progress through 11/30/01. |
| | | C | 859 | | | | 6,745 | | | 7,614 | Shortages aside from payments on adjusted gross wages |
| | | J | 1,000 | | | 1,755 | 6,669 | 1,593 | | 9,222 | Award issued through March 2003 for Pension. |
| | | C | 500 | | | | 3,314 | 795 | | 4,450 | Period of Settlement "elegance" award. |

'Greater' Funds Delinquency Report

December 2003

02/17/2004

| ID# | Institution | | Current | 1-30 | 31-60 3 Months | 61-90 | 07/01-09/01 | 9/1/03-06/01 | 24 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8307 | Oceanview | B P E C | 18,978 | 7,448 157 636 | | | | | | | |
| 41024 | Tend. View Nursing Home | B P E C | | 51,640 18,850 1,614 827 | 19,860 15,560 1,102 626 | 187,840 64,562 3,323 3,225 1,662 | 166,510 | 69,730 77,540 | 514,020 180,312 7,041 6,191 3,925 | Delinquency letter sent and arbitration demanded. Shortages, due to paying W/E at 12% instead of 18%. COI in progress. Period of Schulman "abeyance" award. |
| 41892 | Glen Haven Residential Healthcare Faci | B P E C | 34,990 14,210 1,218 609 | 28,310 10,342 835 443 | 1,051 1,091 545 | 98,740 36,323 3,110 3,110 1,555 | 6,783 7,323 2,221 1,110 | 146,620 38,248 7,325 1,088 544 | 346,590 99,143 20,409 8,613 4,866 | Confession of Judgment through November 30, 2001. Period of Schulman "abeyance" award. |
| 4027 | Forest View Care Center | B P C | 930 | 6,700 | 890 | 13,710 | 22,808 | 105,510 | 148,720 | Confession of judgment. |
| 41003 | Crystal Lake Rehabilitation Center | B P C | | | 34,900 | 217,710 | 57,650 | 6,105 | 84,760 13,724 | Confession of Judgment through 11/03/04. |
| 41756 | Palm Beach Home for Adults | B P C | | 6,100 | 7,550 | 17,660 | 21,310 | 7,500 | 60,550 | Delinquency letter sent and arbitration demanded. Hearing held 09/16/03. Award to be issued. COI in progress through 10/21/03. Period of Schulman "abeyance" award. Delinquency letter sent and arbitration demanded. NLRB charges pending. Hearing held 11/18/01, seeking COI. Award issued. |
| 41028 | Glengariff Nursing Home | B P E F C | 68,540 23,921 2,044 2,645 1,024 | 60,250 21,992 1,883 1,883 541 | 76,320 4,164 2,385 2,385 1,093 | 246,130 89,839 7,692 7,692 3,846 | 50,330 4,043 15,057 7,373 3,616 | 337,010 85,605 16,624 | 835,593 231,957 45,724 21,151 10,692 | Confession of Judgment through November 30, 2001. Period of Schulman "abeyance" award. |
| 8375 | Healthcare Services-Palm Gardens | B P C | 62,100 23,571 2,036 2,200 1,100 | 2,056 | 502 | 161,780 59,450 6,170 5,544 3,087 | 13,000 34,943 | 152,690 69,506 357 4,227 40 | 389,599 187,470 8,465 11,469 4,227 | Confession of Judgment through 09/30/03. Period of Schulman "abeyance" award. |
| 8312 | Healthcare Services-Palm Tree | B P C | 14,200 5,900 494 350 | 69 | 115 | 42,620 13,267 2,247 1,257 494 | 12,098 | 25,840 7,308 | 62,660 36,073 1,841 2,777 494 | Confession of Judgment through 08/30/03. Period of Schulman "abeyance" award. |

'Greater' Funds Delinquency Report

December 2003

02/17/2004

| Ref | Institution | | 1 Month | 2 Months | 3 Months | 4-6 Mos. | 7-12 Mos. | >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41571 | Perth Amboy Care Center | B P E H C J | | | | | 34,350 | 49,420 | 87,760 | |
| 41717 | Plaza Rehabilitation and Nursing Center | B P E H C J | | 13,700 | 13,571 | 20,750 | 24,200 | | 82,330 | Confession of Judgment. |
| 8311 | Prospect Park | B P E H C J | 1,387 | 390 | 936 | 1,188 | 2,274 | 1,467 | 2,602 | 4,523 | Confession of Judgment. |
| 8358 | Workmen's Circle Multicare Center | B P E H C J | 91,790 41,500 3,410 3,500 1,800 | | 148,740 48,717 4,171 4,171 2,016 | 384,780 126,000 70,780 9,563 5,395 | 318,940 241,027 70,606 16,509 10,318 1,807 | 1,298,190 346,731 53,182 4,301 1,940 | 2,434,440 704,303 54,189 38,344 21,406 | Confession of judgment and award through October 2003. Period of Stabiment "abeyance" award. |
| | Confession of Judgment [shaded] 14.67% | | | | | | | | | Confession of judgment and award through October 2003. Period of Stabiment "abeyance" award. |
| 41733 | Central Island Nursing Home | B P E H C J | 2,100 1,000 | 68,710 22,158 1,397 949 | 75,760 24,577 2,399 1,200 | 204,320 79,550 6,385 6,383 3,177 | 318,940 237 2,412 | 421,360 173,113 10,912 15,260 6,426 | Delinquency letter sent and arbitration demanded. 1st step arbitration letter sent 01/30/04. Period of Stabiment "abeyance" award. |
| 8960 | Clearview Nursing Home | B P E H C J | 16,992 1,455 1,455 | 66,010 21,757 1,863 1,363 | 51,790 1,452 1,452 | 106,030 54,238 2,963 3,223 | | 41,971 1,006 818 511 | 276,190 135,658 8,759 8,816 511 | Arbitrator to issue award through January 2004. COJ in progress thru Jan. 2004. Period of Stabiment "abeyance" award. 1st step termination letter sent 01/30/04. |
| 41024 | Confidence Management-Regency Park | B P E H C J | 500 | 600 | 600 | 800 | | 2,700 | Delinquency letter sent and arbitration demanded. 1st step termination letter sent 01/30/04. |
| 41777 | Confidence Management-Windsor Oaks | B P E H C J | 4,000 | 3,980 | 3,938 | 4,160 | 260 | 1,340 | 17,760 | Delinquency letter sent and arbitration demanded. 1st step termination letter sent 01/30/04. |
| 8971 | David | B P E H C J | 170,900 56,000 4,800 4,800 2,400 | 157,670 51,642 4,421 4,421 2,311 | 192,070 9,255 5,386 2,693 | 354,510 153,267 12,919 7,503 | 2,120 105,934 22,847 14,280 | 110 41,396 6,523 | 847,380 382,443 23,902 64,789 36,015 | Delinquency letter and arbitration demanded. Hearing scheduled 02/05/04. 1st step termination letter sent 01/30/04. |

| Id | Institution | | 10/03 1 Month | 11/03 2 Months | 11/03 3 Months | 10/03 4-6 Mos. | 07/13-10/03 7-12 Mos. | 01/02-6/03 13-24 Mos. | 1/02 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8979 | Eastchester Park | B | 98,650 | 87,340 | 100,690 | 262,770 | 369,310 | | 93,000 | 1,020,593 | Delinquency letter sent and arbitration demanded. |
| | | P | 2,710 | 24,805 | 32,981 | 85,086 | 157,251 | | 26,203 | 359,122 | Hearing postponed from 8/07/2003. |
| | | | 2,110 | 2,466 | 2,824 | 7,465 | 9,747 | | 7,263 | 33,366 | 1st step termination letter sent 01/30/04. |
| | | C | 2,110 | 2,466 | 2,824 | 6,343 | 8,747 | | 4,713 | 27,303 | Period of Subrimann "abeyance" award. |
| | | J | 155 | 1,233 | 1,412 | 3,686 | 3,467 | | 2,827 | 14,172 | |
| 8977 | Far Rockaway | B | 25,500 | 22,510 | 25,520 | 20,100 | | | 3,700 | 111,000 | Delinquency letter sent and arbitration demanded. |
| | | P | 8,300 | 7,574 | 9,670 | 9,364 | | | 5,171 | 55,379 | Award issued 01/26/04 through 12/31/03. To be paid within |
| | | C | 700 | 631 | 828 | 1,508 | | | 1,561 | 5,226 | 30 days, unless payout agreement is reached. |
| | | J | 700 | 631 | 823 | 814 | | | | 2,573 | Benefits termination scheduled for 5 February 2004. |
| | | | | | | | | | | | Period of Subrimann "abeyance" award. |
| 3613 | Friedwald House | B | 35,300 | 34,240 | 41,960 | 29,500 | | | 29,503 | 140,500 | Delinquency letter sent and arbitration demanded. |
| | | P | 11,900 | 10,886 | 13,414 | 10,355 | | | | 40,388 | Shortages arise from payments on adjusted gross wages |
| | | C | 1,000 | 932 | 1,140 | 2,025 | | 357 | 1,114 | 6,593 | Period of Subrimann "abeyance" award. |
| | | J | 1,006 | 932 | 1,166 | 814 | | | | 3,098 | 1st step termination letter sent 01/30/04. |
| 8953 | Gold Crest | B | 31,690 | | 28,260 | 40,440 | 930 | | | 101,230 | Delinquency letter sent and arbitration demanded. |
| | | P | 10,230 | | | 32,397 | 1,013 | | 17,447 | 61,146 | Hearing held Sep 16, 2003. |
| | | C | 900 | 821 | 792 | 1,013 | | | | 3,326 | Period of Subrimann "abeyance" award. |
| | | J | 900 | 10 | 722 | 949 | | | | 2,611 | 1st step termination letter sent 01/30/04. |
| 3395 | Greenpark | B | 47,220 | | 51,410 | 82,145 | 53,689 | | 5,023 | 164,180 | Delinquency letter sent and arbitration demanded. |
| | | P | 22,255 | 31,038 | | 7,803 | 4,596 | | 5,230 | 189,127 | Arbitration held 10/21/03. Award to be issued for all but Pension. |
| | | C | 1,905 | 2,657 | 2,663 | 6,631 | 10,167 | | 2,917 | 23,282 | Period of Subrimann "abeyance" award. |
| | | | 1,303 | 2,657 | 2,063 | | 4,055 | | | 28,873 | 1st step termination letter sent 01/30/04. |
| | | | | | | | | | | 6,973 | Hearing of arbitration scheduled 28 January 2004. |
| 41764 | Hoffman Manor | B | | | | | 5,040 | | 5,040 | 10,980 | Delinquency letter sent and arbitration demanded. |
| | | | | | | | | | | | Payments returned for insufficient funds. |
| | | | | | | | | | | | 1st step termination letter sent 01/30/04. |
| 8845 | Mapletonville Health Care Center, Inc. | B | 26,810 | 31,870 | 25,200 | 56,140 | | | 12,517 | 140,070 | Arbitrator to issue award through January 2004. |
| | | P | 2,824 | 3,354 | | 4,538 | 1,632 | | 1,660 | 27,133 | COLA in progress thru Jan. 2004. |
| | | | 1,412 | 1,677 | 1,328 | 2,956 | 4,951 | | | 10,665 | Period of Subrimann "abeyance" award. |
| | | | 1,412 | 1,677 | 1,328 | 2,633 | 3,984 | | | 12,003 | 1st step termination letter sent 01/30/04. |
| | | | | | | | | | | 3,094 | |
| 8300 | Meadowbrook Care Center | B | 36,700 | 34,010 | 42,390 | 76,410 | 17,524 | | 17,839 | 193,310 | Delinquency letter sent and arbitration demanded. |
| | | P | 9,800 | 2,265 | 2,813 | 29,404 | | | 5,455 | 76,347 | Period of Subrimann "abeyance" award. |
| | | C | 2,400 | 2,265 | 2,313 | 5,094 | | | | 18,024 | 1st step termination letter sent 01/30/04. |
| | | J | 1,220 | 1,134 | 1,606 | 3,159 | | | | 11,060 | |
| | | | | | | 2,548 | | | | 6,288 | |
| 41521 | New Vista Manor | B | 18,350 | 19,910 | 27,890 | 60,170 | | | | 128,230 | Hearing scheduled 01/27/04 through 12/31/04. |
| | | | | | | | | | | | Postdated checks 2/6/04 and 3/16/04 for debt thru 12/03. |
| | | | | | | | | | | | 1st step termination letter sent 01/30/04. |
| 3222 | Rockaway Care Center | B | 3,100 | 2,980 | 3,550 | 9,610 | | | | 35,100 | Delinquency letter sent and arbitration demanded. |
| | | P | 2,300 | 2,675 | 3,188 | 8,506 | | | | 17,187 | Period of Subrimann "abeyance" award. |
| | | C | 500 | 458 | 546 | 1,455 | | | | 2,950 | 1st step termination letter sent 01/30/04. |
| | | J | 200 | 229 | 273 | 525 | | | 765 | 2,072 | Hearing of arbitration scheduled 10 February 2004. |
| | | | 100 | 114 | 136 | 364 | | | 244 | 938 | |

"Greater" Funds Delinquency Report

December 2003

02/17/2004

| IDB | Institution | | 12/03 1 Month | 11/03 2 Months | 10/03 3 Months | 07/03-09/03 4-6 Mos. | 01/03-06/03 7-12 Mos. | 01/02-06/02 >1 Year | Total | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 41613 | Rockaway Care Center | B | 30,700 | 28,126 | 35,790 | 90,810 | | 9,550 | 194,980 | Delinquency letter sent and arbitration demanded. |
| | | P | 10,000 | 9,211 | 11,724 | 29,745 | 77,216 | | 137,896 | Period of Submission to "abeyance" award. |
| | | E | 500 | 789 | 1,004 | 2,547 | 7,256 | | 12,493 | 1st step termination letter sent 01/30/04. |
| | | C | 900 | 789 | 1,004 | 2,193 | 2,777 | | 7,605 | Hearing of arbitration scheduled 5 February 2004. |
| | | C | 400 | 394 | 502 | 1,277 | 1,306 | | 3,871 | |
| 3510 | Seacrest Health Care Center | B | 83,620 | 112,610 | 84,840 | 189,380 | 70,459 | 25,979 | 471,570 | Arbitrator to issue award through January 2004. |
| | | P | 21,722 | 24,567 | | | 70,459 | 25,979 | 178,838 | COJ in progress thru Jan. 2004. |
| | | E | 2,656 | 3,467 | 2,601 | 5,776 | | 1,476 | 15,956 | Period of Submission "abeyance" award. |
| | | C | 2,656 | 3,467 | 2,601 | 6,034 | | 1,203 | 15,593 | 1st step termination letter sent 01/30/04. |
| | | J | | | | | | 748 | 748 | |
| 8356 | Shoreview Nursing Home | B | 102,720 | 135,100 | 155,420 | 230,890 | 169,287 | 575,130 | 575,130 | Arbitrator to issue award through January 2004. |
| | | P | 33,573 | 44,231 | | | 169,287 | 46,897 | 276,691 | COJ in progress thru Jan. 2004. |
| | | E | 7,069 | 3,789 | 2,956 | 6,171 | | 1,524 | 17,750 | Period of Submission "abeyance" award. |
| | | C | 2,509 | 3,789 | 2,956 | 6,724 | | 1,728 | 17,766 | 1st step termination letter sent 01/30/04. |
| | | J | | | | | | 161 | 161 | |
| 41035 | South Shore Nursing Home | B | 33,500 | 6,580 | 38,800 | 56,070 | 38,300 | 31,491 | 213,259 | Delinquency letter sent and arbitration determined. |
| | | P | 12,800 | | 14,162 | 35,667 | 38,300 | 31,491 | 56,520 | 1st step termination letter sent 01/30/04. |
| | | C | 1,030 | | 1,212 | 1,002 | | | 7,821 | Period of Submission "abeyance" award. |
| | | J | | 350 | 606 | 1,501 | | | 3,107 | |
| 8377 | Split Rock | B | 93,400 | 84,910 | 107,320 | 261,990 | 14,930 | 1,027,320 | 1,027,320 | Delinquency letter sent and arbitration demanded. |
| | | P | 30,600 | 29,121 | 153,148 | 90,265 | 199,620 | | 587,093 | Hearing postponed from 05/07/03. |
| | | E | 2,620 | 2,693 | 3,026 | 7,908 | 14,236 | | 30,213 | 1st step termination letter sent 01/30/04. |
| | | C | 2,600 | 2,693 | 3,026 | 6,794 | 11,570 | | 26,483 | Period of Submission "abeyance" award. |
| | | C | 1,300 | 1,247 | 1,513 | 3,954 | 7,222 | 325 | 15,571 | |
| 8350 | Ulmer Plaza Nursing Home | B | 50,750 | 64,570 | 47,940 | 90,550 | 178,570 | 110,600 | 542,950 | Delinquency letter sent and arbitration demanded. |
| | | P | | | 7,097 | 17,051 | 14,105 | 2,327 | 40,580 | Shortages arise from payments on reduced contribution rate. |
| | | E | 1,880 | 2,391 | 1,714 | 7,294 | 4,524 | 5,774 | 18,677 | Hearing held 10/21/03. Follow up hearing scheduled 1/13/04. |
| | | C | 1,880 | 2,391 | 1,714 | 322 | | | 6,667 | Period of Submission "abeyance" award. |
| | | J | 944 | 1,195 | 857 | | | | 3,033 | 1st step termination letter sent 01/30/04. |
| | **Grand Totals** | | | | | | | | | |

A better receivable figure is $7,575,672.

Of this amount, $7,458,154 relates to the Schairzner "abeyance" award.

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.
Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5568

December 4, 2007

**BY HAND**
Alvin Blyer, Esq.
Regional Director
National Labor Relations Board
Region 29
One Metrotech Center - North
10th Floor
Brooklyn, New York 11201

Re: 1199 SEIU (Kingsbridge Heights Rehabilitation and Care Center) 29-CB-

Dear Mr. Blyer,

We represent charging party Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge") in the above referenced matter. Enclosed please find an original and eight copies of the charge which alleges that 1199 SEIU has violated Section 8(b)(3) of the Act. The charge is being filed in Region 29 due to its relationship to Case No. 29-CA-27502.

Kingsbridge and 1199's last collective bargaining agreement expired in 2005. The parties have not negotiated for a new agreement since 2006. In August 28, 2007, after 1199 repeatedly harassed Kingsbridge over "late" payments to the 1199 benefit funds (with payments actually being made no later than scores of other 1199 represented healthcare institutions,) Kingsbridge proposed that it be given up to seven months to make payments to the funds on a go forward basis. Kingsbridge asked 1199 to bargain regarding this issue. A copy of a letter I sent on behalf of Kingsbridge to counsel for 1199 with fax receipt confirmation is enclosed. To date 1199 has not responded.

While simultaneously ignoring Kingsbridge's request to bargain, 1199 has now cut off healthcare benefits for Kingsbridge's employees due to "late payments" and has announced plans to strike Kingsbridge, ostensibly over this very issue. Such a strike would be devastating to Kingsbridge and its residents. We therefore ask the Region to seek 10(j) relief.

Very truly yours,

Joel E. Cohen

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue  New York, New York  10173-1922  Telephone: 212.547.5400  Facsimile: 212.547.5444  www.mwe.com
NYK 1134622-1.057806.0011


EXHIBIT
6

FORM NLRB-608
(9-07)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST LABOR ORGANIZATIONS
OR ITS AGENTS**

FORM EXEMPT UNDER 44 U.S.C 3512

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
|  | / / |

INSTRUCTIONS: File an original together with four copies and a copy for each additional charged party named in item 1 with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

| a. Name<br>1199 Service Employees International Union, United Health Care Workers East | b. Union Representative to contact<br>Mike Rifkin |
|---|---|

| c. Telephone No.<br>212-582-1890<br>Fax No.<br>( ) - | d. Address (Street, city, state, and ZIP code)<br>310 West 43rd Street, New York, New York 10036 | |

e. The above-named organization(s) or its agents *(have)* engaged in and is *(are)* engaging in unfair labor practices within the meaning of section 8(b), subsection(s) *(list subsections)* (3) _____ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Since on or about August 28, 2007, the above named labor organization has refused to bargain with Kingsbridge Heights Rehabilitation and Care Center regarding fringe benefit fund contributions.

| 3. Name of Employer<br>Kingsbridge Heights Rehabilitation and Care Center | 4. Telephone No.<br>(718-796-8100<br>Fax No.<br>(718) 796-8182 | |

5. Location of plant involved *(street, city, state and ZIP code)*
3400-26 Cannon Place, Bronx, New York 10463

| 6. Employer representative to contact<br>Joel E. Cohen |

| 7. Type of establishment *(factory, mine, wholesaler, etc.)*<br>Nursing Home | 8. Identify principal product or service<br>Healthcare | 9. Number of workers employed<br>300 |

10. Full name of party filing charge
Kingsbridge Heights Rehabilitation and Care Center

| 11. Address of party filing charge *(street, city, state and ZIP code.)*<br>3400-26 Cannon Place, Bronx, New York 10463 | 12. Telephone No.<br>(718) 796-8100<br>Fax No.<br>(718) 796-8182 |

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

By _____
*(signature of representative or person making charge)*

Joel E. Cohen/Attorney
*(Print/type name and title or office, if any)*

Address McDermott Will & Emery LLP 340 Madison Avenue
New York, New York 10173

(Fax) (212-547-5374
(212-547-5566
*(Telephone No.)*    12-11-07
*(date)*

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

```
*************** -COMM. JOURNAL- ******************* DATE AUG-27-2007 ***** TIME 15:42 *********

       MODE = MEMORY TRANSMISSION              START=AUG-27 15:41    END=AUG-27 15:42

       FILE NO.=543

   STN    COMM.   ONE-TOUCH/    STATION NAME/TEL. NO.                 PAGES    DURATION
   NO.            ABBR NO.

   001    OK      #             #969912122391311                      002/002  00:00:22



          **************************** -                 - ***** -    212 5475830- *********
```

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

**FACSIMILE**

**Date:**  August 27, 2007                          **Time Sent:**

| To: | Company: | Facsimile No: | Telephone No: |
|---|---|---|---|
| Hanan Kolko, Esq. | Meyer, Suozzi, English & Klein, P.C. | 212-239-1311 | 212-239-4999 |

| From: | Joel E. Cohen | Direct Phone: | 212.547.5566 |
|---|---|---|---|
| E-Mail: | jcohen@mwe.com | | |
| Sent By: | | Direct Phone: | |
| Client/Matter/Tkpr: | 057806-0011-2974 | Original to Follow by Mail: | No |
| | | Number of Pages, Including Cover: | 2 |

**Re:**  Kingsbridge Heights and 1199

**Message:**

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the original message to us at the below address by mail. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL AS SOON AS POSSIBLE.

Main Facsimile: 212.547.5444    Facsimile Operator: 212.547.5400

U.S. practice conducted through McDermott Will & Emery LLP.
340 Madison Avenue    New York, New York 10017-4613    Telephone: 212.547.5400

NYK 1061369-1.057806.0011

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5566

August 27, 2007

**VIA FACSIMILE**
Hanan B. Kolko, Esq.
Meyer, Suozzi, English & Klein, P.C.
1350 Broadway, Suite 501
New York, NY 10018

Re:    Kingsbridge Heights and 1199

Dear Hanan:

We represent Kingsbridge Heights Rehabilitation Care Center. Kingsbridge wishes to negotiate a change in how it makes payments to the 1199 fringe benefit funds. Kingsbridge proposes that it be given up to 7 months to make payments to the various funds without being considered in arrears.

Please contact me with dates when the Union is available to negotiate.

Very truly yours,

Joel E. Cohen

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue  New York, New York  10173-1922  Telephone: 212.547.5400  Facsimile: 212.547.5444  www.mwe.com
NYK 1118343-1.057806.0011

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.
Strategic alliance with MWE China Law Offices (Shanghai)

Joel E. Cohen
Attorney at Law
jcohen@mwe.com
212.547.5586

January 31, 2008

**BY FAX**
Alvin Blyer, Esq.
Regional Director
National Labor Relations Board
Region 29
One Metrotech Center - North
10th Floor
Brooklyn, New York 11201

Re: <u>1199 and Kingsbridge Heights</u>

Dear Mr. Blyer,

As you know we represent Kingsbridge Heights Rehabilitation Care Center ("Center"). I am writing to request a meeting with you. On Monday morning January 28, 2008, moments before the hearing before ALJ Fish on whether the Center was in violation of the settlement in the prior 8(a)(5) case, Henry Powell told me that the Center's pending related 8(b)(3) charge against 1199 for refusing to bargain over when payments to the 1199 benefit funds would be considered in arrears, was being dismissed. Mr. Powell said this was due to a Regional determination that the Center had implicitly withdrawn its request to bargain (a) at a "negotiating session" between Helen Sieger, the Center's owner and 1199 Vice President Mike Rifkin; in late November 2007 held at a kosher deli in Riverdale (b) in a December 11, 2007 letter I wrote (in response to an 1199 flyer that there has been no contact between the parties since 2000 because Helen Sieger has "refused to bargain") to the effect that the "only" open issue between the parties was how arbitrations would be handled.

No one from the Region ever asked about the second "factor" and as to the first "factor", as I told the investigator only last week, in a phone conversation, the "negotiating session" was not a negotiating session but a meeting requested by Mike Rifkin so he could tell Helen Sieger that he was going to shut the Center down and put her out of business "as an example to the industry." No contract terms were discussed at this meeting. In fact, Mr. Rifkin began the meeting by saying "I am not here to negotiate".

On the morning of June 28th, I called you to discuss this matter but I have not heard back from you. I know how courteous and fair you are so I assume this was an oversight.

U.S. practice conducted through McDermott Will & Emery LLP.
340 Madison Avenue  New York, New York  10173-1922  Telephone: 212.547.5400  Facsimile: 212.547.5444  www.mwe.com
NYK 1144475-1.057806.0011

EXHIBIT
7

Alvin Blyer, Esq.
January 31, 2008

In advance of speaking directly with you, I ask that you consider the following:

1)    The only *substantive* issue between the parties since 2005 has been the arbitration issue. As I testified in the previous 8(a)(5) case without any contradiction, the Union -- Jay Sackman in particular -- told the Center that other 1199 institutions are in arrears on benefit fund contributions but that the Union does not cut off health benefits for them because of the existence of a contract. He told us that if we signed the contract the Union wanted, then the late payment of benefit fund contributions would not be a big issue for the Union. Mr. Sackman admitted that the Union was using the health benefit cut-off as a means of pressuring the Center into agreeing to the Union's terms.

2)    In August 2007 when the Union used the "late payment" issue to threaten a cut-off in health benefits again and to pursue a reopening of the 8(a)(5) case, we asked the Union in writing to bargain over when payments would be considered "late". The Union ignored this request. This is undisputed.

3)    Not only did the Center make this request to bargain in writing, it filed the 8(b)(3) charge over the Union's refusal to bargain and raised it explicitly in writing as a defense to the reopened 8(a)(5) charge, was actively pursuing this issue before the Region and made clear in writing that it would pursue it as a defense before a ALJ Fish. This conduct is completely inconsistent with a claim that the Union believed the Center was "implicitly withdrawning" its demand to bargain over the payment schedule in late November or December 2007. What is absolutely amazing to me is that at no time until I was notified of the "dismissal" on January 28th did 1199 or the Region ask if any alleged "non-raising" of the payment issue at a meeting in a deli, or my characterization of the arbitration issue being the "only" open issue between the parties in a December 11, 2007 letter (written in response to a flyer falsely saying Helen Sieger had totally refused to bargain since 2000) -- in fact meant a withdrawal of the August 2007 request to bargain over a payment schedule.

4)    As I explained at the hearing on the 28th, the characterization of the arbitration dispute as the "only" issue was meant to convey that it was the only *substantive* issue, especially since Jay Sackman had always told us "late payments" are not pursued as vigorously if there is a contract. As stated above, to the degree anyone was confused by this letter, someone could have asked for clarification. I doubt seriously that anyone could have legitimately thought that the payment schedule issue was being withdrawn in light of the fact that we had not withdrawn the ULP charge or our defense to the reopened 8(a)(5).

5)    To the degree there was any "confusion", my testimony on January 28, 2007 and the attached letter from Helen Sieger to Mike Rifkin, now clears up the confusion. Is 1199 now willing to bargain over this issue?

6)    Finally, to the degree that 1199 claims that it didn't bargain over this issue because it thought that in late November and/or mid December the request to bargain had been implicitly withdrawn, why didn't it agree to bargain in August, September, October and virtually all of November of 2007? What was it's excuse then? At the very least, based on the "facts" the

Alvin Blyer, Esq.
January 31, 2008

Region was supposedly relying on to dismiss the 8(b)(3) charge, why wasn't a "merit dismissal" appropriate?

These are the issues I wish to discuss with you. Thank you in advance for your kind consideration.

Very truly yours,

Joel E. Cohen



January 30, 2008

Mike Rifkin
Executive Vice President
1199 SEIU
United Healthcare Workers East
310 West 43rd Street
New York, New York 10036

VIA FACSIMILE  212-399-9395

Dear Mr. Rifkin:

This responds to your January 25 and January 29, 2008 letters. Our proposal is to use the American Arbitration Association ("AAA") for arbitrations, not "one or more arbitrators" who also are on an AAA panel as permanent arbitrators. There is a big difference as you surely know. Your claim that all we ever wanted was to replace Mr. Scheinman is false. At an NLRB hearing on January 28, 2008 your attorney, Mr. Kolko, tried to spin your "offer" to an NLRB Judge as the Union accepting our proposal, but the NLRB Judge called him on it and made clear that the Union was <u>not</u> agreeing to Kingsbridge's proposal. If you want to accept our proposal say so, stop playing games. If you want to work out terms for payment of 1199 fringe benefit fund contributions as we asked you in writing in August 2007 (and which the Union ignored and instead promptly cut off health benefits) please let us know. Just in case you really were "confused" at no time did we intend to drop our proposal that we negotiate new payment terms.

Moreover, please stop telling our vendors and referral sources that we will not provide quality care during the strike. We will, and the Union and your personal continued attempts to destroy Kingsbridge and me personally will not only fail but will continue to be pursued in litigation. I note that you have told me and my attorney that you don't care if you cost all the Kingsbridge employees their jobs, as long as it helps "make me an example to the industry" of what 1199 and its individual officers will do to employers who don't do what they want.

Mike Rifkin
January 30, 2008
Page 2

As to union dues the law is clear. After the expiration of a union contract, there is no obligation to continue the "union security clause" and employees do not have to pay union dues to keep their jobs. Both you and any employees are free to call the NLRB's information officer (212) 264-0300 or (718) 330-7723 and confirm that this is the law.

Finally, please inform your "temporary organizer" Witold ("Victor") Nizio that if he continues to threaten our managers for doing their jobs, we will file 8(b)(1)(B) charges with the NLRB for interfering with managers and supervisors. Also inform him that we have the right to ask our employees if they plan on striking-as we have an obligation and a right to plan patient care coverage in the face of a strike threat. We have and will continue to tell employees that they have a right to strike without retaliation, and that in no case will they be fired for striking but that we as a nursing home have a right to know in advance of a strike of their intentions. Contrary to what Mr. Nizio claims, employees who tell us that they will not strike and then strike <u>can</u> be discharged in a health care setting for jeopardizing patients' well being. To the degree Mr. Nizio is telling employees to lie to us about their intentions he is intentionally jeopardizing those employees. Again I invite you and our employees to check with the NLRB to verify this.

Very truly yours,

Helen Sieger

FORM NLRB-508
(9-07)

FORM EXEMPT UNDER 44 U.S.C 3512

**UNITED STATES OF AMERICA**
**NATIONAL LABOR RELATIONS BOARD**
**CHARGE AGAINST LABOR ORGANIZATIONS**
**OR ITS AGENTS**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 2-CB- 21511 | 13/26/08 |

INSTRUCTIONS: File an original together with four copies and a copy for each additional charged party named in item 1 with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

a. Name

1199 SEIU, Health Care Workers East

b. Union Representative to contact

Mike Rifkin

c. Telephone No.
( ) -
Fax No.
( ) -

d. Address (Street, city, state, and ZIP code)

310 West 43rd Street, New York, NY 10173-1922

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) (1) and (3) of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

See attachment

3. Name of Employer

Kingsbridge Heights Rehabilitation and Care Center

4. Telephone No.
( ) -
Fax No.
( ) -

5. Location of plant involved (street, city, state and ZIP code)

3400-3428 Cannon Place, Bronx, New York 10463

6. Employer representative to contact

David F. Jasinski, Esq.

7. Type of establishment (factory, mine, wholesaler, etc.)

long term health care facility

8. Identify principal product or service

9. Number of workers employed

approximately 200

10. Full name of party filing charge

David F. Jasinski, Esq.

11. Address of party filing charge (street, city, state and ZIP code)

Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102

12. Telephone No.
( ) -
Fax No.
( ) -

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

By
(signature of representative or person making charge)

Attorney DAVID F. JASINSKI
(Print/type name and title or office, if any)

Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102
Address

(Fax) 973-824-6061
973-824-9700 (Telephone No.)   03/25/08 (date)

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

PRIVACY ACT STATEMENT
Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

EXHIBIT 8

**ATTACHMENT**

In or around January 2008, 1199 SEIU, Health Care Workers East (the "Union") unlawfully conditioned the settlement of a collective bargaining agreement with Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge") on a permissive subject of bargaining. Specifically, the Union insisted that Kingsbridge pay all of its alleged delinquent contributions into the Greater New York Funds (the "Funds"). (A copy of the proposed settlement agreement is annexed hereto.) By making such payments to the Funds a condition to settling the contract, the Union is unlawfully seeking to compel Kingsbridge to resolve a pending lawsuit filed by the Funds in federal district court in November 2007, and unlawfully enforce a 2006 NLRB settlement agreement. Such an act is per se bad faith bargaining by the Union.

On or about February 20, 2008, the Union engaged in an illegal strike based on Kingsbridge's refusal to settle the contract on a permissive subject of bargaining -- Kingsbridge's immediate and full payment of all alleged delinquencies into the Funds.

# 1199 – Kingsbridge Nursing Home Settlement Agreement

This dispute should be settled right away, for the benefit of workers, residents and management.

*Therefore*

If Kingsbridge Heights Nursing Home agrees to number 1 and 2 below, the Union will agree to number 3 and 4 below.

*The Agreement*

1. Kingsbridge Heights Nursing Home agrees to the contract terms of the 6/1/04 – 4/30/2011 contract between 1199 SEIU and Greater New York Healthcare Facilities Assoc. which covers most NYC 1199 Nursing Home members.

2. Kingsbridge Heights Nursing Home will pay, prior to February 20, 2008, all delinquencies owed to the Greater New York Funds and agrees to continue the Benefit Fund in the new contract.

3. 1199 agrees with Kingsbridge Heights Nursing Home's request to have the American Arbitration Association and therefore will accept arbitrators admitted to the National Academy of arbitrators from a panel provided by the American Arbitration Association under its labor arbitration rule.

4. 1199 agrees that if Kingsbridge Heights Nursing Home agrees to number 1 and 2 above, 1199 will withdraw the 1199 strike notice as soon as Ms. Sieger signs a full contract that includes 1 and 2 above.

Mike Rifkin, Executive Vice President

Date _____

Helen Sieger, Owner
Kingsbridge Heights Nursing Home



August 5, 2008


Ms. Celeste Mattinas
Regional Director
National Labor Relations Board
Region 2
26 Federal Plaza – Room 3614
New York, NY 10278-0104


VIA FACSIMILE: (212) 264-2450


Re: 1199SEIU United Healthcare Workers East
    (Kingsbridge Heights Rehabilitation and Care Center)
    Case No. 2-CB-21511

Dear Ms. Mattinas,

Enclosed for re-filing is the charge in the reference case. This is being re-filed pursuant to Ms. Slahetka's correspondence, a copy of which is also attached.



Sincerely,

Helen Sieger


cc: Mr. Hanan Kolko
    Meyer, Suozzi, English and Klein, P.C.
    1350 Broadway – Suite 501
    New York, NY 10018-0026
    (Via regular and certified mail)



3400 - 26 Cannon Place • Bronx, New York, 10463 • Tel. 718.796.8100 • Fax.718.796.8182



## Kingsbridge Heights Rehabilitation Care Center

# Fax

| | | | |
|---|---|---|---|
| **To:** | Ms. Celeste Mattinas (NLRB Regional Director) | **From:** | Helen Sieger |
| **Fax:** | (212) 264-2450 | **Pages:** | 8 (including cover sheet) |
| **Phone:** | | **Date:** | 8/5/2008 |
| **Re:** | | **CC:** | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

☻ **Comments:**

*The information contained in this FAX is **HIGHLY CONFIDENTIAL**. It is intended for the exclusive use of the addressee. If any PHI (Personal Health Information) has been faxed it must be used only to aid in providing healthcare services to the specific residents. Any other use is a violation of Federal Law (HIPAA) and will be reported a such.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* —IND. XMT JOURNAL— \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE AUG-05-2008 \*\*\*\*\* TIME 15:26 \*\*\*\*\*\*\*\*

```
DATE/TIME      = AUG-05-2008 15:24

JOURNAL No.    = 52

COMM.RESULT    = OK

PAGE(S)        = 008/008

DURATION       = 00:01'55

FILE No.       = 253

MODE           = MEMORY TRANSMISSION

DESTINATION    = 12122642450

RECEIVED ID    =                    /

RESOLUTION     = STD
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* —            — \*\*\*\*\* —            — \*\*\*\*\*\*\*\*\*



**United States Government**
**NATIONAL LABOR RELATIONS BOARD**
Region 2
26 Federal Plaza – Room 3614
New York, New York 10278-0104

Tel. 212-264-0313
Fax. 232-264-2450

April 25, 2008

<u>VIA FACSIMILE AND REGULAR MAIL</u>

Helen Sieger
Kingsbridge Heights Rehabilitation and Care Center
3400-26 Cannon Place
Bronx, NY 10463

       Re:   1199SEIU United Healthcare Workers East
              (Kingsbridge Heights Rehabilitation and Care Center)
              Case No. 2-CB-21511

Dear Ms. Sieger:

I am writing to confirm our telephone conversation yesterday. As we discussed, all evidence in support of the allegations in the charge, including your affidavit if you choose to provide one, still must be presented by Wednesday, May 7, 2008. However, if you are not able to present evidence in support of the allegations by May 7, 2008, you may withdraw the charge. You may then re-file the charge when you are able to present evidence. Please note that Section 10(b) of the National Labor Relations Act prohibits any action on an unfair labor practice charge that is filed and served more than six (6) months after the alleged unfair labor practice occurs.

If you would like to withdraw the charge, you may do so either by calling me or by sending me a short letter. If no evidence is submitted by May 7th, and you have not withdrawn the charge, I will recommend to the Regional Director that she dismiss the case for lack of cooperation.

Yesterday we did not discuss whether or not you are available for the appointment that I scheduled on April 30, 2008, at 2:00 p.m. If you are unable to make the appointment, please call me to reschedule.

Sincerely,

Nancy Slahetka
Board Attorney



May 6, 2008


Ms. Nancy Slahetka
Board Attorney
National Labor Relations Board
Region 2
26 Federal Plaza – Room 3614
New York, NY 10278-0104


VIA FACSIMILE: (212) 264-2450


      Re: Case No. 2-CB-21511


Dear Ms. Slahetka,

      Pursuant to your letter of April 25, 2008, I will withdraw the charge at this point and re-file at a later date.

      I hope to have representation shortly. I am also hopeful that I have not prejudiced myself in any way as per your representation to me.


Sincerely,

Helen Sieger


HS/mv

\*\*\*\*\*\*\*\*\*\*\*\*\*\* —IND. XMT JOURNAL— \*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE MAY-06-2008 \*\*\*\*\* TIME 10:25 \*\*\*\*\*\*\*

DATE/TIME       = MAY-06-2008 10:18

JOURNAL No.     = 28

COMM.RESULT     = OK

PAGE(S)         = 001/001

DURATION        = 00:00'19

FILE No.        = 064

MODE            = MEMORY TRANSMISSION

DESTINATION     = 12122642450

RECEIVED ID     =                    /

RESOLUTION      = STD

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* —          — \*\*\*\* —          — \*\*\*\*\*\*\*\*

FORM EXEMPT UNDER 44 U.S.C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST LABOR ORGANIZATIONS
OR ITS AGENTS**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>2-CB- 21511 | Date Filed<br>/3/26/08 |

**INSTRUCTIONS:** File an original together with four copies and a copy for each additional charged party named in Item 1 with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

| a. Name<br><br>1199 SEIU, Health Care Workers East | b. Union Representative to contact<br><br>Mike Rifkin |
|---|---|

| c. Telephone No.<br>( ) -<br>Fax No.<br>( ) - | d. Address (Street, city, state, and ZIP code)<br><br>310 West 43rd Street, New York, NY 10173-1922 | |
|---|---|---|

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) **(1) and (3)**_____ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

**2. Basis of the Charge** (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

See attachment

RECEIVED
MAR 2 6 2008
SECOND REGION
NEW YORK, N.Y.
NLRB

| 3. Name of Employer<br><br>.Kingsbridge Heights Rehabilitation and Care Center | 4. Telephone No.<br>( ) -<br>Fax No.<br>( ) - | |
|---|---|---|

| 5. Location of plant involved (street, city, state and ZIP code)<br><br>3400-3426 Cannon Place, Bronx, New York 10463 | 6. Employer representative to contact<br><br>David F. Jasinski, Esq. |
|---|---|

| 7. Type of establishment (factory, mine, wholesaler, etc.)<br>long term health care facility | 8. Identify principal product or service | 9. Number of workers employed<br><br>approximately 200 |
|---|---|---|

10. Full name of party filing charge
David F. Jasinski, Esq.

| 11. Address of party filing charge (street, city and state and ZIP code.)<br>Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102 | 12. Telephone No.<br>( ) -<br>Fax No.<br>( ) - |
|---|---|

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

By _____
(signature of representative or person making charge)

Jasinski & Williams, PC, Ten Park Place, Newark, NJ 07102

Address

Attorney DAVID F. JASINSKI
(Print/type name and title or office, if any)

(Fax) 973-824-6061
973-824-9700    03/25/08
(Telephone No.)    (date)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

## ATTACHMENT

In or around January 2008, 1199 SEIU, Health Care Workers East (the "Union") unlawfully conditioned the settlement of a collective bargaining agreement with Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge") on a permissive subject of bargaining. Specifically, the Union insisted that Kingsbridge pay all of its alleged delinquent contributions into the Greater New York Funds (the "Funds"). (A copy of the proposed settlement agreement is annexed hereto.) By making such payments to the Funds a condition to settling the contract, the Union is unlawfully seeking to compel Kingsbridge to resolve a pending lawsuit filed by the Funds in federal district court in November 2007, and unlawfully enforce a 2006 NLRB settlement agreement. Such an act is per se bad faith bargaining by the Union.

On or about February 20, 2008, the Union engaged in an illegal strike based on Kingsbridge's refusal to settle the contract on a permissive subject of bargaining -- Kingsbridge's immediate and full payment of all alleged delinquencies into the Funds.

# 1199 – Kingsbridge Nursing Home Settlement Agreement

This dispute should be settled right away, for the benefit of workers, residents and management

*Therefore*

If Kingsbridge Heights Nursing Home agrees to number 1 and 2 below, the Union will agree to number 3 and #4 below

*The Agreement*

1. Kingsbridge Heights Nursing Home agrees to the contract terms of the 6/1/04 – 4/30/2011 contract between 1199 SEIU and Greater New York Healthcare Facilities Assoc. which covers most NYC 1199 Nursing Home members.

2. Kingsbridge Heights Nursing Home will pay, prior to February 20, 2008, all delinquencies owed to the Greater New York Funds and agrees to continue the Benefit Fund in the new contract.

3. 1199 agrees with Kingsbridge Heights Nursing Home's request to have the American Arbitration Association and therefore will accept arbitrators admitted to the National Academy of arbitrators from a panel provided by the American Arbitration Association under its labor arbitration rule.

4. 1199 agrees that if Kingsbridge Heights Nursing Home agrees to number 1 and 2 above, 1199 will withdraw the 1199 strike notice as soon as Ms. Sieger signs a full contract that includes 1 and 2 above.

Mike Rifkin, Executive Vice President

_____
Date

Helen Sieger, Owner
Kingsbridge Heights Nursing Home

A threat to care for patients in need — A denial of decency for their devoted caregivers

# Help us stop the greed

and prevent a strike at Kingsbridge Heights Nursing Home

While Kingsbridge Heights Nursing Home owner Helen Sieger is reaping her profits, the dedicated caregivers who feed, bathe, lift and comfort the frail and elderly are struggling to survive.

Having worked without a contract for nearly eight years, these compassionate healthcare workers were left with an even bigger burden late last year, when Helen Sieger stopped paying for health benefits for them and their children. *What makes it even worse is that this is one of the most profitable nursing homes in the state.*

The caregivers of Kingsbridge Heights have been left with the difficult choice of going on strike in the coming weeks. Without the ability to support their families, or the health benefits that they depend on, they have no other choice.

## You can help.

**Call Helen Sieger today at (718) 796-8100.** Tell her to put care and decency ahead of her profits.

**1199SEIU**
United Healthcare Workers East

EXHIBIT
10



Protect Your Patients.
Protect Your Future.
Protect Your Reputation and/or License.

## Are you a strike breaker at Kingsbridge Heights Nursing Home?

**Here are some things to think about *before* you cross the picket line.**

- **This could be you!** Imagine waking up one morning and your boss decides to cut your health insurance? That happened to us. Helen Sieger is a boss who thinks she can fire employees at her whim and is trying to throw out our union, which protects workers. She has been fined by the National Labor Relations Board several times and she doesn't care. She continues to violate labor law. That's why we were forced to strike. This could happen to you too! Wouldn't you want the support of other healthcare workers and the community?

- **Meanwhile, in 2006, Kingsbridge Heights reported over 5 million dollars in profit;** most paid by the Medicaid program. Medicaid dollars are *your* tax dollars! *(The report also includes a lease for a Jaguar at $1,040/month.)*

- **Workers like you,** not having all the information, have crossed the picket line and went to work in the nursing home. They then reported working 12-16 hour shifts with deteriorating conditions. They unknowingly put their selves and their licenses and reputations at risk by working at a facility where patient care may not be the priority. Many left once they realized what's actually going on. Some have joined us on the picket line.

- **Kingsbridge Heights** is currently being audited by the Health Department. And residents' families are reporting complaints to the Health Department every day.



**Don't let yourself be used.** Don't jeopardize your livelihood and the safety of nursing home residents. Many other 1199SEIU institutions are hiring qualified workers. STOP! Don't cross the picket line. Ask us how we can help you get a different job. Or call us at (212) 261-2332.

# KINGSBRIDGE HEIGHTS CARE CENTER

**65989**

LOCAL 144 NH WELFARE FUND
P O BOX 796
TIMES SQUARE STATION
NEW YORK, NY  10108-0796

11/10/2007     $112,179.10

| INVOICE # | DESC. | AMOUNT |
|-----------|-------|--------|
| OCT 07 | | 112,179.10 |

EXHIBIT
11

# KINGSBRIDGE HEIGHTS CARE CENTER

**65992**

LOCAL 144/1199 CHILD CARE FUND          11/10/2007     $2,162.52
TIMES SQUARE STATION
NEW YORK  NY  10108

| INVOICE # | DESC. | AMOUNT |
|-----------|-------|--------|
| OCT 07 | | 2,162.52 |

# KINGSBRIDGE HEIGHTS CARE CENTER                     65993

LOCAL 144/1199 JOB SECURITY                    11/10/2007    $1,351.82
FUND
TIMES SQUARE STATION
NEW YORK   NY   10108

INVOICE #      DESC.              AMOUNT
OCT 07                          1,351.82

## 'KINGSBRIDGE HEIGHTS CARE CENTER                65994

LOCAL 144/1199 WORKERS                    11/10/2007    $1,351.82
PARTICIPATION FUND
TIMES SQUARE STATION
NEW YORK  NY  10108

INVOICE #      DESC.              AMOUNT
OCT 07                          1,351.82



May 6, 2008


Mr. Hanan Kolko
Meyer, Suozzi, English and Klein, P.C.
1350 Broadway – Suite 501
New York, NY 10018-0026


VIA FACSIMILE: (212) 239-1311


Dear Mr. Kolko,

　　　In August 2007, our labor counsel Joel Cohen filed an NLRB Charge against 1199 for failure to negotiate.

　　　We requested a payment plan for monies owed. This request was ignored. The Regional Director dismissed the charged in January of 2008 despite its significant relevance to the case before Judge Fish that I am being forced to proceed in, without labor counsel.

　　　We later received a letter from the acting Regional Director accepting a withdrawal of this charge but have not seen the letter from Joel Cohen withdrawing same.

　　　In March of 2008, a letter was sent to Counsel for 1199, proposing that Kingsbridge Heights Rehabilitation Care Center procure its own Health Care Benefit Plan for its employees rather than through 1199. This, so that 1199 will not have the ability to arbitrarily discontinue the medical benefits to our employees. Once again we were ignored.

　　　We are now additionally proposing that Kingsbridge Heights Rehabilitation Care Center will procure its own Pension Plan for its employee instead of the 1199 Pension Plan.

　　　We anticipate a prompt response.


Sincerely,

Helen Sieger

EXHIBIT
12

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 2

-------------------------------------------------------------x
                                 :
                                 :

1199 SEIU, UNITED
HEALTH CARE WORKERS EAST     :
                                 :

      and                 :

                                 :      Case Nos.    2-CA-37660
                                                 2-CA-37898

KINGSBRIDGE HEIGHTS
REHABILITATION CARE CENTER

                                 :
                                 :
                                 :
-------------------------------------------------------------x

### KINGSBRIDGE HEIGHTS REHABILITATION CARE CENTER'S EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE WITH BRIEF SUPPORTING ITS EXCEPTIONS

McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173
(212) 547-5400

*Attorneys for Respondent*
Kingsbridge Heights
Rehabilitation Care Center

Of Counsel:

    Joel E. Cohen





EXHIBIT

13

## I.

## STATEMENT OF THE CASE

Pursuant to 29 C.F.R. § 102.46, respondent Kingsbridge Heights Rehabilitation Care Center ("Respondent" or the "Center"), by and through its attorneys, McDermott Will & Emery LLP, submits this brief in support of its exceptions to the July 9, 2007 Decision (the "Decision") of Administrative Law Judge Mindy E. Landow ("ALJ Landow"). In the Decision, ALJ Landow made two improper findings: (i) in March 2006, the Center unlawfully videotaped picketing employees who were members of Local 1199 SEIU, United Health Care Workers East ("1199" or the "Union") and (ii) the Center falsely told employees that their reinstatement may be delayed if they participated in a threatened strike.

Despite ALJ Landow's findings to the contrary, a review of the record clearly demonstrates that the Center, as a healthcare institution, had legitimate business reasons for videotaping Union members who have a history of unpredictable and dangerous tactics that threaten the Center's ability to properly care for its residents. More specifically, the Center must be able to gather evidence to support charges against the Union based on their past unpredictable and threatening conduct. The Center has been videotaping Union pickets and demonstrations for over a decade with the Union's knowledge and without any protest from the Union. It is undisputed that no employee has ever been retaliated against for participation in a videotaped picket or demonstration. Moreover, the evidence adduced at the hearing demonstrates that the Center did not mislead employees about their reinstatement rights in the event of a strike; in fact, the Center clearly informed employees of the status of negotiations with a temporary agency and the possible impact those negotiations may have on the timing of any striking employee's reinstatement at the Center.

In sum, and as set forth in greater detail below, because the Decision is unsupported by the record evidence and by existing law, the Board should not adopt the Decision.

## II.

## ISSUES PRESENTED

1.      Did a healthcare institution have a legitimate business reason to videotape its picketing employees based on the Union's unpredictable history of threats and violence?

2.      Did the Center accurately inform employees who threatened to strike of the Center's right to delay reinstatement pursuant to an agreement with a temporary agency in the context of a pending economic strike?

## III.

## BACKGROUND FACTS AND PROCEDURAL HISTORY[1]

The Center is "engaged in the operation of a nursing home providing residential nursing care to patients." (GC Ex. 1 at Complaint ¶2(a)). The Center prides itself on its commitment to providing first-rate care to its residents in conformity with its long tradition of quality and comfort. Moreover, the Center is primarily responsible, per state codes, for ensuring that residents feel safe and protected in their vulnerable state of health. (Tr. 122). To this end, the Center has permanent surveillance cameras both on the exterior and interior of the Center to monitor the premises as a basic security measure. (Id.). Moreover, the surveillance system allows any state regulatory agency to gather information about events occurring on the Center's premises for purposes of state-mandated surveys and inspections. (Tr. 122-23).

---

[1] All references to Exhibits introduced by the General Counsel during the Hearing are referred to herein as "GC Ex. [exhibit number]." Exhibits introduced by the Center are referred to herein as "Resp. Ex. [exhibit number]." All references to the Transcript of the February 22, 2007 Hearing appear as "Tr. [page number]." All references to ALJ Landow's Decision appear as "Decision [page number], lines [line numbers]."

2

The last Collective Bargaining Agreement (the "CBA") between the Center and the Union expired on April 30, 2005. (Tr. 23). The contract has not since been extended between the parties.[2] (Id.). The Union has a long history of improper conduct at the Center to pressure the Center to cede to the Union's demands.[3]

In February 2006, 1199 sent a Section 8(g) notice to the Center notifying the Center of its intention to picket, allegedly due to a delay in payment of medical contributions to the Union's welfare fund.[4] (GC Ex. 6). The picket took place on March 15, 2006. (Tr. 33, 66, 86). Given the Center's experience with 1199's aggressive tactics, and the Center's prior knowledge of the Union's disruptive tactics at other healthcare facilities (such as the highly inappropriate conduct that took place at Staten Island University Hospital)[5], the Center, as it had done on prior occasions, had two non-Unionized employees of the Center capture the picket on video to preserve evidence for the Board or for any potential State court legal proceedings (e.g., seeking an injunction for blocking the Center's entrance). (Tr. 148). *For over a decade, the Center has taped Union activity with the Union's knowledge and without any protest.* (Tr. 44, 46, 80-81, 95-

---

[2] The only reason a renewed CBA has failed to come to fruition is because the parties could not come to an agreement on the appointment of an acceptable arbitrator. The Center wanted to use the American Arbitration Association, while 1199 wanted to use Martin Scheinman, the "Impartial Industry Chairman."

[3] For example, in December 2000, within the context of a labor dispute, 1199 delegates trespassed into the patient care areas of the Center in the middle of the night with photographers and reporters from The New York Daily News (the "Daily News Break-In"). (Tr. 123-24). On another occasion in 2000, Union members stormed Larry Abrams' ("Mr. Abrams") office, which trespass was caught on the Center's surveillance cameras. (Tr. 132-33). In 2006, the Center discharged three employees for intimidating threats made toward non-striking employees. (Tr. 140-41). Also in 2006, the Center's former affiliate, Resort, charged 1199 with unlawful picketing outside the facility because it failed to give the proper § 8(g) notice to the facility. (Tr. 137).

[4] The Center believes the picket's purpose was to pressure the Center to agree to a new collective bargaining agreement on the Union's terms.

[5] Ms. Sieger testified to her knowledge of the Union's disruptive tactics at Staten Island University Hospital. (Tr. 148). In that case, the Board found, in part, that "Hospital employees, who were fully aware of [the Union official's] actions, would reasonably tend to fear that they would be subjected to the same abusive tactics if they failed fully to support . . . the impending strike." See Staten Island Univ. Hosp., 339 NLRB 1059 (2003). In that case, an 1199 official ventured into patient care areas of the hospital and began shouting at the security guard (among other outbursts), "I'm not listening to you. I don't care what you're saying. You touch me and I'll kick all your asses," which the Board found to have the effect of intimidating employees.

96). *It is undisputed that no disciplinary action ever has been taken against any employee for participating in any picket.* (Tr. 80-81, 95-96, 149).

On April 27 and May 1, 2006, through its § 8(g) notices, the Union informed the Center of its intention to strike between May 15 and May 19, 2006. (GC Ex. 7-8). Of the Center's 300 employees, more than 250 are members of the Union, so the Center negotiated in good faith with three temporary agencies – Town, Big Apple and Juno – to find any option to provide emergency coverage for its residents in the event of a strike. (Tr. 152). The Center's operator, Helen Sieger ("Ms. Sieger"), explained to Solomon Rutenberg ("Mr. Rutenberg") that the best deal she could negotiate with any agency for such a large group of agency replacements would require a three-week employment contract. (Tr. 152-53). At a meeting prior to the anticipated strike, Mr. Rutenberg informed employees that, if they chose to strike, the Center *may* have to delay reinstatement for three weeks to allow temporary replacement employees to cover their positions because the temporary agencies would not supply replacements for a shorter period of time. (Tr. 81, 92). The Union requested that the Center put Mr. Rutenberg's statements into writing, and such a letter was distributed to employees. (Tr. 81, 93).

Shortly before the May 2006 strike was scheduled to begin, the Union called the strike off. (Tr. 39, 75). The Union then filed two Section 8(a)(1) charges under the National Labor Relations Act (the "Act") against the Center: the first charge was filed on May 12, 2006 for the Center's videotaping of the picket, and the second charge was filed on September 25, 2006 for Mr. Rutenberg's statement at the employee meeting regarding the delay in reinstatement. A complaint consolidating these two charges was issued by Region 2 on November 30, 2006 (the "Complaint"). (GC Ex. 1). At the hearing on February 22, 2007, Counsel for the General

Counsel sought to amend the Complaint to add an independent Section 8(a)(1) charge based on the letter that was distributed to employees regarding the delayed reinstatement. (Tr. 102-07).

On July 9, 2007, ALJ Landow found that the Center violated Section 8(a)(1) by videotaping employees who participated in the March 2006 picket. (Decision 14, lines 32-36). ALJ Landow also found that the Center violated Section 8(a)(1) when Mr. Rutenberg told employees that they may be delayed reinstatement for three weeks if they chose to strike in May 2006. (Decision 20, lines 6-7). However, ALJ Landow did not find that the Center violated Section 8(a)(1) when it distributed the letter to employees explaining the lockout.[6] (Decision 20, lines 12-14).

Additional facts appear in the argument.

<div align="center">

## IV.

## <u>ARGUMENT</u>

</div>

### A.    ALJ LANDOW IMPROPERLY <u>DISCREDITED MS. SIEGER'S UNDISPUTED TESTIMONY.</u>

Here, it is a key *undisputed* fact that Ms. Sieger undertook negotiations with at least three temporary agencies to try and find 250+ replacement workers for striking employees on short notice. (Tr. 152). As Ms. Sieger testified without contradiction, the temporary agencies initially demanded a five-week commitment, and Ms. Sieger was able to bring the temporary agency requirements down to a three week commitment in exchange for absorbing orientation costs. (Tr. 152-53). ALJ Landow wrongfully discredited Ms. Sieger's uncontradicted and fully supported testimony because, ALJ Landow characterized Ms. Sieger's testimony as "non-specific" and "conclusory," without even addressing most of Ms. Sieger's lengthy and detailed

---

[6] Despite the Center's objection to the Counsel for General Counsel's amendment for an independent Section 8(a)(1) allegation based on the letter, the Center takes no exception to the ALJ's finding on this issue.

testimony. (Decision 9, line 39). The fact is, Ms. Sieger's testimony was not only detailed and supported, but it made common sense.[7]

It is the Board's policy, as enunciated in <u>Standard Dry Wall Prods.</u>, 91 NLRB 544 (1950), <u>enf'd</u>, 188 F.2d 362 (3d Cir. 1951), to attach great weight to a judge's credibility findings insofar as they are based on demeanor. However, to the extent that credibility findings are based upon factors other than demeanor, the Board itself may proceed with an independent evaluation. <u>Starcraft Aerospace, Inc.</u>, 346 NLRB no. 104 at 17-21 (2006); <u>Canteen Corp.</u>, 202 NLRB 767, 769 (1973) (<u>citing</u> <u>Valley Steel Prods. Co.</u>, 111 NLRB 1338 (1955)). Here, ALJ Landow does not address the fact that Ms. Sieger's testimony was wholly undisputed and unrebutted by Counsel for the General Counsel and Counsel for the Charging Party. Instead, ALJ Landow merely attacked Ms. Sieger's testimony without even addressing significant portions of the record. (Decision 9-10). ALJ Landow did not consider that Counsel for the General Counsel or the Charging Party could have subpoenaed representatives of the temporary agencies to contradict Ms. Sieger's testimony, but they chose not to do so. As such, ALJ Landow's credibility findings as to Ms. Sieger must be disregarded.

Specifically, Ms. Sieger testified that for the Center to obtain such a large number of replacement workers for a short strike, she had to agree to a three-week commitment. (Tr. 152-53). Neither Counsel for the General Counsel nor Counsel for the Charging Party ever introduced testimony or other evidence that Ms. Sieger's contract terms with the agency were inappropriate or incredible. Clearly, then, because the Center's decisions were purely based on

---

[7] The Center admits that Ms. Sieger's testimony was "self-serving." If this was a basis for discrediting witnesses, no party witness would ever be credited.

the availability of 250-plus temporary workers, and neither opposing party presented any contrary evidence, Ms. Sieger's uncontradicted testimony must be credited.[8]

## B.    THE CENTER DEMONSTRATED ITS REASONABLE BASIS FOR VIDEOTAPING THE MARCH 2006 PICKET

As acknowledged by ALJ Landow, an employer may engage in surveillance of its employees participating in protected activity if the employer can present a "solid justification" or "legitimate business reason" for its surveillance. Nat'l Steel & Shipbuilding Co., 324 NLRB 499 (1997), enfd., 156 F.3d 1268 (3d Cir. 1998). The Center asserts that its responsibility to care for vulnerable residents in a healthcare institution requires it to take every reasonable measure to protect its residents from any actual or threatened harm. (Tr. 122). Given the vast amount of evidence presented at the Hearing regarding the Center's specific prior experiences with the Union's misconduct and the impact that misconduct has already had on the Center's residents (Tr. 123-24, 131-33, 140-41), ALJ Landow's conclusion that the Center did not have a reasonable basis to videotape Union pickets on or near the Center's premises was wholly misguided.

### 1.    The Center Presented Sufficient Evidence of Union Misconduct to Justify Surveillance.

#### a. The Center presented sufficient evidence of the Union's prior misconduct.

In her Decision, ALJ Landow again discredits the testimony of the Center's Operator, Ms. Sieger, regarding the Center's past experiences of Union misconduct. (Decision 10, lines 2-33). The fact remains that Ms. Sieger's testimony was unrebutted by both Counsel for the General Counsel and Counsel for the Charging Party, so that ALJ Landow's credibility determination is undermined. In fact, few, if any, facts are disputed by the Parties in this case. However, ALJ

---

[8] We note that there was no rebuttal testimony from the Counsel for the General Counsel or Counsel for the Union as to what kind of arrangements Ms. Sieger could have made to accommodate the large number of employees who had to be replaced.

Landow discredited Ms. Sieger's testimony based on the facts that (a) she was not an eyewitness to the incidents of Union misconduct in 2000 and, (b) in any case, events that took place in 2000 were too remote in time to justify the Center's surveillance of Union picketing in 2006. (Decision 10, lines 6-39).  Both of ALJ Landow's assumptions are improper.

Contrary to ALJ Landow's finding that the newspaper article introduced as Resp. Ex. 2 does not implicate the Union, the article specifically states that, "On the night of The News' visit, workers voted in favor of a protest, turning a first-floor lunchroom into a raucous union hall filled with workers decked out in white nurses' uniforms."  (Resp. Ex. 2 at 5).  Thus, the article does implicate union involvement in orchestrating the trespass into the facility.  (Id.).  Although Ms. Sieger testified that she did not witness the actual events of the Daily News Break-In (Tr. 125), the fact remains that Ms. Sieger, as the Center's Operator, was responsible for the aftermath of the incident – i.e., following up with the press that reported on the incident and arranging for therapy and trauma counseling for those residents who were frightened by the commotion.  (Tr. 149).

ALJ Landow assumed that just because Ms. Sieger was not an eyewitness to the trespass that the Center did not show sufficient evidence that the event actually happened; such a conclusion is illogical given the evidence in the record, which includes Ms. Sieger's testimony regarding her responsibility to arrange therapy for residents and press response with respect to the incident.  (Tr. 149).  Ms. Sieger's testimony regarding her arrangement of therapy combined with the newspaper article's reference to the Union's participation in the incident was sufficient evidence to show that the Union's coordinated trespass threatened residents' safety.  (Resp. Ex. 2).  Thus, ALJ Landow's determination that there was insufficient evidence to prove that the Union orchestrated the trespass was unwarranted.

8

With respect to the incident wherein Union delegates stormed Mr. Abrams' office, sat on his desk and threw things off of it, Ms. Sieger testified that although she was not present, she saw the event on the surveillance camera in the facility. (Tr. 132-33). Again, just because Ms. Sieger was not an eyewitness to the event, ALJ Landow cannot assume that Ms. Sieger has no personal knowledge of the event since Ms. Sieger testified that she saw the surveillance tape of the event itself. (Id.).

### b. As a healthcare facility, the Center demonstrated surveillance was necessary out of a legitimate concern for resident safety.

Next, ALJ Landow reasons in the Decision at pages 10-11 that because these events occurred six years prior to the Center's surveillance in March 2006, the Center's surveillance was unjustified. (Decision 10, lines 36-39, Decision 11, lines 7-10). This reasoning simply cannot be adopted by the Board. In Smithfield Foods, Inc., 347 NLRB No. 109 (2006), cited by ALJ Landow in her Decision at 10, the Board refused to adopt the ALJ's finding of unlawful surveillance by an employer that manufactured and sold pork products. In doing so, the Board observed:

> As the videotaping was precipitated by the Union's [prior] trespass, *its timing does not support a violation* . . . . As the Union never offered assurances that it would not trespass again, the Respondent was not obligated to halt its videotaping and wait to see if the Union resumed its trespass.

347 NLRB at *15 (emphasis added). If the Board has found that a pork manufacturer was not required to halt videotaping because it anticipated union trespass based on a prior incident of union trespass, it must follow that the Center, which is a *healthcare facility* caring for residents, should also be allowed to monitor the Union's activity based on prior evidence of trespass. Thus, given the Board's decision in Smithfield Foods, ALJ Landow's argument that the six-year span of time between the trespass and the March 2006 surveillance is wrong where the Union's own

9

misconduct precipitated the surveillance. (Decision 10, lines 37-38). Moreover, while six years may be more remote than the eight-month span in Trailmobile Trailer, LLC, 343 NLRB 95 (2004), also cited by ALJ Landow in her Decision, the Board should seriously consider the policy implications of requiring a healthcare institution that must care for elderly residents to just stand by and wait for the Union's predatory tactics to threaten resident care. Indeed, even the Supreme Court of the United States has recognized that healthcare facilities are unique and should be assessed differently than factories or warehouses:

> "Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family – irrespective of whether that patient and that family are labor or management oriented – need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed."

Beth Israel Hosp. v. NLRB, 437 U.S. 483, 509 (1978)(Blackmun, J., concurring). Unlike Trailmobile and Smithfield Foods, which dealt with factory and manufacturing settings respectively, a healthcare facility cannot afford the risk of another break-in that would threaten resident safety. ALJ Landow's focus on the timing of these events in relation to the March 2006 surveillance was simply inapposite given the healthcare context.

### c. Contrary to ALJ Landow's statement, the Board does not require a showing of police presence to find that an employer's safety concerns are legitimate for purposes of surveillance.

Further, ALJ Landow's assessment that the Center did not demonstrate that the events in 2000 were not sufficiently dangerous to resident safety because the police were not summoned to the scene of these events is also inapposite. (Decision 11, lines 7-10). Significantly, the Board decisions cited by ALJ Landow do *not* require that employers supply evidence of police presence to justify their legitimate concerns for safety; those cases just happen to involve situations where

10

the police were summoned. Thus, an employer need not be required to prove that the police addressed the situation in question because the Board has never required such a showing, and, in any event, the beginning of the surveillance DVD entered into evidence as Respondent's Exhibit 1 shows that the police *were* present at the March 2006 picket. (Resp. Ex. 1).

Notably, other Board decisions that do *not* address police involvement still allow an employer to engage in surveillance when the employer's reasonable basis is justified. See, e.g., Concord Metal, Inc., 295 NLRB 912 (1989)(adopting dismissal of surveillance charge based on employer's "preservation of proof" defense even though no police presence demonstrated); Roadway Express, Inc., 271 NLRB 1238 (1984)(adopting dismissal of surveillance charge because employer gathered evidence of picketing even though no police presence demonstrated). In this case, there is no question that the Center's responsibility to protect residents required it to monitor the Union's protected activity given the Union's unpredictable history of behavior. Thus, ALJ Landow's reasoning that police presence is required to justify a reasonable basis for surveillance should not be adopted by the Board.

### d. Undisputed evidence that Union employees have never been retaliated against for their protected activity is relevant to the analysis of the Center's lawful purpose for surveillance.

Finally, ALJ Landow found irrelevant to her analysis that the undisputed evidence from all of the witnesses at the Hearing demonstrated that no one has ever been retaliated against for participation in protected activity despite the Center's open surveillance. (Decision 14, lines 20-22). In fact, the Board has found that evidence of no retaliation, discipline or discharge for protected activity tends to indicate that surveillance under attack does not restrain employee participation, thereby adding credence to an employer's stated safety concerns. See, e.g., Karatjas Family Lockport Corp., 292 NLRB 953, 956 (1989)(reversing ALJ and dismissing

11

surveillance charge because no evidence of employee coercion); Roadway Express, 271 NLRB 1238 (adopting dismissal of surveillance charge because ALJ found there was no evidence that employees were coerced as a result of surveillance). Put simply, the undisputed evidence at the Hearing that employees did neither felt restrained nor that anyone knew of any employee who had been restrained from protected activity as a result of the Center's surveillance shows that the Center is truly concerned about resident safety and is not interested in identifying Union members who participate in protected activity for coercive, restraining or retaliatory purposes. Thus, this reasoning should not be given weight.

ALJ Landow's reasoning essentially adopts a per se approach for her Section 8(a)(1) finding based on surveillance. This approach should not be adopted by the Board given the modern realities of surveillance in the workplace. See infra at 16. In Rossmore Homes, 269 NLRB 1176 (1984), the Board rejected a "per se" approach to alleged Section 8(a)(1) interrogations of union employees, stating that the overall "context" must be considered in evaluating whether the "interrogation" was really coercive and within employees' Section 7 rights. Given the undisputed fact that here there was a decade-long record of videotaping without even a hint of retaliation, and given the modern realities that videotaping is now absolutely commonplace and routine in American society, the Rossmore rationale must be adopted in this case to find that the there has been no violation of Section 8(a)(1).

**2.    Evidence Preservation is a Valid
        Justification for an Employer's Anticipatory Surveillance.**

The Board has recognized that anticipatory surveillance is lawful provided that the employer demonstrate a need to preserve evidence for future use. "*It does not follow*, however, that the Board requires that 'solid justification' can be established only after specific instances of anticipated problems have occurred." See Wash. Fruit & Produce Co., 343 NLRB 1215, 1218

(2004)(emphasis added).    Evidence preservation is a legitimate reason for an employer to undertake anticipatory surveillance.  Id.  The Center introduced evidence at the Hearing that, in addition to monitoring protected activity to ensure resident safety, the Center seeks to satisfy requests from *NLRB Regional Offices* to evaluate picketing cases.  (Tr. 137-38).  ALJ Landow assumed that evidence preservation would only be a valid defense where the party preserving the evidence actually uses the evidence in a future proceeding.    (Decision 12, Lines 31-34).  However, Board precedent does not suggest that a party relying on the defense need to actually use the evidence in a future proceeding for the defense to be successful.

For example, in Saia Motor Freight Line, Inc., 333 NLRB 784 (2001), the Board held that an employer's concern for traffic safety due to union conduct warranted surveillance because of "the *potential* for accidents."  333 NLRB at 784 (emphasis added).  Thus, it made no difference that the employer never had to use the videotape in a subsequent legal proceeding; rather, the fact that there was a *potential* for an accident was enough to persuade the Board that the employer's concern was legitimate.  Id.  Moreover, the ALJ in that case specifically observed the fact that there had been no evidence in the record that the employer wished to use the photographs to support any complaint or to seek an injunction; however, the ALJ and the Board still found that the employer's evidence preservation defense was legitimate.  Id. at 793.

In a case involving a fruit packaging employer, the Board found that a fear of recurrence of Union trespassing justified surveillance by the employer for evidence preservation.  Wash. Fruit, 343 NLRB at 1217.  The Board observed that "[the employer] could easily visualize the consequences of such a . . . gathering, and he could predict that he would have safety, property, and security issues to face."  Id.  In Wash. Fruit, the Board observed that given the "close proximity of the public areas" and "prior incidents of trespassing on the [employer's] property . .

. it was prudent of [the employer] to plan on documenting the Union's rally." 343 NLRB at

1218. As the Board reasoned in that case,

> The Board's rules regarding picture-taking of protected activity do not mean that
> an employer is precluded from asserting a legitimate concern simply because no
> disruption has yet occurred . . . .[otherwise], there would be no reason for the
> Board to require 'solid justification for . . . *anticipatory* photographing.

Id. (emphasis added). Here, Union picketing takes place across the street from the Center's only

entrance and the Center has experienced prior trespassing on its premises by the Union. [9] Thus,

under Wash. Fruit, it was prudent of the Center to engage in surveillance for evidence

preservation purposes. Again, in the context of a healthcare facility, it is unfathomable to believe

that the Board would find that traffic safety, but not resident safety, was valid for purposes of

evidence preservation. If that reasoning were adopted, the Board would essentially be endorsing

an approach that would allow healthcare employers to rely on the evidence preservation defense

to protect the cars parked on the premises of a healthcare facility, but would not allow a

healthcare facility to rely on the same defense to protect patients or residents of that facility.

Such a result would be absurd.

In fact, the Center demonstrated that its former affiliate, Resort, that also operated with

employees belonging to the Union already has had to submit a surveillance tape to comply with

Region 29's request for video evidence in a prior NLRB charge. (Tr. 137-38). Thus, because the

Center has already had to use such evidence in the past and may be expected to gather such

evidence in the future given its difficult relationship with the Union, it is unfair for the Board to

---

[9] In Robert Orr-Sysco Food Servs., 334 NLRB 977 (2001), the Board found an employer's surveillance unlawful
because the employer sought to videotape handbilling that was taking place far from the employer's premises on the
public highway "two turns away from the Employer's driveway." 334 NLRB at 978. In this case, it is undisputed
that the Union picketed across the street from the only entrance of the Center that is located on a very narrow street
within close proximity of residents' rooms. (Tr. 147, Resp. Ex. 1). Thus, the physical proximity of the picketing
warranted surveillance to protect residents.

take away the Center's right to preserve evidence when there has been no showing of any tendency to restrain protected activity as a result of the surveillance. (Tr. 80-81, 95-96, 149).

### 3. This Case is Distinguishable From Cases Relied on by ALJ Landow.

ALJ Landow relies on Snap-On Tools, Inc., 342 NLRB 5 (2004), to argue that an employer who cannot sufficiently demonstrate evidence to support its reasonable basis for surveillance cannot overcome a finding of a Section 8(a)(1) violation. (Decision 13, lines 50-52). In that case, the employer claimed that it was concerned about parking lot safety, when in fact, the employer did not introduce *any* evidence of prior incidents of trespass or violence to justify the employer's safety concern. Id. at 12. In this case, the Center introduced evidence of two prior incidents of trespass to justify its concern for resident safety. [10]

Moreover, in Snap-on Tools, there was actual evidence in the record that "the continuous observation of handbilling *prevented* employees who desired to receive union literature anonymously from doing so." Id. (emphasis added). Here, no such evidence of restraint on protected activity was adduced at the Hearing and, in fact, it was undisputed that no employee has ever suffered retaliation as a result of the Center's long history of open surveillance. (Tr. 80-81, 95-96, 149).

In the Decision at page 13, ALJ Landow also relies on Trailmobile, 343 NLRB 95, where the Board found that an employer's concern for vandalism did not justify the employer's surveillance because the employer installed the surveillance cameras eight months after an incident of vandalism occurred; thus, the Board found that given the eight-month time span, the employer's reasoning was a pretext for unlawful surveillance because if that employer was

---

[10]ALJ Landow also relied on Center Constr. Co., Inc., 345 NLRB No. 45 (2005), a case in which the Board adopted the ALJ's finding that an employer engaged in unlawful surveillance because it failed to produce any evidence that it reasonably anticipated any misconduct on the picket line. Again, in this case, the Center provided ample evidence of prior incidents of Union misconduct to justify its anticipatory surveillance.

legitimately concerned about parking lot safety, it would have installed the cameras sooner. 343 NLRB at 96. Here, Ms. Sieger testified the Center has had surveillance cameras around the premises for many years and that the Center has been videotaping Union picketing for many years to preserve evidence in case any residents are harmed in the course of Union activity. (Tr. 122). Thus, the Board cannot find any pretext because the Center has always been concerned for resident safety given its long history of surveillance that pre-dated the incidents of trespass in 2000. (Id.). Further, there was evidence that the employer in Trailmobile took adverse actions against employees who participated in the union activity caught on tape, 343 NLRB at 96, whereas it is undisputed in this case that the Center has never taken any action against any employee who participated in protected activity. (Tr. 80-81, 95-96, 149).

In the instant case, not only did the Center present evidence of prior trespass and aggression, but the Center also cross-examined several Union members who all consistently testified that no one felt restrained from participating in protected activity despite knowledge of the Center's surveillance. (Tr. 80-81, 95-96, 149). Thus, unlike Snap-On Tools and Trailmobile, the Center presented sufficient evidence to justify its legitimate concerns for resident safety, warranting dismissal of the Section 8(a)(1) finding.

### 3.    Policy Dictates a Shift in the Board's Surveillance Doctrine.

Finally, as described *supra* at 12, the Center requests that the Board reconsider the scope of its surveillance doctrine given the fact that both employers and labor organizations in the twenty-first century are living in a technologically-advanced reality far removed from the concerns of the creators of the Act. Both employees and employers have access to the internet and various surveillance techniques. Moreover, employees generally consent to information technology privacy practices upon initiation of employment, which practices may include

16

surveillance cameras on the premises and surveillance of computer hardware and internet activity, so surveillance no longer has the restraining impact that it once did because employees have a lessened expectation of privacy in the modern workplace. Further, the advent of the internet has increased the amount of information available to both parties in labor disputes, eliminating any concern for an imbalance of bargaining power. Thus, surveillance does not tend to restrain or coerce employees in the same way that it once did at the time when the Act was created and should not be analyzed in the same rigid manner the Board has ascribed to it in the past.

**B.    THE CENTER DID NOT MISLEAD**
**EMPLOYEES ABOUT THEIR REINSTATEMENT RIGHTS.**

ALJ Landow found that the Center violated Section 8(a)(1) by telling employees that they would be delayed reinstatement for three weeks if they participated in the May 2006 strike[11] due to the minimum three-week commitment of the temporary replacement worker contract, because no written contract had been introduced into evidence at the Hearing. (Decision 20, lines 6-7). In fact, Ms. Sieger testified that no written contract had been entered into.[12] (Tr. 151-53). It was improper of ALJ Landow to assume that just because there had been no written contract in place at the time of Mr. Rutenberg's statement, the Center misled employees about the consequences of the temporary employment contract on their reinstatement. Further, even if no contract existed, the Board must still find for the Center because it lawfully advised employees of the employer's rights in the context of a pending economic strike.

---

[11] For purposes of her Decision, ALJ Landow assumed that although no strike actually occurred, the nature of the strike in this case would have been an economic strike because Counsel for the General Counsel failed to prove any unfair labor practices that were the root of the strike at the Hearing. In the context of an economic strike, the Center would lawfully have the right to replace striking employees with replacements. Moreover, the employer must inform employees at the time of or prior to the time that the replacement employees have been hired of the striking employees reinstatement rights, if any.

[12] This makes sense because the strike was called off before there was a need for a formal written contract.

1.    The Record Indicates That a Verbal Contract Existed,
      so The Center Never Misled Employees About The Status of The Contract.

At the Hearing, Ms. Sieger testified that she had been in contact with three temporary employment agencies to find replacements for the employees who had threatened to strike in May 2006. (Tr. 152-53). As a healthcare facility, the Center had an obligation to arrange for replacements who could provide continuous resident care in the event of a strike. Ms. Sieger agreed with the temporary employment agencies to drop their minimum commitment from five weeks to three weeks in exchange for the Center's promise to absorb orientation costs. (Tr. 153). Ms. Sieger instructed Mr. Rutenberg to inform the employees of the impact of this contract on the employees' reinstatement rights. (Id.). Accordingly, Mr. Rutenberg, told employees that if they struck they would be replaced for three weeks pursuant to the contractual requirement with the temporary agencies. (Tr. 81, 92). ALJ Landow found that because the Center did not produce a written contract with a temporary employment agency, that such an agreement never existed. (Decision 19, lines 14-17). The Center excepts to ALJ Landow's reasoning.

ALJ Landow relies on Noel Foods Div., 315 NLRB 905 (1994), wherein the Board found a Section 8(a)(1) violation because the employer had told the employees they would be replaced if they went on strike even though it had not yet finalized any contract for replacement workers. (Decision 20, lines 6-7). In this case, the Center already had a verbal agreement with the temporary agency at the time Mr. Rutenberg made his statement to the employees (Tr. 152-53); thus, Mr. Rutenberg did not make any misleading statement that would tend to reasonably interfere with the employees' strike. The employees even testified that Mr. Rutenberg explained that the temporary agency contract would be the reason for the delayed reinstatement. (Tr. 81, 92). Further, with respect to Ms. Sieger's discussions with various temporary agencies, Ms. Sieger testified: "I was happy that some people *took on the project* to be able to help for

whatever percentage of staff that they can." (Tr. 152)(emphasis added). Ms. Sieger's testimony that an agency "took on the project" shows that a verbal agreement in fact existed to provide replacements in the event of a strike.

The fact is that Ms. Sieger, who made the phone calls and engaged in negotiations with the temporary agencies, testified that the contract had been verbally entered into with the temporary agency. (Tr. 152-53). Thus, when Mr. Rutenberg informed employees of the situation, he presented an accurate picture of the employees' reinstatement prospects. (Tr. 81, 92). It was improper for ALJ Landow to find a Section 8(a)(1) violation based on these facts in the record, and such a finding should not be adopted by the Board. (Decision 20, lines 6-7). Again, we note that the Counsel for the General Counsel and the Charging Party could have subpoenaed the employment agencies at issue to present contrary evidence regarding the verbal contract's existence but chose not to do so.

### 2. Regardless of The Contract's Existence, Mr. Rutenberg's Statement Was Lawful Because it Was Not Coupled With Any Other Threats or Permanent Job Loss.

Regardless of whether the Board adopts ALJ Landow's factual finding regarding the status of the temporary agency contract, the Board must find that Mr. Rutenberg's statement did not constitute a Section 8(a)(1) violation because it did not threaten any permanent job loss and because it was not coupled with any threats of reprisal. Mr. Rutenberg's statement in this case is similar to the statement made by the employer in Eagle Comtronics, Inc., 263 NLRB 515 (1982), which statement was deemed lawful by the Board. The employer in that case told employees who were going on strike that in an economic strike context, the strikers "could be replaced with applications [on] file." 263 NLRB at 515. In finding that the employer's statement did not violate Section 8(a)(1), the Board explained:

> [A]n employer may address the subject of striker replacement without fully detailing the protections enumerated in <u>Laidlaw</u>, so long as it does not threaten that, as a result of a strike, employees will be deprived of their rights in a manner inconsistent with those detailed in <u>Laidlaw</u> . . . . As long as an employer's statements on job status after a strike are consistent with the law, they cannot be characterized as restraining or coercing employees in the exercise of their rights under the Act.

263 NLRB at 516. The Board reversed the ALJ's finding of a Section 8(a)(1) violation, holding that the employer merely told employees that they *could* be replaced by applicants on file, which "does not contravene any <u>Laidlaw</u> rights, but, indeed, is entirely consistent with the law." 263 NLRB at 515. Similarly, Mr. Rutenberg explained that striking employees may be out of work for three weeks pursuant to the temporary agency contract. (Tr. 81, 92). Because in the context of an economic strike Mr. Rutenberg was entitled to make such a simple statement to the employees of the Center's replacement rights, his statement cannot possibly be construed as a Section 8(a)(1) violation. <u>See</u> <u>Eagle Comtronics</u>, 263 NLRB at 516.

### a. Recent Board decisions require dismissal of the Section 8(a)(1) allegation.

Indeed, the Board recently examined a nursing home employer's statement in <u>River's Bend Health & Rehab. Serv.</u>, 350 NLRB No. 16 (June 29, 2007), a case decided just over one week prior to ALJ Landow's Decision in the instant case. In that case, the employer distributed a letter to employees who were planning on striking a nursing home that stated, in part: "In a strike the Company would be forced to hire replacements to be sure we can take care of the residents. This puts each striker's continued job status in jeopardy." 350 NLRB No. 16, at *4-5. The Board held that the statement did not violate Section 8(a)(1) because the employer "did *not* say that replaced strikers would permanently lose their jobs." <u>Id.</u> The Board reasoned that the employer's statement was lawful and fully consistent with <u>Laidlaw</u> precisely because, in the economic strike context, the employer has the right to replace employees with temporary

workers, and those employees may not be immediately reinstated at the end of the strike, which "in a very real sense" would "place strikers' 'job status in jeopardy' . . . ." 350 NLRB No. 16, at *8. Moreover, the statement was not accompanied by any threats, so "any ambiguity in [the statement] must be construed in the [employer's] favor." Id.

The nursing home employer's statement in River's Bend Health & Rehab. Serv. is wholly duplicative of the statement made by Mr. Rutenberg in this case; thus, the Board must apply the same analysis here as it did in that case and dismiss the Section 8(a)(1) finding. First, Mr. Rutenberg did not ever permanently threaten job loss -- the testimony of union employees who attended the meeting specifically indicated that the employees understood that they may be delayed reinstatement for three weeks due to the temporary agency contract. (Tr. 81, 92). There is simply no evidence in the record that any employee thought permanent job loss was an issue to be concerned about.

Next, Mr. Rutenberg's statement was entirely consistent with Laidlaw, 171 NLRB 1366 (1968). Even if there were any doubt that the statement was an incomplete statement of an employee's Laidlaw rights, the Board has specifically held that an employer's "incomplete" statement of employee rights does not violate Section 8(a)(1). See Eagle Comtronics, 263 NLRB at 516 (holding employer need not "explicate all the possible consequences of being an economic striker"); see also Quirk Tire, 330 NLRB 917, 926 (2000)("While [employer's] comments may have been legally incomplete, they do not suggest or intimate that any employee rights would be denied as a result of a strike."). Finally, the plethora of evidence in the record dictates that Mr. Rutenberg's statement was not accompanied by any unlawful threat of reprisal against striking employees; thus, his statement "cannot be characterized as restraining or coercing employees." Eagle Comtronics, 263 NLRB at 516.

The Board has also held that an employer's statement in a pamphlet during an economic strike that the employees were "not discharged, technically speaking, [b]ut they're not working" was not unlawful because the statement "sufficiently dispels any impression that employees who engage in an economic strike are absolutely terminated." John W. Galbreath & Co., 288 NLRB 876, 877 (1988). At most, the Board found that the statement would "puzzle" economic strikers about whether or not they would be able to return to work, but because there was no implication that they had been discharged, there was no finding of a Section 8(a)(1) violation. Id. Similarly, Mr. Rutenberg never even spoke in terms of discharge, termination or job loss – he merely spoke about the impact temporary replacement workers would have on *delaying* reinstatement. (Tr. 81, 92). Notably, there was no evidence at the Hearing that any employee felt "puzzled" as to his or her ability to return to work after the temporary worker contract had been satisfied by the Center.

Similarly, in Novi Am., Inc., 309 NLRB 544, 545 (1992), the Board held that an employer's statement that "striking employees can be replaced by permanent replacements" was entirely consistent with the law. The Board also held that the second portion of the employer's statement, that "employees may not have a job when the strike is over," was consistent with the law because the employer was merely informing employees that they may not be able to "*immediately* return" to their jobs at the conclusion of the strike. 309 NLRB at 545. The Board further found that because the statements were not accompanied by any threats, the employees would not be under the impression that, "as a result of a strike, [they] would be deprived of their rights in a manner inconsistent with Laidlaw." Id; see also Quirk Tire, 330 NLRB at 925-926 (finding no 8(a)(1) violation for statement that employees "could" be permanently replaced in event of strike because statement was not a threat and was not made in context of other threats). Similarly, Mr. Rutenberg's statement was an accurate explanation of an employer's rights in the

22

context of an economic strike and was not accompanied by any threats; thus, the Section 8(a)(1) finding must be dismissed based on Board precedent.

ALJ Landow cites <u>Sutter Health Ctr.</u>, 20-CA-30946-1, 2007 NLRB LEXIS 436, at *4 (Sept. 29, 2006), to support her contention that the Center violated Section 8(a)(1) by telling employees their reinstatement would be delayed by three weeks. (Decision 15, lines 42-43). In that case, the Board held that because of the union's history of *predictable* one-day strike behavior (which always resulted in the union's submission of reinstatement requests with their strike notices), it was unreasonable for the employer to assume that the one-day strike at issue would have been any different to justify the employer's five-day delay in reinstatement. 2007 NLRB LEXIS at *4. Here, 1199 had never given the Center any assurances that it would refrain from engaging in follow-up strikes to disrupt the Center's healthcare operations. (Tr. 154). Accordingly, based on the Union's unpredictable tactics at the Center, and the Union's failure to give any assurance that it would refrain from engaging in further strikes, the Center had legitimate reasons to bring in temporary replacements. See <u>Sociedad Espanola de Auxilio Mutuo y Beneficiencia</u>, 342 NLRB 458 (2004)(holding employer's use of temporary workers for two weeks given employees' threat to hold two short strikes justified).

**b.    Cases Cited by Counsel for the General Counsel**
**Are Inapposite and Do Not impact The Outcome in This Case.**

ALJ Landow's Decision and Counsel for the General Counsel improperly relied upon <u>Grinnell Fire Prot. Sys. Co.</u>, 328 NLRB 585 (1999), wherein the Board adopted the ALJ's recommendation that the employer violated Section 8(a)(1) by informing unfair labor practice ("ULP") strikers prior to a strike that, if they chose to strike, they would be fired and that they would not be hired back after the strike ended. (Decision 16, line 14, GC Post-Hearing Br. 30). It is undeniable that Mr. Rutenberg's statement in this case is patently different from the threat in

23

Grinnell. As an initial matter, ALJ Landow assumed that 1199's strike would have been an economic strike, not a ULP strike (Decision 18, lines 19-20), so the Center was entitled to inform employees that they would be replaced during their strike. See Eagle Comtronics, 263 NLRB at 516. Also, unlike in this case, the employer in Grinnell blatantly misstated the employees' rights in the ULP strike context, which rights would allow the employees full reinstatement at the conclusion of the strike. Grinnell, 328 NLRB at 599. Here, Mr. Rutenberg truthfully explained that the temporary agency required the striking employees to be out of work for three weeks, which explanation is wholly consistent with the Center's rights in the economic strike context. See Eagle Comtronics, 263 NLRB at 516.

Counsel for the General Counsel also relied on Laidlaw Corp., 171 NLRB 1366 (1968), wherein the employer told employees that if they went on strike "you LOSE FOREVER your right to employment by this company . . . . I want to assure you that such is the law." 171 NLRB at 1387. There is simply no similarity in the type of statement made by the employer in Laidlaw and Mr. Rutenberg's statement in this case. Mr. Rutenberg never told employees they would permanently lose their jobs; thus, Laidlaw also does not support ALJ Landow's Section 8(a)(1) finding in this case.

Finally, ALJ Landow's and Counsel for the General Counsel's reliance on both Pennant Foods Co., 347 NLRB No. 41 (June 27, 2006), and Cagle's Inc., 234 NLRB 1148 (1978), are similarly misplaced because both of those cases involve ULP strikes where the employees were advised by the employers in advance that they would be permanently replaced in derogation of their ULP strike rights. On the other hand, Mr. Rutenberg's statements regarding an employer's rights during an economic strike were appropriate in the context of an impending economic strike. Thus, it was improper for ALJ Landow and Counsel for the General Counsel to rely on

any of these ULP cases to support a Section 8(a)(1) finding based on Mr. Rutenberg's statements made in the context of a pending economic strike.

## CONCLUSION

For all of the foregoing reasons, the Board should not adopt ALJ Landow's Decision.

Dated: New York, New York
      September 5, 2007

**MCDERMOTT WILL & EMERY LLP**


By:_____
        Joel E. Cohen

340 Madison Avenue
New York, New York  10173
(212) 547-5400

Attorneys for Respondent
Kingsbridge Heights Rehabilitation Care Center

NYK 1115684-1.057806.0011

UPN.A - Blog Archive » Strike Update Day 106 - (6/4/2008)                    Page 8 of 11











# ATTENTION 1199SEIU MEMBERS

A message from the 1199SEIU workers at Kingsbridge Heights Nursing Home.

The workers at Kingsbridge Heights Nursing Home in the Bronx have been on strike since February 20th. Management has cut their 1199 health benefits. Management is trying to throw out the union.

**These people are believed to be strike breakers and are crossing the picket line.**

They hope to take our jobs.

## PLEASE HELP US AND OUR FAMILIES.

## IF CAN YOU IDENTIFY ANY OF THESE PEOPLE






EXHIBIT
15

3400-26 Cannon Place
Bronx, New York 10463
Tel: 718-796-8100
Fax: 718-796-8182



# Memo

**To:**       All Employees

**From:**   Administration

**Date:**    1/29/2008

---

The facility would like to inform ALL employees that Kingsbridge Heights Rehabilitation Care Center respects the Union Members right to strike.

I assure you that this right will come with **NO** retribution of any kind.

For the safety and well being of our residents we do **legally** have the right to know who will be going out on strike and who will continue to work.

We expect **ALL** employees to cooperate fully to ensure the residents we care for are not affected by the strike.

Thank you for your cooperation.

EXHIBIT

_1 6_

3400-26 Cannon Place
Bronx, New York 10463
Tel: 718-796-8100
Fax: 718-796-8182



# Memo

**To:**    Wojciech Orlos and All Kingsbridge Heights Employees

**From:**    Helen Sieger

**Date:**    6/17/2008

As per the Memo posted on January 29, 2008, I will again reiterate that Kingsbridge Heights Rehabilitation Care Center respects the right of all Union Members to strike.

There has not been and will never be any retribution of any kind for participation in the strike.

3400-26 Cannon Place
Bronx, New York 10463
Tel: 718-796-8100
Fax: 718-796-8182

**Kingsbridge Heights
Rehabilitation Care
Center**

# Memo

**To:**    All Employees

**From:**   Administration

**Date:**   3/31/2008

---

As a valued employee, you have numerous rights under Federal and State laws. This Administration would never think of or try to take away any of those rights from you. We recognize and readily admit that, as an employee of our facility, the law gives you the absolute right to form or join, any labor organization as permitted by law. We will never take those rights away from you and we will never discriminate or retaliate against, or otherwise interfere with, your right to join or refrain from joining a union.

Any statement in your employment agreement where you affirmed that "you are not a member of any union and will not join (a union)" was a mistake on the part of the Administration and we were wrong. This statement will never be used for any purpose and is withdrawn. Thank you and we sincerely appreciate your association with our organization and the important work you provide to the residents in our Facility.



EXHIBIT
17



# Family Voices

News For And About Kingsbridge Heights Nursing Home Resident Families

Issue Number 2 February 19, 2008

**1199SEIU** United Healthcare Workers East

For more info: (212) 261-2416

We are being to forced to strike today by Kingsbridge Heights owner, Helen Sieger. It's not what we want to do. We love our jobs and we love our residents. But your loved ones are not getting the best care possible when we suffer hardship because we cannot even take care of our own families.

We have not had a contract in many years, because Ms. Sieger will not negotiate with us. In late 2007, around the holidays, *she took away our health benefits—leaving our families, our children and us without health care.* She is blatantly disregarding the law when she refuses to bargain with us.

By law, we informed Ms. Sieger of the possibility of a strike well in advance. Still, she refused to negotiate. We did everything possible to avert a strike; including leafleting, public education campaigns, contacting our elected officials and agreeing to meet with a mediator (she and/or her lawyers just didn't show up). A strike is the final legal action we can take, because she has refused all other options.

Our voices fell on the deaf ears of Helen Sieger who cares more about making a lot of money (she owns one of the most profitable nursing homes in the state) than she does about the residents and employees at Kingsbridge. We simply want to improve our lives and make Kingsbridge better for the residents and *all of our families.*

We want to work closely with you, resident family members and friends. We are aware that any change in regular caregivers can be a hardship on your family member. That's why it is critical that we keep each other informed everyday.

You have all been supportive and wonderful. Your calls to the Department of Health have helped. They have already come to the facility to assess the situation and will continue to do that. It is possible that Ms. Sieger will hire unqualified workers while we are on strike, so you must continue to call everyday.

New York State Health Department Nursing Home Patient Care Complaints
**1-888-201-4563**

Rema Smith, Ombudsperson Kingsbridge Heights
**212-962-2720**

We hope you understand that *Helen Sieger is forcing us to strike* and we will stand by this decision until she does the right thing. We love our jobs, but we cannot take care of our residents, if we cannot take care of our own families and ourselves. A nursing home worker should not have to choose between buying groceries and getting medicine for their kids or ourselves. We need health benefits because a healthy, stable workforce is what our residents deserve. The last thing we want to do is jeopardize the health of the residents we love. That's why we need your help and support!

## Questions & Answers

Q:  I want to take my loved one out of the nursing home, but Helen Sieger is saying that I can't do that. Is that true? What can I do?

A.  First of all, it is not true. You are ultimately responsible for your loved one. If you feel that the care at the nursing home may jeopardize your loved one, there are many excellent nursing homes, right in the area and staffed by 1199SEIU members. In fact, the employers at these nursing homes work well with our union and understand that there is a direct connection to quality care and a healthy stable workforce.

Here are a few:

- **SCHERVIER NURSING CARE**
  2975 INDEPENDENCE AVE
  BRONX, NY 10463
  (718) 548-1700

- **RIVERDALE NURSING HOME**
  641 WEST 230TH ST
  BRONX, NY 10463
  (718) 796-4800

- **MANHATTANVILLE HEALTH**
  311 W 231ST STREET
  BRONX, NY 10463
  (718) 601-8400

If you have any questions at all, please visit us on the picket line or call (212) 261-2416. With your help, we will make Kingsbridge Heights a place your loved ones can really call home.



EXHIBIT
18

**PRESIDENT**
Dennis Rivera

**SECRETARY TREASURER**
George Gresham

**EXECUTIVE VICE-PRESIDENTS**
Norma Amsterdam
Yvonne Armstrong
Marshall Blake
Maria Castaneda*
Jennifer Cunningham*
Mike Fadel*
Aida Garcia
Betty Hughley
Eustacia Jarrett
Steven Kramer
Patrick Lindsay*
John Reid
Bruce Richard
Mike Rifkin
Jay Sackman

**VICE-PRESIDENTS AT LARGE**
Mark Bergen
Lenore Colbert
Patrick Gaspard
Pearl Granat
Robert Moore**
Barbara Rosenthal
Neva Shillingford
Minerva Solla
Celia Weisle**

**VICE-PRESIDENTS**
Maryann Allen
Denise Allegretti
Jacqueline Alleyne
Peggy Bachman*
Hassan Bilal*
Coort Bordhius
Carolyn Brooks
Lisa Brown
Gerard Cadet
Donald Crosswell
Al Davidoff*
Armeta Dixon*
Angela Doyle
Enid Eckstein*
Jerry Fishbein*
Frances Gentle
Larry Ginsburg*
Brenda Hartley*
Michelle Healy*
Anne Jacobs-Mourkie
Keith Joseph
George Kennedy
Maria Kercado
Rosa Lomuscio*
Window Luna*
Coraminita Mahr
Dalton Mayfield
Joanne McCarthy
Joyce Neil
Gerard Nordenberg
Isaac Nortey
Elsie Otero*
Vasper Phillips
Bruce Popper
Anne Powe
Rhadames Rivera
John Seales
Rona Shapiro
Allan Sherman
Patricia Smith
Greg Speller
Clare Thompson
Kathy Tucker
Nelson Valdez
Laurie Vallone
Mary Whitten
Gladys Wrenick*

**GENERAL COUNSEL**
Daniel J. Ratner, Esq.

**CHIEF FINANCIAL OFFICER**
Louise Bayer

\* Acting
\*\* Acting Assistant
    Division Director



**1199SEIU**
United Healthcare Workers East

March 5, 2008

Stallion Group
1783 45th Street
Brooklyn, NY 11204

    Re:    Kingsbridge Heights Rehabilitation and Care Center

Dear Sir/Madam:

On February 20th, Kingsbridge Rehabilitation and Care Center, Inc. ("Kingsbridge") forced their health care employees, represented by 1199SEIU United Healthcare workers East ("1199"), to commence an unfair labor practice strike by refusing to bargain a new contract and causing the termination of health insurance coverage for its employees and their families.

Since then we have learned that your firm has chosen to ally itself with Kingsbridge by providing a substantial compliment of agency employees to fill-in for the jobs previously performed by our striking unit members. By so allying, your firm has shed any neutral standing in the unfair labor practice dispute, and has made common cause with Kingsbridge in its continuing unfair labor practices.

We call upon your firm to cease providing fill-in employees to Kingsbridge during the unfair labor practice strike.

Unless your alliance with Kingsbridge ends by Monday, March 10, 2008, 1199 intends to:

* picket your office(s);
* picket the homes of its principals;
* ask 1199 members and other healthcare employees who work through your agency to cease working through your agency;
* advertise in appropriate media targeting the per diem nurse population;
* engage in other lawful, concerted economic activities, including but not limited to notifying the hospitals and nursing homes in New York City that they should not do business with your firm while it allies itself with Kingsbridge in the unfair labor practice strike.

**NEW YORK CITY PRINCIPAL HEADQUARTERS**
310 West 43rd St.
New York, NY 10036
(212) 582-1890
www.1199seiu.org

**ALBANY**
155 Washington Ave.
Albany, NY 12210
(518) 396-2300

**KINGSTON**
75 Crown Street
Kingston, NY 12401
(845) 339-1900

**BALTIMORE**
611 North Eutaw Street
Baltimore, MD 21201
(410) 332-1199

**ROCHESTER**
225 W. Broad St., Ste. B
Rochester, NY 14608
(505) 244-0830

**BOSTON**
21 Fellows Street
Roxbury, MA 02119
(617) 442-4100

**SYRACUSE**
404 Oak St., Suite 120
Syracuse, NY 13217
(315) 424-1743

**BUFFALO**
974 Kenmore Ave
Buffalo, NY 14216
(716) 982-0540

**UNIONDALE**
50 Charles Lindbergh, Ste. 6
Uniondale, NY 11553
(516) 542-1115



EXHIBIT
19

Please advise us if you will stop supplying strikebreakers to Kingsbridge. Unless we hear from you by March 10, 2008 at noon, we will assume that you are continuing to supply workers to perform struck work at Kingsbridge, and will take all lawful and appropriate steps to protect the interests of this union and its members striking at Kingsbridge.

Very truly yours,

Mike Rifkin
Executive Vice President, 1199SEIU

cc: Kingsbridge Nursing Home 1199 Committee

**1199SEIU**
United Healthcare Workers East

93385

04/07/2008 12:52 FAX                                      @001/001

# WANTED

## Do you or someone you know do business with this company?

**Upstate Dairy/ Golden Flow**

54 Walworth St.
Brooklyn, 11205

(718) 488-0700

Call the 1199SEIU Strike Breaker Hot Line at (212) 261-2532

**1199SEIU**
United Healthcare Workers East

This company is believed to be a strike breaker at Kingsbridge Heights Nursing Home in the Bronx!

Background: 1199SEIU workers at Kingsbridge Heights Nursing Home in the Bronx have been on strike since February 20th. The boss, Helen Sieger, cut off our health benefits and is trying to throw out our union.

All of us walked out together. We have been standing strong together. We have the support of our community and all of our elected officials. But, shamefully there are still some companies that are crossing our picket line. We need *your* help! Help us identify these strike breakers Tell them **SHAME ON YOU!** Tell the workers at these companies that the next time there is a strike, it could be them without health insurance and carrying a picket sign!

AN INJURY TO ONE IS AN INJURY TO ALL OF US. TELL THEM NOT TO CROSS OUR PICKET LINE.