Michael J. Sciotti, Esq. (MS0007)
John T. McCann, Esq. (*to be admitted pro hac vice*)
Lindsey H. Hazelton, Esq. (*to be admitted pro hac vice*)
HANCOCK & ESTABROOK, LLP
1500 AXA Tower I – 100 Madison Street 1
Syracuse, New York 13202

*Attorneys for Respondent Kingsbridge
Heights Rehabilitation and Care Center*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELESTE J. MATTINA, Regional Director, Region 2, National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, <br><br>                                  Petitioner, <br><br>     vs. <br><br> KINGSBRIDGE HEIGHTS REHABILITATION AND CARE CENTER, <br><br>                             Respondent. | **Civil Action No: 08-CV-6550 (DLC)** |

**MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR
TEMPORARY INJUNCTION UNDER SECTION 10(j)
OF THE NATIONAL LABOR RELATIONS ACT
AND IN SUPPORT OF MOTION FOR DISCOVERY**

Dated: August 6, 2008

HANCOCK & ESTABROOK, LLP
1500 AXA Tower I
100 Madison Street 1
Syracuse, New York    13202
Telephone:  (315) 471-3151
Facsimile:  (315) 471-3167

# TABLE OF CONTENTS

Page

STATEMENT OF CASE ........................................................ 3

STATEMENT OF FACTS ...................................................... 4

ARGUMENT ........................................................................ 5

I.     STATUTORY STANDARD FOR INJUNCTIVE RELIEF ............... 8

II.    PETITIONER HAS NOT DEMONSTRATED REASONABLE
       CAUSE FOR VIOLATIONS OF SUFFICIENT MAGNITUDE
       TO SIPPORT INJUNCTIVE RELIEF ................................................. 11

       A. Respondent Did Not Unlawfully Refuse to Provide the
          Union With Relevant Requested Information................................. 11

       B. Respondent Did Not Unlawfully Refuse to Grant the
          Union Access to Meet With Employees ......................................... 12

       C. Respondent Permissibly Discontinued Payments to the
          Union/Fund's Arbitrary Cessation of Employee
          Health Care Benefits ....................................................... 13

       D. Respondent's Use of Videotaping Was Reasonably Justified
          and Did Not Intimidate Employees From Engaging
          in Protected Activity ...................................................... 13

       E. Kingsbridge Was Legally Obligated to Cease Deducting
          Union Dues in the Absence of a Collective
          Bargaining Agreement .................................................... 15

       F. Respondent Lawfully Inquired as to Health Care Employees'
          Intention to Strike and Did Not Threaten Discharge................. 16

III.   INJUNCTIVE RELIEF WOULD NOT BE JUST AND PROPER...... 17

       A. The Union's Strike in Support of a Nonmandatory Subject of
          Bargaining Is Unlawful.................................................... 17

       B. A Broad Order Directing Reinstatement to Striking Employees
          Notwithstanding Acts of Strike Misconduct and Breaches of
          their Duty of Loyalty Is Not Appropriate............................... 24

       C. The Requested Order Directed to Reinstatement Is Not Ripe for
          Adjudication.............................................................. 25

D.  Petitioner Unreasonably Delayed Seeking Injunctive Relief........ 27

E.  The Court Should Not Condone Efforts at Litigation in
    Multiple Forums........................................................... 28

F.  Injunctive Relief Should Be Denied under the Doctrine of
    Unclean Hands............................................................. 31

IV.    RESPONDENT IS ENTITLED TO LIMITED DISCOVERY................... 32

CONCLUSION............................................................................ 35

## STATEMENT OF THE CASE

The National Labor Relations Board ("Petitioner") brings the instant application for injunctive relief against Kingsbridge Heights Rehabilitation and Care Center ("Kingsbridge") pursuant to Section 10 (j) of the National Labor Relations Act. The July 23, 2008 Petition is based on a Consolidated Complaint dated May 30, 2008.

The underlying charges that form the basis of the Complaint date back to a series of largely unrelated events which began in August 2007. As is set forth more fully below, the papers submitted fail to establish that that there is reasonable cause to believe the complained of acts occurred or that the requested injunctive relief, is just or proper under the circumstances. Many of the allegations in the Complaint, which refer to individual discipline, information requests or the Union's right of access, are the types of common-place violations which, even if true, can await adjudication by the NLRB in the normal course. Even assuming some of the allegations may rise to the level of technical violations of the NLRA, there is no evidence that the issues complained of, such as video surveillance, direct dealing, or alleged unilateral changes to terms and conditions of employment, had any impact on the employees' freedom to engage in protected activity or otherwise caused disaffection toward the Union. Moreover, the prospective injunctive relief Petitioner seeks with the respect to the potential rights of strikers who have not yet even made a demand to return to work is not ripe for adjudication by the Court. Even assuming a demand was made, the fate of many of these strikers, who engaged in an unlawful strike and committed strike misconduct, cannot properly be addressed with a blanket order of reinstatement. As to the issue of benefit contribution, Kingsbridge is entitled to discovery on the material issues which form the basis of the requested relief, especially where, as here, the legality of the Union's conduct is at issue.

## STATEMENT OF FACTS

Kingsbridge is a 400 bed nursing home located at 3400-26 Cannon Place, Bronx, New York. For some time, its employees have been represented by United Health Care Workers East, 1199 SEIU ("Union"). The most recent collective bargaining agreement with the Union expired in April 2005. Kingsbridge negotiated with the Union in good faith regarding the terms and conditions for a successor agreement and as of October 2006, the only outstanding issue was the selection of an arbitrator. Sieger Decl. 1. The Union refused to agree to Kingsbridge's proposal to utilize the services of the American Arbitration Association and have an arbitrator randomly assigned for each arbitration. Rather, the Union wanted a single person to be designated as the arbitrator on all cases. Kingsbridge was unwilling to agree to this and maintained that the more equitable approach was for arbitrators to be randomly selected on a case by case basis. Sieger Decl. Exhibit 4 and Petitioner's Exhibits XX and ZZ.

Pursuant to the prior collective bargaining agreement, Kingsbridge provided its employees with benefits through the 1199 SEIU Greater Benefit Funds ("Fund"). In or about 2006, the high cost of Fund contributions combined with lower reimbursement rates for health care facilities, created a financial strain on the health care industry as a whole. Like other facilities, Kingsbridge fell behind in benefit fund contributions. Sieger Decl. 3 and Exhibit 5 thereto. However, despite repeated requests from Kingsbridge, the Union refused to work out a payment plan. Instead, the Union filed NLRB charges on the issue, and more significantly, threatened to, and ultimately did, terminate the employees' medical benefits. It is undisputed that although other 1199 facilities were also delinquent in their benefit fund contributions, the Union did not cut off those employees' health care benefits – but only did so for Kingsbridge's employees – an arbitrary inequity which continues to date. Id.

The issue of Kingsbridge's delinquent payments was pursued to hearing before the NLRB in May and June of 2006. Although the benefit cessation then was similar, if not identical, to the issues in the matter at hand, no application for injunctive relief was sought in 2006. In the midst of the hearing, the Union and Kingsbridge reached a settlement agreement. Petitioner's Exhibit K; Sieger Decl. 4.

Over a year later, in or about August 2007, the Union claimed that Kingsbridge had violated the terms of the settlement agreement and sought to reopen the original hearing. Also, at or about this same time, and continuing to date, the Union began utilizing Kingsbridge's existing obligation to make benefit fund contributions and past delinquencies as leverage in attempting to obtain a collective bargaining agreement on the Union's terms. Sieger Decl. 5. Kingsbridge asked the Union to negotiate a change as to how it would make payments to the Fundx in the future, but the Union refused to negotiate. Instead, the Union, via the Fund, sent Kingsbridge a notice of its intent to terminate the employees' health care benefits. Exhibit A to Petitioner's Exhibit L. Thereafter, the Fund sent a letter to Kingsbridge's employees on or about October 3, 2007 threatening the same thing. Exhibit B to Petitioner's Exhibit L. Kingsbridge had still not agreed to the Union's contract terms, and the Fund followed through with its threat to discontinue health benefits as of November 2007. Kingsbridge, who had been remitting payments to the Funds, albeit slowly, made its final payment in or about November 11, 2007 towards the October benefits. Sieger Decl.10 and Exhibit 11 thereto. There was no longer any basis on which to continue making payments once the Fund cut off the employees' benefits. Yet even after the benefits were terminated, the Union persisted in its attempts to secure a contract by conditioning it upon satisfaction of the delinquencies Kingsbridge owed the Fund. Petitioner's Exhibit WW. A charge is currently pending regarding the Union's unlawful bargaining position

and the fact that the strike upon which it was based was unlawful.  Sieger Decl. 8 and Exhibit 9 thereto.

The Union went on strike February 20, 2008.  Since that time the strikers have engaged in misconduct which has brought harm and fear to the facility. They have damaged vehicles and property, physically assaulted the staff, and used vulgar and profane language. The Union has intimidated and coerced Kingsbridge's vendors and otherwise sought to interfere with the level of care provided to the residents. Sieger Decl, 14, 20 and Exhibits 18 and 19 thereto.

## ARGUMENT

### I.    STATUTORY STANDARD FOR INJUNCTIVE RELIEF

Pursuant to section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C.

§ 160(j), the National Labor Relations Board ("NLRB" or "Board") may petition a federal

district court for an injunction preventing an employer from violating the substantive provisions

of the Act. In determining whether to issue an injunction, courts in the Second Circuit apply a

two-prong analysis. E.g., Hoffman v. Inn Credible Caterers, Ltd., 247 F.3d 360, 363 (2d Cir.

2001). An injunction may issue only where the court determines that, first, there is reasonable

cause to believe that unfair labor practice have been committed and, second, the requested relief

is "just and proper." Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051 (2d Cir. 1980)

(citations omitted).

In deciding whether there is reasonable cause to find an NLRA violation, courts generally

defer to the Board's assertions. Accordingly, with regard to issues of fact, courts will sustain the

Board's position "unless the court is convinced that it is wrong." Id. (citing Danielson v. Int'l

Org. of Masters, 521 F.2d 747, 751 (2d Cir. 1975)). Likewise, courts accept the Board's

statement of the law unless such position is clearly incorrect. Danielson v. Int'l Org. of Masters,

521 F.2d at 751. Nevertheless, although courts give the Board deference due its expertise, "to

give the Regional Director's position great weight is not to make it dispositive." Silverman v.

Imperia Foods, Inc., 646 F. Supp. 393, 398 (S.D.N.Y. 1986). Rather, the Board must "come

forward with evidence sufficient to spell out a likelihood of violation" in order to demonstrate

reasonable cause. Danielson v. Joint Bd. of Coat, Suit and Allied Garment Workers' Union,

I.L.G.W.U., 494 F.2d 1230, 1243 (2d Cir. 1974). In short, the Board's allegation of an NLRA

violation is supported by reasonable cause where its factual assertions and legal positions are rational. See, e.g., Danielson v. Int'l Org. of Masters, 521 F.2d at 751.

Respondent would acknowledge that Petitioner's burden to demonstrate "reasonable cause" under established case law is not onerous and that the Court will typically defer to the Board's rendition of facts as establishing a violation per se. It is submitted, however, that where the Petition itself makes little or no reference to many of the allegations in the Complaint and the attached charges, and where the conduct complained of bears little relationship to the relief sought, Petitioner must do more than simply state allegations in order to establish a case of "reasonable cause" for injunctive relief.

The second prong of a court's analysis is mandated by the Act itself, which requires that a section 10(j) injunction may issue only if such remedy is "just and proper." This determination calls on courts to apply traditional equity principles and leaves the district judge full discretion to decide "whether there is a pressing need for extraordinary equitable relief." Danielson v. Int'l Bhd. of Electrical Workers, Local Union No. 501, 509 F.2d 1371, 1375 (2d Cir. 1975). "This means that the court must engage in traditional equitable inquiries concerning irreparable harm, preservation of the status quo, and the balance of hardships." Imperia Foods, 646 F. Supp. at 398 (citing McLeod v. Gen. Electric Co., 366 F.2d 847, 849 (2d Cir. 1966), vacated as moot, 385 U.S. 533 (1967); see also Mattina v. Chinatown Carting Corp., 290 F. Supp. 2d 386, 391 (S.D.N.Y. 2003) ("A § 10 (j) injunction is just and proper if it restores the pre-unfair labor practice status quo and works to deter irreparable injury.") (citations omitted)). "Just and proper" analysis is critical to ensure that an injunction does not issue simply because the court concludes that the Board has reasonable grounds for believing that a unfair labor practice may have occurred. Int'l Bhd. of Electrical Workers, 509 F.2d at 1375. The Second Circuit has

explained that the equitable principles of a traditional injunction combine with the goals of the NLRA such that "injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." Inn Credible Caterers, 247 F.3d at 368 (citations omitted). The Second Circuit has further stated that "the appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred." Id. at 369.

Likewise, where, as here, the Board seeks an injunction in order to prevent irreparable harm, equitable principles dictate that "[t]he injury must be shown to be imminent, not remote or speculative." Reynolds v. Goord, 103 F. Supp. 2d 316, 336 (S.D.N.Y. 2000) (Cote, J.) (quoting Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990)). In accordance with the status quo element of section 10(j) jurisprudence, "[i]rreparable harm is found where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." In re WorldCom, Inc. Securities Litigation, 354 F. Supp. 2d 455, 469 (S.D.N.Y. 2005) (Cote, J.) (quoting Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999)). Though section 10(j) "conditions" traditional equity principles in recognition of overarching public policy concerns, Seeler v. Trading Port, Inc., 517 F.2d 33, 39 (2d Cir. 1975), because "[t]he showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction," the Board must demonstrate immediate, concrete injury caused by the complained-of conduct. Worldcom Litigation, 354 F. Supp. 2d at 469 (quoting Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)).

For reasons set forth more fully below, Respondent submits that Petitioner has not established that injunctive relief is just and proper under all of the facts and circumstances presented.

II.    **PETITIONER HAS NOT DEMONSTRATED REASONABLE CAUSE FOR VIOLATIONS OF SUFFICIENT MAGNITUDE TO SUPPORT INJUNCTIVE RELIEF**

A.    **Respondent Did Not Unlawfully Refuse to Provide the Union with Relevant Requested Information**

As a general matter, an employer is obliged to provide a union with information that is necessary to its efforts in representing union employees in the bargaining process. Columbus Product s Co., 259 NLRB 220, n.1 (1981) (citing Tool and Die Makers' Lodge No. 78, 224 NLRB 111 (1976)). This duty is not unlimited. For example, an employer must supply the bargaining representative with information only upon the union's good faith request or demand that that it be furnished. S.L. Allen & Co., 1 NLRB 714 (1936). Moreover, in the event that information sharing becomes an issue before the Board, it examines the employer's obligation on a case-by-case basis to determine whether the requested information is "is relevant, and if relevant, whether it is sufficiently important or needed to invoke a statutory obligation of the other party to produce." Tool and Die Makers', 224 NLRB at n.1. The Board has also held that an employer does not violate the Act where requested information is readily available through another source. California Portland Cement Co., 101 NLRB 1436, 1441 (1952) (employer did not to violate the Act where information requested was already posted on the plant bulletin board).

An employer is free to refuse union demands for information that are made in bad faith. See, e.g,. Utica Observer-Dispatch v. NLRB, 229 F.2d 575, 577 (2d Cir. 1956). For example, in Unbelievable, Inc. d/b/a Frontier Hotel & Casino, the union requested presumptively relevant information on new hires two weeks after having brought an unfair labor practice complaint. 318 NLRB 857, 877 (1995). Because the timing of the request made it clear that the information

was intended to assist the union and the general counsel in obtaining evidence in support of the complaint, the Board upheld the employer's refusal to submit the requested information. The Board held that even if the information sought would have been producible for collective bargaining or representational purposes, it need not be produced where it would constitute a substitute for discovery in a Board proceeding. Id.

At issue here are two Union letter requests for generic employee information set forth in letters dated June 13 and August 3, 2007. Neither the Petitioner nor the Union has articulated why this information was "sufficiently important" to it during the summer of 2007. Moreover, most if not all of the information had already been provided to the Union on a monthly basis with reports submitted with Benefit Fund checks.

**B.    Respondent Did Not Unlawfully Refuse to Grant the Union Access to Meet with Employees**

Petitioner claims that the Union was denied access to the facility when Kingsbridge refused to grant the requests of Union organizer Ms. Wray-Roach. The fact that access may have been denied must be considered in light of the additional facts of Wray-Roach's disruptive behavior which Kingsbridge reasonably requested be addressed before access could resume and in recognition that the "evidentiary proof" of the denial of access (Petitioner's Exhibit 0) is nothing more than a self serving paper trail designed by Wray-Roach to form the basis for a charge. There is cause to question whether these events demonstrate reasonable cause to suggest a violation as opposed to unreasonable Union tactics in contravention of accepted rules for access. There is no indication that the Union was hindered or otherwise impacted by this sequence of events. The Union was able to meet with its members on its own property across the street. These examples are offered not for the proposition that the lack of harm negates or

otherwise justifies an NLRA violation, but rather to demonstrate that this type of conduct simply should not trigger a basis for injunctive relief.

### C.    Respondent Permissibly Discontinued Payments to the Union Benefits Funds following the Union/Fund's Arbitrary Cessation of Employee Health Care Benefits

On November 11, 2007, Respondent remitted payment for its October 2007 benefit fund obligations. Shortly thereafter, Respondent learned that the Union had terminated its employees' health benefits. In view of the Union's termination of employee benefits and the Union's announced intention to maintain this position going forward, Respondent was under no obligation to continue to pay for benefits not received.

### D.    Respondent's Use of Videotaping Was Reasonably Justified and Did Not Intimidate Employees from Engaging in Protected Activity

Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of the rights to engage in concerted collective activity guaranteed in section 7 of the NLRA. 29 U.S.C. § 158(a)(1). The Board and the courts have long recognized that "absent proper justification, the photographing of employees engaged in protected concerted activities violates [§ 8(a) (1)] because it has a tendency to intimidate." F.W. Woolworth Co., 310 NLRB 1197, 1197 (1993); see also Road Sprinkler Fitters Local Union No. 669 v. NLRB, 681 F.2d 11, 19 (D.C. Cir. 1982); Waco, Inc., 273 NLRB 746, 747 (1984). The Board has suggested that photography and videotaping in particular go beyond mere observation because "pictorial recordkeeping tends to create fear among employees of future reprisals." F.W. Woolworth, 310 NLRB at 1197.

Section 8(a)(1) does not prohibit photography or videotaping *per se,* only such

photography that has a reasonable tendency to coerce.  United States Steel Corp. v. NLRB, 682

F.2d 98, 101-03 (3d Cir.1982).  The Board has also held that a reasonable, objective justification

for video surveillance mitigates its tendency to coerce.  For example, an employer's legitimate

security interests may justify its use of surveillance cameras, even if they happen to capture

protected activities.  See Lechmere, Inc., 295 NLRB 92, 94, 99-100 (1989), *rev'd on other*

*grounds,* 502 U.S. 527 (1992).  Similarly, if an employer has a "reasonable basis for anticipating

picket line misconduct," then its employees have less reason to fear that the purpose of

videotaping their protected activities is to aid in later taking reprisals against them.  See Waco,

273 NLRB at 747.  The Board has also found anticipatory videotaping to be lawful when there is

some meaningful temporal relationship between prior misconduct and the acts being recorded.

For example, in Smithfield Foods, 347 NLRB 109, 2006 WL 2559835, at *4 (Aug. 31, 2006),

the Board concluded that the videotaping of protected conduct was permissible after union

organizers engaged in repeated instances of trespass and the employer called the police who

asked the handbillers to remain on public property.  The Board explained that "in light of the

physical proximity of the handbilling to the Respondent's property and the temporal proximity of

the previous trespassing incident, the Respondent's concern about a recurrence was reasonable

and, therefore, the security guard's redirection of the security camera was not unlawful."  Id.

Gathering evidence for use in legal proceedings also constitutes a sufficient justification

for videotaping protected activities.  See Roadway Express, Inc., 271 N.L.R.B. 1238, 1240, 1244

(1984); see also NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d 691, 701 (7th Cir.

1976) (holding that "anticipatory photographing . . . does not violate § 8(a) (1) of the Act where

the photographs are taken to establish for purposes of an injunction suit that pickets engaged in

violence").  Particularly given the fact that Respondent is a health care institution, it was

reasonably justified in seeking to preserve evidence of potential recurring picket line and strike misconduct. Respondent would note that the Board's prior decision on surveillance was based on the record in that case, and cannot be considered dispositive with respect to events and occurrences taking place after the close of that record. Moreover, no evidence has been presented in support of an argument that the more recent surveillance has inhibited the exercise of protected rights.

### D.    Kingsbridge Was Legally Obligated to Cease Deducting Union Dues in the Absence of a Collective Bargaining Agreement

The Petition seeks an injunction against Kingsbridge for a violation of Sections 8(a)(5), (3) and (1) based upon its actions of October, 2007 in reimbursing employees' for union dues there had been deducted from their pay after the date the contract expired. The dues had already been remitted to the Union.

Section 8 (a) (3) of the NLRA and sections 302(c) (4) of the Labor Management Relations Act, 29 U.S.C. §§ 186(a) (2), 186(c) (4), permit an employer to make payments to a union only under a dues check-off provision contained in an effective bargaining agreement. Southwestern Steel & Supply, Inc. v. NLRB, 806 F.2d 1111, 1114 (D.C. Cir. 1986). Notwithstanding the fact that union security and dues check-off clauses are mandatory subjects of bargaining, the acquisition and maintenance of union membership cannot be made a condition of employment except under a contract which conforms to the provision of Section 8 (a) (3) of the Act. Wilkes Telephone Membership Corp., 331 NLRB 823, 829 (2000). A union's right to dues check off is a contractual right which continued to exist only so long as the contract remained in force. See Wilkes at 830. After the contract expires, it is unlawful for the employer to make such deductions. Id.

### E.     Respondent Misunderstood the Effect of Employee Resignations from the Union in Offering Individual Contracts

Petitioner alleges that Respondent violated the NLRA by dealing directly with employees and offering them "yellow dog" contracts. Respondent acknowledged the circumstances upon which these documents were created – i.e., in response to inquiries from employees who had resigned from the Union and who sought confirmation of their benefits now that they would be without an employment relationship based on contract. Respondent did not solicit employees to leave the Union. The violation came about not because Respondent was purposefully intending to create disaffection for the Union, but because it did not understand the distinction between membership in a union and membership in a bargaining unit. Upon realizing the distinction and the error, Respondent renounced the improper language and apologized to the employees for the mistake.

### F.     Respondent Lawfully Inquired as to Health Care Employees' Intention to Strike and Did Not Threaten Discharge

Under section 8(d) of the NLRA, 29 U.S.C. § 108(d), a party to a collective bargaining agreement is required to provide the other party notice that it desire to terminate or modify such CBA. In addition to the notice and conciliation requirements that delay a union's attempt to strike on the basis of its intention to enter a new agreement, section 8(d)(4) contains additional requirements for collective bargaining involving "employees of a health care institution," including lengthened notice requirements. Additionally, "[t]he National Labor Relations Board has long held that it is well within the rights of employers to engage in discussions with their employees about the employees' inclinations or intentions to join a strike." G & H Products, Inc. v. N.L.R.B., 714 F.2d 1397, 1400 (7th Cir. 1983) (citing Mosher Steel Co., 220 N.L.R.B. 336 (1975); Industrial Towel & Uniform Service Co., 172 N.L.R.B. 2254 (1968)). Accordingly,

"where the record shows that at the time the questions were asked the employer had a reasonable basis to fear an imminent strike and merely sought to ascertain the chances for keeping his business open, such inquiries are lawful." Id.

In this case, particularly in view of the public interest reflected in the more rigorous strike notice provisions to health care employers, Respondent properly availed itself of its right to inquire into its employees' intention to strike. Respondent's discussions for this purpose do not amount to threats or other interference with union activities.

## III.    INJUNCTIVE RELIEF WOULD NOT BE JUST AND PROPER

### A.    The Union's Strike in Support of a Nonmandatory Subject of Bargaining Is Unlawful

#### 1.    2006 Benefit Funds Dispute

The following facts have been determined by the NLRB in *Kingsbridge Heights Rehabilitation Care Center*, 352 NLRB No. 5 (January 31, 2008): "Sometime in early 2006, facility Operator Helen Sieger, together with Assistant Administrator Solomon Rutenberg, met with union representatives, including Executive Vice President Jay Sackman and Vice Presidents Neva Shillingford and Isaac Nortey, to discuss these delinquencies. Sieger had asked for a delinquency report and testified that this report showed that Respondent was more current in its payments to the Union's funds than other facilities. She asked why the Union was picketing Respondent but not other facilities more in arrears to the union funds. According to Sieger, Sackman told her that it was because Respondent had not executed a contract with the Union, while the other facilities had done so. Sackman stated that there were contractual remedies for such delinquencies; however, as Respondent was not bound by any such agreement, the Union's

only recourse was to picket and strike the facility. According to Sieger's unrebutted testimony, Sackman also stated that without a signed contract, the Union would have no remedy but to continue to picket and strike the facility." *Kingsbridge*, slip op. at 2 (footnotes omitted)

These facts were elaborated upon at length in findings made by NLRB Administrative Law Judge Steven Fish in his July 30, 2008 Decision forwarded to the Court by Petitioner by letter dated August 1, 2008. *Kingsbridge Heights Rehabilitation and Care Center*, Case No. 2-CA-27502 (hereinafter ALJ at __). Respondent respectfully submits that Petitioner is bound to ALJ Fisher's findings of fact for purposes of this proceeding, as follows:

"0n or about November 28, 2005, Respondent was notified by the Benefit Fund, that health coverage for its employees would be terminated effective January 31, 2006, unless all arrearages were satisfied." Slip op. at 6.

"Between November 28, 2005 and January 31, 2006, Joel Cohen Respondent's attorney had several phone conversations with Irwin Bluestein and Henan Kolko, attorneys for the Union and the Funds, during which Cohen indicated that Respondent did not have the money to make a lump sum payment to satisfy its arrearages. Cohen asked to work out a payment schedule with the Union, so that medical coverage could continue. Bluestein and Kolko replied that the Union was not interested in a payment schedule, and that Respondent must make up all the payments or benefits would be cut off." Id.

"On January 31, 2006 the Benefit Fund did cut off medical benefits for Respondent's employees. On February 22, 2006, a meeting was held at the Union's offices on West 43rd Street, New York, NY. Present were Joel Cohen, Helen Sieger an administrator of Respondent, plus an administrator of Resort Nursing Home, which was as noted in the prior Board decision, related to Respondent, and which was also in arrears to the Funds. Present for the Union was Jay

Sackman, who is vice president of the Union and head of its nursing home division, Bluestein, and several other Union officials. Cohen began by stating that Respondent did not want health benefits to be cut off, and pointed out that while Respondent was slow in making payments, this had been a pattern for many, many years and benefits had never been cut off before. Sackman replied that it is true that in the past the Benefit Fund had never cut off benefits when there had been delinquencies, but the Funds are trying to tighten up, because of the financial constraints on the Funds, and 'they were making an effort to collect money in a more timely fashion'." Id.

"Cohen responded that 'we can't possibly be the only health institutions who have relationships with 1199 who were delinquent in payments to the Funds'. Sackman answered that the 'Union is pushing to get people not to be as delinquent as in the past'." Id.

"Cohen asked if any other health care institutions had their benefits cut off. Sackman replied 'No', and explained that the other institutions had a signed contract with the Union. Cohen inquired 'What does that have to do with it'? Sackman explained, 'We have no enforcement mechanism to make sure that you will be bound by contract to make payments to the benefit Funds. We can't take it to arbitration, because there is no agreement. We can't go, we can't bring it to Court, we need to have a signed contract'. Cohen then offered to sign a interim agreement on health benefits, with an arbitration clause that would obligate Respondent to continue making benefits contributions. This would meet the Union's criteria, in that it provides the Union with an enforcement mechanism, so that employee benefits will not be cut off." Id.

"Sackman responded that the Union is not willing to sign such an agreement. Cohen asked 'Why not'? *Sackman answered that 'If the Union signs such an agreement, and health benefits continue, Respondent will not have an incentive to agree on an overall contract'. Cohen then stated that the Union was using the health benefits issue and the cut off of*

*benefits as leverage in order to reach an agreement. Sackman answered that Cohen could characterize it however he wants, but the Union will not enter into an interim agreement and wants to 'reach agreement on a full contract'.*" Id. at 6-7 (emphasis supplied).

### 2.   2007 Benefit Funds Dispute

The Union carried through with Sackman's threats in the Fall of 2007 and into 2008. On August 27, 2007, upon receipt of notice of further delinquencies in payments by Respondent, Respondent's Attorney Joel Cohen sent a letter to Union Attorney Hanan Kolko seeking the opportunity to negotiate a change in the benefits payment schedule in order not to be considered in arrears. Id. at 10. Neither Kolko nor the Union responded to this overture by Respondent. Id. On August 29, 2007, the Union Benefits Funds notified Respondent that if it did not become current on all delinquencies by September 29, 2007, the Funds would be notifying covered employees that their benefits would be terminated in 30 days. Rifkin Aff. Ex. A. The Funds then notified Respondent's covered employees by letter dated October 3, 2007 that their health benefits would be terminated effective November 3, 2007, Rifkin Aff. Ex. B, and in fact followed through with the threatened termination of health benefits on November 5, 2007. Rifkin Aff. ¶ 10. Petitioner submits no evidence to suggest that any other health care facility in arrears on benefit fund contributions were subjected to such action by the Funds. Respondent submits that it was singled out for this treatment in order to force it to make a concession on its position in collective bargaining, as the Union Vice President Sackman had acknowledged was the case.

Any dispute over the motivation for the Union's motivation to utilize the continuation of employee health care and benefits as a bargaining chip in contract negotiations with Respondent

was removed with the written proposal provided by Union Executive Vice President Rifkin to

Respondent in early February 2008, in the time period between the Union's statutory strike

notification to Respondent and commencement of the strike on February 20, 2008. Petition ¶

5(nn), Ex. HH ¶ 13, Ex. WW; Rif. In that proposal, entitled "1199 – Kingsbridge Nursing Home

Settlement Agreement," the Union identified the "dispute" between the parties. It then expressly

conditioned withdrawal of the Union's strike notice on Respondent paying all Benefit Fund

delinquencies prior to the February 20, 2008 strike date and Respondent *signing a full contract*

*that includes the repayment of delinquencies*. Petition Ex. WW. This statement of the Union's

strike position was signed by the Union's Executive Vice President and presented to

Respondent's Owner. Petition Ex. HH ¶ 13, Ex. WW. In doing so, the Union made sure that its

intentions and purposes in striking were unambiguously presented to Respondent. Nothing could

be clearer.

3.    There Is No Right to Reinstatement from an Unlawful Strike

The Supreme Court established the fundamental labor law principle some fifty years ago

that a party to collective bargaining may not lawfully insist upon the other party's acceptance of

a proposal on a subject as to which bargaining is not mandatory. NLRB v. Borg-Warner Corp.,

356 U.S. 342, 349, 78 S.Ct. 718, 723 (1958). This is true even if the "nonmandatory" subject is

itself lawful and would be enforceable if agreed to by the other party. As the Supreme Court

held, it does not follow from the lawfulness fo the proposal that a party "can lawfully insist upon

them as a condition to any agreement." Id. It is the *tendency* of such proposals to delay or

impede or otherwise circumscribe the bargaining process over mandatory subjects which renders

them improper. Teamsters Local 294 (Conway's Express), 87 N.L.R.B. 972, 979 (1949). "Such

conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining." NLRB v. Borg-Warner Corp., 356 U.S. at 349.

Section 8(d) of the Labor Management Relations Act, 29 U.S.C. § 158(d), defines the obligation to bargain as extending to "wages, hours and other terms and conditions of employment." Matters falling outside these areas are not mandatory subjects of bargaining. Local 282, International Brotherhood of Teamsters, AFL-CIO and E.G. Clemente Contracting Corp., 335 N.L.R.B. 1253, 1254 (2001). Thus, it is well-settled that extraneous proposals not directed to terms and conditions of employment, including such matters as indemnification, performance bonds, and settlement of outstanding unfair labor practice charges, grievances or other litigation, constitute nonmandatory subjects as to which a party may not insist upon as a condition of reaching agreement. See NLRB v. Local 964, United Brotherhood of Carpenters & Joiners, 447 F.2d 643, 646 (2d Cir. 1971)(union unlawfully insisted that employer association abandon litigation concerning management of union fund and hire only union employees as trustees of fund); Fitzgerald Mills Corp., 133 N.L.R.B. 877 (1961), enf'd. 313 F.2d 260 (2d Cir.), cert. denied, 375 U.S. 834 (1963)(employer unlawfully insisted on union's withdrawal of pending grievances); Plattdeutsche Park Restaurant, Inc., 298 N.L.R.B. 133 (1989)(employer unlawfully refused to sign contract unless union withdrew suits filed to collect delinquent fund contributions).

Moreover, a strike to support demands for nonmandatory bargaining subjects is not only unprotected, but also is *unlawful* as a breach of the duty to bargain. Chicago Tribune Co., 304 N.L.R.B. 259, 260 (1991); Nassau Insurance Co., 280 N.L.R.B. 878 fn. 3 (1986). The NLRB recently summarized the law in this area as follows:

> "There are certain situations in which the Board had found that a strike in support of a proposal on a nonmandatory bargaining subject is *unlawful* under *Borg-Warner*

principles. These situations have involved a strike in support of insistence to impasse on the inclusion of a proposed nonmandatory subject in any collective-bargaining agreement or a strike in furtherance of the unlawful condition that further bargaining depends on acquiescence to a demand on a nonmandatory subject."

Pratt Towers, Inc., 339 N.L.R.B. 157, 171 (2003)(footnote omitted). Where a strike is unlawful, the employer not only has no obligation to reinstate the strikers at the conclusion of the strike, it is free to discharge employees who engage in the strike. Correctional Medical Services, Inc., 349 N.L.R.B. No. 111, 2007 NLRB LEXIS 207 *16-19 (2007)(collecting cases). This is true even though it may be the labor organization which commits the violation. Id. at 17. As the NLRB noted early on, "it would not effectuate the policies of the Act" to order that employees engaging in an unlawful strike be reinstated. Mackay Radio & Telegraph Co., 96 N.L.R.B. 740, 741 (1951).

    The Union here expressed conditioned avoidance of the strike and agreement on a contract upon Respondent agreeing to a nonmandatory subject of bargaining, the satisfaction of a past liability with payment of delinquent benefit fund contributions before the strike deadline. This position was not only clearly stated in writing by the Union's Executive Vice President, it was consistent with statements by Union Executive Vice President Jay Sackman to Respondent in the past. The strike, accordingly, was unlawful even if the employees were innocent pawns of the Union in this effort. The striking employees have no legal right to reinstatement from an unlawful strike. The relief sought by Petitioner herein that Respondent make offers of reinstatement to strikers on request to return from an unlawful strike is barred as a matter of law.

**B.    A Broad Order Directing Reinstatement to Striking Employees Notwithstanding Acts of Strike Misconduct and Breaches of their Duty of Loyalty Is Not Appropriate**

In any event, the Board's request for a blanket order permitting is overbroad and therefore cannot be deemed "just and proper". Even assuming the legality of the instant strike, workers who engage in misconduct or violence during the course of the stoppage are not entitled to reinstatement. E.g., Donovan v. N.L.R.B., 520 F.2d 1316, 1323 (2d Cir. 1975); Blyer v. Pratt Towers, Inc., 124 F. Supp. 2d 136, 145 (E.D.N.Y. 2000) (holding that refusal to reinstate employees for strike misconduct does not constitute an unfair labor practice); Clear Pine Mouldings, 268 NLRB 1044, 1045-48 (1984), enforced by 765 F.2d 148 (9th Cir. 1985). Many of the strikers in this case have engaged in violence, intimidation, vandalism and other physical and verbal misconduct. Regardless of the Board or this Court's determination as to the status or legality of the ongoing strike, those strikers who engaged in misconduct will not be entitled to reinstatement in the event that they request to return to work.

In addition, flyers have been sent to other health care facilities, patient families and vendors which were, highly critical of patient care in Respondent's facility and/or suggesting that patients not be referred to the facility during the strike. On their face, these are designed in a manner reasonably calculated to harm the Respondent's reputation and reduce its income. The Supreme Court held that employee attacks which are reasonably calculated to harm their employer's reputation and reduce its income may under appropriate circumstances constitute unprotected activity NLRB v. Local Union No. 1229, Int'l Bhd. Of Elec. Workers, 346 U.S. 464 (1953) ("Jefferson Standard"). The Supreme Court noted that there is no more elemental cause for discharge of an employee than disloyalty to his employer. Id. at 472. Even assuming such actions may be extended protection by the Act, notwithstanding the deliberate negative impact

on the employer's reputation and business interests, this Court should not broadly condone such actions with injunctive relief not allowing Respondent assess the suitability of these employees for continued employment.

By giving striking union members a "free pass" to return to work without consideration for their individual misconduct or other inappropriate acts, such an Order could remove the chief obstacle to future and ongoing strike violence and abuses. In light of the extensive allegations of strike misconduct, any Order directing prospective relief of reinstatement is premature and unwarranted. Accordingly, an injunction of this type is not just and proper, and the Petition must be denied.

**C.     The Requested Order Directed to Reinstatement Is Not Ripe for Adjudication**

Petitioner requests that the Court issue an order requiring the Respondent to "treat the striking unit employees as unfair labor practice strikers and, upon their unconditional offer to return to work, reinstate them to their former positions . . . ." Petitioner Br. p. 66. Because none of the striking employees have been terminated, and because none of the striking employees have sought to return to work, there is no basis for the extraordinary, affirmative remedy of prospective and contingent injunctive relief. There is no support for the Board's position seeking prospective injunction relief compelling the Respondent to reinstate striking workers who have not requested to return to work. The cases cited by the Board in support of its argument are inapposite. Pet'r. Br. pp. 61-62. In NLRB v. D'Armigene, Inc., for example, the employer discharged two union members for their efforts to organize their fellow employees into a bargaining unit. 353 F.2d 406, 407 (2d Cir. 1965). In Pascarell v. Orit Corp./Sea Jet Trucking, the conduct at issue was the employer's conduct **after** it had received an unconditional request for reinstatement following a labor strike. 705 F. Supp. 200, 203 (D.N.J.), aff'd, 866 F.2d 1412

(3d Cir. 1988). Thus, it was in that context that the court analyzed the employer's duty to reinstate workers who had previously been on strike and were seeking to return to work. Id. Moreover, the NLRB was challenging the employer's decision to terminate two workers during the strike. Id. at 204. In sum, the issue of reinstatement arose only after the strike was over, and only after the strikers attempted to return to work. Id. at 203. Likewise, in Silverman v. Imperia Foods, Ind., the employer fired all of its employees and relocated its plant earlier than it had planned, admittedly in order to avoid a strike resulting from its refusal to bargain with the employees' union. 646 F. Supp. 393, 399-400 (S.D.N.Y. 1986). The court noted that due to the "significant possibility that, by the time the Board rules in the Union's favor, the employees who will be entitled to reinstatement as a result of a Board-issued resumption order will have accepted [other] employment[,] a final Board order alone will provide no relief" for the harms that they suffered. Id. at 400.

As Petitioner acknowledges, injunctive relief is proper where necessary to preserve the integrity of the collective bargaining process. Reinstatement may therefore be ordered pursuant to section 10 (j) where a union member's discharge risks "a serious adverse impact on employee interest in unionization," Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1053 (2d Cir. 1980), or erodes the integrity of the bargaining unit. Imperia Foods, 694 F. Supp. at 400. This is not the case here. Rather, the union strikers are still on strike, and have not indicated their intent or desire to return to work. There is no allegation that the Respondent has terminated any striker. Accordingly, there is currently no threat to "the integrity of the bargaining unit" other than the impact of the on-going strike.

As such, Petitioner cannot allege that such an order is necessary to prevent irreparable injury to the workers or that it is necessary to maintain the status quo. Even assuming that the

Court rejects Respondent's position that the strike is unlawful, it would then be the case that its "obligation to reinstate strikers depends on whether the strike protested an unfair labor practice, as opposed to economic conditions." Hoffman v. Polycast Tech. Division of Uniroyal Tech. Corp., 79 F.3d 331 (2d Cir. 1996). As the Petition notes, the Board's determination of the nature of the strike will establish the parties' rights and responsibilities at that time. See Beaird Indus., 311 NLRB 768, 770-71 (1993). Without any indication that the strikers will return or be entitled to return to work, interim relief is inappropriate and could potentially lead to inconsistent results after final review of the NLRB action. Because a claim for reinstatement is not yet ripe, public policy does not counsel in favor of extraordinary injunctive relief, especially "when the need for interim relief is doubtful . . . and the issue will ultimately be presented in fuller and final form after the Board has acted on the unfair labor practice charge." Danielson v. Int'l Bhd. of Elec. Workers, Local Union No. 501, 509 F.2d 1371, 1376 (2d Cir. 1975).

### D.    Petitioner Unreasonably Delayed Seeking Injunctive Relief

As the Petition explains, the first of the underlying NLRB charges were filed in Region 2 approximately one year ago, on August 23, 2007. Petition, p. 2. Although the Petition is based on additional charges, filed in January and March of 2008, the first charge was the most comprehensive, alleging violations of the NLRA based on the Petition's cessation of payments to the Funds, reimbursing employees' union dues, videotaping union activities, and denying union representatives access to the Respondent's facility. Id. Moreover, although the first charge was amended four times, the latest amendment was made on December 20, 2007. Id.

A party's delay in seeking preliminary relief cuts against an argument that it is suffering an irreparable injury. E.g., Hirschfeld v. Bd. of Elections in City of New York, 984 F.2d 35, 39

(2d Cir. 1993) (delay in seeking preliminary stay undermines assertion of irreparable harm);

Satcom Intern. Group PLC v. Orbcomm Intern. Partners, L.P., 49 F. Supp. 2d 331, 335

(S.D.N.Y. 1999) (Cote, J.) (explaining prior holding declining to enter a temporary restraining

order in light of the plaintiff's delay in seeking preliminary relief), aff'd, 205 F.3d 1324 (2d cir.

1999) (unpubl.). Indeed, even in cases where there is a legally-mandated presumption of

irreparable harm, a motion for an injunction should nonetheless be denied where the petition has

delayed in seeking such relief. E.g., Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964,

968 (2d Cir. 1995) (presumption of irreparable harm due to violation of trade dress in violation

of the Lanham Act "inoperative" because the plaintiff delayed in moving for preliminary

injunctive relief). Although delay alone is generally not determinative in section 10(j) cases, see

Ahearn v. House of Good Samaritan, 884 F. Supp. 654, 659 (N.D.N.Y. 1995), it nonetheless cuts

against the Petitioner's suggestion that an injunction is necessary to prevent irreparable harm to

the employees in question.

The Regional Director's delay of almost a year in seeking an injunction, as well as the

fact that no such preliminary relief has been sought in the other NLRB and civil proceedings

currently pending on nearly identical issues, all demonstrate that the extraordinary relief

requested is not necessary to prevent irreparable harm or to restore the status quo.

### E.    The Court Should Not Condone Efforts at Litigation in Multiple Forums

There are currently at least three legal proceedings directed toward compelling

Respondent to pay the Funds both "delinquent" sums and contributions to the Funds going

forward.

First, in November 2007, the trustees of the relevant 1199 Funds filed a civil suit against Kingsbridge pursuant to Retirement Income Security Act (ERISA) seeking arrears and prospective payments. Dkt. 07 CIV 9744. That action is currently pending in this Court. Second, the Director for Region 29 issued a complaint against the Respondent on May 1, 2006, alleging that it had violated the Act "by refusing to make timely or complete contributions to various Union Funds, without bargaining with the Union." Kingsbridge Heights Rehabilitation, Case No. 29-CA-27502 (ALJ decision). In a decision dated July 30, 2008, and rendered after a reopening of this case, the Administrative Law Judge recommended that Respondent be ordered to "cease and desist from [f]ailing and refusing to make timely contributions to the" Funds cited in the instant petition. Id. at p. 24. The action has been transferred to the full Board. Finally, an ALJ will hear the complaint issued by the Director for Region 2 that underlies the instant action. The Petition now before the Court is thus the fourth forum in which the Respondent is being required to defend itself against identical allegations.

Petitioner has apparently decided to initiate a race to the finish by seeking an injunction to obtain the same relief that the Union, the Union Funds and yet another Regional Director have already sought. The inequity of permitting Region 2 to obtain an injunction in light of the ongoing proceedings in this matter is clear. For all of the reasons that courts are loathe to interfere with the administrative process (e.g., via an interlocutory appeal of an agency determination), this Court should refrain from issuing an injunction in this case that pre-supposes the outcomes of all other proceedings, and may very well conflict with them. Specifically, refraining from issuing an injunction here will "advance important policy goals: avoiding interference with the proper functioning of the agency; affording the agency an opportunity to correct its own mistakes and apply its expertise; and preventing piecemeal review." Top Choice

Distributors, Inc. v. U.S. Postal Service, 138 F.3d 463, 466 (2d Cir. 1998) (analyzing F.T.C. v. Standard Oil Co., 449 U.S. 232, 101 S. Ct. 488 (1980)).

More importantly, the Court should withhold injunctive relief here to avoid the possibility of inconsistent adjudications and/or duplicative liability. Even ignoring for a moment the administrative and procedural difficulties that the Respondent could face due to inconsistent orders or judgments, the mere fact that the Union and Board are using section 10(j) as yet another bludgeon against the Respondent for the same conduct has constitutional implications. By prosecuting the Respondent in four proceedings for identical activity, the Petition may very well violate the Respondent's due process rights. See Blue v. Koren, 72 F.3d 1075, 1082 (2d Cir. 1995) (holding that "repeated and duplicative administrative proceedings may offend due process"). Moreover, by initiating two administrative proceedings, a single civil proceeding and now a "partial" proceeding, the Union has effectively immunized itself from the common procedural mechanisms by which a federal litigant may avoid duplicative liability and the cost of defending multiple suits based on identical conduct. See, e.g., Illinois Brick Co. v. Illinois, 431 U.S. 720, 731, 97 S. Ct. 2061, 2067 (1977) (explaining that procedural devices such as statutory interpleader reduce the risk of duplicative proceedings or recovery).

For these reasons, the injunctive relief sought here cannot be considered "just and proper". Rather, Petitioner, without sufficient evidence that the complained-of conduct is actually causing irreparable harm or that there is any need to restore the "status quo," is simply seeking the same relief that is being pursued in multiple forums. The issues must be decided on their merits and upon the full, fair and deliberate consideration of this Court and the NLRB.

**F.    Injunctive Relief Should Be Denied under the Doctrine of Unclean Hands**

"The doctrine of unclean hands is based on the principle that since equity tries to enforce

good faith in defendants, it no less stringently demands the same good faith from the plaintiff."

Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC, 149 F.3d 85, 90 (2d Cir. 1998) (internal

quotation omitted).  The rule arises from the proposition that a court's equitable powers "can

never be exerted in behalf of one . . . who by deceit or any unfair means has gained an

advantage." Buffalo Southern R.R. Inc. v. Village of Croton-on Hudson, 434 F. Supp. 2d 241,

253 (S.D.N.Y.,2006) (quoting PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d

Cir. 2004)).  Thus, when assessing the merits of a request for the equitable remedy of injunction,

courts require that the petitioner "shall have acted fairly and without fraud or deceit as to the

controversy in issue." Dunlop-McCullen, 149 F.3d at 90 (quoting Precision Instrument Mfg. Co.

v. Automotive Maint. Mach. Co., 324 U.S. 806, 814-15, 65 S.Ct. 993 (1945)).

In Dunlop-McCullen, the Second Circuit held that in a suit under the Labor-Management

Reporting and Disclosure Act, a court properly assessing whether an unclean hands defense

would preclude a union member from successfully prosecuting its claim.  Id.  Though the court

concluded that the plaintiff there was not guilty of having "unclean hands," it nonetheless held

that the issue was germane to equity analysis.  Id.  This equitable principle extends into the realm

of collective bargaining and union representation.  Where a union has acted in bad faith or

otherwise improperly gained an unfair advantage over the employer, it may not obtain equitable

relief with regard to such issues. Cf. Transport Workers Union of America, Local 100 v. New

York City Transit Authority, 341 F. Supp. 2d 432, 452 (S.D.N.Y. 2004) (union not required to

negotiate for the removal of or declare impasses with regard to an unlawful CBA provision prior

to seeking equitable relief).

Respondent submits that this doctrine has particular applicability to the facts of this case. It is evident that the Union sought to strong-arm Respondent into dropping its proposal to utilize the services of the American Arbitration Association. The Union refused to enter into a collective bargaining agreement with Respondent having AAA as the arbitration service, and then attempted to exert its power over the Union benefit funds to exact penalties on Respondent that were not imposed on any other employer with fund delinquencies. It seems almost inconceivable that the Union would then use Respondent's employees as pawns in this dispute by cutting off health insurance benefits to provoke a strike, but that is exactly what happened. Certainly, no reasonable workforce would have gone out on strike to keep an employer from utilizing a nationally recognized arbitration service, so the Union used its influence with the Benefit Funds to provoke this result. Respondent would acknowledge that 1199 is a strong union in the health care industry. Respondent objects to the Union's effort to exert its muscle with the tactics employed here, and respectfully submits that a court of equity should not countenance, much less reward, such actions. Injunctive relief should be denied.

## IV.    RESPONDENT IS ENTITLED TO LIMITED DISCOVERY

Respondent is requesting limited discovery in this proceeding. Under all of the facts and circumstances set forth in connection with the foregoing arguments, "it would be against the interests of true justice to foreclose respondent from an opportunity to investigate and discover evidence in support of its position." Fusco v. Richard W. Kaase Baking Co., 205 F. Supp. 459, 463 (D.C. Ohio 1962).

Respondent is requesting the Court to allow it to conduct the following limited expedited discovery: (1) Request for Production of Documents to the National Labor Relations Board; and (2) Non-party Subpoena for documents and testimony on 1199 SEIU and applicable benefit

funds. Respondent maintains that a two week adjournment of the motion return date should be

sufficient time to conduct the discovery is question, and would request that the Court enter an

expedited scheduling order in this regard. Respondent would acknowledge that this limited

discovery, "will not only protect the rights of all parties, but will enable the respondent to

properly prepare its case in the interim." Kobell v. Reid Plastics, Inc., 136 F.R.D. 575 (W.D.

Pa. 1991). The fact that Respondent might be given an adequate opportunity to respond to

Petitioner's polished and long considered papers in support of injunctive relief should not

militate against granting the limited discovery sought here. To the contrary, there is nothing

inherent in Petitioner's application to justify either a reasonable period of time to respond or

reasonable efforts at discovery under the Federal Rules of Civil Procedure.

It is clear that respondents are entitled to limited discovery in the context of 10(j)

proceedings. Squillacote v. Local 248, Meat & Allied Food Workers, 534 F.2d 735 (7th Cir.

1976) ("the district court did not abuse its discretion by granting discovery" in a 10(j)

proceeding); Dunbar v. Landis Plastics, Inc., 977 F. Supp. 169, 176 (N.D.N.Y. 1997) (the district

court recognized that "limited depositions" could be authorized); Kinney v. Chicago Tribune

Co., 1989 WL 91844 *1 (N.D. Ill. Aug. 7, 1989) ("courts have concluded that a respondent in a

section 10(j) proceeding is entitled to discovery limited to the issues raised by the petition for a

injunction...") (internal quotes and citations omitted); Meter v. Minnesota Mining & Mfg. Co.,

42 F.R.D. 663 (D. Minn. 1967) (court approved respondent's taking of depositions prior to the

return date).

Having established that Respondent is entitled to discovery, the question then turns to

what is properly the subject of discovery. One district court stated in the context of a 10(j)

proceeding that: "[t]he test in this court for discoverability, absent a claim of privilege, is

relevancy...Relevancy is construed broadly to include any matter that bears on, any issue that is or may be in the case." United States v. Electro-Voice, Inc., 879 F. Supp. 919, 922 (N.D. Ind. 1995). In Reid Plastics, 136 F.R.D. at 579 the court "concluded that a respondent [was] entitled to discovery limited to the issues raised by the petition for an injunction...Thus, a respondent is entitled to discover the facts upon which the Board will rely to support its allegations [as set forth in the petition for relief] of reasonable cause to believe that a violation of the National Labor Relations Act has occurred." (internal quotes and citations omitted).

The limited discovery in this case is necessary for Respondent and, if allowed, would cause no prejudice. The Union's treatment of other health care institutions in connection with benefit fund delinquencies and the Union's motivation in taking the employees out on strike are central factual issues in the case. The limited discovery will directly address these issues and will allow Respondent to fully and properly prepare its response.

Further, the NLRB, Union, or the Benefit Fund will not suffer any prejudice. It is Respondent's position that (a) the Union triggered any harm to the employees by cutting off benefits, and (b) the Union and the NLRB together delayed the commencement of this 10(j) request for nine months after the benefits were cut off and five months after the strike began. These lengthy delays undercut any argument of prejudice. Respondent also maintains that Petitioner is unlikely to prevail on the injunctive relief directed to reinstatement of strikers, for reasons stated above, and that therefore the likelihood of prejudice in that respect is minimal.

## CONCLUSION

For all of the foregoing reasons, the Petition for injunctive relief should be denied in its

entirety, together with costs and such further relief as the Court may deem appropriate.

**Dated:**     August 6, 2008                    Respectfully submitted,


HANCOCK & ESTABROOK, LLP
John T. McCann, Esq.
Lindsey Helmer Hazelton, Esq.
Michael J. Sciotti, Esq. (MS0007)
*Attorneys for Respondent*
1500 AXA Tower I
100 Madison Street 1
Syracuse, New York     13202
Telephone:  (315) 471-3151
Facsimile:  (315) 471-3167