Jamie Rucker (JCR-6767)
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, New York 10278-0104
(212) 264-0300

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------X
**CELESTE J. MATTINA, Regional Director,**
**Region 2, National Labor Relations Board,**
**for and on Behalf of the NATIONAL**
**LABOR RELATIONS BOARD,**

                    **Petitioner,**

     **-against-**                    08 Civ. 6550

**KINGSBRIDGE HEIGHTS REHABILITATION**        J. Cote
**AND CARE CENTER**

                   **Respondent.**          **ECF**
--------------------------------------------X

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT

## TABLE OF CONTENTS

I.    STATEMENT OF THE CASE ...................................1
II.   PROCEDURAL POSTURE ......................................3
III.  FACTS ..................................................5
   A. Background ............................................5
   B. The Previous Unfair Labor Practices and Associated
   Litigation ..............................................7
   C. Summer 2007: The Employer Stops Dealing with the Union as
   the Collective Bargaining Representative and Ceases Making Fund
   Contributions ..........................................10
      1. The Employer Refuses the Union Access and Fails to
      Provide Relevant, Requested Information .............10
      2. The Employer Stops Making Contributions to the Funds...13
   D. Fall 2007: The Employees Vote to Strike; Employee Health
   Care Benefits Are Terminated; the Employer Videotapes Union
   Meetings; the Employer Grants Employees Benefits by
   "Reimbursing" Them Their Union Dues ....................14
      1. The Unit Employees Vote to Strike Based on the Employer's
      Failure to Make Fund Contributions .................15
      2. The Employer "Reimburses" Employees Their Union Dues...18
      3. The Employees' Health Insurance Terminates...........18
      4. The Employer Videotapes Employees Engaged in
      Informational Picketing ............................18
   E. Winter 2007-2008: The Employer Videotapes Union Picketers
   and Offers Employees "Yellow Dog" Contract. ............20
      1. The Union Conducts Further Informational Picketing; the
      Employer Films the Picketers .......................20
      2. The Employer Conveys Its Intent to Enter Into the
      Association Agreement, Using the American Arbitration
      Association for Arbitration of Contract Disputes .........22
      3. The Employer Offers Employees "Yellow Dog" Contracts...22
      4. The Employees Go on Strike; The Employer Videotapes and
      Photographs Strikers ...............................26
      5. The Employer Refuses to Meet and Bargain, and Makes a
      Regressive Contract Proposal .......................26
IV.   STATUTORY STANDARD FOR INJUNCTIVE RELIEF ...............33
   A. Reasonable Cause Analysis ............................34
      1. The Employer Violated Section 8(a)(1) and (5) of the Act
      by Refusing to Provide the Union with Relevant Requested
      Information ........................................35
      2. The Employer Violated Section 8(a)(1) and (5) By Refusing
      to Grant the Union Access to the Employer's Facility .....37
      3. The Employer Violated Section 8(a)(1) and (5) By
      Unilaterally Discontinuing Payments to the Union's Benefits
      Funds ..............................................39
      4. The Employer Violated Section 8(a)(1) By Videotaping and
      Photographing Employees ............................40
      5. The Employer Violated Section 8(a)(5), (3) and (1) By
      "Reimbursing" Employees' Union Dues ................42

6. The Employer Violated Section 8(a)(1) by Soliciting Employees to Sign a Contract Renouncing Their Union Membership. ...............................................46
7. The Employer Violated Section 8(a)(1) by Threatening to Discharge Employees if They Went on Strike. ..............48
8. The Employer Violated Section 8(a)(1) and (5) by Bypassing the Union and Dealing Directly with Employees. .49
9. The Employer Violated Section 8(a)(1) and (5) of the Act by Refusing to Meet with the Union for the Purpose of Collective Bargaining ...................................51
10. ...The Employer's Unlawful Failure to Make Payments into the Funds Caused an Unfair Labor Practice Strike. ........52
    B. The "Just and Proper" Analysis ...........................54
V.   REQUESTED RELIEF .........................................63
VI.  CONCLUSION AND REMEDY ....................................65

## TABLE OF AUTHORITIES

**Federal Cases**

*Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367 (11th Cir. 1992)...54

*Asseo v. Centro Medico Del Turabo*, 900 F.2d 445 (1st Cir. 1990).56

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001)56, 57, 58

*Blyer v. P & W Elec., Inc.*, 141 F.Supp.2d 326 (E.D.N.Y. 2001)..62

*Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union (ILGWU)*, 494 F.2d 1230 (2d Cir. 1974) ........35

*Fournelle v. NLRB*, 670 F.2d 331 (D.C.Cir.1982) ................37

*Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147 (D. Mass. 1983), aff'd per curiam 725 F.2d 664 (1st Cir. 1983)................34

*Grondorf, Field, Black & Co. v. NLRB*, 107 F3d 883 (D.C. Cir. 1997) .........................................................46

*Hoban v. Connecticut Foundry Co.*, 62 LRRM 2139, 2141 (D. Conn. 1966)............................................................61

*Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360 (2d Cir. 2001) ..........................................................54

*International Assn. of Machinists & Aerospace Workers v. Trans World Airlines, Inc.*, 601 F.Supp. 1363, 1371-72 (W.D.Mo. 1985). ...............................................................60

*International Union of Electrical Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C.Cir.), cert. denied 400 U.S. 950 (1970) ....56, 57, 58

*Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980) ....34, 35, 54

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980).33, 34, 35

*Kobell v. Beverly Health and Rehabilitation Services., Inc.*, 987 F. Supp. 409 (W.D. Pa. 1997) affd. 142 F.3d 428 (3d Cir. 1998) ...............................................................61

*LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48 (2d Cir. 2004) .....................................................60

*Levine v. C & W Mining Co.*, 465 F. Supp. 690, 694 (N.D. Ohio 1979), affd. in relevant part 610 F.2d 432, 436-7 (6th Cir. 1979) ..........................................................58

*Lineback v. Printpack, Inc.*, 979 F. Supp. 831 (S.D. Ind. 1991).61

*Local Union No. 9735, UMW v. NLRB*, 258 F.2d 146 (D.C.Cir.1958).38

*Mattina v. Chinatown Carting Corp.*, 290 F.Supp.2d 386 (S.D.N.Y. 1003) .........................................................57

*McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237 (2d Cir. 1962) ................34

*McLeod v. General Elec. Co.*, 366 F.2d 847 (2d Cir. 1966), vacated as moot, 385 U.S. 533 (1967) ................................54

*Moore-Duncan v. Horizon House Developmental Services*, 155 F.Supp.2d 390, 396-397 (E.D.Pa. 2001).......................58

*Morio v. North American Soccer League*, 501 F.Supp 633, 640 (S.D.N.Y. 1980) ...............................................61

*Morio v. North American Soccer League*, 632 F.2d 217 (2d Cir. 1980) ..........................................................54

*NLRB v. Acme Industrial Co.*, 385 US 432 (1967) ............35, 36

*NLRB v. Colonial Haven Nursing Home*, 542 F.2d 691 (7th Cir. 1976) ................................................................40

*NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570 (7th Cir. 1996), cert. denied 519 U.S. 1055 (1997) ........................34, 56

*NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983)...43

*NLRB v. Truitt Manufacturing Co.*, 351 US 149 (1956) ...........35

*NLRB. v. Katz*, 369 U.S. 736, 747 (1962) .......................59

*Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union, AFL-CIO*, 430 U.S. 243 (1977) .................37

*Pascarell v. Gitano Group, Inc.*, 730 F.Supp. 616, 625 (D. N.J. 1990) .........................................................61

*Pascarell v. Orit Corp/Sea Jet Trucking*, 705 F.Supp. 200 (D.N.J. 1988), affd. 866 F.2d 1412 (3rd Cir. 1988) (table) ..........62

*Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 667 (9th Cir. 2001) ................................................................58

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975) ...33

*Sheeran v. American Commercial Lines*, 673 F.2d 970 (6th Cir. 1982) .........................................................60

*Silverman v. Imperia Foods, Inc.*, 696 F.Supp. 393 (S.D.N.Y. 1986) ................................................................62

*Silverman v. J.R.L. Food Corp., d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999) ...............................................34

*Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054 (2d Cir. 1995) ........................35, 54, 58

*Southwest Forest Industries, Inc. v. NLRB*, 841 F.2d 270 (9th Cir. 1988) .........................................................59

*Squillacote v. Generac Corp.*, 304 F.Supp. 435, 440 (E.D. Wis. 1969) .........................................................61

*Szewczuga v. NLRB*, 686 F.2d 962 (D.C.Cir.1982) .................38

*United Steelworkers of America v. Ft. Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979) ..............................59

*Whelan v. Colgan*, 602 F.2d 1060 (2d Cir. 1979) ................59

**Cases**

*Acme Bus Corp.*, 320 NLRB 458 (1995) ..........................44

*Albertson's, Inc.*, 351 NLRB No. 21 (2007) .....................36

*Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23 (1st Cir. 1986) .........................................................57

*Atlanta Hilton and Tower*, 271 NLRB 1600 (1984) ...............36

*Benchmark Indus.*, 270 NLRB 22 (1984), affd. sub nom. *Amalgamated Clothing v. NLRB*, 720 F.2d 267 (5th Cir. 1985) ...........45, 46

*Bethlehem Steel*, 135 NLRB 1500 (1962) ........................42

*Brentner Trucking Co.*, 232 NLRB 428 (1977) ...................47

*Buck Brown Contracting Co., Inc.*, 272 NLRB 951 (1984) .........39

*Capitol EMI Music*, 311 NLRB 997 (1993) .......................44

*Center Construction Company, Inc.*, 345 NLRB 729 (2005), enfd. 482 F.3d 425 (6th Cir. 2007) ...............................40

*Central Valley Meat*, 346 NLRB 1078 (2006) ....................49

*C-Line Express*, 292 NLRB 638 (1989) ..........................53

*Clock Electric, Inc.*, 338 NLRB 806 (2003) ....................44

*Colonial Haven Nursing Home, Inc.*, 218 NLRB 1007 (1975) .......53

*Colonna's Shipyard*, 293 NLRB 136 (1989), *enfd.* 900 F.2d 250 (4th Cir. 1990) ........................................................37

*Community Cash Stores, Inc.*, 238 NLRB 265 (1978) ...............48

*D'Armigene Inc.*, 148 NLRB 2 (1964), *enfd. in rel. part* 353 F.2d 406 (2d Cir. 1965) .................................................62

*Domsey Trading Corp.*, 310 NLRB 777, 791 (1993) ................53

*Eagle Comtronics*, 263 NLRB 515 (1982) ......................48, 49

*Eddyleon Chocolate Co., Inc.*, 301 NLRB 887 (1991) .............47

*Engineered Steel Concepts*, 352 NLRB No. 73 (2008) .............47

*Ernst Home Centers*, 308 NLRB 848 (1992) .....................39

*F.W. Woolworth Co.*, 310 NLRB 1197 (1993) ...................40, 41

*First Legal Support Services LLC*, 342 NLRB 350 (2004) .........47

*Flambeau Plastics Corp.*, 167 NLRB 735 (1967), *enfd.* 401 F.2d 128 (7th Cir. 1968), *cert. denied* 393 US 1019 (1969) .............41

*Florida-Texas Freight, Inc.*, 203 NLRB 509 (1973), *enfd.* 489 F.2d 1275 (6th Cir. 1974) ..............................................59

*Freedom WLNE-TV, Inc.*, 278 NLRB 1293 (1986) ...................46

*Frito-Lay, Inc.*, 243 NLRB 137 (1979) ..........................42

*Gilberton Coal*, 291 NLRB 344 (1988) ........................37, 38

*Gilliam Candy Co.*, 282 NLRB 624 (1987) .......................37

*Gino Morena*, 287 NLRB 1327 (1988) ...........................49

*Hacienda Resort Hotel and Casino*, 351 NLRB No. 32 (2007) .......42

*Herman Sausage Co., Inc.*, 122 NLRB 168 (1958), enfd. 275 F.2d 229 (5th Cir. 1960) ...................................................59

*Houston Coca-Cola Bottling Co.*, 265 NLRB 766 (1982), *enfd.* 740 F.2d 398 (5th Cir. 1984) ...........................................37

*Kingsbridge Heights Rehabilitation Care Center*, 352 NLRB No. 5 (January 31, 2008); *enfd.* No. 08-2025-ag, slip op. (2d Cir. July 11, 2008) ..............................................5, 7, 41

*Lee Lumber and Building Material Corp.*, 306 NLRB 408 (1992) ....48

*Little Rock Downtowner, Inc.*, 168 NLRB 107 (1967), *enfd.* 414 F.2d 1084 (8th Cir. 1969) .............................................59

*Lowell Corrugated Container Corp.*, 177 NLRB 169 (1969), *enfd. on other grounds*, 431 F.2d 1196 (1st Cir. 1970) ...................42

*Manno Electric*, 321 NLRB 278 (1996) ..........................43

*Millard Processing Services, Inc.*, 308 NLRB 929 (1992); ........36

*Mountain Valley Care and Rehabilitation Center*, 346 NLRB 281 (2006) .................................................................51

*National Steel & Shipbuilding Co.*, 324 NLRB 499 (1997) .........40

*New Surfside Nursing Home*, 322 NLRB 531 (1996) .........35, 36, 37

*New Surfside Nursing Home*, 330 NLRB 1146 (2000) ...............36

*North American Pipe Corp.*, 347 NLRB No. 78 (2006) .............45

*Ortiz Funeral Home Corp.*, 250 NLRB 730 (1980), *enfd. on other grounds*, 651 F.2d 136 (2d Cir. 1981), *cert. denied* 455 U.S. 946 (1982) .................................................................42

*Pennant Foods Co.*, 347 NLRB No. 41 (2006) ....................49

*Permanente Medical Group*, 332 NLRB 1143 (2000) ...............50

*Regency House of Wallingford, Inc.*, 347 NLRB No. 15 (2006) .....50

*Resort Nursing Home and Kingsbridge Heights Rehabilitation Care Center*, 340 NLRB 650 (2003) ......................................5

*Robert Orr-Sysco Food Services*, 334 NLRB 977 (2001) ...........40

*Scott Brothers Dairy*, 332 NLRB 1542 (2000) ...................37

*Southern California Gas*, 316 NLRB 979 (1995) ...................50

*State Plaza Hotel*, 347 NLRB No. 70 (2006) .................43, 44

*Trailmobile Trailer, LLC*, 343 NLRB 95 (2004) ...................40

*Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982) .......................43

*Yoshi's Japanese Restaurant*, 330 NLRB 1339 (2000) .............43

*Zimmerman Plumbing Co.*, 325 NLRB 106 (1997), *enfd. mem. in pertinent part* 188 F.3d 508 (6th Cir. 1999) .................47

**Statutes**

29 U.S.C. § 158(a)(1) ......................................passim

29 U.S.C. § 158(a)(3) ...........................................1

29 U.S.C. § 158(d) ............................................51

29 U.S.C. § 160(j) ..........................................1, 33

## I. **STATEMENT OF THE CASE**

Celeste J. Mattina, Regional Director for Region 2 of the National Labor Relations Board, herein called the Board, has petitioned this court, for and on behalf of the Board, pursuant to Section 10(j) of the National Labor Relations Act, (61 Stat. 149; 29 U.S.C. Sec. 160(j)), herein called the Act, for appropriate injunctive relief pending the final disposition of the matters involved herein pending before the Board on the Amended Complaint and Notice of Hearing of the General Counsel of the Board in Case Nos. 2-CA-38418, 2-CA-38628, 2-CA-38688, and 2-CA-38708, alleging that Kingsbridge Heights Rehabilitation and Care Center, herein Respondent or Kingsbridge or the Employer, has engaged in, and is engaging in, unfair labor practices in violation of Section 8(a)(1), (3), and (5) of the Act.

The petition herein is predicated on Petitioner's conclusion that there is reasonable cause to believe, based upon the below-summarized evidence, including affidavit testimony and documentary evidence attached to the petition, that Respondent has engaged in the unfair labor practices charged. Having reached this conclusion, the Board is authorized under Section 10(j) of the Act to petition the Court for a temporary injunction against the continuation of such unfair labor practices, and the Court has jurisdiction to grant such relief when it is deemed to be just and proper.

Interim injunctive relief is necessary in this case to prevent Respondent from achieving its unlawful objective, to

protect the Board's remedial powers, and to further the Act's purpose of promoting peaceful collective bargaining. As described *infra*, the Respondent has engaged in a prolonged and relentless attack on the Union's status as the collective bargaining representative of Respondent's employees. Respondent is a recidivist; its previous violations of the Act have led to the issuance of two Board Orders against it, both of which have been enforced by United States Courts of Appeal. Since August 2007, Respondent has continued to recklessly disregard its obligations under federal law by, among other acts:

- breaching settlement agreements it negotiated with the Union and Board;

- refusing to provide the Union necessary, relevant information;

- denying the Union contractually-mandated access to Respondent's employees;

- ceasing benefit fund payments, which resulted in its employees losing their health insurance;

- engaging in surveillance of its employees' Union activities;

- offering employees individual "yellow-dog" contracts of employment if they renounced their Union membership; and

- refusing to meet and bargain with the Union.

In February 2008, in response to Respondent's conduct, all but a handful of Respondent's bargaining unit employees commenced an unfair labor practice strike. That strike continues to date.

Interim injunctive relief is necessary in the present case to restore the status quo ante---particularly the employees' health insurance---and thereby end the strike. Unless the Court halts Respondent's current course of conduct, Respondent will have effectively stymied its employees' statutorily-protected right to the benefits of collective bargaining and irreversibly weakened the Union's status and effectiveness as the workers' bargaining representative.

## II.  PROCEDURAL POSTURE

On August 23, 2007, 1199SEIU United Healthcare Workers East, herein called the Union, filed the charge in Case No. 2-CA-38418. The Union amended that charge on October 16, November 21, December 11, and December 20, 2007. As amended, the charge alleges in pertinent part that Respondent violated Section 8(a)(1) and (5) of the Act by (i) unilaterally changing employees terms and conditions employment by ceasing to make fringe benefit fund contributions; (ii) reimbursing employees for their Union dues; (iii) failing and refusing to provide the Union with relevant, requested information; (iv) videotaping employees engaged in meetings with Union representatives; (v) unilaterally altering terms and conditions of employment by denying Union representatives access to the Employer's facility for the purpose of meeting with employees; and (vi) videotaping employees engaged

in picketing on various occasions.    (Exh. A.)    The Union filed the charge in Case No. 2-CA-38628 on January 28, 2008 and amended that charge on March 26, 2008.    As amended, that charge alleges that Respondent violated Sections 8(a)(1) and (5) of the Act by: (i) bypassing the Union and dealing directly with employees regarding their terms and conditions of employment; (ii) on about January 23, 2008, threatening employees with discharge if they went on strike; and (iii) asking Union-represented employees to sign "yellow dog" contracts.    (Exh. B.)    The Union filed the initial charge in Case No. 2-CA-38688 on March 6, 2008 and amended that charge on March 26 and June 26, 2008.    The amended charge alleges, in relevant part, that the Employer violated Section 8(a)(1) of the Act by videotaping employees attending a December 22, 2007 Union rally.    (Exh. C.)    On March 20, 2008, the Union filed the charge in Case No. 2-CA-38708, which alleges, in relevant part, that the Employer has violated Section 8(a)(1) and (5) of the Act by refusing to meet with the Union for the purposes of collective bargaining.    (Exh. D.)

The aforesaid charges were referred to the Regional Director of Region 2 of the Board.    Following an investigation of the allegations, the General Counsel of the Board, by the Regional Director, issued an Order Consolidating Cases, Consolidated Complaint, and Notice of Hearing, herein called the

Complaint.[1]  (Exh. E.)  On or about June 20, 2008, Respondent, by

its Counsel, filed an Answer to the Complaint.  (Exh. F.)

## III.  FACTS

### A. Background

The Employer is a nursing home located at 3400-26 Cannon

Place, Bronx, New York. (*Kingsbridge Heights Rehabilitation Care*

*Center*, 352 NLRB No. 5, slip op. at 2 (January 31, 2008); *enfd.*

No. 08-2025-ag, slip op. (2d Cir. July 11, 2008).)  Helen Sieger

("Sieger") is its sole owner; its current Administrator is Jacob

Perles ("Perles"). (Exh. JJ (Shaw Aff.), ¶ 1, Exh. N (Wray-Roach

Aff.), ¶ 1.)

The Union has represented a unit of the Employer's

paraprofessionals since at least 1997. (*Resort Nursing Home and*

*Kingsbridge Heights Rehabilitation Care Center*, 340 NLRB 650, 651

(2003).)  The most recent collective bargaining agreement

covering those unit employees is the result of the decision in

*Resort Nursing Home and Kingsbridge Heights Rehabilitation Care*

*Center*, in which the Board ordered the Employer to execute a

multi-employer agreement between the Union and the Greater New

York Healthcare Facilities Association, Inc. ("the Association"),

finding that the Employer's January 31, 2002 withdrawal from the

Association came too late and that the Employer was therefore

bound to the agreement negotiated by the Union and Association.

340 NLRB 650, 653-658 (2003).  That Union-Association agreement

("the 2002-2005 CBA") expired on April 30, 2005.  (Exh. H.)  The

---

[1] The Complaint was amended by Order dated July 15, 2008 to seek a
reinstatement remedy for the alleged unfair labor practice strikers.

Union and Employer have not executed any successor/renewal agreement.

The 2002-2005 CBA defines the bargaining unit as "all regular full and part-time Employees (including recreation Employees) listed in the classifications in Schedule 'B' attached hereto, as supplemented by custom, usage, and practice, and excluding professional, confidential Employees and supervisory Employees." (Exh. H, Art. 1.A.)   Schedule B lists the job classifications of Assistant Chef, Chef, First Cook, Second Cook, Kitchen Aide, Dishwasher, Telephone Operator, Receptionist, Clerk (all departments), Dietary Aide, Assistant Dietitian, Dietitian, Recreation Worker Aide, Recreation Worker with Associate Degree or three years experience, Social Worker Aide, Social Worker Assistant, Licensed Engineer, Window Cleaner, Painter, Fireman, Gardener, Handyman, Maintenance, Certified Nursing Aide, Laundry Aide, Housekeeping Aide, Housekeeper, Maid, Porter, and Head Porter. (Exh. H, Schedule B.)   The bargaining unit comprises approximately 200-300 employees.   (*See* Exh. KK (252 employees); Exh. LL (estimating unit at 300 employees).)

Since April 30, 2005, the Employer has, with certain significant exceptions noted below, abided by the terms of the expired agreement.

Some time presumably prior to expiration of the 2002-2005 CBA, a dispute arose regarding Union access to the Employer's facility. (Exh. M (Award of Impartial Chairman Re: Union Access Issues, Kingsbridge Heights Rehabilitation Care Center and New York's Health & Human Service Union 1199/Service Employees

International Union, AFL-CIO, p. 2 (May 26, 2005)).) The matter went to arbitration, and the Impartial Chairman issued an Opinion and Award dated May 26, 2005, pursuant to which the Employer must permit the Union access to the Employer's facility within 24 hours of the Union providing notice of the desire for access, absent compelling reasons; the Union must give the Employer 48 hours notice prior to meeting with employees at the Employer's facility; the Employer shall provide a reasonable location (outside of resident care areas) for the meetings; and the Employer shall permit Union Chapter meetings in the facility at least once a month for each work shift. (*Id.*)

## B. The Previous Unfair Labor Practices and Associated Litigation

Shortly after the expiration of the 2002–2005 CBA, in about June 2005, the Employer ceased making contributions to various Taft-Hartley funds.[2] (*Kingsbridge Heights Rehabilitation Center,* 352 NLRB No. 5 at 2.) The Union filed an unfair labor practice charge regarding that alleged unilateral change in December 2005 and on January 1, 2006, the Funds notified bargaining unit employees that their benefits were being suspended because of the Employer's failure to make contributions. (*Id.*) In February 2006, bargaining unit employees took a strike vote; on the basis of that vote, the Union Executive Council approved a three-day strike during the period of May 16–19, 2006. (*Id.*)  The unit

---

[2] Pursuant to the 2002–2005 CBA, the Employer is required to make monthly contributions to the 1199/SEIU Greater New York Funds ("the Funds"), comprising the 1199/SEIU Greater New York Benefit Fund, the 1199/SEIU Greater New York Pension Fund, the 1199/SEIU Greater New York Education Fund, the 1199/SEIU Greater New York Child Care Fund, the 1199/SEIU Greater New York Job Security Fund, and the 1199/SEIU Greater New York Worker Participation Fund.  (Exh. H, Arts. 23–29.)

employees also planned to conduct informational picketing at or near the Employer's facility on March 15 and May 15, 2006. (*Id.*) On February 27, 2006, Union Vice President Isaac Nortey ("Nortey") sent the Employer's then-Assistant Administrator Solomon Rutenberg ("Rutenberg") a letter advising Rutenberg of the Union's plan to picket on March 15. (*Id.*)  The March 15 picketing took place as planned, across the street from the Employer's facility. (*Id.*)  The Employer videotaped that event from two different locations. (*Id.*)

On April 27 and again on May 1, 2006, the Union gave the Employer written notice of its intent to picket on May 15 and strike during May 16-19, 2006. (*Id.* at 4.)  Also on May 1, 2006, Region 29 of the Board issued a complaint alleging that the Employer had violated Section 8(a)(1) and (5) of the Act by failing and refusing to make timely or complete payments to the Funds.[3] (*Id.* at 2.)  On May 9 and 12, 2006, Rutenberg warned employees that, if they struck, they would not be able to immediately return to work after three days but would instead have to wait three weeks. (*Id.* at 4.)  At the second meeting, Rutenberg also distributed a letter to employees, which warned that the Employer would likely not be able to immediately reinstate employees if they struck, based on a need to protect continuity of patient care and the requirements imposed by the

---

[3] The charge in Case No. 29-CA-27502 was originally docketed as Case No. 2-CA-37367 in Region 2, the Region in which the Employer is located. However, because the Union also alleged therein that an affiliated medical facility located within Region 29's purview had also violated Section 8(a)(5) and (1) of the Act by failing to make Fund contributions, the charge was transferred to Region 29.

employment agencies through which the Employer might hire temporary replacements. (*Id.*) That same day, the Union filed a charge regarding the threat to delay reinstatement, Case No. 2-CA-37660.

On May 15, 2006 Union Executive Vice President Jay Sackman ("Sackman") told unit employees that that the Employer had agreed to make Fund contributions and that the picketing and strike were therefore canceled. (*Id.* at 5.) Sackman also notified the Employer of this by letter to Administrator Lawrence Abrams. (*Id.*)

At the start of the trial on the allegations of the May 1, 2006 complaint, held June 8, 2006 before Administrative Law Judge Steven Fish, the parties reached a settlement regarding most of the complaint allegations and stipulated to various facts regarding the Employer's history of payments to the Funds. (*See generally* Exh. J (Order in Case No. 29-CA-27502 (June 26, 2006)).) Judge Fish approved the partial settlement; it included an official notice posting, was signed by counsel for the General Counsel, and referred to settlement with the NLRB. (*Id.*) Some testimony was taken, and then the hearing was adjourned. (*Id.*) By Order dated June 26, 2006, on the basis of a non-Board settlement of the remaining complaint allegations, Judge Fish approved the withdrawal of the charge and the dismissal of the complaint, but consolidated the previously severed and settled allegations with the more-recently settled allegations and made the charge withdrawal and complaint dismissal conditional, subject to reopening in the event the Employer failed to comply

with either the June 8, 2006 settlement or the non-Board settlement. *Id.*

On September 25, 2006, the Union filed a charge in Case No. 2-CA-37898, alleging that the Employer had engaged in unlawful surveillance of employees by videotaping the March 15, 2006 informational picketing. (*Kingsbridge Heights Rehabilitation and Care Center*, 352 NLRB No. 5 at 2.)

On November 30, 2006, the Regional Director for Region 2 issued a consolidated complaint on the surveillance allegation and the May 1 charge regarding the threat to delay reinstatement. A hearing on the allegations of that complaint was held before Administrative Law Judge Mindy Landow on February 21, 2007. (*Id.* at 1.) The ALJ issued her decision on July 9, 2007 and the Board affirmed that decision by decision and order dated January 31, 2008. (*Id.*) The Board concluded that Respondent had unlawfully threatened employees and videotaped their Union activities. (*Id.*) That Board order was enforced by the Second Circuit on July 11, 2008.

**C. Summer 2007: The Employer Stops Dealing with the Union as the Collective Bargaining Representative and Ceases Making Fund Contributions**

### 1. The Employer Refuses the Union Access and Fails to Provide Relevant, Requested Information

Between about April 2005 and August 2007, Union Organizer Noreen Wray-Roach ("Wray-Roach") followed a regular pattern of meeting with bargaining unit employees at the Employer's facility. (Exh. N (Wray-Roach Aff.), ¶¶ 1 and 3.) Consistent

with the May 26, 2005 Union access arbitration award, Wray-Roach routinely sent a facsimile transmission to the Employer's Administrator approximately one week prior to her planned visit, stating the date and times she intended to be at the facility, generally on Thursday, from 6:30 a.m. to 7:30 a.m., and again from 11:00 a.m. or 1:00 p.m. to 4:00 p.m. (*Id.* at ¶ 3; Exh. O.) The Administrator typically responded by facsimile transmission to Wray-Roach, approving or denying the request. (Exh. N, ¶ 3.) Between March 6, 2006 and July 30, 2007, inclusive, Wray-Roach made over twenty requests for access to the Employer's facility; only three of the requests were denied and each denial included the reason therefore. (*See* Exh. O.)

Article 11(B)(2) of the 2002-2005 CBA requires the Employer to make monthly reports to the Union showing, *inter alia*, the hours worked by each employee during the preceding month. (Exh. H.) According to Wray-Roach, starting in about April 2007 she made monthly requests for that information, as well as for the name, date of hire, status as full- or part-time, rate of pay, department, and shift of each bargaining unit employee. (Exh. N. (Wray-Roach Aff.), ¶¶ 14-15.) Wray-Roach received no response to any of those requests. (*Id.*) Presumably some time after April 2007, on a date that Wray-Roach characterizes as "early 2007," she asked Abrams about the Employer's failure to respond to her information requests. (*Id.* at ¶ 15.) Abrams responded to Wray-Roach, "I have no control over it. When you send me the request, I forward it to Ms. Sieger. That's as much as I can say." (*Id.*) By letter dated June 13, 2007, Wray-Roach asked Employer

Administrator Abrams to investigate why the Employer had "not been sending [those reports] to the Union on a regular basis." (Exh. P (letter from Wray-Roach to Laurence Abrams (June 13, 2007).)    On August 3, 2007, Wray-Roach sent the new Administrator, Jacob Perles ("Perles"), a written request for "a listing of all bargaining unit employees by: date of hire, department, shift, status, rate of pay, and Social Security number," plus "a monthly schedule." (Exh. N, ¶ 14; Exh. Q (letter from Wray-Roach to Perles (Aug. 3, 2007)).)    Wray-Roach has not received a response to that letter. (Exh. N, ¶¶ 14-15.)

Also on August 3, 2007, Wray-Roach transmitted to Perles, by facsimile, a separate request to use a room to meet with employees on August 9, 2007. (Exh. N, ¶ 4; Exh. O.)    In his reply letter dated August 7, 2006, Perles responded that the conference room would not be available. (Exh. N, ¶ 5; Exh. O (letter from Perles to Wray-Roach (Aug. 7, 2007)).)    Wray-Roach did not, however, receive Perles' response. (Exh. N, ¶ 5.)    Wray-Roach therefore visited the facility as planned. (*Id.* at ¶ 4.)    At about 7:00 a.m., while Wray-Roach was in the conference room meeting with unit employees, she received a telephone call from Perles, asking why she was there. (*Id.*)    Wray-Roach responded that she was meeting with members. (*Id.*)    Perles said, "Didn't I tell you that you weren't supposed to be here?" (*Id.*)    Perles told Wray-Roach that he was going to use the conference room that day. (*Id.*)    Wray-Roach told Perles that the previous Administrator, Mr. Abrams, had let her use the conference room in the morning if he needed to use it in the afternoon. (*Id.*)    Perles responded

12

**1. The Unit Employees Vote to Strike Based on the Employer's Failure to Make Fund Contributions**

The Employer did not make any Fund contributions or arrange a payout schedule. (Exh. L (Rifkin Aff.), ¶ 9.)  On October 3, 2007, the Funds sent a letter to the bargaining unit workers informing them that, due to the Employer's delinquencies, their healthcare benefits would be terminated effective November 3, 2007. (Exh. L (Rifkin Aff.), attachment B (memo from the Benefit and Pension Fund to bargaining unit employees (Oct. 3, 2007)).)

Following issuance of the October 3, 2007 termination notice, a number of bargaining unit workers approached organizer Noreen Wray-Roach and accused the Union of not doing anything to make Kingsbridge comply with its obligation to make payments to the Funds. (Exh. T (Wray-Roach Supp. Aff.), ¶ 2.)  Many of the workers told her that they wanted to go on strike. (*Id.*)

Shortly thereafter, Wray-Roach met with Union Executive Vice President Mike Rifkin, Union Vice President Isaac Nortey, and others. (Exh. T (Wray-Roach Supp. Aff.), ¶ 3.)  During that meeting, Rifkin asked if the workers were ready for a strike, and Wray-Roach responded that they were. (*Id.*)  Rifkin directed the group to hold a strike vote. (*Id.*)

During the next week or two, the Union created and distributed a flyer to unit employees, announcing that the Union was going to hold a pair of emergency meetings at 7:00 a.m. and 2:00 p.m. on Wednesday October 17, 2007 in front of the Employer's facility. (*Id.* at ¶ 4.) The flyer read, in part,

> Medical Benefits for ourselves [sic] and our dependents are being TERMINATED because management of Kingsbridge Heights

Rehabilitation has stopped their contributions to the funds. Please let management know that we will not tolerate injustice against our lives! We will demand: · the signing of a full contract; · enforce the National Labor Relations Board Decision; · strike vote.

(*Id.*)

On the appointed date, Wray-Roach and other Union representatives stood across the street from the Kingsbridge facility and spoke with the Kingsbridge workers individually. (*Id.* at ¶ 5.) Wray-Roach told workers that if they wanted to strike, they had to follow a process, which included a strike vote and sending a strike vote notice to Sieger. (*Id.*) Wray-Roach told the workers that when a strike notice was sent to Sieger, it would assert that the strike was an unfair labor practice strike and that since the strike would be an unfair labor practice strike, the workers could not be locked out. (*Id.*) She cautioned the workers that they would not earn pay while they were on strike, so they needed to discuss the issue with their spouses. (*Id.*) Wray-Roach showed the strike ballot to the workers and told them that they had to vote yes or no for a strike. (*Id.* at ¶ 6.) The ballot read:

**We the members of 1199@ Kingsbridge Heights Nursing Home authorize the Union to send 10 days notice of a strike.**

**STRIKE VOTE**

**YES                    NO**

(Exh. CCC.) Wray-Roach advised the workers that the vote was by secret ballot, instructed them to step aside to fill out the ballot, and told them to place their completed ballots in a box

that was on the table. (Exh. T (Wray-Roach Supp. Aff.), ¶ 6.) The other Union representatives were standing next to Wray-Roach at the table; they made the same statements to the workers with whom they spoke. (*Id.*)

Similar strike vote events were held on October 18 and 20, 2007, during the same hours of the day, also across the street from the Employer's facility. (*Id.* at ¶ 7.) Wray-Roach provided about 15 to 20 ballots to Union delegate Kervin Campbell ("Campbell"), who distributed them to workers inside the facility. (*Id.* at ¶ 8.) Wray-Roach instructed Campbell to determine whether a worker had received notification of the termination of his or her benefits before handing a ballot to that individual. (*Id.*)

At about 3:15 p.m. on Thursday, October 18, 2007, while Wray-Roach and Rifkin were meeting with employees, Wray-Roach noticed that the Employer's head of housekeeping, Tony Szereszewski ("Szereszewski"), was videotaping the assembled group from the roof of the Employer's facility. (*Id.*) Szereszewski moved out of view as soon as he was observed. (*Id.*)

Wray-Roach counted the ballots on Monday, October 22, 2007, sometime between 1:00 and 2:00 p.m., at a table in front of the Employer's facility. (*Id.* at ¶ 9.)  Of the 170 votes cast, 166 were for, and 4 were against, the strike. (*Id.*)  Union Delegate Noeller Reilly, Union Vice President Isaac Nortey, and several workers were present while Wray-Roach tallied the ballots. (*Id.*)

### 2. The Employer "Reimburses" Employees Their Union Dues

At a staff meeting for all Union workers held near the end of October 2007, Sieger told the workers that, according to the law, she should not have continued to deduct Union dues from the employees' pay during the period when no collective-bargaining agreement was in effect. (Exh. R (Campbell Aff.), ¶ 8; Exh. S (Beica Aff.), ¶ 8.) Therefore, Sieger said, she was returning all of the Union dues that had been deducted from employees' pay and remitted to the Union for the period October 2006 through September 2007. (Exh. R, ¶ 8; Exh. S, ¶ 8.)  At the end of the meeting, Sieger's secretary handed out employee checks for the reimbursed Union dues. (Exh. R, ¶ 8.)  November 7, 2007 employee paystubs show a "Union dues adjust" of various amounts. (Exh. S, ¶ 8; Exh. Exh. JJ (Shaw Aff.), ¶ 6.) The same week, the Employer stopped deducting Union dues from the workers' pay. (Exh. S (Beica Aff.), ¶ 8.)  An Employer-produced chart, entitled "Union dues checks," lists employees' names alongside the amount the employee was supposed to be reimbursed. (Exh. KK.)

### 3. The Employees' Health Insurance Terminates

The Employer did not correct its Fund delinquencies. (Exh. L (Rifkin Aff.), ¶ 10.)  As a result, on about November 5, 2007, the Funds terminated health insurance coverage for unit employees. (*Id.*)

### 4. The Employer Videotapes Employees Engaged in Informational Picketing

By letter dated November 13, 2007, Union Vice President Nortey gave the Employer and the Federal Mediation and

18

Conciliation Service ("FMCS") notice, pursuant to Section 8(g) of the Act[6], that the Union would be conducting informational picketing at the Employer's facility from 2:00 p.m. to 7:00 p.m. on November 28, 2007. (Exh. PP (letter from Nortey to Perles (Nov. 13, 2007)).)

A number of video cameras are permanently attached to the exterior of the Employer's facility. (Exh. R (Campbell Aff.), ¶ 10.) These cameras are mounted parallel to the face of the building, directed at the sidewalk in front of the building. (Id.) Some time in November 2007, Beica observed Employer Assistant Administrator Gregory Korzeb ("Korzeb") escort a man from the maintenance department into room 246. (Exh. S (Beica Aff.), ¶ 6.) There, the maintenance person adjusted the security camera attached to the building outside of the room so that it no longer pointed down and parallel to the building---thereby filming the sidewalk directly along the front of the building---but instead pointed across the street, where the Union regularly met with employees and set up its picket lines. (Id.)

On the Thursday before Thanksgiving 2007, while talking with Wray-Roach at her table across the street from the facility, Campbell noticed that one of the video cameras pointed directly towards them. (Exh. R (Campbell Aff.), ¶ 10.) The camera remained in that position through at least December 19, 2007. (Id.)

---

[6] Section 8(g) of the Act requires a labor organization to provide the employer and the Federal Mediation and Conciliation Service ten days notice of its intention to engage in any strike, picketing, or other concerted refusal to work, including the date and time that such action will commence.

On November 28, 2007, the Union conducted informational picketing across the street from the Employer's facility. (Exh. N (Wray-Roach Aff.), ¶ 10.)   About thirty minutes after that activity began, Wray-Roach noticed a man standing inside the Employer's facility videotaping the picketers. (*Id.*)   About fifteen minutes later, Sarah Newman, Esq. ("Newman"), an attorney for the Union, walked across and street and spoke to the guard (*Id.*)   After that conversation, the guard stopped videotaping for approximately 30 minutes, but then resumed the activity. (*Id.*)

**E. Winter 2007–2008: The Employer Videotapes Union Picketers and Offers Employees "Yellow Dog" Contract.**

By letter dated December 7, 2007, Nortey again gave the Employer and FMCS Section 8(g) notice of its intent to picket. (Exh. QQ (letter from Nortey to Perles (Dec. 7, 2007)).)   That letter stated that the Union would be conducting informational picketing at the Employer's facility from 2:00 p.m. to 6:00 p.m. on December 18, 19, and 22, 2007. (*Id.*)

**1. The Union Conducts Further Informational Picketing; the Employer Films the Picketers**

On December 18, 2007, starting at about 2:00 p.m., the Union conducted its planned picketing across the street from the Employer's facility. (Exh. R (Campbell Aff.), ¶ 9.)   At the start of the picket, Campbell noticed someone standing inside the lobby, videotaping through the doors. (*Id.*)   The cameraman remained where he was for about fifteen minutes. (*Id.*)   Later, Campbell noticed the same man videotaping the picketing from a patient's room on the second floor. (*Id.*)   The videographer

remained in that location and continued to film through the end of picketing. (*Id.*)

Other employees also observed preparations for or actual filming of picketing: Beica saw Director of Housekeeping Szereszewski escort a man with a video camera to room 243 on one of the December 2007 picket dates, (Exh. S (Beica Aff.), ¶ 5), and on both December 18 and 22, 2007, Wojciech Orlos saw a person standing in the window of room 246 with a video camera. (Exh. U (Orlos Aff.), ¶ 7.)

Around this time, Wray-Roach began receiving letters of resignation from Union members. (Exh. T (Wray-Roach Supp. Aff.), ¶ 10; Exh. SS (letter from Jozef Hubacek to Wray-Roach (Dec. 17, 2007)).)

Two weeks later, on January 21, 2008, the Union sent Perles a notice pursuant to Section 8(g) of the Act informing him that the bargaining-unit employees would engage in a strike, picketing, and other protected concerted activities beginning at 6:00 a.m. on Wednesday, February 20, 2008, and continuing indefinitely. (Exh. RR (letter from Gresham to Perles (Jan. 21, 2008)).) The letter further stated that the strike was in protest of the Employer's unfair labor practices, including its failure to make payments to the Unions funds, which caused the loss of employee healthcare benefits. (*Id.*; Exh. HH (Rifkin Aff.), ¶ 8.)

### 2. The Employer Conveys Its Intent to Enter Into the Association Agreement, Using the American Arbitration Association for Arbitration of Contract Disputes

Throughout January 2008, the parties communicated by letter regarding their bargaining positions, with many of the Employer's letters distributed directly to unit employees rather than to the Union. The Employer consistently asserted that it had agreed to the industry contract, with one exception: when hearing contract disputes, the Employer wanted to use arbitrators from the American Arbitration Association ("AAA"), rather than the Industry Impartial Chairman. (*See* Exhs. UU-ZZ.)

### 3. The Employer Offers Employees "Yellow Dog" Contracts

In early February 2008, the Employer began offering certain employees individual employment contracts. Director of Activities Irena Volinsky ("Volinsky") told Activities Leader Bibirakeba Seebaram ("Seebaram"), a unit employee, that Joseph[7], who works in the purchasing department, was holding a meeting in five minutes—during working time—in the residents' dining room. (Exh. G (Seebaram Aff.), ¶¶ 1-2.) During that meeting, Joseph told the Activities Leaders, "Ms. Sieger is offering a contract. You're going to have [] benefits and $3.00 more per hour." (*Id.*) He then distributed a contract. (*Id.*; Exh. V ("Agreement Between

---

[7]Although Seebaram did not know Joseph's last name, circumstantial evidence shows that the individual was Jozef Hubacek. As stated below, Director of Housekeeping Tony Szereszewski told employee Wojcieck Orlos that employees should speak to Joseph Hubacek about the contract. On December 17, 2007, Hubacek sent a letter to the Union withdrawing his membership. Hubacek also filed the petition to decertify the Union in Case No. 2-RD-1562 on March 6, 2008.

Kingsbridge Heights Rehabilitation Care Center (Employer) and Kingsbridge Heights Rehabilitation Care Center Employees (Employee)" (v.1)).[8])  Joseph told the workers, "If you guys go on strike, you're not coming back." (Exh. G (Seebaram Aff.), ¶ 2.) He then reviewed the various provisions of the agreement and told the group that if they signed the contract, it would mean that they were no longer Union members. (*Id.*) None of the workers signed the contract during the meeting, which lasted less than five minutes. (*Id.*)

The contract given to Seebaram at the meeting sets forth certain terms and conditions of employment, including annual wage increases of 2%, a health benefit plan, holidays, sick leave, vacation time, a profit-sharing option, and an offer of a 401(k) plan. (Exh. V.)  Under the heading "Affiliations," the contract states, "By signing this agreement you affirm that you are not a member of any union and will not join throughout the duration of this agreement." (Id.)

During his lunch break on February 6, 2008, unit employee Wojciech Orlos met with some Union representatives at a temporary Union office near the Kingsbridge facility. (Exh. U (Orlos Aff.), ¶ 18.) The Union representatives told Orlos that a large number of workers, including some kitchen workers, were meeting with an attorney in a room on the first floor in the west building marked by a sign that read "Administrator." (*Id.*)  Orlos returned to Kingsbridge and went to the room described. (*Id.*) The Employer's

---

[8] The "v.1" designation is to distinguish this contract from a slightly different version that appeared later, designated "v.2."

Assistant Administrator Korzeb and Director of Housekeeping Tony Szereszewski---both Section 2(11) supervisors---were standing outside the room. (*Id.*) They told Orlos that if he really wanted to leave the Union, then they would let him enter. (*Id.*) Orlos did not go in. (*Id.*)

The next day, co-worker Ryszard Slominski ("Slominski") told Orlos that there had been two sessions of the meeting on the previous day. (*Id.* at ¶ 19.) According to Slominski, a female Polish interpreter was present during the meeting, along with Sieger, an attorney, and unit employee Dariusz Szereszewski, who had reportedly organized a collection of money for an attorney to represent the workers. (*Id.*) Slominski said that during the meetings the workers were asked to sign a contract which would replace the Union contract and require that the workers resign their Union membership. (*Id.*) Later, Director of Housekeeping Tony Szereszewski told Orlos that Sieger had held a meeting about two weeks earlier, during which she told the employees that they could sign a contract that she created and that if they wanted more information, they should contact Jozef Hubacek. (*Id.*)

Later in the same day that Slominski and Dariusz Szereszewski spoke to Orlos about the various meetings, Orlos encountered Assistant Administrator Korzeb in the hallway. (*Id.*) Orlos told Korzeb that it would be nice if they could place the contract being offered behind a glass display case so everyone could be familiar with it. (*Id.*) Korzeb replied that it was not his decision, but Sieger's. (*Id.*)

On the morning of February 11, 2008, Orlos received a copy of a contract from Barbara (LNU), who works in the kitchen. (*Id.* at ¶ 20.) That contract is similar to the one given to Seebaram, but includes some additional terms, including specification of the normal work week hours and the base pay rate. (Exh. W.) Two other new provisions state that the signatory employee has been represented by legal counsel or elected to waive such representation and that the parties may choose to enter into a formal written employment agreement at a later time. (*Id.*)

On February 13, 2008, as Orlos was leaving the Employer's facility, Szereszewski called him back. (Exh. U (Orlos Aff.), ¶ 20.) Szereszewski showed Orlos some workers' paychecks, pointing to their pay rates. (*Id.*) One of the paychecks showed one pay rate for the first four days of the week and a new pay rate for the fifth day. (*Id.*) Szereszewski said, "Isn't it nice to have a bigger salary?" (*Id.*) He also said that Tadeuesz Srednicki might be signing the contract. (*Id.*) Orlos asked Tony, "Just in case, if a colleague asks me if they should sign the contract, whom should they get in touch with?" (*Id.*) Szereszewski said, "This is not possible right now unless another group is found who would pay for the same attorney or a different one." (*Id.*)

Between January 24 and February 14, 2008, as the Employer was offering the yellow-dog contracts to unit employees, Wray-Roach received nine letters of resignation from the Union. (Exh. T (Wray-Roach Supp. Aff.), ¶ 10; Exh. SS (Julia Rozwadowsky resignation letter (Feb. 1, 2008); Activities Leader Raisa Kutsenko resignation letter (Feb. 11, 2008); Activities Leader

Nedialka Tchilnogirov resignation letter (Feb. 14, 2008); Joanna
Wesnerowska resignation letter (Feb. 1, 2008); Activities Leader
Yelena Grigoryan resignation letter (Feb. 13, 2008); Activities
Leader Yelena Yakusheva resignation letter (Feb. 13, 2008);
Debbie Bethea resignation letter (Jan. 29, 2008); Ryszard
Szereszewsky resignation letter (Jan. 24, 2008); Daniela Mayer
resignation letter (Jan. 24, 2008)).)

### 4. The Employees Go on Strike; The Employer Videotapes and Photographs Strikers

In conformity with the Union's January 21, 2008 strike
notice to the Employer, nearly all of the approximately 250
bargaining unit employees commenced a strike on February 20,
2008. (Exh. HH (Rifkin Aff.), ¶ 16; Exh. G (Seebaram Aff.), ¶ 2.)
All of the workers who resigned from the Union, along with three
current Union members, have been working through the strike.
(Exh. T (Wray-Roach Supp. Aff.), ¶ 10.)  Since the start of the
strike, various Employer agents have videotaped the strikers
throughout the day, at intermittent intervals, for about 10
minutes at a time. (Exh. NN (Cichon Aff.), ¶10; Exh. OO (Marut
Aff.), ¶ 7.) The Employer's security guards, who stand in front
of the facility, have taken photographs and movies of the
picketers with digital cameras. (Exh. G (Seebaram Aff.), ¶ 6.)

### 5. The Employer Refuses to Meet and Bargain, and Makes a Regressive Contract Proposal

Kathy Murray Cannon ("Murray Cannon"), Commissioner of the
FMCS, by letter dated February 18, 2008, asked to meet with the
parties on February 19, 2008 at 1:00 p.m., for the purpose of a

mediation session to avoid the strike. (Exh. Y (letter from Murray Cannon to Perles and Rifkin (Feb. 18, 2008)).) The letter asked the parties to telephone Cannon to discuss a mutually agreeable location for the meeting and advised that the FMCS would choose a site if they could not agree on one. (*Id.*) The meeting was held on the 6th Floor of 26 Federal Plaza, New York, New York on February 19th. (*Id.*) Rifkin appeared for the meeting with other Union representatives, but no Employer representative was present. (Exh. HH (Rifkin Aff.), ¶ 15.)

In a March 1, 2008 letter to Rifkin, Perles, and their attorneys, issued pursuant to Section 8(d)(4)(C) of the Act, John Sweeney ("Sweeney") of the FMCS called for a meeting of the parties to be held on Friday March 7, 2008. (Exh. HH (Rifkin Aff.), ¶ 17; Exh. Z (letter from Sweeney to Bluestein, Cohen, Perles, and Rifkin (Mar. 1, 2008)).) On March 6, 2008, Sweeney sent an e-mail message to the parties stating that, based on Sweeney's communications with Employer counsel, the meeting scheduled for March 7 would not take place. (Exh. HH (Rifkin Aff.), ¶ 18; Exh. AA (letter from Sweeney to Sieger, Perles, Cohen, Rifkin, and Bluestein (Mar. 6, 2008)).) In this communication, Sweeney asked the Employer to provide a list of dates on which it would be available to meet. (Exh. AA.)

That same day, Rifkin sent Sieger a Memorandum of Agreement, with a cover letter. (Exh. HH (Rifkin Aff.), ¶ 19; Exh. TT (letter from Rifkin to Sieger (Mar. 6, 2008)).) Under that Memorandum of Agreement, the Employer would adopt the June 1, 2004 industry contract, as extended through April 30, 2011, as

an independent employer, with the American Arbitration Association substituted for the industry Impartial Chairman. (Memorandum of Agreement by and between 1199SEIU United Healthcare Workers East and Kingsbridge Heights Rehabilitation Care Center, Inc.)  The cover letter stated, in part:

> All you need to do to bring this strike to an end is to sign the enclosed **Memorandum of Agreement** and to make immediate arrangements with the Benefit Fund to pay your Benefit Fund delinquency, so that the health benefits of our members can be reinstated. Any other issues that remain with respect to outstanding obligations of the facility to the workers and the other Funds can be resolved through further discussion. Failing resolution, these issues can be referred to arbitration in accordance with the Memorandum of Agreement.

(Exh. TT (letter from Rifkin to Sieger (Mar. 6, 2008)).)[9]

On March 14, 2008, Rifkin received a letter from David Jasinski, Esq. ("Jasinski"), the Employer's then-new counsel. (Exh. HH (Rifkin Aff.), ¶ 20; Exh. AAA (letter from Jasinski to Rifkin (Mar. 14, 2008)).)  In that letter, Jasinski wrote:

> In an effort to end the acrimony, and in the best interest of the employees and this facility, we are willing to put forth a contract proposal. Based on the changed circumstances – including, but not limited to, the strike and the Union's recent unilateral termination of employees' health benefits – Kingsbridge proposes a contract with the following terms:
>
> 1. Kingsbridge continues to propose the utilization of the American Arbitration Association ("AAA") procedure to resolve any disputes;

---

[9] Also on March 6, 2008, Joseph Hubacek filed a petition seeking decertification of the Union. (Exh. KK.) The investigation of this petition was blocked due to the pending unfair labor practice charges. *NLRB Casehandling Manual, Part Two, Representation Proceedings, Sec. 11730.*

2.   The length of the contract will be three (3)
     years upon ratification;

3.   Kingsbridge is forced and will provide health
     coverage to the employees and will no longer
     participate in the Fund due to the Union and the
     Fund's unilateral decision to terminate benefits;
     and

4.   Kingsbridge will have the right to offer no-
     frills package to those employees who voluntarily
     elect to participate in this program. Those
     employees will receive an additional $2.00 per
     hour to their base hourly rate.

(Exh. AAA (letter from Jasinski to Rifkin (Mar. 14, 2008)).)

On March 20, 2008, Rifkin responded. (Exh. HH (Rifkin
Aff.), ¶ 21; Exh. BBB (letter from Rifkin to Jasinski (Mar. 20,
2008)).) In his letter, Rifkin wrote that Sieger's position
prior to and since the beginning of the strike had been that the
contract issues involving wages, benefits and language had all
been resolved, that the Employer's former counsel had made a
written offer to accept the terms and conditions of the Greater
New York Collective Bargaining Agreement provided the Union
agreed to adopt the AAA in place of the Impartial Chairman, and
that the Union had accepted that offer in writing, thereby
concluding an agreement, which Sieger had unlawfully refused to
execute and implement. (Exh. BBB.) Rifkin continued that,
nevertheless, he had forwarded Jasinski's letter to FMCS
Commissioner Sweeney and asked that Sweeney call the parties
together. (*Id.*)

Jasinski replied by letter dated March 25, 2008. (Exh. HH
(Rifkin Aff.), ¶ 24; Exh. GG (letter from Jasinski to Rifkin

(Mar. 25, 2008)).)   In his letter, Jasinski took issue with the Union's characterization of the facts:

1.  The Union threatened and ultimately commenced and continues a strike to advance its unlawful goals. This is not an unfair labor practice strike – the facts demonstrate and your own literature demonstrates that this dispute has always been about the contract and nothing more.

2.  Of course, the parties never came to an agreement. If that were true, and Kingsbridge agreed to the Union's terms, the employees would not have been on strike for the past month. Your claim to the contrary is belied by the facts. We specifically refer you to the Union's own document reflecting that the Union would only settle the contract with retroactivity back to June 1, 2004, as well as a capitulation to the Union's unlawful contract proposal demanding the payment of all alleged delinquencies into the Funds. (A copy of this proposal is annexed hereto.) As you are well aware, neither Administration nor prior counsel agreed to retroactivity or conceded to the Union's unlawful demands.

3.  Finally, with regards to your claim that Kingsbridge's latest contract proposals are somehow "inconsistent' with the bargaining history, Kingsbridge has successfully weathered more than one month of this unlawful strike. Accordingly, and consistent with the law, Kingsbridge is free to secure contract terms that it deems beneficial under these circumstances.

(Exh. GG.)   Jasinski concluded by stating that the Employer was willing to meet with the Union in good faith, but that unless the Union rescinded its position, future bargaining would be futile. (*Id.*)

Rifkin answered by letter dated the next day. (Exh. HH (Rifkin Aff.), ¶ 24; Exh. BBB (letter from Rifkin to Jasinski (Mar. 26, 2008)).)  Rifkin maintained that the strike constituted

an unfair labor practice strike, pointing to the hearing regarding the Employer's failure to make payments into the funds and the Employer's refusal to follow the Board's January 31, 2008 decision. (Exh. BBB.)    Rifkin again said he would forward Jasinski's March 25th letter to FMCS Commissioner Sweeney and request a meeting of the parties. (Id.)[10]

The same day, Sweeney wrote to the parties and called for a meeting. (Exh. HH (Rifkin Aff.), ¶ 23; Exh. BB (letter from Sweeney to Perles, Jasinski, Rifkin, and Bluestein (Mar. 26, 2008)).)    Sweeney asked the parties to provide him with dates they were available to meet. (Exh. BB.)

On April 3, 2008, Rifkin received an email from Sweeney in which Sweeney noted that he had not received a response from Kingsbridge and was scheduling a meeting of the parties for April 16, 2008. (Exh. HH (Rifkin Aff.), ¶ 25; Exh. CC (letter from Sweeney to Perles, Jasinski, Rifkin, and Bluestein (Apr. 3, 2008)).)

On April 11, 2008, Barbara C. Deinhardt ("Deinhardt"), Chair of the New York State Employment Relations Board, wrote to Perles and Rifkin. (Exh. DD (letter from Deinhardt to Perles and Rifkin (Apr. 11, 2008)).)    Deinhardt asked the parties to attend a meeting at her office on either April 16 or 17, 2008 at 1:00 p.m. and requested that the parties advise her of which date

---

[10] Also on March 26, 2008, the Employer filed a charge alleging that the Union had violated Section 8(b)(3) of the Act, by conditioning settlement of the contract on a permissive subject of bargaining - the Employer's agreement to pay delinquent benefit funds contributions - and by engaging in a strike in pursuit of that goal.  The Employer's request to withdraw that charge was approved on May 8.

would be preferable. (*Id.*)  On April 15, 2008, Deinhardt sent a letter to Sieger and Rifkin, in which she stated that, despite several calls to both Perles and Jasinski, she had received no response from the Employer to her April 11th letter. (Exh. EE (letter from Deinhardt to Sieger and Rifkin (Apr. 15, 2008)).) Deinhardt also rescheduled the date of the parties' meeting to April 22, 2008, due to the inability of Mark Kissinger, Deputy Commissioner of the New York State Department of Health, to attend the previously-offered dates. (*Id.*)

No meeting took place on April 22, 2008.  By letter dated April 28, 2008, apparently in response to a communication from Sieger, Deinhardt apologized for any offense caused by her previous correspondence, suggested that the parties could meet without counsel if Sieger was having trouble retaining a representative, and noted that the Union had agreed to attend without counsel if Sieger preferred. (Exh. FF (letter from Deinhardt to Sieger (Apr. 28, 2008)).)  Deinhardt asked Sieger to provide dates when she would be available to meet. (*Id.*)

To date, there has been no mediation meeting to resolve the strike.  The employees remain on strike and without health insurance.  Recently, striking employee Audrey Smith-Campbell, who in the absence of health insurance was unable to afford the asthma medication she needed, succumbed to asthma and died. (*See generally*, Exh. II (Young Aff.).)

The Union has pledged to make an unconditional offer to return to work if the Employer is ordered to rescind its

32

unilateral changes and restore the status quo ante. (Exh. L (Rifkin Aff.), ¶ 13.)[11]

## IV.  STATUTORY STANDARD FOR INJUNCTIVE RELIEF

Section 10(j) of the Act authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint and thereby render a final Board order ineffectual. *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975), *citing* S.Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted at *Legislative History of the Labor Management Relations Act of 1947*, 44, 433 (Government Printing Office 1985). Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *See, e.g., Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38.

To resolve a Section 10(j) petition, a district court in the Second Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether temporary injunctive relief is "just and

---

[11] Similarly, the Funds have agreed to reinstate the employees' health insurance benefits if the Employer is ordered to, and resumes, making

proper." *See, e.g., Silverman v. J.R.L. Food Corp., d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999) and the cases cited therein.

## A. Reasonable Cause Analysis

In determining whether there exists reasonable cause to believe that the Act has been violated, the district court may not decide the merits of the case. *See Kaynard v. Mego Corp.*, 633 F.2d 1026, 1032-1033 (2d Cir. 1980). Rather, the court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *Kaynard v. Mego Corp.*, *supra* at 1033, *quoting McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n.17 (2d Cir. 1962). The district court should not resolve contested factual issues; the General Counsel's version of the facts "should be given the benefit of the doubt," *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37, and together with the inferences therefrom, "should be sustained if within the range of rationality." *Kaynard v. Mego Corp.*, *supra* at 1031. The district court also should not attempt to resolve issues of credibility of witnesses. *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051-1052 n.5; *see also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570, 1571 (7th Cir. 1996), *cert. denied* 519 U.S. 1055 (1997); *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-1151 n.2 (D. Mass. 1983), *aff'd per curiam* 725 F.2d 664 (1st Cir. 1983).

contributions to the Funds. (Exh. L (Rifkin Aff.), ¶ 12.)

Similarly, on questions of law, the district court "should be hospitable to the views of the [General Counsel], however novel." *Kaynard v. Mego Corp.*, *supra* at 1031, *quoting Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union (ILGWU)*, 494 F.2d 1230, 1245 (2d Cir. 1974). The General Counsel's legal position should be sustained "unless the [district] court is convinced that it is wrong." *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051; *accord Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) ("appropriate deference must be shown to the judgment of the NLRB and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed").

As set forth below, the evidence obtained during the investigation of the charge establishes reasonable cause to believe that the Employer has violated Section 8(a)(1), (3), and (5) of the Act.

### 1. The Employer Violated Section 8(a)(1) and (5) of the Act by Refusing to Provide the Union with Relevant Requested Information

An employer has the duty to supply a union that represents its employees with requested information that is necessary and relevant to the union's performance of its responsibilities. *NLRB v. Truitt Manufacturing Co.*, 351 US 149 (1956); *NLRB v. Acme Industrial Co.*, 385 US 432 (1967); *New Surfside Nursing Home*, 322 NLRB 531, 534 (1996). In its interpretation of the "necessary and relevant" standard, the Board applies a liberal standard,

requiring that a union only establish that there is a probability that the requested information is relevant and that the union would use the information to carry out its statutory duties and responsibilities. *NLRB v. Acme Industrial Co.*, 385 US at 437, *New Surfside Nursing Home*, 322 NLRB at 534. Pursuant to this standard, information that is related to employees' terms and conditions of employment is presumed to be relevant. *Atlanta Hilton and Tower*, 271 NLRB 1600 (1984). Upon request, an employer must furnish presumptively relevant information to the union. *New Surfside Nursing Home*, 330 NLRB 1146, 1148 (2000).

The record evidence establishes that, on June 13, 2007, the Union asked the Employer to provide monthly employee schedules. On August 3, 2007, the Union repeated this request, and additionally asked the Employer for a listing of all bargaining unit employees by date of hire, department, shift, status, rate of pay, and social security number. The Employer has not responded to these requests. The Board has held that all of the above information, with the exception of Social Security numbers, is presumptively relevant.[12] *New Surfside Nursing Home*, 330 NLRB 1146, 1149 (2000); *Millard Processing Services, Inc.*, 308 NLRB 929, 930 (1992); *Albertson's, Inc.*, 351 NLRB No. 21 (2007). Therefore, because the Employer failed to provide presumptively relevant information to the Union upon its request, there is reasonable cause to believe that the Employer violated Sections 8(a)(1) and (5) of the Act.

---

[12] Petitioner does not allege that the Employer's failure to provide Social Security numbers is a violation of the Act.

## 2. The Employer Violated Section 8(a)(1) and (5) By Refusing to Grant the Union Access to the Employer's Facility

The union access provisions of a collective-bargaining agreement survive the agreement's expiration. *New Surfside Nursing Home*, 322 NLRB 531, 534 (1996); *Gilberton Coal*, 291 NLRB 344, 348 (1988); *Houston Coca-Cola Bottling Co.*, 265 NLRB 766, 777 (1982), enfd. 740 F.2d 398 (5th Cir. 1984). The Board has found that an employer's denial of contractual right to access is a violation of Section 8(a)(5) of the Act, as well as an independent violation of Section 8(a)(1). *Houston Coca-Cola Bottling Co.*, 265 NLRB at 778; *Colonna's Shipyard*, 293 NLRB 136, 141 (1989), enfd. 900 F.2d 250 (4th Cir. 1990); *Gilliam Candy Co.*, 282 NLRB 624 (1987). In addition, the Board has found that a unilateral change in the past practice of permitting union access is a material change about which an employer is obligated to bargain, even in the absence of a contractual provision. *Scott Brothers Dairy*, 332 NLRB 1542, 1553 (2000).

In the present case, the parties' 2002-2005 collective bargaining agreement included a union access provision. Because the grievance regarding Union access arose while the contract was still in effect, it was properly before an arbitrator, *Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union, AFL-CIO*, 430 U.S. 243 (1977), and the arbitrator's award became part of the collective bargaining agreement between the parties, *Fournelle v. NLRB*, 670 F.2d 331, 344 (D.C.Cir.1982) ("[a]n award interpreting a collective bargaining agreement

usually becomes a binding part of the agreement," *quoting* F. Elkouri & E. Elkouri, *How Arbitration Works* 377 (1973)); *Local Union No. 9735, UMW v. NLRB*, 258 F.2d 146, 148 (D.C.Cir.1958) (arbitrator's decision generally becomes part of the contract); *Szewczuga v. NLRB*, 686 F.2d 962, 973 n. 84 (D.C.Cir.1982) ("collective bargaining process" includes certain arbitral results as well as the terms of the collective agreement reduced to writing). The arbitrator's decision provided that, absent compelling reasons, the Union should provide the Employer with forty-eight hours advance notice of its desire to meet with its members at the Employer's facility. The decision further directed that, absent compelling reasons, the Employer should allow such access and provide a reasonable location for such meetings.

Both documentary and testimonial evidence establishes that in about August 2007 the Employer ceased permitting the Union access to its facility for the purpose of meeting with employees. Because the union access provision of the contract, as interpreted by the May 26, 2005 arbitration award, survived the expiration of the 2002-2005 agreement, the Employer's unilateral alteration of that provision---by refusing to maintain it in effect---constituted a violation of Section 8(a)(5) and (1) of the Act. *Gilberton Coal*, 291 NLRB at 348.

Further, between April 2005 and August 2007, the parties created a practice whereby the Union faxed requests for access to the Employer's Administrator approximately one week before the planned visit, and the Administrator promptly responded with his

approval via facsimile unless a there existed a specific reason that the Union request could not be accommodated at the requested time. The Employer neither gave notice to nor bargained with the Union before it began denying the Union's access requests without explanation. The Employer's unilateral discontinuance of the established practice for Union access thereby violated Section 8(a)(5) and (1) of the Act. *Ernst Home Centers*, 308 NLRB 848, 849 (1992).

Based on the above, there is reasonable cause to believe that the Employer's denial of access to the Union's representative is a violation of Section 8(a)(1) and (5) of the Act.

### 3. The Employer Violated Section 8(a)(1) and (5) By Unilaterally Discontinuing Payments to the Union's Benefits Funds

An employer violates Section 8(a)(1) and (5) when it unilaterally changes or discontinues existing terms and conditions of employment, including contributions to fringe benefit funds, upon the expiration of a collective bargaining agreement unless: (1) the union has waived bargaining on the issue; or (2) the parties have bargained to impasse and the unilateral change is reasonably encompassed by the employer's pre-impasse proposals. *Buck Brown Contracting Co., Inc.*, 272 NLRB 951, 953 (1984). Here, the evidence shows that the Employer has made no payments to the Union's benefits funds since August 9, 2007. There is no evidence that the Union waived its right to bargain regarding payments into the funds or that the parties

have reached impasse on this issue. Therefore, there is reasonable cause to believe that the Employer violated Section 8(a)(1) and (5) by ceasing its contributions to the Union's Funds.

### 4. The Employer Violated Section 8(a)(1) By Videotaping and Photographing Employees

It is well-established that absent proper justification, photographing or videotaping employees as they engage in protected concerted activity violates Section 8(a)(1) of the Act. *Trailmobile Trailer, LLC*, 343 NLRB 95 (2004); *Robert Orr-Sysco Food Services*, 334 NLRB 977 (2001); *F.W. Woolworth Co.*, 310 NLRB 1197 (1993). The Board has explained that photographing and videotaping employees while they are engaged in protected concerted activity is unlawful because it has a tendency to intimidate employees, implant the fear of future reprisals, and interfere with the exercise of Section 7 rights. *Center Construction Company, Inc.*, 345 NLRB 729 (2005), *enfd.* 482 F.3d 425 (6th Cir. 2007). It is the Employer's burden to put forth a defense that it had a reasonable basis to videotape the informational picketing. *Trailmobile Trailer*, 343 NLRB at 2; *National Steel & Shipbuilding Co.*, 324 NLRB 499, 501 (1997). "[T]he Board may properly require a company to provide a solid justification for its resort to anticipatory photographing." *National Steel & Shipbuilding Co.*, 324 NLRB at 499, *quoting NLRB v. Colonial Haven Nursing Home*, 542 F.2d 691, 701 (7th Cir. 1976). Further, the Board has held that purely anticipatory photographing and videotaping of peaceful picketing in the mere

40

belief that something might happen is not a sufficient justification. *F.W. Woolworth Co.*, 310 NLRB at 1197; *Flambeau Plastics Corp.*, 167 NLRB 735, 743 (1967), *enfd*. 401 F.2d 128, 136 (7th Cir. 1968), *cert. denied* 393 US 1019 (1969).

Here, the evidence demonstrates that the Employer has videotaped employees on multiple occasions while they were engaged in protected activity: while meeting with Union representatives on October 18, 2007; during picketing on November 28, December 18, and December 22, 2007; and since the strike began on February 20, 2008. In addition, since November 2007 the Employer has directed its security cameras towards an area across the street from the Employer's main entrance where the employees regularly engage in their protected activity. The Employer has provided no justification for this videotaping, and the investigation has revealed no evidence to show that the Employer had a reasonable basis for this conduct.

Further, by engaging in such conduct the Employer is flagrantly ignoring the Board's recent order that it cease engaging in the surveillance of employees' Section 7 activities. In *Kingsbridge Heights Rehabilitation Care Center*, 352 NLRB. No. 5 (2008), the Board found unlawful the Employer's previous videotaping of employees who also were engaging in picketing. The Board concluded that the Employer's purported justification for its surveillance activity---that the Union had been engaged in inappropriate and unlawful conduct---was unsupported. *Kingsbridge Heights Rehabilitation Care Center*, 352 NLRB No. 5, slip op. at 6. Moreover, the Board found that that the alleged

misconduct would not have provided a sufficient justification for videotaping the picketers. *Id.* Based on these facts, there is reasonable cause to believe that the Employer has engaged in surveillance of employees' Section 7 activities, in violation of Section 8(a)(1) of the Act.

### 5. The Employer Violated Section 8(a)(5), (3) and (1) By "Reimbursing" Employees' Union Dues

Following the expiration of the collective bargaining agreement, the Employer continued to deduct Union dues from employees' pay and remit the money to the Union. Then, in October 2007, Sieger told employees that it had been improper for the Employer to deduct Union dues after the contract expired and advised them that they would be paid a sum of money equal to the amount of Union dues that had been deducted from their pay from October 2006 through September 2007.[13]

---

[13] Although most contractually-established terms and conditions of employment are mandatory subjects of bargaining that cannot be unilaterally altered when the collective bargaining agreement expires, *NLRB v. Katz*, 369 US 736 (1962), the Board and courts have historically considered dues checkoff provisions to be an exception to the general rule. Hence, an employer does not violate the Act by ceasing to deduct and remit union dues after the expiration of its collective-bargaining agreement. *Bethlehem Steel*, 135 NLRB 1500, 1502 (1962); *Ortiz Funeral Home Corp.*, 250 NLRB 730, 731 fn. 6 (1980), *enfd. on other grounds*, 651 F.2d 136 (2d Cir. 1981), *cert. denied*, 455 U.S. 946 (1982); *cf. Hacienda Resort Hotel and Casino*, 351 NLRB No. 32, slip op. at 3 (2007). Conversely, and contrary to Sieger's representation to employees, an employer's decision to continue deducting dues from employees' pay after expiration of a contract also is not a violation of the Act. *See, e.g.*, *Frito-Lay, Inc.*, 243 NLRB 137 (1979); *Lowell Corrugated Container Corp.*, 177 NLRB 169, 173 (1969), *enfd. on other grounds*, 431 F.2d 1196 (1st Cir. 1970). Here, the amounts paid to the employees were not their actual dues, because those funds had already been remitted to the Union. Thus, the Employer's payments were simply bonuses equal in amount to the amount of dues each employee had paid over the previous year.

Section 8(a)(3) provides that it is an unfair labor practice for an employer to discriminate in regard to any term or condition of employment in order to encourage or discourage membership in any labor organization. Thus, if an employer bestows such a benefit on employees in order to dissuade them from supporting a union, it thereby violates Section 8(a)(3) of the Act. *Yoshi's Japanese Restaurant*, 330 NLRB 1339, 1345 (2000) (re-institution of $20 shift bonus constituted 8(a)(3) violation where it was result of unlawful solicitation of grievances).

As noted, the Employer's "reimbursement" to employees of previously deducted and remitted Union dues was an unprecedented bonus payment of, generally, several hundred dollars. Whether the Employer violated Section 8(a)(3) and (1) of the Act by making the payments turns on proof of the Employer's motivation. Under the causation test set forth in *Wright Line*,[14] the General Counsel bears the initial burden of showing that the grant of benefits were motivated, at least in part, by anti-union considerations. The General Counsel typically meets this burden by showing that employees were engaged in union activity, that the employer was aware of the activity, and that the employer harbored animosity towards the Union or union activity. *State Plaza Hotel*, 347 NLRB No. 70, slip op. at 13 (2006). Once this showing has been made, the burden shifts to the employer to demonstrate that the same action would have taken place even in

---

[14] *Wright Line*, 251 NLRB 1083 (1980), *enfd.* 662 F.2d 899 (1st Cir. 1981), *cert. denied* 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399-403 (1983). *See also Manno Electric*, 321 NLRB 278, 280 fn. 12 (1996).

43

the absence of the protected conduct. *Id.*; *Clock Electric, Inc.*, 338 NLRB 806 (2003).

In the present case, the record leaves no doubt that the Employer was well aware of the Union activities of its employees before it instituted the bonuses. Likewise, the record is replete with evidence of the Employer's animus toward those activities. Further, the timing of the reimbursement---on the heels of the Employer's cessation of Fund contributions and denial of Union access and coincident with the Union's conduct of a strike vote---constitutes strong evidence that the Employer's motivation was to discourage Union activity. Because the General Counsel's initial *Wright Line* burden has clearly been met, the Employer is required to show that it would have made the bonus payments even in the absence of employees' union activities. However, the Employer has provided no argument or evidence in support of that defense. Indeed, the evidence is to the contrary. Accordingly, the evidence establishes reasonable cause to believe that the Employer violated Section 8(a)(3) and (1) of the Act when it reimbursed employees for their Union dues.[15]

---

[15] Alternatively, the Board has also found that an employer's grant of benefits in order to dissuade employees from supporting a union is an independent violation of Section 8(a)(1) of the Act. *Acme Bus Corp.*, 320 NLRB 458 (1995) (finding employer's introduction of a new wage and benefits package unlawful, even though the employer had a practice of implementing wage increases at the same time in prior years, because the cover letter announcing the implementation essentially admitted that employer's motive was to influence employees to abandon their support for the union); *Capitol EMI Music*, 311 NLRB 997, 1012 (1993) (finding that an employer's grant of wage and benefits increases shortly after the onset of union activity is evidence of unlawful motivation). An employer may successfully defend against such an allegation that it unlawfully granted benefits by demonstrating that its bestowal of such a benefit was consistent with established past practice or that the grant of the benefits was planned before the onset

The Employer's reimbursement of the deducted and remitted Union dues also constitutes an unlawful unilateral change in a mandatory subject of bargaining. Under Section 8(a)(5) of the Act, an employer must notify and bargain with its employees' collective-bargaining representative before imposing changes in employee wages, hours, and other terms and conditions of employment. *North American Pipe Corp.*, 347 NLRB No. 78, slip op. at 1 (2006). Offerings of monetary amounts are considered wages, rather than gifts, if they are related to remuneration which employees receive for their work. *Id.* Such a relationship is found to exist where the compensation is tied to various employment-related factors, including work performance, wages, regularity of payment, hours worked, seniority, and production. *Id.*, *Benchmark Indus.*, 270 NLRB 22, fn. 5 (1984), *affd. sub nom. Amalgamated Clothing v. NLRB*, 720 F.2d 267 (5th Cir. 1985). Here, the Employer characterized the subject payments as reimbursements of Union dues that had been deducted from employees' pay over the preceding twelve-month period and remitted to the Union. Because Union dues are only paid during periods when employees are employed, the amount paid to each employee was tied to the employee's tenure. Further, because Union dues are calculated as

---

of union activity. *Acme Bus Corp.*, 320 NLRB at 476; *Capitol EMI Music*, 311 NLRB at 1012. As described above, the timing of the "reimbursement"/bonus compels the conclusion that the Employer's motive was to discourage employee support for the Union. Moreover, the Employer has not previously made similar payments to its employees and there is no evidence that the Employer planned to take such an action prior to the uptick in Union activity during the fall of 2007. Therefore, there is reasonable cause to conclude that the Employer violated Section 8(a)(1) of the Act by making these unprecedented payments to its employees.

a percentage of earnings, the amount the Employer paid to each employee was also tied to the employee's earnings. These factors distinguish the Employer's payments to the employees from a gift under applicable Board law. *Freedom WLNE-TV, Inc.*, 278 NLRB 1293, 1297 (1986); *Benchmark Indus., supra*. Because the Employer payments to employees amounted to earnings-related bonuses, they constituted wages. Further, inasmuch as the Employer did not notify the Union of the "reimbursement" or bargain with the Union over the issue, there is reasonable cause to believe that the Employer's reimbursement also constituted an unlawful unilateral change, in violation of Section 8(a)(5) and (1) of the Act. *NLRB v. Katz*, 369 U.S. 736 (1962).

### 6. The Employer Violated Section 8(a)(1) by Soliciting Employees to Sign a Contract Renouncing Their Union Membership.

Section 8(a)(1) of the Act prohibits employers from interfering with, restraining, or coercing employees in the exercise of their Section 7 rights, including the right to join a union. Although employers may give employees information on how to resign from a union, they violate Section 8(a)(1) if they "attempt to ascertain whether employees will avail themselves of this right [] or offer [] any assistance, or otherwise create[ ] a situation where employees would tend to feel peril in refraining from such revocation." *Grondorf, Field, Black & Co. v. NLRB*, 107 F3d 883, 886 (D.C. Cir. 1997).

Yellow dog contracts are contracts of employment that prohibit employees from joining labor organizations or that

condition employment on refraining from union activity. *First Legal Support Services LLC*, 342 NLRB 350, 362 (2004); *Eddyleon Chocolate Co., Inc.*, 301 NLRB 887 (1991); *Don Brentner Trucking Co.*, 232 NLRB 428, 434 (1977). Such contracts are a *de facto* violation of the Section 8(a)(1) of the Act, as they interfere with employees' exercise of their statutory rights. *First Legal Support Services LLC*, 342 NLRB at 362; *Eddyleon Chocolate Co., Inc.*, 301 NLRB at 887.

In early February 2008, a man named Joseph[16] distributed yellow dog contracts to employees in the Activities Department. The evidence demonstrates that Joseph was acting as an agent of the Employer for the purpose of distributing the agreements: Employer supervisor Director of Activities Volinsky told employee Seebaram that a meeting was to be held by Joseph in five minutes, during working hours, in the room where Seebaram and Volinksy were speaking. Volinsky's statement to Seebaram thereby constitutes "a manifestation by the principal to a third party that creates a reasonable basis for that party to believe that the principal has authorized the alleged agent to perform the act[] in question." *Engineered Steel Concepts*, 352 NLRB No. 73, slip op. at 12 (2008), *quoting Zimmerman Plumbing Co.*, 325 NLRB 106 (1997), *enfd. mem. in pertinent part* 188 F.3d 508 (6th Cir. 1999). This conclusion---that Volinsky designated Joseph for the purpose of distributing and discussing the yellow dog contracts---is also supported by the contemporaneous February 7, 2008 party-

---

[16] As stated above in footnote 7, this individual is Joseph Hubacek.

admission (under Fed. R. Evid. 801(d)(2)) by Director of Housekeeping Szereszewski that employees should speak with Jozef Hubacek about a contract Sieger had created for employees to sign. *See Community Cash Stores, Inc.*, 238 NLRB 265, 266 (1978) (finding that an employee had apparent authority to act on behalf of the employer, where his solicitations to repudiate the Union were adopted and supported by the employer's supervisors).

Other evidence also strongly suggests that the Employer was soliciting employees to sign yellow-dog contracts. For example, Administrator Korzeb and Housekeeping Director Szereszewski told employee Orlos that they would admit him to the meeting room if he wished to "leave the Union." Further, when Szereszewski asked Orlos, "Isn't it nice to have a bigger salary," Szereszewski also mentioned the name of another unit employee who might be signing a contract with the Employer.

Based on the foregoing, there is reasonable cause to believe that the Employer violated Section 8(a)(1) of the Act by soliciting employees to sign yellow dog contracts.

### 7. The Employer Violated Section 8(a)(1) by Threatening to Discharge Employees if They Went on Strike.

Employer statements to employees are protected by Section 8(c) of the Act only if those statements accurately reflect the law and are made without threats of reprisal or promises of benefits. *Lee Lumber and Building Material Corp.*, 306 NLRB 408, 409 (1992); *Eagle Comtronics*, 263 NLRB 515 (1982). Therefore, when an employer speaks to employees about reinstatement, the

employer need not give a complete recitation of employees' rights, but must be accurate in its statements. *See Pennant Foods Co.*, 347 NLRB No. 41 (2006); *Eagle Comtronics*, 263 NLRB 515.

During the meeting with Activities Department employees, Joseph told the group, "If you guys go on strike, you're not coming back." As established in the foregoing section, Joseph was acting as the Employer's agent during this meeting and his statements during the meeting are therefore attributable to the Employer. The Board has found that similar statements constitute unlawful threats of discharge for engaging in concerted, protected activity rather than protected expressions of opinion or statements of the law. *Central Valley Meat*, 346 NLRB 1078, 1079 (2006); *Gino Morena*, 287 NLRB 1327 (1988) (finding unlawful an employer's statement to employees that if they struck they would probably lose their jobs). Consequently, there is reasonable cause to believe that the Employer violated Section 8(a)(1) of the Act by threatening employees with discharge if they struck.[17]

> **8. The Employer Violated Section 8(a)(1) and (5) by Bypassing the Union and Dealing Directly with Employees.**

The Act requires an employer to meet and bargain exclusively with the bargaining representatives of its employees, and an employer who deals directly with its unionized employees

---

[17] The Employer recently has been found by the Board to have violated the Act in similar fashion. *Kingsbridge Heights Rehabilitation Care Center*, 352 NLRB No. 5, slip op. at 12 (statement to employees that if they struck for three days they would be out of work for three weeks violated Section 8(a)(1) of the Act).

regarding terms and conditions of employment violates Section 8(a)(5) and (1) of the Act. *Regency House of Wallingford, Inc.*, 347 NLRB No. 15, slip op. at 24 (2006). The elements of a direct dealing violation are: (1) the employer was communicating directly with union-represented employees; (2) the discussion was for the purpose of establishing or changing wages, hours, and terms and conditions of employment or undercutting the union's role in bargaining; and (3) such communication was made to the exclusion of the union. *Permanente Medical Group*, 332 NLRB 1143, 1144 (2000); *Southern California Gas*, 316 NLRB 979 (1995).

All three elements are clearly satisfied in this case. The unrebutted evidence establishes that the Employer, through Joseph, met with employees in early February 2008 and offered those workers a contract that contained significant provisions concerning several terms and conditions of employment, including wages, health benefits, holidays, and sick leave. Thus, the Employer was communicating directly with employees regarding the establishment and change of terms and conditions of employment. No Union representatives were present at this meeting, and the Union was not notified of the meeting.

The evidence also strongly suggests that the meeting was designed to undercut the Union's role in bargaining. Thus, the meeting took place as the Employer and the Union were exchanging correspondence regarding the final terms of a collective-bargaining agreement. Even more revealing, the contracts explicitly derogated the Union's bargaining role by requiring employees to resign their Union membership.

Based on the foregoing, the evidence establishes reasonable cause to believe that the Employer's actions constitute direct dealing with employees, in violation of Section 8(a)(5) and (1) of the Act.

### 9. The Employer Violated Section 8(a)(1) and (5) of the Act by Refusing to Meet with the Union for the Purpose of Collective Bargaining

It is a violation of Section 8(a)(1) and (5) of the Act for an employer to refuse to bargain collectively with the representatives of its employees. *Mountain Valley Care and Rehabilitation Center*, 346 NLRB 281 (2006). Section 8(d) defines the obligation to bargain collectively as the "mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." Section 8(d)(4)(C) further provides that "the parties shall participate fully and promptly in such meetings [with the Federal Mediation and Conciliation Service] as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute."

Here, between February 18 and April 3, 2008, the Federal Mediation and Conciliation Service ("FMCS") made five requests to meet with the parties for the purpose of mediation. The Union, by letters dated March 20 and March 26, 2008, asked the Employer to meet with the Union and the FMCS commissioner. In addition, since April 11, 2008, the New York State Employment Relations Board ("NYSERB") has made three requests to meet with the

parties; the Employer simply failed to provide any dates on which it would be available.    In its sole response to the Union, by letter dated March 25, 2008, the Employer wrote that it was unwilling to meet with the Union unless the Union rescinded its position that an agreement had already been reached, thereby impermissibly conditioning further bargaining on the Union's rescission of its position.    As a consequence, since February 18, 2008, the Employer has failed to meet with either the Union or any federal or state representative.

Based on the above, there is reasonable cause to believe that the Employer violated Section 8(a)(1) and (5) of the Act by refusing to meet with the Union for the purpose of collective bargaining.

### 10. The Employer's Unlawful Failure to Make Payments into the Funds Caused an Unfair Labor Practice Strike.

In early October 2007, the Funds informed the Employer's employees that their health benefits could be terminated in 30 days due to the Employer's failure to make payments to the Funds. Thereafter, the employees began suggesting to the Union that they should respond by striking.    Within two weeks of the Funds' announcement to employees, the Union distributed flyers to employees calling for a strike vote.    The flyers emphasized the Employer's failure to make Funds payments.    In addition, at the time that the strike vote ballots were distributed, employees were asked if they had received notification of the possible termination of benefits.    While some Union literature also

indicated that the employees and the Union desired to pressure the Employer to sign a collective-bargaining agreement, this issue was not the motivating factor behind the strike, as by that time the employees had been without a successor contract for nearly two and one half years. On November 5, 2007, shortly after the employees voted on whether to authorize a strike, the benefit fund terminated the employees' health insurance coverage. The Union provided the Employer with the requisite strike 8(g) notice on January 21, 2008. The strike commenced on February 20, 2008.

"Board law is firmly established that a strike is an unfair labor practice strike if the employer's unfair labor practice had anything to do with causing the strike." *Domsey Trading Corp.*, 310 NLRB 777, 791 (1993); *see also Colonial Haven Nursing Home, Inc.*, 218 NLRB 1007 (1975) (a strike motivated by both economic concerns and unfair labor practices is an unfair labor practice strike). Based on the foregoing, there is reasonable cause to believe that, from its inception, the employees' strike constituted an unfair labor practice strike.[18]

---

[18] The evidentiary record suggests that the Employer's failure and refusal to meet with Union in the presence of mediators, operated to prolong the unfair labor practice strike. See *C-Line Express*, 292 NLRB 638 (1989) ("Certain types of unfair labor practices by their nature will have a reasonable tendency to prolong the strike and therefore afford a sufficient and independent basis for finding conversion. The most notable examples typically involve an unlawful withdrawal of recognition, which may be accompanied by a course of other unlawful conduct including withdrawal of contract proposals, [and] refusals to meet and bargain").

## B. The "Just and Proper" Analysis

In the Second Circuit, "injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 368 (2d Cir. 2001), *citing Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir. 1980), *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1062 (2d Cir. 1995), and *McLeod v. General Elec. Co.*, 366 F.2d 847, 850 (2d Cir. 1966), *vacated as moot*, 385 U.S. 533 (1967). Courts should grant interim relief under § 10(j) "in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress has sought to protect." *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980), *quoting Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 39-40 (2d Cir. 1975).

"One of the underlying purposes of § 10(j) is to protect the status quo in order to protect employees' statutory collective bargaining rights." *Inn Credible Caterers*, 247 F.3d at 368. The Employer's status as a recidivist---Respondent is already subject to Board orders requiring it to abide by the 2002-2005 agreement and to cease engaging in surveillance and threatening its employees---together with its demonstrated propensity to violate the Act make interim relief necessary and appropriate. *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 374 (11th Cir. 1992) ("This history of management resistance…makes future labor violations and its attendant impact likely"). Further, preliminary injunctive relief is necessary to prevent

the Employer from irreversibly undermining the Union's status and effectiveness as the employees' collective bargaining representative.

The facts here, as recited above, demonstrate that the Employer has engaged in an extended effort to frustrate the Union's fulfillment of its duties as collective bargaining representative of the bargaining unit employees. Following the expiration of the 2002-2005 collective-bargaining agreement, the Employer ceased making benefit fund contributions. Although the Employer resumed its fund contributions after the Board instituted unfair labor practice proceedings regarding this unilateral change, almost immediately after settling the unfair labor practice case the Employer again stopped making fund contributions. In June and August 2007, the Employer refused to respond to the Union's written requests for presumptively relevant information. Soon thereafter, the Employer ceased permitting the Union access to bargaining unit employees. Then, although warned by the Funds that failure to make any arrangements to address its delinquencies would result in the suspension of benefits, the Employer failed and refused to address the matter in any way, thereby causing the employees to lose their health insurance. The Employer thereafter engaged in repeated instances of videotaping employees engaged in Union activities. When the Union announced the employees' intent to strike, the Employer began to bypass the Union and negotiate individual contracts with employees. Among other provisions, those agreements included unlawful requirements that employees

surrender their core Section 7 rights.  In response to these "yellow-dog" contracts, at least twelve unit employees resigned their membership in the Union.  Finally, the Employer has refused to meet with the Union.

Courts in this Circuit and elsewhere have recognized the irreparable injury caused to the collective bargaining process when an employer refuses to deal with its employees' collective bargaining representative.  *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001) ("the longer that the Union is kept out of the store and from working on behalf of [the employer]'s employees, the less likely it is to be able to organize and represent those employees effectively if and when the Board order the company to commence bargaining"); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) ("As time passes, the benefits of unionization are lost and the spark to organize is extinguished.  The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable.  That loss, combined with likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process").  Without an injunction, the Board's ability to foster peaceful labor negotiations through normal procedures would be imperiled"); *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 454 (1st Cir. 1990); *International Union of Electrical Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970), cert. denied 400 U.S. 950 (1970) ("Employee interest in a union can wane quickly as working conditions remain apparently

unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees"); *Mattina v. Chinatown Carting Corp.*, 290 F.Supp.2d 386, 394 (S.D.N.Y. 2003) ("As other courts in this Circuit have noted, employee support for a union is likely to erode the longer it remains absent from the collective bargaining process").

Absent an interim bargaining order under Section 10(j), employee support will predictably erode as the Union is unable to adequately protect the employees or affect their working conditions through collective bargaining during the period that the case is pending before the Board. *See Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26-27 (1st Cir. 1986) ("[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining"), *quoting I.U.O.E. v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243, 1249 (D.C. Cir.), *cert. denied* 400 U.S. 950 (1970). By the time the Board issues its final order directing the Employer to bargain with the Union, it will be too late to preserve employee choice and for the Union to regain its lost support. *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001) (the longer a union "is kept…from working on behalf of…employees, the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining"). The employees predictably will shun the Union because their working conditions

have been unaffected by collective bargaining for several years, and they will have little, if any, reason to support the Union. See *I.U.O.E. v. NLRB*, 426 F.2d at 1249 ("[w]hen the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees"). Further, employee support is necessary for the Union to enter into meaningful negotiations after a final Board order issues. *Cf., e.g., Moore-Duncan v. Horizon House Developmental Services*, 155 F.Supp.2d 390, 396-397 (E.D. Pa. 2001). Lastly, an interim bargaining order will ensure that the employees will not be deprived of the benefits of Union representation pending a Board order, a loss that cannot be remedied. *See, e.g. Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 667 (9th Cir. 2001) *quoting Levine v. C & W Mining Co.*, 465 F. Supp. 690, 694 (N.D. Ohio 1979), *affd. in relevant part* 610 F.2d 432, 436-7 (6th Cir. 1979); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 299.

Interim rescission of the Employer's unilateral changes, upon the Union's request, is necessary to allow the parties effectively to engage in good faith collective bargaining while the unfair labor practice case is pending before the Board. *See Silverman v. Major League Baseball Player Relations Committee, Inc.*, 880 F. Supp. 246, 259 (S.D.N.Y.), *affd.* 67 F.3d 1054 (2d Cir. 1995) (interim rescission of unilateral change appropriate to "salvage some of the important bargaining equality that existed" prior to violations); *accord Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980). Unilateral

changes strike at the heart of a union's ability to represent employees by allowing an employer to enjoy the fruits of its unlawful conduct and gain an undue bargaining advantage. *See NLRB. v. Katz*, 369 U.S. 736, 747 (1962) ("Unilateral action by an employer … must of necessity obstruct bargaining, contrary to the congressional policy"); *Little Rock Downtowner, Inc.*, 168 NLRB 107, 108 (1967), *enfd.* 414 F.2d 1084 (8th Cir. 1969).; *Herman Sausage Co., Inc.*, 122 NLRB 168, 172 (1958), *enfd.* 275 F.2d 229 (5th Cir. 1960). Further, absent rescission of the unlawful changes, the Employer can use restoration of the proper status quo working conditions as "bargaining bait" to force acceptance of its other bargaining proposals. *See Florida-Texas Freight, Inc.*, 203 NLRB 509, 510 (1973), *enfd.* 489 F.2d 1275 (6th Cir. 1974); *accord Southwest Forest Industries, Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988) (restoration of status quo ensures "meaningful bargaining").

In particular, the Employer's cessation of Funds contributions and the resultant loss of employee health insurance produces irreparable harm, the most extreme example of which is demonstrated by the death of employee Audrey Smith-Campbell. *United Steelworkers of America v. Ft. Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979) (affirming a preliminary injunction prohibiting an employer from ceasing hospitalization and medical insurance premiums because "the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury'"); *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979)

(in suit by union trustees against employer trustees to force fund to continue benefits to striking employees pending adjudication of arbitration, court affirmed that "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury"); *see LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 55-59 (2d Cir. 2004)(accepting proof of irreparable harm by affidavits from six unnamed plaintiffs in certified class, but indicating that proof of representativeness could be required); *International Assn. of Machinists & Aerospace Workers v. Trans World Airlines, Inc.*, 601 F.Supp. 1363, 1371-72 (W.D. Mo. 1985). Ms. Smith-Campbell's death unmistakably shows that a final Board order reimbursing employees for their medical expenses is wholly inadequate here, where employees and their families are forced to limit or curtail their medical treatments because they cannot afford them.

Reversal of the Employer's unlawful change in Union access and refusals to provide information is just and proper because such rescission is necessary to protect the Union's ability to represent bargaining unit employees. First, restoring the Union's right of access to the Employer's facility will revitalize the Union's ability to communicate with and represent the bargaining unit. *See Sheeran v. American Commercial Lines*, 673 F.2d 970, 980 (6th Cir. 1982) (enjoining employer's denial of historical union agent access to river vessels to investigate and process grievances); *Kobell v. Beverly Health and Rehabilitation Services., Inc.*, 987 F. Supp. 409, 416 (W.D. Pa. 1997) (enjoining

employer's rescission of union's historical right to bulletin boards on employer property), *affd.* 142 F.3d 428 (3d Cir. 1998); *Lineback v. Printpack*, Inc., 979 F. Supp. 831, 846-847, 852 (S.D. Ind. 1991) (enjoining denial of access to employer facility to union officer consistent with past practice). Second, providing the Union the requested relevant information will further enable the Union to fully and intelligently represent the unit employees. *See, e.g. Pascarell v. Gitano Group, Inc.*, 730 F.Supp. 616, 625 (D. N.J. 1990); *Squillacote v. Generac Corp.*, 304 F.Supp. 435, 440 (E.D. Wis. 1969); *Hoban v. Connecticut Foundry Co.*, 62 LRRM 2139, 2141 (D. Conn. 1966).

Requiring the Employer to rescind the unlawful yellow dog contracts is just and proper because those agreements not only bypass the collective bargaining representative, but also lead to loss of support for the Union, as demonstrated by the resignations required by the yellow-dog contracts. *Cf. Morio v. North American Soccer League*, 501 F.Supp 633, 640 (S.D.N.Y. 1980) (ordering interim rescission of certain provisions of individual employment contracts because "to continue to enforce them is to bypass and to undermine support for the union"), *enfd. per curiam* 632 F.2d. 217, 218 (2d Cir. 1980).

Ordering the Employer to offer striking employees interim reinstatement upon their unconditional application to return to work is necessary if the Union and bargaining unit employees are to realize the benefits of collective bargaining. Reinstatement upon unconditional application is the traditional Board remedy relief where employees have engaged in an unfair labor practice

strike,[19] *D'Armigene Inc.*, 148 NLRB 2, 4 (1964), *enfd. in rel. part* 353 F.2d 406 (2d Cir. 1965); *Beaird Industries*, 311 NLRB 768, 770 (1993), and such reinstatement   restores the Union's most active supporters, thereby ensuring that the Union can effectively represent the unit employees. *See, e.g., Pascarell v. Orit Corp/Sea Jet Trucking*, 705 F.Supp. 200, 204 (D.N.J.), *affd.* 866 F.2d 1412 (3rd Cir. 1988) (table) ("This Court agrees with petitioner's contentions that if these Union supporters are excluded from the bargaining process pending resolution of unfair labor practice charges before the NLRB, many of the supporters will lose confidence in the Union's ability to come to their aid…[and] absent injunctive relief, by the time the Board renders its decision, several employees may be forced to accept employment elsewhere and will therefore be unable or unwilling to return to their former jobs should reinstatement be ordered"); *Silverman v. Imperia Foods, Inc.*, 696 F.Supp. 393, 400 (S.D.N.Y. 1986) ("With each passing day, the integrity of the bargaining unit erodes, and may result in the frustration of the Act even in the event that the Board finally rules in the Union's favor"); .

Finally, a cease and desist order regarding the alleged threat and surveillance also is just and proper to prevent the Employer from further undermining the Union and continuing its pattern of coercive conduct against the employees. *See Blyer v. P & W Elec., Inc.*, 141 F.Supp.2d 326, 330 (E.D.N.Y. 2001).

---

[19] Such an order may require displacing any replacement workers. *See., e.g., Silverman v. Reinauer Transportation*, 130 LRRM 2505, 2509, 1988 WL 159172, at *5 (S.D.N.Y. 1988), *affd. mem.* 880 F.2d 1319 (2d Cir. 1989).

## V. REQUESTED RELIEF

For all of the foregoing reasons, the Region is of the view that Section 10(j) injunctive relief is warranted herein to restore and maintain the status quo ante and to prevent irreparable injury to employees' statutory rights and to the remedial purposes of the Act.

The Region therefore requests authorization to seek an order, pending the Board's final adjudication of the underlying charge, requiring the Employer to cease and desist from (1) giving effect to the individual employment agreements between the Employer and bargaining unit employees; (2) granting employees benefits in order to discourage employees from membership in the Union or from engaging in protected, concerted activities; (3) granting employees benefits without giving the Union notice and an opportunity to bargain regarding those benefits; (4) bypassing the Union and dealing directly with bargaining unit employees regarding their terms and conditions of employment; (5) threatening employees with discharge if they engage in a strike; (6) soliciting employees to resign their Union membership and to promise not to join any labor organization as a condition of employment; (7) videotaping and/or photographing employees engaged in picketing, striking, meeting with Union representatives, or other concerted, protected activities; (8) failing and refusing to meet and bargain in good faith with the Union as the exclusive collective bargaining representative of all employees in the bargaining unit as defined

63

in the expired collective bargaining agreement; (9) failing and refusing to provide the Union with relevant, requested information; (10) making unilateral changes in employees' terms and conditions of employment, including but not limited to ceasing to make benefit fund contributions on behalf of employees, without giving the Union notice and an opportunity to bargain regarding such terms and conditions of employment; and (11) in any like or related manner interfering with, restraining, or coercing its employees in the exercise of their Section 7 rights.

The Region would also seek an order directing and ordering the Employer to (1) provide the Union with the information it requested by letters dated June 13 and August 3, 2007; (2) treat the striking unit employees as unfair labor practice strikers and, upon their unconditional offer to return to work, reinstate them to their former positions, without prejudice to their seniority or other rights and privileges previously enjoyed, displacing, if necessary, any employees hired, transferred, or reassigned to replace them; (3) rescind, on an interim basis, any yellow-dog contract that it entered into with a unit employee; (4) upon request, bargain in good faith with the Union as the exclusive collective bargaining representative of all employees in the bargaining unit as defined in the expired collective bargaining agreement; (5) upon request and notice by the Union of at least 48 hours, permit the Union access to the Employer's facility for the purpose of meeting with employees; (6) upon request of the Union, rescind any changes in employees' terms and

64

conditions of employment as set forth in the parties' expired collective-bargaining agreement, including but not limited to, resuming making benefit fund contributions on behalf of employees, upon their unconditional offer to return to work; (7) post copies of the District Court's opinion and order, in both English and Spanish, at the Employers' facility where notices to employees are customarily posted; and (8) within twenty (20) days of issuance of this decree, file with the District Court, with a copy served to the Regional Director, Region 2, a sworn affidavit from a responsible official setting forth with specificity the manner in which the Employer is complying with the terms of the decree.

## VI.    CONCLUSION AND REMEDY

Based on the foregoing, Petitioner contends both that there is reasonable cause to believe that Respondent has violated the Act and that interim injunctive relief is just and proper. Petitioner therefore seeks an order enjoining Respondent from:

(1) Giving effect to the individual employment agreements between the Employer and bargaining unit employees;

(2) Granting employees benefits in order to discourage employees from membership in the Union or from engaging in protected, concerted activities

(3) Granting employees benefits without giving the Union notice and an opportunity to bargain regarding those benefits

(4) Bypassing the Union and dealing directly with bargaining unit employees regarding their terms and conditions of employment;

(5) Threatening employees with discharge if they engage in a strike;

(6) Soliciting employees to resign their Union membership and to promise not to join any labor organization as a condition of employment;

(7) Videotaping and/or photographing employees engaged in picketing, striking, meeting with Union representatives, or other concerted, protected activities;

(8) Failing and refusing to meet and bargain in good faith with the Union as the exclusive collective bargaining representative of all employees in the bargaining unit as defined in the expired collective bargaining agreement;

(9) Failing and refusing to provide the Union with relevant, requested information;

(10) Making unilateral changes in employees' terms and conditions of employment, including but not limited to ceasing to make benefit fund contributions on behalf of employees, without giving the Union notice and an opportunity to bargain regarding such terms and conditions of employment; and

(11) In any like or related manner interfering with, restraining, or coercing its employees in the exercise of their Section 7 rights.

Petitioner further requests an affirmative order requiring

Respondent, pending final Board adjudication, to, within five (5)

days of the issuance of the Court's Order:

(1) Provide the Union with the information it requested by letters dated June 13 and August 3, 2007;

(2) Treat the striking unit employees as unfair labor practice strikers and, upon their unconditional offer to return to work, reinstate them to their former positions, without prejudice to their seniority or other rights and privileges previously enjoyed, displacing, if necessary, any employees hired, transferred, or reassigned to replace them;

(3) Rescind, on an interim basis, any yellow-dog contract that it entered into with a unit employee;

(4) Upon request, bargain in good faith with the Union as the exclusive collective bargaining representative of all employees in the bargaining unit as defined in the expired collective bargaining agreement;

(5) Upon request and notice by the Union of at least 48 hours, permit the Union access to the Employer's facility for the purpose of meeting with employees;

(6) Upon request of the Union, rescind any changes in employees' terms and conditions of employment as set forth in the parties' collective-bargaining agreement, including but not limited to, resuming making benefit fund contributions on behalf of employees, upon their unconditional offer to return to work;

(7)    Post copies of the District Court's opinion and order, in both English and Spanish, at the Employers' facility where notices to employees are customarily posted; and

(8)    Within twenty (20) days of issuance of this decree, file with the District Court, with a copy served to the Regional Director, Region 2, a sworn affidavit from a responsible official setting forth with specificity the manner in which the Employer is complying with the terms of the decree.

Dated at New York, New York
July 23, 2008

Jamie Rucker (JCR 6767)
Counsel for Petitioner
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, New York 10278-0104
(212) 264-0300

Ronald Meisburg, General Counsel
Barry J. Kearney, Associate General Counsel
Ellen A. Farrell, Deputy Associate General Counsel
Judith I. Katz, Assistant General Counsel
Karen P. Fernbach, Regional Attorney, Region 2
Donald B. Zavelo, Deputy Regional Attorney, Region 2