UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
CELESTE J. MATTINA, Regional Director,  :
Region 2, National Labor Relations      :
Board, for and on Behalf of the         :    08 Civ. 6550 (DLC)
NATIONAL LABOR RELATIONS BOARD,         :
                                        :    OPINION AND ORDER
                         Petitioner,    :
                                        :
               -v-                      :
                                        :
KINGSBRIDGE HEIGHTS REHABILITATION AND  :
CARE CENTER,                            :
                         Respondent.    :
                                        :
----------------------------------------X

Appearances:

For Petitioner Celeste J. Mattina:
James C. Rucker
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, NY 10278-0104

For Respondent Kingsbridge Heights Rehabilitation and Care
Center:
John T. McCann
Lindsey H. Hazelton
Michael Joseph Sciotti
Hancock & Estabrook, LLP
1500 AXA Tower I
100 Madison Street
Syracuse, NY 13202

DENISE COTE, District Judge:

     On July 23, 2008, petitioner Celeste J. Mattina, Regional

Director, Region 2, National Labor Relations Board (the

"Regional Director"), instituted this action against respondent

Kingsbridge Heights Rehabilitation and Care Center

("Kingsbridge"), pursuant to Section 10(j) of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. § 160(j). The Regional Director seeks an injunction pending the final disposition of proceedings before the National Labor Relations Board (the "Board" or the "NLRB") against Kingsbridge in which it is alleged that Kingsbridge has engaged in, and is engaging in, unfair labor practices in violation of the Act.

As described in the affidavit of service and at the initial conference held on July 24 at 4:00 p.m., personal service of the petition and accompanying submissions was effected on July 23 at 5:30 p.m.  Helen Sieger ("Sieger"), Kingsbridge's sole owner and Facility Operator, was present at the time of service, and directed that the papers be given to a Kingsbridge employee at the facility.  Notice of the initial conference was provided to Sieger via e-mail at 11:15 a.m. on July 24; notice was also provided to Paul Sod and Ernest Collazo, attorneys who had represented Sieger in a related action.  No one appeared on behalf of Kingsbridge at the initial conference.

Counsel for Kingsbridge filed a notice of appearance on July 30 and requested an extension of time to file opposition papers, which was granted.  Opposition was filed on August 6, and petitioner replied on August 8.  A hearing was held on

August 12, at which Sieger was the sole witness.[1]  For the following reasons, the petition is granted, and an injunction shall issue.

BACKGROUND

The following facts are undisputed, unless otherwise noted. Kingsbridge, a New York corporation, is a 400-bed nursing home located at 3400-26 Canon Place, in the Bronx.  As noted, it is wholly owned by Sieger.  1199/SEIU, United Healthcare Workers East ("1199" or the "Union"), represents approximately 250 to 300 full- and part-time workers employed by Kingsbridge, including, inter alia, cooks, chefs, dishwashers, receptionists, clerks, dietary aids, recreation workers, social workers, maintenance staff, porters, and certified nursing aides (the "Employees").  The most recent collective bargaining agreement ("CBA") covering the Employees was entered into in 2002 by the Union and the Greater New York Health Care Facilities Association ("Greater New York"), a multi-employer association of which Kingsbridge had been a member (the "2002-2005 CBA"). The 2002-2005 CBA expired on April 30, 2005; it has not been renewed, and a superseding CBA has not been executed.  Since the expiration of the 2002-2005 CBA, numerous disputes have arisen between Kingsbridge and the Union -- several of which have been

---

[1] The parties were given an opportunity to call other witnesses, but both sides declined.

the subject of unfair labor practice litigation before the NLRB
-- culminating in a strike by the Union and the Employees that
commenced on February 20, 2008, and continues to the present
day.  Before proceeding to a discussion of the instant petition,
a review of this history, as well as a more detailed examination
of the recent allegations that form the basis for the underlying
NLRB action and this petition, is in order.

I.    History of Labor Relations Between Kingsbridge and 1199:
      2002 to Mid-2007

A.    The 2002-2005 CBA and Related Litigation

      As described in Resort Nursing Home & Kingsbridge Heights
Rehabilitation Care Center v. NLRB, 381 F.3d 1262 (D.C. Cir.
2004), enforcing 340 N.L.R.B. 650 (2003), Greater New York and
the Union were parties to a CBA that was to remain in effect
until September 30, 2002.  Id. at 1266.  Greater New York and
the Union began negotiations on a new contract in early January
2002, and conducted formal bargaining sessions on January 23 and
February 1, after which a renewed CBA was executed.[2]  Id.
Kingsbridge and Resort Nursing Homes ("Resort"),[3] however,
indicated on January 31, 2002, that they no long wished Greater
New York to negotiate on their behalf, and thereafter refused to

---

[2] This is the 2002-2005 CBA referred to above.

[3] As noted by the Court of Appeals, Resort and Kingsbridge,
"[a]lthough separate corporations . . . share common ownership
and control."  Resort Nursing Home, 381 F.3d at 1265

acknowledge that they were bound by the new CBA.  Id. at 1266-
67.  The Union subsequently filed an unfair labor practices
charge with the NLRB, which ruled that, under Retail Associates,
Inc., 120 N.L.R.B. 388 (1958), and Chel LaCort, 315 N.L.R.B.
1036 (1994), Kingsbridge and Resort were not permitted to
withdraw from multi-employer bargaining after the commencement
of negotiations "absent unusual circumstances," which the Board
found were not present in the case before it.  Resort Nursing
Home, 381 F.3d at 1265 (quoting Retail Associates, Inc., 120
N.L.R.B. at 395).  The Board further found that there was no
evidence of collusion between the Union and Greater New York
designed to prevent Kingsbridge and Resort from discovering that
negotiations had begun.  Id. at 1270.  The Board's order,
directing that Kingsbridge and Resort execute and abide by the
terms of the 2002-2005 CBA, was enforced by the United States
Court of Appeals for the District of Columbia on November 30,
2004.  Id. at 1272.

B.  Disputes Following the Expiration of the 2002-2005 CBA:
    May 2005 to Mid-2007

    As noted above, the 2002-2005 CBA expired on April 30,
2005, and has not since been renewed or superseded.  In the year
following the expiration of the CBA several unfair labor
practice disputes arose between the Union and Kingsbridge,
resulting in one arbitration and two NLRB proceedings.

First, as described in an opinion dated May 26, 2005, issued by Martin F. Scheinman, the Impartial Chairman appointed under Article 9 of the 2002-2005 CBA (the "2005 Arbitration Decision"), Kingsbridge and the Union had "for some time . . . been at odds over the issue of the Union's right to reasonable access to [Kingsbridge's facility] in order to perform its function as bargaining agent."  The Impartial Chairman's opinion established various "principles" for resolving (and avoiding) such disputes in the future, including (1) that the Union "must provide reasonable notice" to Kingsbridge administrators prior to visiting Kingsbridge's facility to meet with Employees, with 48 hours' notice being ordinarily sufficient; and (2) that Kingsbridge must cooperate with Union requests by giving notice to the Employees of the impending visit, and must provide a reasonable location for meetings between the Union and the Employees.

Second, a series of disputes arose between Kingsbridge and the Union related to Kingsbridge's obligations under Articles 23 through 28 of the 2002-2005 CBA to make contributions to various funds maintained by the Union, including the Benefit Fund (which provides healthcare coverage to the Employees), Pension Fund, Education Fund, Child Care Fund, Job Security Fund, and Worker Participation Fund (the "Funds").  These Articles required that contributions to the Funds be paid on the tenth day of the month

following the month in which the required contribution was

accrued.[4]  Article 29 of the CBA further defined, as a percentage

of gross payroll, the amount Kingsbridge was required to

contribute to each of the Funds.[5]

    As described in the two NLRB proceedings that arose out of

this aspect of the dispute -- an action in Region 2 that

resulted in a January 31, 2008 NLRB Order, <u>Kingsbridge Heights</u>

<u>Rehabilitation Care Center</u>, 352 N.L.R.B. No. 5, 2008 WL 310888

(Jan. 31, 2008), <u>enforced</u> No. 08-2025-AG (2d Cir. July 11,

2008),[6] and an action in Region 29 in which Administrative Law

Judge Steven Fish has recently issued a decision, <u>Kingsbridge</u>

<u>Heights Rehabilitation Care Center</u>, Case 29-CA-27502 (N.L.R.B.

July 30, 2008)[7] -- Kingsbridge ceased making timely contributions

---

[4] Thus, for example, the April 2003 contributions would have been due on May 10, 2003.

[5] Kingsbridge does not contest that the obligation to make payments to the Funds survived the expiration of the 2002-2005 CBA.

[6] The order of the Court of Appeals enforcing the NLRB's Order was entered by default.

[7] The parties' exceptions to ALJ Fish's decision are due to be filed with the Board on August 27, 2008.  In this action, however, both sides have relied upon the factual findings made in the decision.  Kingsbridge has asserted that the Regional Director "is bound to ALJ Fish['s] findings of fact for purposes of this proceeding," and the Regional Director has similarly asserted that the findings are "persuasive and relevant evidence" in these proceedings of which this Court should "take notice."  In light of this consensus, it is appropriate for this Court to consider the findings reached by ALJ Fish as undisputed facts for the purposes of this proceeding.  Of course, it may also be noted that those findings would be afforded significant

to the Funds in June 2005.  Kingsbridge Heights, Case 29-CA-27502, slip op. at 5.  As a result, on November 28, 2005, Kingsbridge was notified by the Benefit Fund that health coverage for the Employees would be terminated effective January 31, 2006, unless all arrearages were satisfied.  Id. at 6.  The Union also filed charges with the NLRB on December 6, 2005, alleging that this unilateral change in the terms and conditions of the Employees' employment was an unfair labor practice. (These charges would ultimately result in the Region 29 proceedings.[8])  Following the failure of limited negotiations between Kingsbridge and the Union,[9] health coverage for the Employees was terminated as scheduled on January 31, 2006.

---

deference by the Court of Appeals in any subsequent enforcement proceeding.  See generally Silverman v. J.R.L. Food Corp., 196 F.3d 334, 335-27 (2d Cir. 1999).  Finally, neither party contests the findings made in connection with the Board's January 31, 2008 Order, which will also be considered here to the extent they are relevant.

[8] The charge was filed in Region 2, but was transferred to Region 29 on March 28, 2006.  Kingsbridge Heights, Case 29-CA-27502, slip op. at 1 n.1.  The Regional Director reports that this transfer was initiated because the Union's charges also included similar allegations against "an affiliated medical facility located within Region 29's purview."  The identity of this "affiliated medical facility" is not apparent from this record.

[9]  As found by ALJ Fish,

Between November 28, 2005 and January 31, 2006, Joel Cohen[,] Respondent's attorney[,] had several phone conversations with Irwin Bluestein and Hanan Kolko, attorneys for the Union and the Funds, during which Cohen indicated that Respondent did not have the money to make a lump sum payment to satisfy its arrearages. Cohen asked to work out a payment schedule with the

In February 2006, the Employees took a strike vote, and a 3-day strike was approved by the Union's executive counsel, with the strike to take place on May 16-19. <u>Kingsbridge Heights</u>, 352 N.L.R.B. No. 5, 2008 WL 310888, at *3. The Union also planned to engage in informational picketing outside of Kingsbridge's facility on March 15 and May 15. <u>Id.</u>

On February 22, the parties held a meeting regarding this dispute that, as subsequently found by ALJ Fish, proceeded as follows:

> Present were Joel Cohen [attorney for Kingsbridge], Helen Sieger[,] an administrator of Respondent, plus an administrator of Resort Nursing Home, which was as noted in the prior Board decision, related to Respondent, and which was also in arrears to the Funds. Present for the Union was Jay Sackman, who is vice president of the Union and head of its nursing home division, Bluestein, and several other Union officials. Cohen began by stating that Respondent did not want health benefits to be cut off, and pointed out that while Respondent was slow in making payments, this had been a pattern for many, many years and benefits had never been cut off before. Sackman replied that it is true that in the past the Benefit Fund had never cut off benefits when there had been delinquencies, but the Funds are trying to tighten up, because of the financial constraints on the Funds, and "they were making an effort to collect money in a more timely fashion."

---

> Union, so that medical coverage could continue. Bluestein and Kolko replied that the Union was not interested in a payment schedule, and that Respondent must make up all the payments or benefits would be cut off.

<u>Kingsbridge Heights</u>, Case 29-CA-27502, slip op. at 6.

Cohen responded that "we can't possibly be the only health institutions who have relationships with 1199 who were delinquent in payments to the Funds." Sackman answered that the "Union is pushing to get people not to be as delinquent as in the past." Cohen asked if any other health care institutions had their benefits cut off. Sackman replied "No," and explained that the other institutions had a signed contract with the Union. Cohen inquired "What does that have to do with it"? Sackman explained, "We have no enforcement mechanism to make sure that you will be bound by contract to make payments to the benefit Funds. We can't take it to arbitration, because there is no agreement. We can't go, we can't bring it to Court, we need to have a signed contract." Cohen then offered to sign a[n] interim agreement on health benefits, with an arbitration clause that would obligate Respondent to continue making benefits contributions. This would meet the Union's criteria, in that it provides the Union with an enforcement mechanism, so that employee benefits will not be cut off.

Sackman responded that the Union is not willing to sign such an agreement. Cohen asked "Why not"? Sackman answered that "If the Union signs such an agreement, and health benefits continue, Respondent will not have an incentive to agree on an overall contract." Cohen then stated that the Union was using the health benefits issue and the cut off of benefits as leverage in order to reach an agreement. Sackman answered that Cohen could characterize it however he wants, but the Union will not enter into an interim agreement and wants to "reach agreement on a full contract."

The parties then discussed the two open issues in the contract at the time. They were who the arbitrator would be in the contract, and the Respondent's position that it did not want to continue to contribute to the Child Care Fund. Various proposals went back and forth, but no agreement was reached. Cohen reiterated Respondent's prior offer to sign an interim agreement, so that health benefits are not cut off. Sackman reiterated the Union's position, that it was not willing to do that. The meeting concluded with no agreements reached on any issues.

Kingsbridge Heights, Case 29-CA-27502, slip op. at 6-7.

Following the failure of these negotiations, Kingsbridge engaged in two courses of conduct in violation of the Act. First, during the March 15, 2006 informational picketing, two individuals made, at Kingsbridge's request, video recordings of the picketing activity.  During the proceedings that followed in Region 2,[10] ALJ Mindy E. Landow found that the security justifications for the video recording proffered by Sieger during her testimony -- including allegations of past Union misconduct and the need to preserve evidence of such misconduct -- were unsupported by probative evidence and, more generally, that Sieger "was neither a reliable nor wholly credible witness with regard to her descriptions of particular events." Kingsbridge Heights, 352 N.L.R.B. No. 5, 2008 WL 310888, at *10.

Second, during the week preceding the planned May 15, 2006 informational picketing and May 16-19 strike, the Employees were informed by Kingsbridge administrators that, if they went on the three-day strike, they would not be promptly reinstated, but would rather have to wait three weeks to return to work.  Id. at *6-7.  The administrators explained, and Sieger subsequently testified, that the reason for this delay was that the contracts that would be signed with the agencies who would provide

_____

[10] The Union charges underlying this action were filed on May 12 and September 25, 2006.

temporary workers during the strike would have minimum terms of
three weeks.  Id. at *7.  While ALJ Landow found this
explanation "compelling," she further found that it was not,
however, supported by the evidence.  Id. at *20.  Kingsbridge
offered no evidence, and Sieger's testimony did not establish,
that it had ever entered into a specific agreement with an
agency that would provide replacement workers, or that any such
agencies had ever proposed or required three-week terms of
employment.  Id.  ALJ Landow accordingly found that Kingsbridge
did not have a "sufficient business justification to assert its
right to delay the reinstatement of employees" after the
Employees' (anticipated) unconditional offer to return to work
following the strike,[11] and, in addition, that the administrators
had been "falsely communicating to employees that a delay in

---

[11] Because the NLRB General Counsel had "neither pled nor proven
the existence of unfair labor practices prior to the strike vote
taken in February 2006," ALJ Landow assumed for the purposes of
the proceeding that the planned May 16-19, 2006 strike would
have been an economic strike, and not an unfair labor practice
strike.  Kingsbridge Heights, 352 N.L.R.B. No. 5, 2008 WL
310888, at *19.  Thus, she applied the rule that "where an
employer fails to show that economic strikers have been
permanently replaced prior to their unconditional offer to
return to work, an economic striker is entitled to immediate
reinstatement, absent a demonstrated business justification."
Id. (citing Teledyne-Stillman, 298 N.L.R.B. 982, 985 (1990),
enforced 938 F.2d 627 (6th Cir. 1991)).

their reinstatement was a <u>fait accompli</u> based upon contractual arrangements which, at the time, failed to exist." <u>Id.</u>[12]

Meanwhile, on May 1, 2006, Region 29 of the Board issued a complaint (based on the Union's December 6, 2005 charge) alleging that Kingsbridge had violated the Act by failing or refusing to make timely or complete payments to the Funds. <u>Kingsbridge Heights</u>, Case 29-CA-27502, slip op. at 1. On May 15, however, with the Employees gathered to begin their planned picketing, Union officials announced that Kingsbridge had agreed to make its payments to the Funds, and the picketing and strike were canceled. On June 2, the Benefit Fund reinstated health coverage for the Employees, and the parties reached a settlement regarding the Region 29 complaint on June 8. <u>Id.</u> at 7-8. The settlement was memorialized in an agreement (the "Settlement Agreement")[13] in which Kingsbridge agreed to pay $186,059.28 to

---

[12] Based on these findings, on January 31, 2008 -- shortly before the current strike began -- the Board ordered Kingsbridge to "[c]ease and desist from . . . [e]ngaging in surveillance of its employees' union activities with video cameras, without proper justification," and from "[t]hreatening to delay the reinstatement of employees if they engage in a strike and make an unconditional offer to return to work." <u>Kingsbridge Heights</u>, 352 N.L.R.B. No. 5, 2008 WL 310888, at *23. As noted above, this Order was enforced by the United States Court of Appeals for the Second Circuit on July 11, 2008.

[13] A limited exception to the Settlement Agreement were payments for a three-month period -- February through April 2006 -- during which time Kingsbridge argued that the Union and the Funds had improperly terminated medical benefits. This issue was subsequently settled on June 26, 2006. <u>Kingsbridge Heights</u>, Case 29-CA-27502, slip op. at 7-8.

the Funds in three installments over 90 days, and further
promised, "[i]n addition to the contributions described above,"
to "make timely monthly contributions to the [Funds], as they
become due."  Accordingly, ALJ Fish issued an Order of June 26,
2006, dismissing the Region 29 complaint "subject to reopening
and reinstatement in the event that [Kingsbridge] fails to
comply with terms" of the Settlement Agreement.

II.  Recent Allegations: Mid-2007 to the Present

     The NLRB complaint underlying the instant action is
premised upon alleged violations of the Act commencing in June
2007 -- approximately one year after the Settlement Agreement
was executed -- and continuing to the present.  See Kingsbridge
Heights Rehabilitation & Care Center, Cases 2-CA-38418, -38708,
-38628 & -38688 (N.L.R.B. May 30, 2008 & amended July 15, 2008)
(the "Region 2 Complaint").[14]  Several of the violations alleged
in the Region 2 Complaint involve similar actions to those
described above, e.g., failing to make timely contributions to
the Funds, videotaping Union activity, denying Union officials
access to Kingsbridge's facility, and threatening to discharge
Employees who engage in a strike.  New allegations include

---

[14] The allegations of the Region 2 Complaint are drawn from
charges filed by the Union against Kingsbridge on August 23,
2007, and January 28, March 6, and March 20, 2008.  The first
three of these charges have been amended since filing to reflect
additional facts and allegations, with the final amendment
having been made on June 26, 2008.

failing to provide required information about the Employees to
the Union, "reimbursing" Union dues in order to discourage the
Employees from being members of and supporting the Union,
offering "yellow dog" contracts requiring Employees to renounce
Union membership, and failing to meet and bargain with the
Union.  The factual record presented by the Regional Director in
support of each of these allegations is described below, along
with, where relevant, Kingsbridge's factual assertions and
evidence offered in opposition to the petition.

A.    Failure to Provide Required Information

Pursuant to the 2002-2005 CBA, Kingsbridge was required to
provide certain information to the Union regarding, inter alia,
the work schedule of each Employee during the preceding month.
According to an affidavit submitted by Union organizer Noreen
Wray-Roach ("Wray-Roach"), between April and August 2007, she
made monthly requests for this information, as well as for a
list of all Employees represented by the Union (including date
of hire, full- or part-time status, rate of pay, department, and
shift), but never received a response.  During this period,
Wray-Roach reports that she asked the then-Administrator for
Kingsbridge, Lawrence Abrams ("Abrams"), why the information was
not being provided, and Abrams said, "I have no control over it.
When you send me the request, I forward it to Ms. Sieger.

That's as much as I can say to you."  When Abrams was replaced as Administrator by Jacob Perles ("Perles"),[15] she renewed her requests, but likewise did not receive a response.  The Regional Director has submitted letters of June 13 and August 3, 2007, from Wray-Roach to Abrams and Perles, respectively, documenting these requests.

Kingsbridge has submitted a declaration from Perles in which he states that he has "no recollection of receiving the 'information requests' referenced in the Petition."  He further declares that the information described by Wray-Roach is included "as part of the monthly reports sent to [the Union] from the business office which accompanied the benefit fund checks."[16]

---

[15] In her affidavit, Wray-Roach estimates that Abrams was the Administrator until "March or April 2007."  Other evidence in the record places this date more accurately in July 2007.

[16] It should be noted here that the Regional Director contends, and ALJ Fish found, that Kingsbridge has not been sending any checks to the Funds since August 2007, when it sent checks to satisfy obligations to the Funds accrued in May 2007.  Kingsbridge Heights, Case 29-CA-27502, slip op. at 10.  Thus, the claim that the required information was sent along with the "benefit fund checks" cannot be viewed as a germane response to a charge that such information has not been provided since August 2007.  Moreover, if it is assumed that the "union reports" discussed below, see infra n.25, are the reports referred to in Perles's declaration, information reflecting date of hire, full- or part-time status, and shift for each Employee is not included in those reports.

B.    Access to the Kingsbridge Facility

Wray-Roach's affidavit also states that prior to August
2007 she had been given access to the Kingsbridge facility in
accordance with the terms provided in the 2005 Arbitration
Decision -- she would provide notice to Abrams of her intent to
visit the facility to meet with Employees on a particular day,
and Abrams would respond by telling her when the conference room
was available for such meetings.  Wray-Roach reports -- and an
affidavit from Kervin Campbell ("Campbell"), a long-term
Kingsbridge Employee and 1199 shop steward, also describes --
that she generally visited Kingsbridge every Thursday from 6:30
a.m. to 7:30 a.m. and from 11:00 a.m. to 4:00 p.m., which would
allow her to see Employees from both the night and day shifts.
Beginning on August 9, 2007, however, Wray-Roach reports that
Perles began denying her access to the facility.

Wray-Roach avers that on Thursday, August 9, she arrived at
the facility for her usual meetings but was denied access by
Perles because, Perles reported to her, he had sent Wray-Roach a
letter stating that the conference room would not be available
that day.  (A copy of such a letter, dated August 7, 2007, has
been submitted by the Regional Director, and Wray-Roach concedes
that, when she returned to her office, she found that letter.)
Wray-Roach also avers that Perles told her that he needed to
"monitor" her while she was in the building, a condition on her

17

access which she rejected.  Wray-Roach then left the building.
Perles, by contrast, denies telling Wray-Roach that she needed
to be monitored, and states that Wray-Roach became "verbally
abusive" during their discussion.

It is not disputed that the following Thursday, despite
receiving another fax from Perles saying that no room would be
available for Wray-Roach to meet with Employees, Wray-Roach went
to the facility.  When she arrived, Wray-Roach claims, she was
informed by the receptionist, Nadine Boyce (a Union Employee),
that she had been suspended by Kingsbridge for five days, and
told that she was required to call the Kingsbridge
administration when Wray-Roach arrived.[17]  Boyce did so, and
Wray-Roach then spoke on the telephone with Sieger, who informed
Wray-Roach that she was trespassing, and that the police would
be called.  (Perles states that the police were called because
Wray-Roach was "again loud and disruptive.")  In any event,
according to Wray-Roach, the police officers who arrived
declined to intervene in what they termed "a labor issue," and
Wray-Roach then left the facility to meet with Employees
outside.

---

[17] Perles acknowledges that Boyce was disciplined, but states
that this discipline was due to her "failure to follow policy on
August 9, 2007, by failing to immediately contact me or another
member of the administration when Ms. Wray-Roach first arrived,
especially because there was not authorization for her to be
there."

Wray-Roach avers that between August 9 and sometime in October or November 2007, she sent weekly letters to Perles requesting access to the facility, and "[e]ach time, I received a response stating that there was no room available for me to meet with the members."  The Regional Director has submitted copies of letters from Perles to Wray-Roach dated August 20 and 28, September 10, 19, and 24, and October 1, 2007, each stating, in response to a letter from Wray-Roach, that "the Conference room will not be available" on the date requested.  Kingsbridge, in turn, has submitted a letter from then-counsel for Kingsbridge, Joel Cohen ("Cohen") to counsel for the Union, Hanan Kolko ("Kolko"), dated August 17, 2007, which describes the August 9 dispute between Wray-Roach and Perles and directs Kolko to "notify the Union that until this matter is resolved, Kingsbridge will not make its facilities available for Union meetings."  In light of this letter, Perles avers that the letters sent by Wray-Roach between August and November 2007 were sent "for no other reason than to create a self-serving paper trail to use to file a charge."[18]

---

[18] Perles's letters regarding the availability of the conference room do not make reference to Cohen's letter of August 14, 2007, but rather simply report that the requested room is not available.

C.    Failure to Make Contributions to the Funds

It is not disputed that Kingsbridge made the lump-sum payments to the Funds called for under the Settlement Agreement entered into on June 8, 2006.  The Regional Director has alleged, however, that Kingsbridge again became delinquent in its Fund contributions shortly after the Settlement Agreement was executed, and ceased making contributions altogether after a final payment made on August 9, 2007, for the obligations accrued in May 2007.[19]

Kingsbridge, while conceding that it was delinquent in its Fund contributions, contends -- and Sieger testified at the August 12 hearing -- that it made its final contributions in early November 2007, and only ceased making such payments after that time because the Funds had terminated the Employees' health benefits.  Kingsbridge asserts that this action was taken because, due to the termination of benefits, Kingsbridge "was under no obligation to continue to pay for benefits not received."

In support of its claim that it made payments -- albeit delinquent payments -- through early November 2007, Kingsbridge has offered two collections of documents.  With its submission

---

[19] At the final pre-hearing conference, held with the parties on August 7, 2008, counsel for the Union reported that Kingsbridge had made a payment in July 2008, to be credited toward the Fund contributions accrued during June 2007.  It maintained that this was the first payment received by the Funds since August 2007.

in opposition to this motion, and in support of Sieger's declaration reporting that Kingsbridge had made payments to the Funds as late as November 10, 2007, it provided copies of what appear to be check stubs indicating that certain payments were made to each of the Funds on November 10, 2007, to be credited toward the Fund obligations accrued in October 2007.  At the August 12 hearing, Sieger changed course.  She testified that she discovered "late last night" that her declaration was in error, that the checks associated with the November 10 check stubs had never been sent to the Funds, and that Kingsbridge never paid the Funds the amounts due for October.  Instead, she offered three new sets of documents purporting to show that Kingsbridge made payments to the Funds for the obligations accrued in June, July and August 2007, with checks written in September, October, and November 2007, respectively.

    ALJ Fish's recent decision -- on which both sides have relied here -- provides a detailed account of this aspect of the dispute between Kingsbridge and the Union.  On August 23, 2007, Kolko sent an e-mail to ALJ Fish requesting, on behalf of the Union, that the hearing on the charges resolved by the Settlement Agreement be reopened in light of Kingsbridge's failure to make timely payments to the Funds.  This e-mail also indicated that, due to Kingsbridge's delinquency in contributions to the Benefit Fund, the Benefit Fund would soon

be notifying Employees that their benefits would be terminated
at the end of October 2007.  Kingsbridge Heights, Case 29-CA-
27502, slip op. at 10.

Cohen responded on behalf of Kingsbridge on August 27,
stating in a letter to Kolko that Kingsbridge "wishes to
negotiate a change in how it makes payments to the [Funds].
Kingsbridge proposes that it be given up to 7 months to make
payments to the various Funds without being considered in
arrears.  Please contact me when the Union is available to
negotiate."  The Union did not respond to this proposal, nor did
Kingsbridge make any further effort to discuss it with the
Union.  Id. at 10, 17.  Not having received any additional
contributions from Kingsbridge, on November 5, 2007, the Benefit
Fund again terminated the health coverage of the Employees.[20]
Id. at 10-11.

---

[20] On November 2, 2007 -- three days before health coverage was
terminated -- the Union instituted an action in this Court
alleging breach of the Settlement Agreement.  See Trustees of
the 1199/SEIU Greater New York Benefit Fund v. Kingsbridge
Heights Rehabilitation Care Center, No. 07 Civ. 9744 (DLC)
(S.D.N.Y.).  An initial conference was held on April 9, 2008,
and a Scheduling Order issued that day.  At the conference,
Kingsbridge contended that this Court lacked subject matter
jurisdiction in light of the pending Region 29 proceedings.
Submissions on that question were made on April 30, May 9, and
May 16; an Order issued June 13, 2008 denied Kingsbridge's
requests that (1) the action be dismissed for lack of subject
matter jurisdiction, or (2) the Court stay the action in
deference to the Region 29 proceedings.  The Order noted that by
the time any summary judgment motion was to be fully submitted
to the Court (September 12, 2008), ALJ Fish would have had more

On November 26, 2007, ALJ Fish issued an Order to Show
Cause why the hearing should not be reopened.  Kingsbridge
opposed, arguing that (1) it had remained "relatively current in
its payments to the Union funds," and (2) its August 27 proposal
was a request to bargain on this issue, and that the Union's
refusal to bargain gave Kingsbridge "the right to unilaterally
change the terms of the collective bargaining agreement as it
relates to when Funds payments must be made."  Id. at 11.

On December 12, the hearing was reopened, and further
proceedings were held on January 28 and May 1, 2008.  ALJ Fish's
decision was issued on July 30, 2008, approximately one week
after this action was filed.  In his decision, ALJ Fish found,
inter alia, (1) that "from the first month after the settlement
was executed, [Kingsbridge] has failed to make timely payments
to the Funds," and has not made any contributions since August
9, 2007, id. at 15-16; (2) that Kingsbridge backdated Fund
contribution checks on several occasions in 2007, id. at 9-10;[21]

---

than a year since an application was made to reopen the Region
29 action to make his ruling.  Any motion for summary judgment
in this action remains due on August 15, and is scheduled to be
fully submitted on September 12.  See Trustees of the 1199/SEIU
Greater New York Benefit Fund, 07 Civ. 9744 (DLC) (S.D.N.Y. July
17, 2008) (Memorandum Endorsed Letter).

[21] ALJ Fish rejected the argument, offered by Kingsbridge
"without a shred of evidence, that the Union and the Funds
engaged in a conspiracy to establish that [Kingsbridge] breached
the settlement, by purposely failing to date stamp the checks
received from [Kingsbridge] until much later than [their]
receipt."  ALJ Fish found "this assertion preposterous, and

and (3) that the refusal of the Union to bargain over the August
27, 2007 proposal from Cohen did not provide a defense to this
course of conduct, because the proposal was made over a year
after Kingsbridge began to violate the Settlement Agreement (and
thus was made "in the context of its unfair practices"), the
policy thereafter implemented (i.e., not making any
contributions to the Funds) was not consistent with its
proposal, and Kingsbridge had not made a "diligent and earnest"
effort to engage in bargaining over the proposal, id. at 16-18.[22]
(Notably, at no time during the proceedings before ALJ Fish did
Kingsbridge claim that it had made payments to the Funds after
August 2007.)  ALJ Fish therefore concluded that Kingsbridge had
violated the terms of the Settlement Agreement and engaged in an
unfair labor practice in violation of the Act by failing to make
timely contributions since June 2005 and failing to make any
contributions whatsoever for various months, including no
payments since August of 2007.  Id. at 23.[23]

---

without any evidentiary basis."  He also noted that Kingsbridge
failed to turn over subpoenaed financial records that could have
supported such a defense, and accordingly drew an adverse
inference against Kingsbridge on this issue.  Id. at 10.

[22] Indeed, ALJ Fish concluded that Kingsbridge's August 27, 2007
proposal, "rather than a good faith request to bargain, was
solely [made] to forestall the reopening of the hearing."  Id.
at 18.

[23] In its memorandum of law dated July 23, 2008 -- prior to ALJ
Fish's ruling -- the Regional Director stated that because the
Region 29 Complaint had been dismissed pursuant to the

The record created in the proceedings before ALJ Fish as well as his findings provide reasonable cause to believe that Kingsbridge ceased making payments to the Funds in August 2007 and that even those payments were delinquent. The evidence provided by Sieger at the August 12 hearing does not alter this finding.

There are several reasons for concluding that Sieger's representations in her declaration about the payment history and her testimony at the August 12 hearing are at worst perjurious and at best entirely unreliable. First, she has no reliable documentary corroboration of her contention that payments to the Funds were made after August 2007.[24] The materials offered at the hearing that purportedly document payments in September, October, and November 2007 for the June, July, and August obligations are identical in all material respects to the documents submitted in connection with Sieger's declaration, which purported to record a payment to the Funds in November

_____

Settlement Agreement and had not yet been formally reinstated by ALJ Fish, "Region 2 determined to proceed on the . . . allegation that [Kingsbridge] unilaterally changed terms and conditions of employment when it again ceased making Fund contributions in August 2007."

[24] Not only did Kingsbridge fail to offer any reliable documentary evidence regarding the disputed payments, it also failed to call any records custodian or employee from its business or accounting office to explain how Kingsbridge keeps records of its payments and of uncashed checks and to show through those records that the checks to the Funds corresponding to the check stubs were, in fact, sent to the Funds.

2007 for the amounts owed for October 2007.  Yet, as Sieger

admitted, Kingsbridge did not make payments in November for the

October period.[25]  Thus, the documents -- including the check

stubs, each of which purport to correspond to actual checks sent

to the Funds in the normal course of business -- are entirely

worthless as evidence that any payments were in fact sent to the

Funds.[26]

---

[25] A description of one set of the documents illustrates just how
unreliable the Kingsbridge documents are as evidence that any
particular check was ever issued or mailed on any particular
date.  The check stubs submitted as an exhibit to Sieger's
declaration are dated November 10, 2007, and purport to reflect
payments made to the Funds for October 2007.  According to
Sieger, they were kept in the Kingsbridge files as attachments
to an eight page "union report" reflecting each Employee's
hours, earnings, and Fund contribution data for the month of
October 2007.  The union report to which the "November 10, 2007"
checks stubs are attached -- which was submitted at the hearing
-- bears the date "December 27, 2007."  Having made this "late
night" discovery, Sieger testified that, because checks to the
Funds are based upon the amounts calculated in the union report,
the checks corresponding to the stubs could not have been
written before December 27, 2007.  (The credit for the
"discovery" is properly given to Sieger's counsel, who, she
testified, "brought it to my attention" in reviewing documents
before the hearing.)  Perhaps even more troubling, however, is
the fact that not only were the checks not sent on the date
indicated on the stubs, they were, by Sieger's own admission,
never sent at all.  She testified that she never sent any checks
to pay the Funds for the amounts due in October 2007, and never
sent to the Funds any checks associated with these November 10
check stubs.  Thus, the "check stubs" and "union reports" are
essentially worthless as evidence of any check-writing or
mailing activity.

[26] It bears emphasizing that none of the Kingsbridge documents
submitted by Sieger to show payments to the Funds have any
reliable date to associate with a purported check.  For example,
the "union report" for August 2007 bears the date November 1,
2007, while each of the "check stubs" attached to that union

Second, Kingsbridge had every opportunity and motive to assert and prove in the proceedings before ALJ Fish (and to plead in its answer in the related litigation before this Court) that it had made payments to the Funds after August 2007, and it failed to do so.[27]  This silence is strong evidence that the assertion that such payments were made is a recent fabrication advanced here to shift the blame to the Union for cutting off the Fund benefits to the Employees.

D.    Reimbursement of Union Dues

Employees were notified by letter on October 3, 2007, of the pending termination of their medical benefits.  Wray-Roach avers that after this notification was sent, she was approached by various Employees who told her that they wanted to go on strike.  Wray-Roach scheduled a meeting with the Employees for October 17, which would take place outside of the Kingsbridge facility (due to the access problems described above).  The

report bears the date September 10, 2007.  September 10 is the date on which Kingsbridge was required under the 2002-2005 CBA to make its payments for the obligations accrued in August. These documents thus appear to be nothing more than records created to calculate Fund payments that were owed and that, if they were to be paid, would be paid through backdated checks. And, as already noted, ALJ Fish found that Kingsbridge made payments in 2007 with backdated checks.

[27] Although Sieger testified that she has "always said, and always knew that [she] continued to make payments up until the health benefits were discontinued by the Union" in November 2007, and that counsel for Kingsbridge had consistently taken that position in litigation related to the Funds, she could not provide any support for that assertion.

flier distributed by the Union informing Employees about the
meeting stated, in relevant part, "[w]e will demand: the signing
of a full contract; enforce[ment] of the National Labor
Relations Board Decision;[28] a strike vote."  A strike was
discussed at the meeting, and voting -- via paper ballots handed
out by Employees and Union officials outside of the facility --
took place over the next several days.  The ballots were counted
on October 22, and revealed a 166-4 vote in favor of authorizing
the Union to send notice of a strike.

As described by affidavits submitted by Campbell and other
Employees (as well as Wray-Roach), around the time of the strike
vote in October, a meeting was held at which Sieger, other
Kingsbridge administrators, and approximately thirty Employees
were present.  During the meeting Sieger stated that, because
Kingsbridge and the Union did not have a CBA, she was forbidden
by law from withholding Union dues from the Employees'
paychecks.  She further stated that she would be returning to
the Employees the dues that had been withheld during the prior
twelve months, and that checks in the appropriate amounts were
being made available to the Employees.  Employee Toma Beica
("Beica"), who worked as a porter at Kingsbridge between April
23, 1999 and January 28, 2008, further averred that while he did

---

[28] It is not apparent to which NLRB action or decision this
refers.

not pick up the check referred to by Sieger during the meeting, his next pay stub indicated a "union dues adjust" in the amount of $571.62.[29]  Employee Pansy Shaw has also submitted an affidavit to the same effect.

In her declaration, Sieger states that following consultation with her attorney in the fall of 2007, she decided to "cease[] deducting union dues and sought to refund this money to employees."  She further states that "I intended these payments not as a gift, but [as] a refund of the dues deductions."  Kingsbridge argues here that continuing automatically to deduct dues from the paychecks would have been illegal after the expiration of the 2002-2005 CBA.  The Regional Director contests that legal conclusion, but also notes that (1) because the dues deducted during the prior year "had already been remitted to the Union," the payments made by Sieger were not "refunds," but rather "simply bonuses equal in amount to the amount of dues each employee had paid over the previous year," and (2) that such "bonuses" were intended, at least in part, to dissuade the Employees from supporting the Union.

---

[29] The Regional Director has submitted a document with the hand-written title "Union Dues Checks," that contains a listing of 252 Employees' names and various dollar amounts, most of which range between $300 and $600 dollars.  It is not apparent how this document was obtained by the Regional Director.

E.    Surveillance of Union Activities

        Affidavits submitted by Wray-Roach, as well as several
Employees, describe video surveillance of Union activities,
beginning with the October 18, 2007 meeting regarding a
potential strike.  Wray-Roach reports that, during that meeting,
she noticed that Tony Szereszewski, Kingsbridge's Director of
Housekeeping, was videotaping the meeting from the roof of the
Kingsbridge facility.  Wray-Roach also recounts that a similar
incident took place on November 28.  Campbell, in addition to
reporting another incident of videotaping during informational
picketing on December 18, 2007 -- this time from a patient's
room on the second floor[30] -- also avers that the security
cameras on the front of the Kingsbridge facility, which were
normally pointed toward the front of the building, had been
turned such that they faced across the street, where Wray-Roach
had been meeting with Employees.[31]  Employee Wladyslaw Cichon's

---

[30] Sieger states in her declaration that this incident could not
have happened because Tony Szereszewski "was not even employed
by Kingsbridge as of" October 18, 2007.

[31] This account is similar to the description of the surveillance
that took place during the March 15, 2006 informational
picketing.  As described by ALJ Landow:

    It is undisputed that, upon instructions from
    [Kingsbridge], two individuals made separate video
    tape recordings of the picketing activity on March 15,
    throughout its duration.  One individual stood outside
    the main entrance to the facility, at times holding
    the camera and at others placing it on a tripod.
    Another individual taped the event from a second-floor

affidavit of April 15, 2008, further states that during the current strike the Employees are "filmed every day," except for one week in which the surveillance did "not occur often." Employees Beica, Bibirakeba Seebaram ("Seebaram"), Orlos Wojciech ("Wojciech"), and Julian Marut have also submitted affidavits to the same effect.

Kingsbridge does not deny that it has been conducting video surveillance of the Employees.[32] It argues, however, that its surveillance is justified by the need to "preserve evidence of potential recurring picket line and strike misconduct," and, as discussed further below, has submitted several declarations from individuals who have been working at Kingsbridge during the strike who report having been the targets of such misconduct. In her declaration, Sieger also describes misconduct she has witnessed during the strike, as well as two instances of

---

window. These cameras were aimed at the picketing activity occurring across the street, rather than at the entrances and sidewalk adjacent to [Kingsbridge]'s facility.

Kingsbridge Heights, 352 N.L.R.B. No. 5, 2008 WL 310888, at *3.

[32] Sieger states in her declaration that the surveillance alleged here almost exclusively took place before the NLRB adopted ALJ Landow's findings on January 31, 2008, and further argues that the surveillance conducted "pending the determination" by the NLRB should not "be viewed as willful disregard of the law." This statement overlooks, however, the statements made in Seebaram, Marut, and Cichon's affidavits, among others, each of which report that during the strike -- which commenced after the January 31, 2008 Board Order -- the striking Employees have been recorded nearly every day.

"violent and unpredictable conduct by" the Union dating from
2000 and 2006.  Finally, Kingsbridge maintains that, in any
event, the surveillance has not "inhibited the exercise of
protected rights," as evidenced by the ongoing strike.

F.    Offering of "Yellow Dog" Contracts and a Threat Regarding
      Reinstatement

Employees Seebaram and Wojciech have each submitted
affidavits stating that, in February 2008 -- prior to the
commencement of the strike on February 20 -- Kingsbridge
officials offered individual Employees contracts that required
them to renounce their Union membership.  Seebaram reports that
at some point in February she was informed of a meeting with an
Employee named Jozef from the purchasing department -- whom the
Regional Director maintains is Jozef Hubacek ("Hubacek")[33] --
which she attended.  At the meeting, Seebaram states that
Hubacek said, "[y]ou know, Ms. Sieger is offering a contract.
You're going to have the benefits and $3.00 more per hour."  He
then handed out a contract and further stated that "[i]f you

---

[33] The Regional Director states that this is the same Jozef
(Hubacek) who, on December 17, 2007, sent a letter to the Union
withdrawing his membership and, on March 6, 2008, filed a
petition with the NLRB seeking decertification of the Union.
(The Regional Director states that the "investigation of this
petition was blocked due to the pending unfair labor practice
charges.")  Kingsbridge has neither confirmed nor denied the
Regional Director's assertion on this point, but it has
submitted a declaration from Hubacek in opposition to the
petition.

guys go on strike, you're not coming back," which the Regional Director argues was a direct threat that Kingsbridge would discharge any striking Employees.[34]

The Regional Director has submitted a copy of an unexecuted "Agreement," which the Regional Director states is the contract handed out at this meeting.[35]  The Agreement has a five-year term and provides a two percent annual salary increase.  With respect to benefits, the Agreement gives Employees an option: They can either receive coverage from another source and "choose[] to be compensated by the facility," or join "the Health Insurance plan offered by the facility," the identity of which is not specified.  Finally, the Agreement states that "[b]y signing this agreement you [the Employee] affirm that you are not a member of any union and will not join throughout the duration of this agreement."  Seebaram states that "[n]obody signed the contract during the meeting," and that she did not hear anything further about the contract after the meeting.

Wojciech avers that, in early February, he learned from Union officials that a meeting was taking place in the Kingsbridge facility between "a large number of Employees" and an attorney.  When he arrived at the room described by the

---

[34] In his declaration, Hubacek does not discuss this meeting.

[35] A line on the top of the page indicates that it was faxed from the law firm representing the Union on January 28, 2008.

officials, he saw two people -- Gregory Korzeb (the Assistant

Administrator) and Tony Szereszewski -- standing by the door

"acting like security guys."  They told Wojciech that "if [he]

really want[s] to leave Local 1199, then they would let [him]

enter the room."  Wojciech did not enter the room, but he avers

that he was later informed by another Employee that during the

meeting Employees were asked to sign individual contracts

requiring them to resign their Union memberships.  He further

reports that, on February 13, Szereszewski showed him the pay

stubs of certain workers who were then receiving a new, higher

wage, and indicated that these employees were receiving a higher

wage because they had signed individual contracts with

Kingsbridge.  Finally, Wojciech states that he obtained a copy

of the new contract, which has been submitted as an exhibit by

the Regional Director.  This document is substantially similar

to the Agreement described above, but contains additional

details regarding wages and hours.  The revised Agreement also

states that the "[e]mployee has been represented by legal

counsel or elected to waive such representation," and that the

"[p]arties may choose to enter into a formal written employment

agreement at a later time."

Wray-Roach avers that, during the period between January 24

and February 14, 2008 -- when, it appears, these contracts were

being discussed with the Employees -- she received nine letters

from Employees resigning from the Union (in addition to the letters already received from Jozef Hubacek and Nadine Boyce, the receptionist mentioned above).  Copies of these letters have been submitted by the Regional Director.

Kingsbridge concedes that it contracted with individual Employees prior the strike, and that those contracts contained language requiring the Employee to disavow union membership.  It further concedes that the inclusion of such terms in the contracts was "not permissible," but reports that it issued a memorandum to its current employees on March 31, 2008, stating that such terms are null and void.[36]  Kingsbridge has also not contested that Hubacek said to Seebaram (and other Employees) that striking employees would not be permitted to return to Kingsbridge,[37] or contested the Regional Director's assertion

---

[36] As Sieger states in her declaration, "[t]he referenced 'yellow dog' contracts were only intended to confirm in writing the benefits that we intended to pay these people. . . . I now understand what a 'yellow dog' contract is and why they are considered impermissible.  We regret the error and will not make this mistake again."

[37] Rather, Kingsbridge focuses on evidence submitted by the Regional Director indicating that Employees were asked by Kingsbridge administrators, in the weeks leading up to the February 20 strike, whether they were planning to strike or not. Although she has submitted declarations that, among other things, describe this questioning, the Regional Director has not argued here that this questioning violated the Act.  Rather, the Regional Director has relied on Hubacek's statement as the basis for the claim that Kingsbridge threatened employees with termination if they went on strike.

that Hubacek was acting on behalf of Kingsbridge when he made
those statements.

Kingsbridge does maintain, however, that the contracts
submitted by the Regional Director were only offered "in
response to inquiries from employees who had resigned from the
Union and who sought confirmation of their benefits now that
they would be without an employment relationship based on
contract."  Kingsbridge therefore denies that it "solicit[ed]
employees to leave the Union."

G.   Refusal to Meet and Bargain with the Union

On January 21, 2008, Union President George Gresham sent a
letter to Perles giving him notice that the Employees would be
going on strike beginning at 6:00 a.m. on February 20, 2008,
"and continuing indefinitely."  The letter further states that
the strike "is in protest of your unfair labor practices which,
among other things, have resulted in the loss of the aforesaid
employees' healthcare benefits."

The strike did begin on February 20 and has continued to
the present day.  Mike Rifkin ("Rifkin"), an Executive Vice
President of the Union, has averred, however, that if a federal
court issues a Section 10(j) injunction directing "Kingsbridge
to rescind its unilateral changes and restore the status quo
ante . . . including the obligation to resume making

contributions to the [Funds], then 1199 will make an unconditional offer . . . to return to work."

The Regional Director contends that, both before and after the strike began, Kingsbridge and its representatives failed or refused to participate in various efforts to resolve the dispute.  First, on February 18, 2008 -- two days before the strike was scheduled to begin -- Commissioner Kathy Murray Cannon of the Federal Mediation and Conciliation Service ("FMCS") sent a letter to counsel for Kingsbridge and the Union inviting the parties to meet with her on February 19 in an effort to avoid the strike.  Representatives of the Union appeared for the scheduled meeting, but a representative of Kingsbridge did not.

Second, on March 1, the FMCS Director of Mediation Services for the Northeast Region, John E. Sweeney, sent a letter to both parties and their attorneys, calling a meeting on March 7 pursuant to Section 8(d)(4)(C) of the NLRA, which requires parties to a labor dispute "involv[ing] employees of a health care institution" to "participate fully and promptly in such meetings as may be undertaken by the [FMCS] for the purpose of aiding in a settlement of the dispute." 29 U.S.C. § 158(d)(4)(C).  On March 6, however, Sweeney sent a letter canceling the meeting in light of an e-mail received from

Kingsbridge's counsel, Joel Cohen.[38]  Sweeney therefore asked
Kingsbridge to provide a list of dates on which it would be
available to participate in a meeting.  No response to that
letter is contained in the record.

Sweeney sent a similar letter on March 26, again requiring
the parties to provide, by March 28, a list of dates they would
be available to meet.  A letter from Sweeney dated April 3
states that Kingsbridge did not respond to the March 26 letter,
and called a meeting for April 16, again pursuant to Section
8(d)(4)(C).  It does not appear from the record that this
meeting ever took place.

Third, on April 11, Barbara C. Deinhardt, Chair of the New
York State Employment Relations Board, contacted both Perles and
the Union and requested, pursuant to the requirements of New
York State labor law, that the parties appear at a meeting on
April 16 or 17.  A letter from Deinhardt of April 15 states that
"despite several calls to Jacob Perles and David Jasinski," new
counsel for Kingsbridge, "I have gotten no response."  The
proposed meeting was adjourned to April 22, but did not take
place.  A letter dated April 28 from Deinhardt to Sieger
indicates that Deinhardt subsequently received some form of

---

[38] The contents of that e-mail are not apparent from the record
here, but it appears likely that Cohen's e-mail reported that he
was no longer acting as counsel for Kingsbridge.  As described
below, new counsel for Kingsbridge was retained, at the latest,
on March 14.

communication from Sieger that, based upon Deinhardt's response,
indicated that (1) Sieger had been offended by Deinhardt's
earlier letters, (2) Sieger's availability had been limited by
religious holidays, and (3) retention of new counsel for
Kingsbridge required delaying any meeting.  Deinhardt apologized
for any offense given and noted, inter alia, that Union
officials had agreed to meet without their counsel if that would
allow a Kingsbridge representative to appear.  The Regional
Director reports that no meeting with the New York State
Employment Relations Board ever took place.

In short, the Regional Director reports that "[t]o date,
there has been no mediation to resolve the strike," despite the
efforts made by third parties outlined above.  Kingsbridge does
not contest any of these facts, but in her declaration, Sieger
explains that she "was out sick with fever prior to the strike
and physically unable to participate in mediation," that she
"was without counsel at times," and claims that she has
"continued [her] dialogue with the mediators to date."[39]

III. Recent Bargaining History

As discussed further below, Kingsbridge's principal
contention in its opposition to the petition is that the
injunctive relief sought by the Regional Director should not be

---

[39] Neither side has placed documents in evidence that would
confirm that assertion.

granted because the Union has engaged in illegal bargaining
tactics -- namely, conditioning execution of a new CBA on
Kingsbridge's agreement to pay all arrearages to the Funds.
Kingsbridge asserts that this bargaining position is unlawful
and, by extension, that the strike taken in support of that
position is also unlawful.[40]  Given the emphasis placed on this
point by Kingsbridge, as well as the Regional Director's
contrary interpretation of this history, it is necessary to
review the evidence placed in the record by the parties
regarding the negotiations between Kingsbridge and the Union
leading up to and shortly after the strike.

> In her declaration, Sieger asserts that
>
> [a]s of October 2006, [Kingsbridge and the Union] had
> come to agreement on all terms with one exception: The
> Union refused to agree to Kingsbridge's proposal to
> utilize the services of the American Arbitration
> Association and have an arbitrator randomly assigned
> for each arbitration.  Rather, the Union wanted a
> single person to be designated as the arbitrator on
> all cases.  Kingsbridge was unwilling to agree to this
> . . . .

Attached as exhibits to Sieger's declaration are letters of
October 31, 2006 (from Sieger to the Employees),[41] and December

---

[40] Kingsbridge further reports that on August 5, 2008 --
approximately two weeks after the instant petition was filed,
and the day before Kingsbridge's responsive papers were due to
be filed in this action -- it refiled a previously withdrawn
unfair labor practice charge with the NLRB premised on these
allegations.

[41] In his declaration of April 9, 2008, Rifkin states that he
"came upon" a copy of the October 31, 2006 letter "[i]in the

11, 2007 (from Cohen to an attorney for the Funds), in which it
was asserted that the choice of arbitrator remained the only
outstanding point of disagreement between Kingsbridge and the
Union with regard to CBA terms.  In his April 9, 2008
declaration, Rifkin reports that at a meeting he held with
Sieger on November 27, 2007, Sieger also took this position.[42]

On January 7, 2008 -- after the termination of health
benefits and the strike vote -- Sieger sent a letter to the
Employees which reasserted this position:[43]

> This letter serves to confirm our conversation of
> today's meeting at 5:00 P.M.  I agree to immediately
> sign the previously agreed upon contract with 1199,

---

course of familiarizing himself with Kingsbridge" when he took
over the Nursing Home Division of 1199 in September of 2007.

[42] Rifkin also states that, at this meeting, Sieger asked him to
speak to a representative of the Funds about a repayment plan
through which Kingsbridge could satisfy its debts to the Funds.
Sieger, for her part, states that at this meeting, Rifkin told
her that he was "not here to negotiate," and that "his plan was
to shut Kingsbridge down, and put [her] out of business 'as an
example to the industry.'"  Evidence of such language being used
by Rifkin was placed into evidence before ALJ Fish by Joel
Cohen, who reported having a similar conversation with Rifkin.
In light of the fact that Rifkin did not testify before him, ALJ
Fish credited Cohen's account of their conversation, Kingsbridge
Heights, Case 29-CA-27502, slip op. at 11 & n.22, but ruled that
Rifkin's threats did not provide a defense to Kingsbridge's
failure to make its contributions to the Funds.  Id. at 20.
Indeed, ALJ Fish ruled that, while he did not "condone some of
Rifkin's remarks," Rifkin "clearly had substantial justification
for questioning the good faith of Respondent in general, and of
Sieger, in particular, who[m] he appeared to blame, at least in
part for Respondent's past conduct."  Id. at 20, 21.

[43] The January 2007 exchange of letters described below is also
recounted in Kingsbridge Heights, Case 29-CA-27502, slip op. at
12-14.

adding the American Arbitrators Association as the
arbitrator instead of Martin Scheinman [the Impartial
Chairman designated in the 2002-2005 CBA].

This, and only this is the reason that I have not
signed the contract to date.  The union terminated
your health benefits in an attempt to exert pressure
on the staff thereby forcing Kingsbridge Heights
Rehabilitation Care Center to forfeit our rights to
utilize American Arbitrators Association.

Rifkin responded to this letter on behalf of the Union on

January 23, 2008:

This is in response to your January 7, 2008
letter to the employees at Kingsbridge Heights
Rehabilitation Care Center, in which you state that
you "agree to immediately sign the previously agreed
upon contract with 1199, adding the American
Arbitrators[sic] Association as the arbitrator instead
of Martin Scheinman."

I don't know what you mean by the "previously
agreed upon contract."  However, I wish to make 1199's
position clear, as follows:

1.    1199 is prepared to enter into an agreement with
      Kingsbridge Heights for the period June 1, 2004
      through April 30, 2011 on the same terms as are
      contained in the June 1, 2004 through April 20,
      2008 and May 1, 2007 through April 30, 2011 MOA's
      between the Union and the Greater New York Health
      Care Facilities Association, Inc.

2.    1199 is prepared to agree with you on one or more
      arbitrators, each of whom is a panel member of
      the American Arbitration Association, to serve as
      Impartial Chairman (or Chairmen) under the
      agreement, in place of Mr. Scheinman.

3.    Whether or not a collective bargaining agreement
      is entered into, health and other benefits cannot
      be reinstated until Kingsbridge pays, or enters
      into an arrangement satisfactory to the funds'
      Trustees to pay its indebtedness to the Funds,
      which is currently in excess of $2,600,000.

4.    Irrespective of whether a collective bargaining
      agreement is entered into, the Union will pursue

through all available means the collection of
this indebtedness to the Funds, and to recover
for the employees any benefits lost by virtue of
the facility's delinquency.

5.    As you know, 1199 has served Kingsbridge with a
strike notice effective February 20, 2008 at 6:00
am.  In the event 1199 is compelled to strike, it
reserves the right to withdraw this offer.

I await your reply.

Sieger responded on January 25 in another letter to

Kingsbridge Employees.  She wrote:

In response to the 1199 Union's letter dated
January 23, 2008 I would like to clarify some of the
techniques Mr. Rifkin is using to further manipulate
the employees of Kingsbridge Heights Rehabilitation
and Care Center.

First, Mr. Rifkin offered to sign a contract **ONLY**
back to June 1, 2004.  This is the union['] way of
taking back the dues monies that is **legally** yours.
Also the end of the year 3 banked days that I paid to
you **instead** of the "benefit fund" as instructed by
1199 will also go back.  Along with other negative
implications to the facility.

Second, Mr. Rifkin says "1199 is prepared to
agree with you on one or more arbitrators," I do not
have a problem with Mr. Scheinman per se, I have a
problem with 1199 denying my right to have a
"**RANDOMLY**" chosen Arbitrator from American Arbitration
Association.

Choosing an Arbitrator with 1199 who will rule on
all cases involving the facility and 1199 is unjust
and unfair.  Ask yourself why is Mr. Rifkin and 1199
so adamant about having a set Arbitrator to the degree
that they are playing with your jobs and your family's
lives?

My position has not changed[.]  I will sign a
contract if and while the Union agrees to the fair
process of American Arbitration Association as the
impartial chairman for all arbitration.

Obviously if Mr. Rifkin and 1199 decide to strike this becomes a moot point and I wish all of you the best of luck.

Rifkin replied on January 29.  After objecting to Sieger's tactic of responding to his letters by sending letters directly to the Employees rather than to him (which Rifkin characterized as "illegal direct dealing"), Rifkin repeated that the Union was willing to replace Scheinman as Impartial Chairman.  He further refuted the claim made in Sieger's January 25 letter that "the Union seeks an agreement dating from June 2004 only to compel payment of Union dues retroactive to that date."  Calling such a claim "absurd," Rifkin noted that "Kingsbridge deducted . . . dues from [Employees'] wages through late 2007.  Since then, the members have been paying their dues directly to the Union."  Rifkin concluded:

> As you have made it clear you are not interested in
> constructive discussion, I will not attempt to engage
> in further discussion with you, although I will be
> available should you choose to engage in an honest
> discussion with me.  In the meantime, I am forwarding
> under separate cover a Memorandum of Agreement
> adopting the industry agreement for the period from
> June 1, 2004 through April 30, 2011.  If you wish to
> avert a strike on February 20th, sign the Memorandum
> of Agreement . . . .

Sieger's response of January 30 -- sent to Rifkin, not the Employees -- reasserted her position regarding the random selection of arbitrators (as opposed to the selection of a new "permanent arbitrator") and Union dues, and reported that "[w]e

44

have and will continue to tell employees that they have a right

to strike without retaliation and that in no case will they be

fired for striking but that we as a nursing home have a right to

know in advance of a strike of their intentions."

In his declaration, Rifkin states that in the first week of

February, shortly after this exchange, he sent Sieger a document

entitled "1199-Kingsbridge Nursing Home Settlement Agreement,"

which he had signed on behalf of the Union.  This document,

submitted by the Regional Director, provides that "[i]f

Kingsbridge Heights Nursing Home agrees to number 1 and 2 below,

the Union will agree to number [3] and [4] below."[44]  It then

states,

> 1.  Kingsbridge Heights Nursing Home agrees to the
>     contract terms of the 6/1/04 - 4/30/2011 contract
>     between 1199 SEIU and Greater New York Healthcare
>     Facilities Assoc. which covers most NYC 1199
>     Nursing Home members.
> 2.  Kingsbridge Heights Nursing Home will pay, prior
>     to February 20, 2008, all delinquencies owed to
>     the Greater New York Funds and agrees to continue
>     the Benefit Fund in the new contract.
> 3.  1199 agrees with Kingsbridge Heights Nursing
>     Home's request to have the American Arbitration
>     Association and therefore will accept arbitrators
>     admitted to the National Academy of [A]rbitrators
>     from a panel provided by the American Arbitration
>     Association under its labor arbitration rule.[[45]]

---

[44] The document says "the Union will agree to number 4 and 5
below," but the document only contains four terms.  This
typographical error has been corrected here.

[45] The American Arbitration Association's Labor Arbitration Rules
make the following provision for the selection of arbitrators:

4.   1199 agrees that if Kingsbridge Heights Nursing
     Home agrees to number 1 and 2 above, 1199 will
     withdraw the 1199 strike notice as soon as Ms.
     Sieger signs a full contract that includes 1 and
     2 above.

---

If the parties have not appointed an arbitrator and
have not provided any other method of appointment, the
arbitrator shall be appointed in the following manner:
immediately after the filing of the demand or
submission, the AAA shall submit simultaneously to
each party an identical list of names of persons
chosen from the [AAA's] Panel of Labor Arbitrators.
Each party shall have ten days from the mailing date
in which to strike any name to which it objects,
number the remaining names to indicate the order of
preference, and return the list to the AAA.

If a party does not return the list within the time
specified, all persons named therein shall be deemed
acceptable.

From among the persons who have been approved on both
lists, and in accordance with the designated order of
mutual preference, the AAA shall invite the acceptance
of an arbitrator to serve.  If the parties fail to
agree upon any of the persons named, if those named
decline or are unable to act, or if for any other
reason the appointment cannot be made from the
submitted lists, the administrator shall have the
power to make the appointment from among other members
of the panel without the submission of any additional
list.

Am. Arbitration Ass'n, Labor Arbitration Rules, Rule 12 (Aug. 1,
2007), available at http://www.adr.org/sp.asp?id=32599 (emphasis
added).  This rule appears to provide for the repeated "random
selection" of arbitrators requested by Sieger in her prior
correspondence, insofar as it provides that a new arbitrator
will be proposed, agreed upon, and selected each time a "demand
or submission" is made by one of the parties.  Thus, it must be
concluded that Rifkin's Memorandum of Agreement represents a
Union concession on the arbitrator issue.

It does not appear from the record that Kingsbridge replied to this proposal and, as noted above, the strike commenced on February 20, 2008.

Approximately two weeks later, on March 6, Kingsbridge and the Union resumed their exchange of proposals.  On that date, Rifkin sent a letter to Sieger enclosing a "Memorandum of Agreement that does what 1199 offered to do before the strike," i.e., "permits Kingsbridge Heights to adopt the June 1, 2004 industry contract, as extended through April 30, 2011, as an independent employer," and "substitutes, at your request, the American Arbitration Association for the industry Impartial Chairman."  The attached Memorandum of Agreement contains the terms described in the letter, including substantially similar language regarding the selection of arbitrators.[46]  Notably, it does not make reference to the payment of any debts to the Funds.[47]  The letter concludes:

---

[46] The Memorandum of Agreement states that, "in lieu of the Impartial Chairman" named in the contract between Greater New York and 1199, "any dispute between the parties shall be submitted to arbitration before an arbitrator selected from a panel of arbitrators provided to the parties by the American Arbitration Association in accordance with its Voluntary Labor Arbitration Rules."

[47] Although Rifkin's March 6 letter implies as much, it is not clear from the record whether the Memorandum of Agreement referred to in Rifkin's January 29, 2007 letter to Sieger is the same document as is attached to the March 6 letter.  In any event, in the Region 2 Complaint underlying this action the Regional Director alleges that it was a violation of the Act for Kingsbridge to have failed to execute a new CBA in light of the

All you need to do to bring this strike to an end is
to sign the enclosed Memorandum of Agreement and to
make immediate arrangements with the Benefit Fund to
pay your Benefit Fund delinquency, so that the health
benefits of our members can be reinstated. . . . I
urge you to sign the Memorandum of Agreement and make
the necessary arrangements with the Benefit Fund for
the payment of the facility's delinquency so the
facility, its residents and our members can move
beyond this unfortunate strike.

The record does not reflect a direct reply to Rifkin's

March 6 letter.  On March 14, however, newly retained counsel

for Kingsbridge David Jasinski wrote to Rifkin and -- after

decrying the Union's "bullying tactics" and a "recent unprovoked

assault on the picket line" -- made a new contract proposal to

the Union:

Based on the changed circumstances -- including, but
not limited to, the strike and the Union's recent
unilateral termination of the employees' health
benefits -- Kingsbridge proposes a contract with the
following terms:

> 1.   Kingsbridge continues to propose the
>      utilization of the American Arbitration
>      Association ("AAA") procedure to resolve any
>      disputes;
>
> 2.   The length of the contract will be three (3)
>      years upon ratification;
>
> 3.   Kingsbridge is forced and will provide
>      health coverage to the employees and will no
>      longer participate in the Fund due to the

---

apparent agreement between the parties on March 6.  (The
Regional Director, however, does not request any interim relief
in connection with that claim in this action.)  Thus, it appears
that it is the Regional Director's position that as of March 6,
2008, the parties had reached agreement on all terms of a new
CBA.

Union and the Fund's unilateral decision to
terminate benefits; and

4.    Kingsbridge will have the right to offer no-
frills package[s] to employees who
voluntarily elect to participate in this
program.  Those employees will receive an
additional $2.00 per hour to their base
hourly rate.

Rifkin responded to Jasinski on March 20, calling Jasinski
"sadly and surprisingly uninformed about the facts,
circumstances and events leading up to and following the
initiation of this unfair labor practice strike."  Rifkin
rejected Jasinski's proposal as "inconsistent with [the]
bargaining history" between Kingsbridge and the Union, in
particular the prior representations by Sieger and Cohen that
the only issue remaining was the choice of the arbitrator, and
the Union's subsequent concession on that issue.  Rifkin
continued, "[t]hus, the Union believes that an agreement has
already been reached, which Mrs. Sieger has unlawfully refused
to execute and implement.  The Union will shortly be filing an
unfair labor practice charge in this regard."  The letter
concludes with Rifkin noting that he had forwarded Jasinski's
letter to the FMCS and requested that the parties be called
together for a meeting.  (As discussed above, such a meeting
never occurred.)

On March 25, Jasinski replied, stating in pertinent part:

These are the facts:

49

1.      The Union threatened and ultimately commenced
        and continues a strike to advance its unlawful
        goals.  This is not an unfair labor practice
        strike -- the facts demonstrate and your own
        literature demonstrates that this dispute has
        always been about the contract and nothing
        more.

2.      Of course, the parties never came to an
        agreement.  If that were true, and Kingsbridge
        agreed to the Union's terms, the employees
        would not have been on strike for the past
        month.  Your claim to the contrary is belied by
        the facts.  We specifically refer you to the
        Union's own document reflecting that the Union
        would only settle the contract <u>with</u>
        <u>retroactivity</u> back to June 1, 2004, as well as
        a capitulation to the Union's unlawful contract
        proposal demanding the payment of all alleged
        delinquencies into the Funds. . . .  As you are
        well aware, neither Administration nor prior
        counsel agreed to retroactivity or conceded to
        the Union's unlawful demands.

3.      Finally, with regard to your claim that
        Kingsbridge's latest contract proposals are
        somehow "inconsistent" with the bargaining
        history, Kingsbridge has successfully weathered
        more than one month of this unlawful strike.
        Accordingly, and consistent with the law,
        Kingsbridge is free to secure contract terms
        that it deems beneficial under these
        circumstances.

The letter concludes with Jasinski's assertion that unless the

Union "rescinds this position,"[48] future bargaining would be

futile.

        The final letter in this exchange is Rifkin's reply of

March 26.  Rifkin reasserts in the letter that "the Union's

---

[48] It is not apparent to which of the Union's bargaining position
this phrase refers.

strike is and has been an unfair labor practice strike," and
pointed to the charges filed by the Union over the past year, as
well as the pending Region 29 action regarding Kingsbridge's
contributions to the Funds, and the January 31, 2008 Board Order
regarding surveillance and reinstatement threats.  The letter
concludes -- as the March 20 letter did -- with a note that
Jasinski's correspondence has been forwarded to the FMCS with a
request for a meeting.[49]


DISCUSSION

     On May 30, 2008, the General Counsel of the NLRB issued the
Region 2 Complaint charging that Kingsbridge committed the acts
described above and that those acts constitute unfair labor
practices.[50]  In the instant action, the Regional Director asks
this Court to issue an injunction pursuant to Section 10(j) of
the Act granting preliminary relief to the NLRB (and, by
extension, the Union and the Employees) pending a final
determination on those charges.

---

[49] As noted above, FMCS Commissioner Sweeney sent a letter to the
parties the same day -- March 26 -- calling for a meeting, but
on April 3, Sweeney e-mailed Rifkin to inform him that he had
not received a response to that request.

[50] The July 15, 2008 amendment of the Region 2 Complaint affected
only the remedy sought in the Region 2 action, and did not
augment or amend the factual or legal assertions made therein.

"In this Circuit, in order to issue a § 10(j) injunction, the district court must apply a two-prong test.  First, the court must find reasonable cause to believe that unfair labor practices have been committed.  Second, the court must find that the requested relief is just and proper."  Hoffman v. Inn Credible Caterers, Ltd., 247 F.3d 360, 364-65 (2d Cir. 2001).  These prongs are discussed in turn below.

I.   Reasonable Cause

In deciding whether a Section 10(j) injunction should issue, "[t]he district court does not need to make a final determination whether the conduct in question constitutes an unfair labor practice; reasonable cause to support such a conclusion is sufficient."  Id. at 365.  In making this determination, the court should "give considerable deference to the NLRB Regional Director."  Id.[51]  "'With respect to issues of fact, the Regional Director should be given the benefit of the doubt . . . and on questions of law, the Board's view should be sustained unless the court is convinced that it is wrong.'"  Id. (quoting Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051 (2d Cir. 1980)).  See also Silverman v. J.R.L. Food Corp., 196

---

[51] See also Silverman v. 40-41 Realty Assocs., Inc., 668 F.2d 678, 681 (2d Cir. 1982) ("Such deference is especially appropriate in section 10(j) cases when the prevailing legal standard is clear and the only dispute concerns the application of that standard to a particular set of facts.").

F.3d 334, 335 (2d Cir. 1999) ("A court considering whether to
grant temporary equitable relief pursuant to § 160(j) . . .
should decline to grant relief only if the NLRB's legal or
factual premises are fatally flawed." (citation omitted));
Kaynard v. Mego Corp., 633 F.2d 1026, 1031 (2d Cir. 1980)
("[T]he Regional Director's version of the facts should be
sustained if within the range of rationality . . . [,]
inferences from the facts should be drawn in favor of the
charging party, and . . . even on issues of law, the district
court should be hospitable to the views of the General Counsel,
however novel." (citation omitted)).  "[T]he Regional Director
is not required to show that . . . the precedents governing the
case are in perfect harmony, but only that there is 'reasonable
cause to believe that a Board decision finding an unfair labor
practice will be enforced by a Court of Appeals.'"  Mego Corp.,
633 F.2d at 1032-33 (quoting McLeod v. Bus. Mach. & Office
Appliance Mech. Conference Bd., 300 F.2d 237, 242 n.17 (2d Cir.
1962)).[52]

---

[52] The Court of Appeals, in turn, conducts a "highly deferential"
review of Board orders "[i]n recognition of the Board's
expertise in interpreting and applying the" NLRA.  NLRB v.
Yonkers Assocs., 94 L.P., 416 F.3d 119, 121 (2d Cir. 2005) (per
curiam).  The Court of Appeals will "enforce the Board's order
where its legal conclusions are reasonably based, and its
factual findings are supported by substantial evidence on the
record as a whole."  Id. at 121-22.  See also Holly Farms Corp.
v. NLRB, 517 U.S. 392, 409 (1996) ("For the Board to prevail, it
need not show that its construction is the best way to read the

The Regional Director's petition contains allegations touching upon the fundamental precepts of federal labor law. Under Section 7 of the NLRA, employees have the right, <u>inter alia</u>, "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8(a), in turn, provides that it is an unfair labor practice by an employer, <u>inter alia</u>, "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7; to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization"; or "to refuse to bargain collectively with the representatives of his employees."  <u>Id.</u> § 158(a)(1), (3), & (5).[53]  Finally, under Section 8(d), employees (when represented by a union[54]) and

---

statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one."); <u>NLRB v. Nat'l Broad. Co., Inc.</u>, 798 F.2d 75, 77 (2d Cir. 1986) ("Our power of review is limited.  Congress has committed to the NLRB the difficult and delicate responsibility of balancing conflicting legitimate interests in labor policy.") (citing <u>Beth Israel Hosp. v. NLRB</u>, 437 U.S. 483, 501 (1978)).

[53] Sections 158(a)(3) and (5) are subject to certain limitations and provisos not relevant here.

[54] <u>See</u> 29 U.S.C. § 159(a) ("Representatives designated or selected for the purposes of collective bargaining by the

employers have a reciprocal duty to engage in collective bargaining, which requires both sides "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party."  Id. § 158(d).

The factual record and legal analysis presented by the Regional Director provide the necessary "reasonable basis" to believe that these provisions of the Act have been violated by Kingsbridge.  First, with respect to Kingsbridge's alleged failure to provide Wray-Roach with a list of Employees represented by the Union, including date of hire, full- or part-time status, rate of pay, department, and shift, "[t]here can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties."  NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36 (1967).  See also Edison Co. v. NLRB, 440 U.S. 301, 303 (1978); New Surfside Nursing Home, 330 N.L.R.B. 1146, 1148 (2000).  Moreover, "[i]t is well-established Board law," and not contested here, "that names of employees, their

---

majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . .").

classification, hours and wages, addresses, dates of hire, fringe benefits, and date and amount of last wage raise are . . . presumptively relevant information for the purpose of collective bargaining." New Surfside Nursing Home, 330 N.L.R.B. at 1148-49.

Although Administrator Perles states that he has "no recollection of receiving" requests for such information from Wray-Roach, letters reflecting such requests have been submitted by the Regional Director.  Moreover, notwithstanding Perles's "understanding" that such information was included in reports sent "from the business office which accompanied the benefit fund checks," as discussed further below, there is reason to believe that such checks were not sent by Kingsbridge after August 2007.  Finally, although Kingsbridge argues that the NLRB and the Union have failed to articulate why the requested information was "sufficiently important" to require its production, this action is premised on the failure to provide basic employment and wage data that is presumptively relevant.[55]

Second, Kingsbridge has not contested that the Union had a right of access to its facility in connection with its representation of the Employees, see, e.g., Gilberton Coal Co.,

---

[55] The Regional Director notes that while Wray-Roach also requested Employees' Social Security numbers, it is not alleged here that the failure to provide that specific information violated the Act.

291 N.L.R.B. 344, 348, enforced 888 F.2d 1381 (3d Cir. 1989)
(Table) (holding that a contractual right of access survives
expiration of a CBA); Beverly Health & Rehab. Servs., Inc., 335
N.L.R.B. 635, 654 (2001) (same); see also Hercules, Inc. v.
NLRB, 833 F.2d 426, 428 (2d Cir. 1987) (discussing the right of
access under Section 8(a)(5) and (d)), that the contours of that
right were further defined by the 2005 Arbitration Decision, or
that Wray-Roach was, in fact, denied all access after August 9,
2007.  Moreover, even if the Court credits Kingsbridge's
assertion that it was Wray-Roach who violated the established
procedures for gaining access to the facility by arriving at a
time when Perles had indicated the conference room was not
available and by being "loud and disruptive," there is
nevertheless reasonable cause to believe that Kingsbridge
violated the Union's right of access -- both under the 2005
Arbitration Decision and the Act itself -- by its subsequent
decision to cut off all further access to the facility by
repeatedly claiming that the conference room was "not
available."  It is no defense to argue, as Kingsbridge does,
that the Union continued to meet with its members elsewhere
despite Kingsbridge barring the Union representative from its
premises.

Third, with regard to the failure to make payments to the
Funds, it is well-established that (1) under Section 8(d),

"[h]ealth benefits are a subject of mandatory bargaining," Long Island Head Start Child Dev. Servs. v. NLRB, 460 F.3d 254, 258 (2d Cir. 2006), and (2) "[w]hen a collective agreement expires, an employer may not alter terms and conditions of employment involving mandatory subjects until it has bargained to an impasse over new terms." Silverman v. Major League Baseball Player Relations Comm., Inc., 67 F.3d 1054, 1059 (2d Cir. 1995) (citing NLRB v. Katz, 369 U.S. 736, 741-43 (1962)).  As described above, and in greater detail by ALJ Fish, Kingsbridge Heights, Case 29-CA-27502, slip op. at 14-24, there is more than reasonable cause to believe that Kingsbridge failed to make timely contributions to the Fund after the June 2006 Settlement Agreement, and ceased making such contributions entirely in August 2007, thereby unilaterally altering the terms and conditions of the Employees' employment and, in turn, violating the Act.

Kingsbridge does not quarrel with this legal analysis, but claims that it did not stop making payments until November 2007, after the Benefit Fund terminated the Employees' health coverage, and that such an act was justified on the ground that Kingsbridge "was under no obligation to continue to pay for benefits not received." As discussed above, however, Kingsbridge's claim to have made post-August 2007 payments cannot be credited; this defense therefore fails for lack of

support in the record.  Nevertheless, even assuming the truth of

that claim, Kingsbridge has cited no authority for the facially

absurd proposition that a decision by an employee benefit fund

to terminate coverage as a result of an employer's failure to

make timely contributions relieves that employer of any further

obligation to make such contributions.

Similarly, Kingsbridge's argument that the Union has

treated Kingsbridge differently than other nursing homes who are

equally, if not more delinquent in their Fund contributions does

not constitute a valid defense to these charges.  As ALJ Fish

found in rejecting this argument,

> [a] Union is not obligated to treat every
> Employer in the same manner, with respect to
> negotiations, positions taken, or when and if to cut
> off benefits.  Here Respondent was and is dealing with
> an Employer that has committed two prior unfair labor
> practices, including the failure to sign a contract
> that had been agreed to by the Association, from which
> Respondent had not timely withdrawn.  Further the
> Union had been forced to go to arbitration to enforce
> Respondent's obligation to make payments under the
> 2002-2005 Agreement.[56]
>
> Th[us,] in view of Respondent's past conduct, I
> find that it was reasonable and clearly lawful, for
> the Union to insist that Respondent make all prior
> payments in order to forestall cutting off benefits,
> and for the Union to insist on Respondent signing a
> contract, rather than an interim agreement, as
> suggested by Cohen.

Id. at 19.

---

[56] The parties have not described this proceeding in their
submissions to the Court.

Fourth, with respect to the alleged "reimbursement" of Union dues, Kingsbridge and the Regional Director agree that, under the applicable case law, the provision of the 2002-2005 CBA requiring Kingsbridge to deduct automatically Union dues from the Employees' paychecks -- known as a "dues checkoff" provision -- did not survive the expiration of that agreement, see, e.g., S.W. Steel & Supply, Inc. v. NLRB, 806 F.2d 1111, 1114 (D.C. Cir. 1986), and further agree that Sieger was therefore entitled to cease deducting Union dues when she did so in October 2007.[57] The Regional Director does not allege that Kingsbridge violated the Act when it ceased deducting dues, however. Rather, the Regional Director alleges that Kingsbridge violated the Act by making the further decision to "reimburse" the past year's dues; Kingsbridge has failed to respond on this point.

"Among the many forms of misconduct that violate [Section] 8(a)(1) are . . . grants or promises to grant benefits to discourage employee support for a union." Kinney Drugs, Inc. v. NLRB, 74 F.3d 1419, 1427 (2d Cir. 1996) (citation omitted).[58]

---

[57] The parties disagree on the legal question of whether such a step was required by law (as Kingsbridge argues) or was simply permissible (as the Regional Director maintains), but that debate is academic in light of the discussion above.

[58] The Regional Director also argues that the "reimbursement" violates Section 8(a)(3), as it represents "discrimination in regard to hire or tenure of employment or any term or condition

The Regional Director has persuasively argued that the context
in which this "reimbursement" was made (just after the health
benefits were terminated, and around the time of the strike
vote), as well as the fact that the payments could not have been
true "reimbursements" insofar as the dues payments for the prior
year had already been remitted to the Union, provide ample
reason to believe that these payments were intended to undermine
support for the Union.  This conclusion is further supported by
Sieger's letter to the Employees of January 25, 2007, in which
she argued -- without any foundation, it would appear -- that
the Union's bargaining position was simply a means "of taking
back the dues monies that [are] **legally** yours."  This statement
provides further reason to believe that the payments (or
attempted payments) made to the Employees in October 2007 were
an attempt to cause the Employees to question the motivations of
the Union.  Cf. NLRB v. Exchange Parts Co., 375 U.S. 405, 409
(1964) (noting that the Act "prohibits not only intrusive
threats and promises but also conduct immediately favorable to
employees which is undertaken with the express purpose of
impinging upon their freedom of choice for or against
unionization and is reasonably calculated to have that effect");
NLRB v. Pratt & Whitney Air Craft Div., United Techs. Corp., 789

---

of employment to encourage or discourage membership in any labor
organization."

F.2d 121, 134 (2d Cir. 1986) ("Attempts to coerce the employees,

or to portray the employer rather than the union as the workers'

true protector, remove such speech from the penumbra of

protection and may constitute an unfair labor practice.").

Fifth, Kingsbridge does not deny that it has videotaped the

Employees in the course of their Union activities, both before

and during the strike, and acknowledges that, as a matter of

law, such surveillance, absent proper justification, violates

Section 8(a)(1) because it has a tendency to intimidate the

Employees in the exercise of their Section 7 rights.  See, e.g.,

Trailmobile Trailer, LLC, 343 N.L.R.B. 95, 96 (2004) (citing

Nat'l Steel & Shipbuilding Co., 324 N.L.R.B. 499, 499 (1997),

enforced 156 F.3d 1268 (D.C. Cir. 1998)); see also Kinney Drugs,

74 F.3d at 1427 (noting that it violates Section 8(a)(1) to

"cultivate[] [the] impression that employees' union activities

are under surveillance").  Kingsbridge maintains that it

possesses such a justification, namely, the need to collect

evidence of potential misconduct by the striking Employees for

later presentation to the Board.  Sieger's declaration also

makes reference to prior acts of misconduct by Union members

that, she contends, further justify the decision to videotape

the Union's activities.  These justifications do not, however,

effectively rebut the Regional Director's showing that there is

a reasonable basis to believe that Kingsbridge's surveillance
was in fact not justified and therefore violated the Act.

Perhaps most relevant, the Board's Order of January 31,
2008, adopted ALJ Landow's findings that Kingsbridge engaged in
illegal surveillance of Union activities in 2006 and, even more
to the point, rejected many of the same justifications offered
by Kingsbridge here.  See Kingsbridge Heights, 352 N.L.R.B. No.
5, 2008 WL 310888, at *8-15.  Indeed, ALJ Landow specifically
found that Sieger was not credible in making precisely the same
allegations of past Union misconduct that she offers in defense
of the surveillance at issue here.  See id. at *11-12.  Finally,
although Kingsbridge has offered affidavits describing certain
misconduct by striking Employees, even assuming such misconduct
provides a justification for the post-February 20, 2008
surveillance, the petition identifies five separate incidents of
pre-February 20 surveillance that cannot be justified on that
ground.  In sum, although Kingsbridge is certainly permitted to
present its justifications to the Board during the proceedings
on the merits of the Region 2 Complaint, at this stage it must
be concluded that there is a reasonable basis to believe that
Kingsbridge's ongoing surveillance of Union activities violates
the Act.[59]

---

[59] Kingsbridge's final defense on this issue is that, in light of
the fact that the strike has gone forward, it is clear that the

Sixth, Kingsbridge has conceded that offering the Employees individual contracts requiring them to affirm that they "are not a member of any union and will not join throughout the duration of this agreement," was a clear violation of Section 8(a)(1).[60] In addition, although Kingsbridge has asserted that it only offered individual contracts to Employees after they had resigned from the Union, the evidence presented by the Regional Director -- in particular, Seebaram's uncontradicted affidavit regarding the meeting with Hubacek in February 2008 -- provides a reasonable basis to believe that Kingsbridge offered such contracts to Employees who remained members of the Union.  Such an act constitutes direct dealing in violation of Sections 8(a)(1) and (a)(5).  See Medo Photo Supply Corp. v. NLRB  321

---

Employees are not actually dissuaded by the surveillance from exercising their rights.  Such a defense clearly fails.  "An employer's conduct violates section 8(a)(1) if, under all the existing circumstances, the conduct has a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced."  New York Univ. Med. Ctr. v. NLRB, 156 F.3d 405, 410 (2d Cir. 1998).

[60] Kingsbridge contends that it disavowed reliance on this provision of the individual contracts in a memorandum to its employees on March 31, 2008.  Given the delay between the offering of the contracts and this memorandum, and the ongoing nature of Kingsbridge's unfair labor practices, it is reasonable to believe that this attempted repudiation of this violation was ineffective.  See Kinney Drugs, 74 F.3d at 1430 (noting that "an employer can effectively repudiate unlawful conduct if the repudiation is 'timely, unambiguous, specific in nature to the coercive conduct and free from other proscribed illegal conduct.'") (quoting Passavant Memorial Area Hosp., 237 N.L.R.B. 138, 138 (1978)).  Kingsbridge, of course, is entitled to present this defense to the Board.

U.S. 678, 684 (1944); Stroehmann Bakeries, Inc. v. NLRB, 95 F.3d
218, 223 (2d Cir. 1996); Pratt & Whitney Air Craft Div., 789
F.2d at 134-35; Permanente Medical Group, 332 N.L.R.B. 1143,
1144 (2000).  Similarly, Seebaram's affidavit also provides a
reasonable basis to believe that Hubacek, acting on behalf of
the Kingsbridge administration, threatened the Employees by
claiming that they would not be allowed back to work if they
went on strike.  "It is well-settled that threats of layoffs or
other adverse economic consequences violate Section 8(a)(1) if
they are motivated by or conditioned upon an employee's
participation in a labor organization."  New York Univ. Med.
Ctr., 156 F.3d at 410.  While "an employer is free to make a
'prediction' as to the 'demonstrably probable consequences' of
protected activity, id. at 411 (quoting NLRB v. Gissel Packing
Co., 395 U.S. 575, 618 (1969)), based upon the record presented
here -- including the history of hostility between Kingsbridge's
administration and the Union -- there is ample reason to believe
that Hubacek's statement did not fall within this safe harbor.
Indeed, Kingsbridge has not attempted to defend Hubacek's
alleged statement.

Seventh, and finally, there is also reason to believe that
Kingsbridge violated Section 8(a)(5) by failing to respond to
the requests made by FMCS and the New York State Employment
Relations Board that it attend meetings with the Union in an

attempt to resolve the parties' dispute.  "An employer violates section 8(a)(5) of the Act when it refuses to bargain collectively with representatives of [its] employees."  NLRB v. Suffield Acad., 322 F.3d 196, 198 (2d Cir. 2003) (citation omitted).  Under Section 8(d), this obligation includes the related obligation to "to meet at reasonable times" in order to engage in good faith bargaining.  29 U.S.C. § 158(d).

Moreover, in recognition of the fact that strikes in the healthcare industry "might present particular problems not present in other industries," Special Touch Home Care Servs., Inc., 351 N.L.R.B. No. 46, 2007 WL 2963267, at *12 (Sept. 29, 2007), Congress has enacted Section 8(g), which requires, inter alia, that a union provide at least ten days' notice to both the employer and the FMCS of any planned strike, and Section 8(d)(4)(C), which requires the parties to labor disputes in the healthcare industry to "participate fully and promptly in such meetings as may be undertaken by the [FMCS] for the purpose of aiding in a settlement of the dispute."  29 U.S.C. 158(d)(4)(C), (g).  See also Functions of the Service in Health Care Industry Bargaining Under the Labor-Management Relations Act, 29 C.F.R. § 1420.1(a) (2008).  Based on Kingsbridge's repeated failure to respond to the requests for meetings made by the FMCS and the New York State Employment Relations Board -- including meetings called explicitly under Section 8(d)(4)(C) -- there is a

reasonable basis to believe that Kingsbridge failed in its obligation "to meet at reasonable times" with the Union to engage in collective bargaining.  Sieger's unsupported claim that she was "physically unable" to meet during this period -- which is not mentioned in any of the contemporaneous correspondence placed in the record -- as well as the equally unsupported claim that Sieger has "continued [her] dialogues with the mediators to date," does not alter that conclusion.

In sum, this Court is compelled to find that there is "reasonable cause to believe that [the] unfair labor practices" described in the petition "have been committed" by Kingsbridge. Inn Credible Caterers, 247 F.3d at 365.  It is therefore necessary to consider whether the remedial relief requested by the Regional Director in connection with these apparent violations is appropriate in this case.

II.  "Just and Proper"

Section 10(j) of the Act provides that

The Board shall have power, upon issuance of a
complaint . . . charging that any person has engaged
in or is engaging in an unfair labor practice, to
petition any United States district court, within any
district wherein the unfair labor practice in question
is alleged to have occurred . . . for appropriate
temporary relief or restraining order.  Upon the
filing of any such petition the court shall cause
notice thereof to be served upon such person, and
thereupon shall have jurisdiction to grant to the
Board such temporary relief or restraining order as it
deems just and proper.

29 U.S.C. § 160(j).  "In this Circuit, injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo" as it existed "before the unfair labor practice occurred." Inn Credible Caterers, Ltd., 247 F.3d at 368, 369.  See also Kaynard v. MMIC, Inc., 734 F.2d 950, 953 (2d Cir. 1984) ("The conditions as they existed before the company's unlawful campaign must be re-established."); Seeler v. Trading Port, Inc., 517 F.2d 33, 38 (2d Cir. 1975) ("[S]ection 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices.").  "While this standard preserves traditional equitable principles governing injunctive relief," it should be applied with "the context of federal labor laws" in mind, including the "underlying purposes of § 10(j)," such as the "protect[ion of] employees' statutory collective bargaining rights," and the prevention of "irreparable harm to the union's position in the [workplace], to the adjudicatory machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective bargaining representatives." Inn Credible Caterers, 247 F.3d at 368-69 (citation omitted).[61]

---

[61] Although the limitations of Rule 65, Fed. R. Civ. P., do not limit the relief available under Section 10(j), see Rule 65(e), Fed. R. Civ. P., its requirements are also instructive in determining the appropriate scope of the proposed injunction. Under Rule 65(d), "[e]very order granting an injunction and

See also Mego Corp., 633 F.2d at 1034 (noting that injunctive relief is appropriate where there is reasonable cause to believe that "flagrant or egregious violations of the Act" have occurred).

Several points should be noted at the outset. First, as the Court of Appeals has held, "[a]ggressive remedial relief is necessary in appropriate labor cases," and that where "an equity court has 'reasonable cause' to believe that particularly flagrant unfair labor practices have been committed, the court's fashioning of those remedies typically framed by the Board in an unfair labor practice proceeding is 'just and proper,' even though a final decision by the Board is pending." Morio v. N. Am. Soccer League, 632 F.2d 217, 218 (2d Cir. 1980). Thus, while it is not for this Court to "make a final determination" as to whether Kingsbridge has engaged in the alleged unfair labor practices, Inn Credible Caterers, 247 F.3d at 365, it is appropriate to observe that the record presented here has provided this Court with "'reasonable cause' to believe that

---

every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." As the Court of Appeals has explained, this Rule "reflects Congress' concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." Corning Inc. v. PicVue Elecs., Ltd., 365 F.3d 156, 158 (2d Cir. 2004) (citation omitted).

particularly flagrant unfair labor practices have been
committed" by the respondent.  N. Am. Soccer League, 632 F.2d at
218.  The record demonstrates that Kingsbridge has repeatedly
and in varied ways failed to respect the rights of its Employees
and the Union that is their chosen representative, and there is
reason to believe that, absent prompt action, this will
continue.  In sum, there is ample reason to fear that,
"[w]ithout an injunction, the Board's ability to foster peaceful
labor negotiations through normal procedures would be
imperiled," Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367,
374 (11th Cir. 1992), and that the "protect[ion of] employees'
statutory collective bargaining rights," and the prevention of
"irreparable harm to the union's position in the [workplace], to
the adjudicatory machinery of the NLRB, and to the policy of the
Act in favor of the free selection of collective bargaining
representatives," requires injunctive relief in this action.
Inn Credible Caterers, 247 F.3d at 368-89 (citation omitted).

    Second, this is not a case in which the Regional Director
has sought interim relief in support of an "unprecedented
application of the Act."  40-41 Realty Assocs., 668 F.2d at 680.
To the contrary, as the discussion above indicates, this case
concerns fundamental and well-established tenets of federal
labor law -- "the prevailing legal standard is clear and the
only dispute concerns the application of that standard to a

particular set of facts." Id. at 681.  In such cases, deference to the Regional Director's considered decision that injunctive relief is necessary to ensure the effectiveness of the NLRB's remedial procedures and to further the policies of the Act is "especially appropriate." Id.

Third, and more specifically, insofar as Kingsbridge's unfair labor practice of failing to meet its obligations to the Funds has directly led to the termination of health coverage for the Employees, the threat of irreparable harm to the Employees is tragically obvious.[62]  Cf. Major League Baseball Player Relations Comm., 67 F.3d at 1062 (finding irreparable harm in support of a Section 10(j) injunction in light of "the short careers of professional athletes and the deterioration of physical abilities through aging.").  Under traditional equitable principles, this is a scenario in which injunctive relief is particularly "just and proper."

Fourth, and finally, the vast majority of the terms of the proposed injunction simply require Kingsbridge to cease and desist from engaging in clear violations of the Act -- e.g., granting employees benefits in order to discourage support for the Union, soliciting Employees to sign contracts requiring them

---

[62] The Regional Director notes that during the course of the strike, Employee Audrey Smith-Campbell died as a result of an asthma attack caused or exacerbated by the fact that she had not been taking her asthma medication, which, due to the termination of her medical coverage, she could no longer afford.

to resign Union membership, failing to provide the Union with Employee information, threatening Employees with discharge if they engage in protected activity, dealing directly with Employees, and refusing to meet and bargain in good faith with the Union. Such relief is clearly "proper" insofar as it simply reconfirms Kingsbridge's existing obligations under Section 8.

Kingsbridge's principal objection to the issuance of the requested injunction is that the bargaining history between it and the Union reveals that the Union has conditioned the signing of a new CBA with Kingsbridge on Kingsbridge's agreement to make all of its overdue payments to the Funds. Kingsbridge argues that this is an illegal bargaining tactic, that the strike commenced by the Employees in support of that tactic is also illegal, and that therefore it would not be "just and proper" to provide equitable relief here. This argument fails, however, for lack of adequate support in the record.

Kingsbridge asserts, and the Regional Director appears to concede, that the question of when and how Kingsbridge will remedy its past failure to make contributions to the Funds is not a mandatory subject of collective bargaining under Section 8(d). Assuming arguendo that this is an accurate statement of the law, Kingsbridge is correct that it is "lawful [to] insist upon matters within the scope of mandatory bargaining and unlawful to insist upon matters without." NLRB v. Wooster Div.

of Borg-Warner Corp., 356 U.S. 342, 349 (1958).  "[N]either an employer nor a Union can insist upon the grant of a non-mandatory bargaining demand as a condition for reaching agreement on mandatory issues."  Spentonbush/Red Star Cos. v. NLRB, 106 F.3d 484, 493 (2d Cir. 1997).  Of course, "this does not mean that non-mandatory issues cannot be considered at all in the bargaining process.  What the Act prohibits is insistence to the point of impasse upon a non-mandatory proposal so that acceptance of the proposal becomes a condition precedent to accepting any collective bargaining contract."  Id.  An employer or union has "a right to present, even repeatedly, a demand concerning a non-mandatory subject of bargaining, so long as it did not posit the matter as an ultimatum."  Id. (citation omitted).

The bargaining history between Kingsbridge and the Union -- described in detail above -- does not support the conclusion that the Union's bargaining position is or has been that an agreement by Kingsbridge to satisfy its past Fund obligations is a "condition precedent" to its execution of a new CBA, or that the strike was commenced in support of such a bargaining position.  Rather, the record supports the conclusion that the Union was and is willing to enter into a CBA on the terms described in the Memorandum of Agreement sent by Rifkin to Sieger on March 6, 2008, which makes no mention of Kingsbridge's

arrearages to the Funds.[63] (Such an offer also appears to have

been made in Rifkin's letter of January 29, 2007.)  Although the

Union did take the position -- for example, in the 1199-

Kingsbridge Nursing Home Settlement Agreement, sent by Rifkin to

Sieger in early February 2008, as well as in the March 6 letter

accompanying the Memorandum of Agreement -- that the avoidance

or termination of the strike was contingent on Kingsbridge's

agreement to make such payments (thereby restoring health

coverage to the Employees), there is no evidence in the record

to indicate that final agreement on a contract was similarly

conditioned.[64]  And, as ALJ Fish concluded, "[t]here is certainly

nothing unlawful, nor unreasonable, in the Union threatening to

strike to force [Kingsbridge] to comply with its obligations" to

make contributions to the Funds.  Kingsbridge Heights, Case 29-

CA-27502, slip op. at 22.  Thus, Kingsbridge's contention that

---

[63] Had Kingsbridge and Sieger adhered to their long-standing
position that the "only" contractual issue in dispute was the
method of selecting an arbitrator, it appears from the record
that a new CBA could have been entered into, at the latest, on
March 6.  (As noted above, this allegation is made in the Region
2 Complaint.)  Despite this record, however, both in their
submissions and at the August 12, 2008 hearing, Kingsbridge has
asserted that the question of how to select an arbitrator
remains an open one between the parties.

[64] Kingsbridge emphasizes that the February 22, 2006 negotiation
described above is further evidence of the Union's illegal
bargaining position.  The discussion recounted by ALJ Fish
indicates, however, that the Union's position was simply that it
would not enter into a collateral agreement regarding back
payments to the Funds, as Cohen proposed, without the parties
also agreeing on the terms of a full contract.

the Employees and the Union are currently engaged in an illegal strike that renders injunctive relief inappropriate in this case must be rejected.[65]

Kingsbridge's only other significant objection to the propriety of the proposed injunction[66] is its related contention that this Court should not order that the striking Employees be reinstated to their former positions.  This argument likewise fails.  It is well-established that a strike that is "at least partly motivated by the unfair labor practices" is an unfair labor practice strike, NLRB v. Heads & Threads Co., 724 F.2d 282, 288 (2d Cir. 1983); see also NLRB v. Vanguard Tours, Inc., 981 F.2d 62, 64 (2d Cir. 1992), and that an employer is required to reinstate unfair labor practice strikers after they make an unconditional request for reinstatement.[67]  See Hoffman v.

---

[65] It follows that Kingsbridge's related argument that the Union has "unclean hands," and thus should not be permitted to benefit from equitable relief, is also rejected.

[66] Kingsbridge also argues that injunctive relief is not appropriate in this case because the Regional Director was not sufficiently prompt in seeking Section 10(j) relief.  This contention may be swiftly rejected.  As the Court of Appeals has noted, "[t]he Board does not take lightly the commencement of a § 10(j) action," and, in any event, "it does not lie in the mouth of the perpetrator of . . . egregious unfair labor practices . . . to complain of whatever delay may have ensued in applying a short leash and tightening the choke collar." Kaynard, 734 F.2d at 954.

[67] As noted above, Rifkin has averred that the Union is prepared to make such an offer.  Kingsbridge has argued that, until the offer is actually made, the reinstatement issue is not "ripe" for adjudication.  The Regional Director has convincingly

Polycast Tech. Div. of Uniroyal Tech. Corp., 79 F.3d 331, 333
(2d Cir. 1996) (citing Mastro Plastics Corp. v. NLRB, 350 U.S.
270, 278 (1956)); see also Spentonbush/Red Star Cos., 106 F.3d
at 494.  This is the case "even if replacements for [the unfair
labor practice strikers] have been made."  Mastro Plastics, 350
U.S. at 278.  In determining what motivated the strike, "[i]t is
the motivations of the strikers," not the union, "that is
relevant."  Douglas E. Ray et al. Labor-Management Relations:
Strikes, Lockouts and Boycotts § 5:4 n.14 (2007) (citing cases).
See also Citizens Publ'g & Printing Co. v. NLRB, 263 F.3d 224,
236 (3d Cir. 2001) ("The Board has repeatedly relied upon
evidence of the strikers' motivation to show that the strike is
based, at least in part, upon the employer's unfair labor
practice.  Citizens Publishing has cited no authority in which
the Board or courts have applied a different rule.").[68]

    The record in this case compels the conclusion that
Kingsbridge's failure to make timely payments to the Funds -- an
unfair labor practice which, in turn, resulted in the
termination of their health coverage -- provided substantial

demonstrated, however, that the issuance of a reinstatement
order contingent upon a later offer to return to work is a
typical remedy in these circumstances, citing, inter alia,
Beaird Industries, 311 N.L.R.B. 768, 770 (1993).

[68] Thus, Kingsbridge's argument -- made without supporting
authority -- that the strike would be "unlawful even if the
employees were innocent pawns of the Union" does not appear to
be accurate.

motivation for the Employees to go on strike on February 20.[69]
Wray-Roach's affidavit, to cite one example, indicates that it
was immediately after the Employees received notice from the
Funds in October 2007 that their health coverage would be
terminated that they approached her and said that they "wanted
to go on strike."  This is not to say that the desire for a new
CBA with Kingsbridge did not also motivate the Employees to go
on strike.  For example, Employee Cichon's affidavit reports
that the placards worn by the strikers at the beginning of the
strike read, "We want contract.  We want benefits."[70]  It is
well-established, however, that the fact that a "strike may have
stemmed from mixed motives does not deprive the employees of
their right to reinstatement."  Heads & Threads Co., 724 F.2d at
288.  See also Vanguard Tours, Inc., 981 F.2d at 64 ("[W]e have
made clear that a strike may have mixed motivations and still be
classified as an unfair labor practice strike.").

     The right to reinstatement is not absolute, of course.
Both sides agree, and it is well established, that an employer
may refuse to reinstate a specific unfair labor practice striker
if the employer can demonstrate that the striker engaged in

---

[69] Indeed, Kingsbridge admits that the Employees decided to
strike because they had lost their health coverage.
[70] Based on the record as a whole, it is fair to read the phrase
"[w]e want benefits," as a reference to Kingsbridge's unfair
labor practices in connection with its obligations to the Funds,
and not simply an economic demand for additional or superior
employee benefits.

"serious misconduct" during the course of the strike.  See,
e.g., Donovan v. NLRB, 520 F.2d 1316, 1323 (2d Cir. 1975)
(citing NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 256-
61 (1939)).  This doctrine recognizes that Congress, in enacting
the NLRA, did not intend "to compel employers to retain persons
in their employ regardless of their unlawful conduct -- to
invest those who go on strike with an immunity from discharge
for acts of trespass or violence against the employer's
property, which they would not have enjoyed had they remained at
work."  Fansteel Metallurgical Corp., 306 U.S. at 255.
Accordingly, at the conclusion of the hearing the parties were
directed to meet and confer to discuss the procedures by which
this Court could expeditiously address any specific allegations
that particular striking Employees should be denied
reinstatement, and such procedures are reflected in the
injunction accompanying this Opinion.  An order directing that
the Employees be reinstated remains "just and proper," however,[71]

---

[71] Similarly, the Regional Director's request that Kingsbridge be
ordered to cease and desist from giving effect to the individual
employment agreements it has entered into with certain Employees
is also just and proper here.  See Morio, 632 F.2d at 218
(affirming the grant of such relief under Section 10(j) and
noting that "the Board in unfair labor practices proceedings has
frequently voided contracts negotiated by the employer with
individual employees"); see also Nat'l Licorice Co. v. NLRB, 309
U.S. 350, 361 (1940) ("Since the contracts were the fruits of
unfair labor practices, stipulated for the renunciation by the
employees of rights guaranteed by the Act, and were a continuing
means of thwarting the policy of the Act, they were appropriate

as Kingsbridge has failed to identify any specific hardship --
beyond the acrimony that typically accompanies a return to work
after a lengthy strike[72] -- that would cause the Court to stay
its hand.

In sum, the injunctive relief requested by the Regional
Director pursuant to Section 10(j) of the Act is just, proper,
and consistent with traditional equitable principles, the
policies underlying the Act, and the public interest.  See
generally Trading Port, 517 F.2d at 40 (2d Cir. 1975)
(discussing Hecht Co. v. Bowles, 321 U.S. 321, 329-30 (1944)).
The petition is therefore granted, and an injunction shall
issue.

---

subjects for the affirmative remedial action of the Board
authorized by § 10 of the Act.")

[72] As counsel for the NLRB noted at the August 12 hearing,
"[i]t's certainly the case that strikers and non-strikers often
do not get along well with one another, but if that were a
reason for denying injunctive relief, there would never be [such
relief] in these sorts of situations."

CONCLUSION

The petition filed by the Regional Director on July 23,

2008, is granted.

SO ORDERED:

Dated:     New York, New York
           August 14, 2008

_____
                    DENISE COTE
         United States District Judge